F I L E D

MAY 20 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
*Ex rel.* KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP,

    Plaintiff,

    v.

BASF CORPORATION;
BAYER MATERIALSCIENCE, LLC, f/k/a/ MILES,
INC. f/k/a MOBAY CHEMICAL COMPANY;
THE DOW CHEMICAL COMPANY; and
HUNTSMAN INTERNATIONAL LLC, f/k/a
IMPERIAL CHEMICAL INDUSTRIES PLC and f/k/a
ICI AMERICAS, INC.

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

SEALED
BY COURT ORDER

CIVIL ACTION NO.

CV 15 2262

*QUI TAM* COMPLAINT

DMR

DEMAND FOR JURY TRIAL

FILED IN CAMERA AND
UNDER SEAL PER
31 U.S.C. § 3730(b)(2)



KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

## TABLE OF CONTENTS

QUI TAM COMPLAINT ................................................................................................................ 1

I.    OVERVIEW ........................................................................................................................ 1

II.   PARTIES .............................................................................................................................. 5

III.  JURISDICTION AND VENUE .......................................................................................... 8

IV.  DEFENDANTS' UNDERLYING FCA OBLIGATIONS ................................................... 9

    A.    Overview of FCA provisions relevant to defendants' underlying
         obligations. ............................................................................................................... 9

    B.    Defendants' TSCA Section 8(e) reporting obligation. ............................................ 9

         1.    Overview of TSCA Section 8(e). ............................................................... 9

         2.    Each defendant is and has been at all material times subject to
              Section 8(e)'s reporting requirement. ....................................................... 13

         3.    The characteristics of reportable substantial risk information ................. 20

         4.    Sources of substantial risk information. ................................................... 23

         5.    The Section 8(e) reporting exemption does not exempt defendants'
              reporting obligation. ................................................................................. 25

C.   Defendants Obtained but Failed to Report Substantial Risk Information. ............37

1.   Historical understanding of isocyanate hazards. .......................................37

2.   By the end of 1979, Bayer had obtained "Bayer's 1979 Skin Contact SRI," which comprised substantial risk information about MDI skin contact. ...............................................................................40

3.   By April 1982, Bayer and Dow had each obtained the "1982 Japanese Skin Contact SRI," which comprised substantial risk information about TDI and MDI skin contact. ..............................45

4.   In or shortly after September 1988, each defendant had separately obtained "the 1988 Mineworkers SRI," which comprised substantial risk information about PMDI skin contact and low-level inhalation exposure. ...................................................................52

5.   In or shortly after March 1989, each defendant had separately obtained the "1989 Human Cases SRI," which comprised substantial risk information about MDI and PMDI skin contact and low-level inhalation exposure. .............................................61

6.   In or shortly after March 1989, each defendant had separately obtained the "1989 German Mine SRI," which comprised substantial risk information about MDI skin contact and low-level inhalation exposure. .............................................................71

7.   In or shortly after March 1989, each defendant had separately obtained the "1989 Nakata Papers SRI," which comprised substantial risk information about MDI skin contact or low-level inhalation exposure. .............................................................82

8.   In or shortly after January 1992, each defendant obtained the "1992 Human Cases SRI," which comprised substantial risk information about MDI skin contact. .........................................95

9.   In or shortly after April 1992, each defendant obtained the "1992 Specific Scenario SRI," substantial risk information about MDI skin contact and low-level inhalation. .....................................112

10.  In or shortly after March 1993, each defendant obtained the "1993 Especial Work Situation SRI," which is substantial risk information about MDI skin contact and low-level inhalation. ...............128

11.  By January 29, 2003, each defendant separately obtained the "2003 Isocyanate Asthma SRI," which comprised substantial risk information about MDI and/or TDI skin contact. ....................................143

12.  Summary of SRI Obtained or Developed by Defendants. .......................160

D.   Each defendant's civil penalty obligations for TSCA reporting violations. ........163

1.   Determination of each defendant's "Gravity Based Penalty." .................163

2.   The adjustment factors justify an upward adjustment to each defendant's Gravity Based Penalty. ..........................................184

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

E.      BASF, Bayer, and Dow's contractual obligations..............................................189

F.      BASF, Bayer, and Dow's obligation to pay damages for breach of the
        CAP Agreement.................................................................................................192

        1.      Damages for BASF's breach of the CAP Agreement. ...........................193

        2.      Damages for Bayer's breach of the CAP Agreement...........................195

        3.      Damages for Dow's breach of the CAP Agreement...............................198

V.      EACH DEFENDANT CONCEALED ITS VIOLATIONS OF ITS
        STATUTORY, REGULATORY, AND CONTRACTUAL OBLIGATIONS ...............200

        A.      Each defendant demonstrated it intention to conceal the SRI by its refusal
                to report the SRI even as it obtained additional SRI and received
                communications that prompted reminders of previously-obtained SRI..............202

        B.      Each defendant demonstrated its intention to conceal the SRI by its refusal
                to report the SRI even as it reported similar but less certain animal data. ..........216

        C.      Each defendant demonstrated its intention to conceal the SRI when,
                individually and in conspiracy, it issued health-effect disclosures in its
                MSDSs and labels that implicitly or explicitly denied the existence of the
                SRI it was concealing. ...................................................................................222

        D.      Each defendant demonstrated its intention to conceal the SRI when it
                publicly disputed the potential for dermal- or low-level-induction of
                respiratory sensitization or asthma, in direct contradiction of the extensive
                substantial risk information it possessed. ..........................................................236

        E.      Each defendant demonstrated its intention to conceal the SRI when it
                refused to report the SRI after a TSCA compliance expert identified some
                of their reporting violations. ...........................................................................240

VI.     THE STATUTES OF LIMITATIONS APPLICABLE TO EACH
        DEFENDANT'S UNDERLYING FCA OBLIGATIONS HAVE NOT  EXPIRED
        AND DO NOT BAR THE FCA CLAIMS.................................................................242

        A.      The statute of limitations applicable to the FCA obligation associated with
                each defendant's TSCA reporting violations has not expired and does not
                bar the FCA claims that are based on those obligations.....................................242

                1.      A violation of TSCA's Section 8(e) reporting is a continuing
                        violation, and the claim to enforce a penalty for its violation does
                        not accrue until the reporting obligation is fulfilled. ..............................242

                2.      Each defendant's concealment of its reporting violations tolled the
                        statute of limitations. ................................................................................246

        B.      The statute of limitations applicable to the FCA obligation associated with
                defendant BASF, Bayer, and Dow's separate breaches of their CAP
                Agreements with EPA has not expired and does not bar the FCA claims
                that are based on those obligations. ...................................................................251

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

VII.  EACH DEFENDANT VIOLATED THE FALSE CLAIMS ACT ................................254

A.  Each defendant knowingly concealed or knowingly and improperly avoided obligations to pay money to the United States Government ................254

1.  Each defendant knowingly concealed or knowingly and improperly avoided or decreased its *statutory and regulatory obligations* to pay *money* to the United States Government ............................................256

2.  Each defendant knowingly concealed or knowingly and improperly avoided or decreased its *contractual obligations* to transmit *money* to the United States Government. ............................................................280

B.  Each defendant knowingly concealed or knowingly and improperly avoided or decreased obligations to transfer *property* to the United States Government. ................................................................................................301

1.  Each defendant knowingly concealed or knowingly and improperly avoided or decreased its *statutory and regulatory obligations* to transfer *property* to the United States Government. ................................301

2.  Each defendant knowingly concealed or knowingly and improperly avoided or decreased its *contractual obligations* to transfer *property* to the United States Government. ................................321

C.  Each defendant had possession, custody, or control of money or property to be used by the United States Government and knowingly delivered less than all of it. ................................................................................................336

1.  Each defendant had possession custody, or control of *money* to be used by the United States Government and knowingly delivered less than all of it. ................................................................................337

2.  Each defendant had possession custody, or control of *property* to be used by the United States Government and knowingly delivered less than all of it. ................................................................................348

D.  Each defendant made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the United States Government. ................................................................362

1.  False records or statements about dermal-induction health effect. .........362

2.  False records or statements about low-level-inhalation-induction health effect. ................................................................................364

COUNT I – KNOWING CONCEALMENT OR KNOWING AND IMPROPER AVOIDANCE OF AN OBLIGATION TO PAY OR TRANSMIT MONEY TO THE GOVERNMENT 31 U.S.C. § 3729(A)(1)(G) ................................................................367

COUNT II – KNOWING CONCEALMENT OR KNOWING AND IMPROPER AVOIDANCE OF AN OBLIGATION TO PAY OR TRANSMIT PROPERTY TO THE GOVERNMENT 31 U.S.C. § 3729(A)(1)(G) ................................................................368

COUNT III – KNOWINGLY DELIVERING LESS THAN ALL THE MONEY OR PROPERTY TO THE GOVERNMENT 31 U.S.C. § 3729(A)(1)(D) ................................370

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COUNT IV – KNOWINGLY MAKING OR USING A FALSE RECORD MATERIAL TO AN OBLIGATION TO PAY OR TRANSMIT MONEY OR PROPERTY TO THE GOVERNMENT 31 U.S.C. § 3729(A)(1)(G)................................................372

COUNT V – CONSPIRACY 31 U.S.C. § 3729(A)(1)(C).........................................374

PRAYER FOR RELIEF ................................................................................375

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

v

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,          )
*Ex rel.* KASOWITZ, BENSON, TORRES &   )          CIVIL ACTION NO.
FRIEDMAN LLP,                       )
                                    )
        Plaintiff,                  )          *QUI TAM* COMPLAINT
                                    )
    v.                              )          DEMAND FOR JURY TRIAL
                                    )
BASF CORPORATION;                   )
BAYER MATERIALSCIENCE, LLC, f/k/a/ MILES, )
INC. f/k/a MOBAY CHEMICAL COMPANY;   )          FILED IN CAMERA AND
THE DOW CHEMICAL COMPANY; and        )          UNDER SEAL PER
HUNTSMAN INTERNATIONAL LLC, f/k/a    )          31 U.S.C. § 3730(b)(2)
IMPERIAL CHEMICAL INDUSTRIES PLC and f/k/a )
ICI AMERICAS, INC.                   )
                                    )
                                    )
        Defendants.                 )

## QUI TAM COMPLAINT

*Qui tam* plaintiff and relator Kasowitz, Benson, Torres & Friedman LLP (KBT&F), on

behalf of itself and the United States of America (United States), complains and alleges as

follows:

### I.    OVERVIEW

1.    Over the past several decades, defendants BASF, Bayer, Dow, and Huntsman

have sold billions of dollars worth of isocyanate chemicals while concealing from consumers and

the EPA that merely touching those chemicals, or inhaling their vapors at concentrations thought

(incorrectly) to be safe, can cause and has caused permanent pulmonary injury in humans.  These

chemical companies have deliberately violated their statutory and contractual duties to report to

the EPA the extensive, non-public evidence they have obtained about these unexpected hazards,

and have instead vigorously concealed that evidence to protect their substantial profits and to

avoid or deflect regulatory scrutiny.  These companies have thus callously caused injury to many

unsuspecting consumers and workers, and have obstructed the EPA's hazard identification and

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   risk assessment activities.  Each of these companies is separately liable to the United States

2   Government for billions of dollars in civil reporting penalties, which continue to accumulate by

3   tens of thousands of dollars daily, and BASF, Bayer, and Dow are separately liable for billions of

4   dollars in breach of similarly increasing contract damages.

5       2.    For decades, each defendant, individually and in conspiracy with the others, has

6   aggressively concealed from the EPA its statutory and contractual violations, as well as its

7   liability for civil penalties and breach of contract damages, and has knowingly and improperly

8   concealed and avoided paying those penalties and damages.  Similarly, each defendant has

9   concealed is multiple obligations to transmit to the government property (the multiple separate

10  items of concealed hazard information) that is worth billions of dollars.  Each defendant's active

11  concealment tolled the applicable statutes of limitations on the underlying reporting and breach

12  of contract claims against it.

13      3.    On May 20, 2009, the effective date of the 2009 amendments to the False Claims

14  Act, each defendant had multiple continuing and increasing obligations to pay money and

15  transmit property to the EPA, and their continuing concealment and avoidance of those

16  obligations began also to violate the False Claims Act.  Each day since May 20, 2009, these

17  companies have continued actively and knowingly to conceal and avoid their individual

18  obligations, which have continued to increase, and are therefore liable under the False Claims

19  Act to the United States Government for three times the amount of those obligations, plus a

20  penalty for each separate violation of the False Claims Act.

21      4.    As authorized by 31 U.S.C. § 3730(b)(1), KBT&F brings this action on behalf of

22  itself and the United States to recover treble damages and penalties under the False Claims Act

23  (FCA), 31 U.S.C. §§ 3729-3733.

24      5.    As required by 31 U.S.C. § 3730(b)(2), KBT&F files this complaint under seal

25  and serves on the United States Government, in accordance with Federal Rule of Civil Procedure

26  4, with a copy of this complaint and with a written disclosure of substantially all material

27  evidence and information that KBT&F possesses.

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

6.      Concurrently with filing this complaint, and in accordance with 31 U.S.C. § 3730(e)(4)(B), KBT&F voluntarily disclosed to the United States Government the information on which it bases the claims in this complaint.

7.      The defendants manufacture and sell isocyanate chemicals, including methylene diphenyl diisocyanate (MDI), polymeric MDI (PMDI), and toluene diisocyanate (TDI).  When reacted with polyol chemicals, isocyanates form polyurethane.  By varying the type of isocyanate and polyol reacted, the manufacturer can produce a variety of polyurethane materials, including liquid coatings, paints, and adhesives; flexible foam used in mattresses and cushions; rigid foam used as insulation; and elastomers used to make automotive interiors.  These isocyanates, and particularly PMDI, are increasingly being used in environments that create the possibility for "by-stander" exposures, and are also being incorporated into consumer-level products, thus increasing the opportunities for exposure and resulting injury.

8.      Individually and in conspiracy, and in conscious violation of its reporting and disclosure obligations imposed by Section 8(e) of the Toxic Substances Control Act (TSCA), each defendant intentionally withheld from the Environmental Protection Agency (EPA) numerous discrete items of non-public information, obtained or developed by it separately over many years, that reasonably support the conclusion that its isocyanate chemicals present a substantial risk of injury to health.  Such information is commonly called "substantial risk information."

9.      As described more specifically below, between at least 1979 and 2003, each defendant obtained and developed discrete and separate items of scientific and medical information that MDI and PMDI can cause and had caused permanent respiratory injury in humans as a result of skin exposure.  Defendants knew that this information reasonably supported the conclusion that MDI and PMDI, as well as the similar chemical TDI, presented a substantial risk of injury to health, that the EPA was not adequately informed of that information, and that TSCA therefore required that they (each defendant) immediately report the substantial risk information to the EPA.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

10.     Each defendant also knew during this time period that a very small quantity of TDI, MDI, or PMDI on the skin—as little as one drop or 50 microliters—could cause permanent respiratory injury in humans.

11.     Moreover, between at least 1979 and 2003, each defendant obtained and developed discrete and separate items of scientific and medical information that TDI, MDI, and PMDI can cause and had caused permanent respiratory injury in humans when inhaled at levels below applicable inhalation exposure limits (low-level inhalation).  Defendants knew that this information reasonably supported the conclusion that TDI, MDI, and PMDI presented a substantial risk of injury to health, that the EPA was not adequately informed of that information, and that TSCA therefore required that they (each defendant) immediately report the substantial risk information to the EPA.

12.     The defendants, the isocyanate industry, and the EPA have long known that inhalation of isocyanates, including MDI, PMDI, and TDI, can cause respiratory injury, if the inhalation exposure exceeds the applicable inhalation exposure limits.  But the EPA, unaware of the defendants' concealed substantial risk information, continues to consider the dermal induction of respiratory injury only a possibility.  Indeed, in direct contradiction of their extensive, concealed evidence that confirms the dermal induction route, the defendants have publicly disputed the potential for dermal induction of respiratory injury.  By concealing their cache of extensive human evidence, the defendants have enabled themselves to deride the scant human evidence that is publicly available as "anecdotal" and "inconclusive," and have thereby misled the EPA and shielded their isocyanate products from increased regulatory scrutiny or action.

13.     Moreover, unaware of the defendants' concealed substantial risk information, the EPA also continues to consider the low-level-inhalation induction of respiratory injury only a possibility.  Indeed, in direct contradiction of their extensive concealed evidence that confirms respiratory injury from low-level inhalation, the defendants have publicly disputed the potential

*Qui Tam* Complaint

for such an injury. By concealing their substantial risk information, the defendants have misled the EPA and shielded their isocyanate products from increased regulatory scrutiny or action.

14.     Rather than rectify their reporting and disclosure violations, defendants have instead continued both to conceal the hazards and risks indicated by the information they were required to report, and to falsely represent to the United States Government, including the EPA, that those hazards and risks are non-existent or, at a minimum, that there is no reliable evidence of those hazards and risks.

15.     Because of their numerous reporting and disclosure evasions, which have continued over many years, defendants have accumulated billions of dollars in civil penalties under TSCA Section 8(e).

16.     Defendants have knowingly concealed or knowingly and improperly avoided or decreased their obligation to transmit property (the substantial risk information about their isocyanate products) and/or money (the accumulated TSCA reporting penalties) to the United States. Each defendant's knowing concealment and avoidance violates the FCA and makes it individually liable for three times the damages to the United States plus FCA penalties or forfeitures in the amount of $5,500 to $11,000 for each of its FCA violation.

## II.     PARTIES

17.     KBT&F, a limited liability partnership, is a law firm with its principal office located at 1633 Broadway, New York, New York 10019.

18.     As alleged more fully below, while KBT&F was prosecuting product liability, fraud, and conspiracy claims against many different companies, including defendants BASF, Bayer, and Dow, in the consolidated actions *Bice, et al. v. Micon, Inc., et al.*, Circuit Court of Tuscaloosa County, Alabama, Civil Action File Nos. CV-07-325, 07-326, and 07-327 (*Bice*), KBT&F, through an aggressive and targeted discovery effort, uncovered evidence showing defendants' TSCA reporting violations, as well as evidence showing their ongoing individual and conspiratorial fraud to conceal from the EPA and others the existence of the reportable information.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

19.    After the resolution of that litigation, KBT&F conducted additional investigation and discovered that these companies' reporting failures also violated their contracts with the EPA.  KBT&F has direct and independent knowledge of the information on which these FCA allegations are based.

20.    None of the evidence concerning the defendants' receipt of the reportable substantial risk information, or their individual and conspiratorial concealment of that information, was ever "publicly disclosed" as "public disclosure" was defined under the terms of the FCA's governing public disclosure bar.

21.    BASF Corporation (BASF) is a Delaware corporation with its principal office in Florham Park, New Jersey.  BASF manufactures MDI, PMDI, and/or TDI in various locations in the United States, and sells MDI, PMDI, and/or TDI throughout the United States, including in the State of California.

22.    Since at least 1988, BASF has manufactured and sold MDI, PMDI, and TDI in the United States.

23.    Since at least 1988, BASF has been a member of and has participated in the business of the International Isocyanate Institute (III), an industry association of isocyanate manufacturers.

24.    Since at least 1988, BASF has been a member of and has participated in the business of the Diisocyanates Panel of the American Chemistry Council (ACC) or its predecessor, the Chemical Manufacturers' Association (CMA).

25.    Bayer MaterialScience LLC (Bayer) is a Delaware limited liability company with its principal office in Pittsburgh, Pennsylvania.  Bayer manufactures MDI, PMDI, and/or TDI in various locations in the United States, and sells MDI, PMDI, and/or TDI throughout the United States, including in the State of California.

26.    Mobay Chemical Company (Mobay) was a joint venture between Monsanto Company, a United States corporation, and Bayer AG, a company organized under the laws of Germany, to market isocyanates/polyurethanes in the United States.  During the 1970s, Bayer

AG bought out Monsanto's share of the Mobay joint venture. In 1992, Bayer AG, having previously acquired Miles Laboratories, Inc., consolidated Mobay and Miles Laboratories, Inc. into Miles, Inc. (Miles). Both Mobay and Miles manufactured and sold MDI, PMDI, and TDI and were members of and participated in the business of the International Isocyanate Institute (III), an industry association of isocyanate manufacturers. Bayer MaterialScience LLC is the successor-in-interest to Mobay and Miles. As used in this complaint, "Bayer" means Bayer MaterialScience and its predecessors-in-interest Mobay and Miles.

27.     Since at least 1979, Bayer, either itself or through its predecessors-in-interest Mobay and/or Miles, has manufactured and sold MDI, PMDI, and TDI in the United States.

28.     Since at least 1979, Bayer, either itself or through its predecessors-in-interest Mobay and/or Miles, has been a member of and has participated in the business of the III.

29.     Since at least 1979, Bayer, either itself or through its predecessors-in-interest Mobay and/or Miles, has been a member of and has participated in the business of the Diisocyanates Panel of the ACC or its predecessor, the CMA.

30.     The Dow Chemical Company (Dow) is a Delaware corporation with its principal office in Midland, Michigan. Dow manufactures MDI, PMDI, and/or TDI in various locations in the United States, and sells MDI, PMDI, and/or TDI throughout the United States, including in the State of California.

31.     Since at least 1982, Dow has manufactured and sold TDI in the United States.

32.     Since at least 1986, Dow has manufactured and sold MDI and PMDI in the United States.

33.     Since at least 1982, Dow has been a member of and has participated in the business of the III.

34.     Since at least 1982, Dow has been a member of and has participated in the business of the Diisocyanates Panel of the ACC or its predecessor, the CMA.

35.     Huntsman International LLC (Huntsman) is a Delaware limited liability company with its principal office in Salt Lake City, Utah. Huntsman manufactures MDI, PMDI, and/or

TDI in various locations in the United States, and sells MDI, PMDI, and/or TDI throughout the United States, including in the State of California.

36.     Imperial Chemical Industries plc (ICI plc) was a public limited company organized under the laws of the United Kingdom.  ICI Americas, Inc. (ICI Americas) was a Delaware corporation and a subsidiary of ICI plc.  Both ICI plc and ICI Americas manufactured and sold MDI, PMDI, and TDI and were members of and participated in the business of the International Isocyanate Institute (III), an industry association of isocyanate manufacturers.  In 1999, a holding company formed by Huntsman acquired ICI plc's isocyanate/polyurethanes business, including the isocyanate/polyurethanes business of ICI America.  Huntsman is now the successor-in-interest to the isocyanate/polyurethanes businesses of ICI plc and ICI Americas.  As used in this complaint, "Huntsman" means Huntsman International LLC and its predecessors-in-interest ICI plc and ICI Americas.

37.     Since at least 1988, Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has manufactured and sold MDI, PMDI, and TDI in the United States.

38.     Since at least 1988, Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has been a member of and has participated in the business of the III.

39.     Since at least 1988, Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has been a member of and has participated in the business of the Diisocyanates Panel of the ACC or its predecessor, the CMA.

## III.    JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, which confers original jurisdiction over actions arising under the laws of the United States, and under 31 U.S.C. § 3732(a), which confers jurisdiction over claims arising under the FCA.

41.     This Court has personal jurisdiction over each defendant under 31 U.S.C. § 3732(a), because one or more of the defendants BASF, Bayer, Dow, or Huntsman can be found, resides, or transacts business in this judicial district.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1      42.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. §

2  1391(b), because one or more of the defendants BASF, Bayer, Dow, or Huntsman can be found,

3  resides, or transacts business in this judicial district.

## IV.   DEFENDANTS' UNDERLYING FCA OBLIGATIONS

**A.   Overview of FCA provisions relevant to defendants' underlying obligations.**

6      43.     As amended effective May 20, 2009, the FCA prohibits "knowingly conceal[ing]

7  or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money

8  or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

9      44.     As amended effective May 20, 2009, the FCA defines the type of "obligation"

10  whose concealment or avoidance violates the FCA:  "[T]he term 'obligation' means an

11  established duty, whether or not fixed, arising from an express or implied contractual, grantor-

12  grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or

13  regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

14      45.     Here, each defendant's FCA obligations arose in two contexts.  First, each

15  defendant's obligations arose "from statute or regulation," specifically the continuing TSCA

16  reporting (Section IV.B, ¶¶ 46-173 below) and penalty (Section IV.D, ¶¶ 801-895 below)

17  obligations.  Second defendants BASF, Bayer, and Dow's obligations arose from the "express . .

18  . contractual . . . relationship" alleged in Sections IV.E and F, paragraphs 896-925 below, and

19  include both the obligation to report information and the obligation to pay damages for breach of

20  the contractual reporting obligation.

**B.   Defendants' TSCA Section 8(e) reporting obligation.**

**1.     Overview of TSCA Section 8(e).**

23      46.     Finding that some chemical substances and mixtures "may present an

24  unreasonable risk of injury to health or the environment" (15 U.S.C. § 2601(a)(2)), Congress

25  enacted TSCA with the policy that

26      adequate authority should exist to regulate chemical substances and mixtures
27      which present an unreasonable risk of injury to health of the environment, and to
         take action with respect to chemical substances and mixtures which are imminent
28      hazards.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 California Street, Suite 2300
SAN FRANCISCO, CALIFORNIA 94111

15 U.S.C. § 2601(b)(2).

47.     Congress therefore granted the EPA broad authority to regulate chemicals, including the authority to prohibit, limit, or restrict the production or sale of any chemical that the EPA reasonably concludes "will present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(a).

48.     Recognizing that the EPA needs information about the risks of these chemicals to exercise its authority to regulate the privilege to manufacture or sell chemicals, Congress declared as "the policy of the United States" that

> adequate data should be developed with respect to the effect of chemical substances and mixtures on health and environment and that the development of such data should be the responsibility of those who manufacture and those who process such chemical substances and mixtures.

15 U.S.C. § 2610(b)(2).

49.     To execute that policy, Congress authorized the EPA to require chemical manufacturing and processing companies to develop risk information about their chemicals, should the EPA find that the existing data is insufficient reasonably to determine or predict those risks. 15 U.S.C. § 2603.

50.     To execute that policy, Congress also required in Section 8(e) of TSCA that chemical manufacturers, processors, and distributors "immediately" disclose to the EPA any information they obtain "which reasonably supports the conclusion" that "a chemical substance or mixture" that the company manufactures, processes, or distributes "presents a substantial risk of injury to health or the environment," unless the company "has actual knowledge that the [EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

51.     After Congress enacted the TSCA, the Chemical Manufacturers' Association (CMA) (of which each defendant or its predecessor was a member) formed the TSCA Regulation Advisory Committee Recording and Reporting Task Group to work with the EPA to develop guidance for compliance with Section 8(e). That group worked with EPA for more than one year to develop the EPA's 1978 policy statement, which reflected the chemical industry's input as to

1   how Section 8(e) should work.  That policy statement is "Toxic Substances Control Act,

2   Statement of Interpretation and Enforcement Policy; Notification of Substantial Risk," 43 Fed.

3   Reg. 11110, March 16, 1978 ("1978 Policy Statement").

4         52.     In June 1991, the EPA issued the "TSCA Section 8(e) Reporting Guide" (the

5   "1991 Reporting Guide"), which can be found on the EPA's website at

6   http://www.epa.gov/oppt/tsca8e/pubs/1991guidance.pdf (last visited May 5, 2015).  The EPA's

7   1991 Reporting Guide reaffirmed and expanded on the 1978 Policy Statement.

8         53.     In July 1993, the EPA proposed clarifications and amendments to its 1978 Policy

9   Statement, in "TSCA Section 8(e); Notice of Clarification and Solicitation of Public Comment,"

10  58 Fed. Reg. 37735, July 13, 1993 ("1993 Proposed Policy Clarification").

11        54.     In June 2003, the EPA formally revised certain parts of the 1978 Policy Statement

12  in a document entitled "TSCA Section 8(e); Notification of Substantial Risk; Policy Clarification

13  and Reporting Guidance," 68 Fed. Reg. 33129, June 3, 2003 ("2003 TSCA Guidance

14  Revisions").  As to reporting policies material to the claims in this complaint, the 2003 TSCA

15  Guidance Revisions are virtually identical to those it announced ten years earlier in its 1993

16  Proposed Policy Clarification.

17        55.     The EPA's 1978 Policy Statement provides that "a person has 'immediately

18  informed' the Administrator if information is received by EPA not later than the 15th working

19  day after the date the person obtained such information."  1978 Policy Statement, 43 Fed. Reg. at

20  11111, Unit IV.  The EPA affirmed that policy in its 1991 Reporting Guide.  1991 Reporting

21  Guide at 11.

22        56.     On July 13, 1993, the EPA announced its intention "to change the current 15-

23  working day reporting deadline for the submission of written reports containing substantial risk

24  information to 30 calendar days."  1993 Proposed Policy Clarification, 58 Fed. Reg. at 37736.  In

25  its 2003 TSCA Guidance Revisions, the EPA formally revised the reporting period to "the 30th

26  calendar day after the date the subject person obtained such information."  2003 TSCA Guidance

27  Revisions at 33138, Section VIII, Unit IV.

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

57.     Under TSCA, a "business organization is considered to have obtained any information which any officer or employee capable of appreciating the significance of that information has obtained." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit II. The EPA left that provision unchanged by the 2003 TSCA Guidance Revisions. See 2003 TSCA Guidance Revisions at 33137, Section VIII, Unit III.

58.     To emphasize that the timely reporting of substantial risk information is indispensable to the EPA's ability to regulate the privilege to manufacture or sell chemicals, Congress imposed significant daily penalties for reporting violations. TSCA originally imposed a "civil penalty" of up to $25,000 for each TSCA violation (since adjusted upward, as detailed below), and specified that "[e]ach day such a violation continues shall . . . constitute a separate violation." 15 U.S.C.§ 2615(a)(1).

59.     Not only are TSCA violations assessed separately for each day that a TSCA violation continues, "TSCA § 8(e) violations are assessed per type of effect per chemical not reported." The Enforcement Response Policy for Reporting and Recordkeeping Rules and Requirements for TSCA Sections 8, 12 and 13, U.S. Environmental Protection Agency, at 26 (1999) ("TSCA Enforcement Response Policy"). "Multiple violations are to be assessed whenever more than one rule is violated and for each violation within a rule." TSCA Enforcement Response Policy, at 26. Thus, a regulated company's failure to report a particular piece of substantial risk information may constitute multiple separate TSCA violations and may therefore subject the company to multiple civil penalties for each day that the reporting violation continues.

60.     In accordance with Congressional instruction, the EPA has adjusted TSCA's civil penalty from time to time for inflation, as reflected in the following chart:

| Adjustments to TSCA Civil Penalty | | | |
|---|---|---|---|
| 01/01/77 - 1/30/97 | 01/31/97 – 3/15/04 | 03/16/04 – 1/12/09 | 01/13/09 - Present |
| $25,000 per violation | $27,500 per violation | $32,500 per violation | $37,500 per violation |

Civil Monetary Penalty Inflation Adjustment Rule, 73 Fed. Reg. 75340, 75345 (Dec. 11, 2008).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

2.   **Each defendant is and has been at all material times subject to Section 8(e)'s reporting requirement.**

61.   Section 8(e)'s requirement to report "substantial risk information" reads in full as follows:

> Any person who manufactures, processes, or distributes in commerce a chemical substance or mixture and who obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform the Administrator of such information unless such person has actual knowledge that the Administrator has been adequately informed of such information.

15 U.S.C. § 2607(e).

62.   As used in Section 8(e) and elsewhere in TSCA, the term "Administrator" means the Administrator of the EPA. 15 U.S.C.§ 2602(1).

63.   TSCA defines "chemical substance" to mean "any organic or inorganic substance of a particular molecular identity, including—(i) any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature, and (ii) any element or uncombined radical," with exceptions not material here. 15 U.S.C. § 2602(2).

64.   TSCA defines "mixture" to mean:

> any combination of two or more chemical substances if the combination does not occur in nature and is not, in whole or in part, the result of a chemical reaction; except that such term does include any combination which occurs, in whole or in part, as a result of a chemical reaction if none of the chemical substances comprising the combination is a new chemical substance and if the combination could have been manufactured for commercial purposes without a chemical reaction at the time the chemical substances comprising the combination were combined.

15 U.S.C. § 2602(8).

65.   Methylene diphenyl diisocyanate (MDI) is and has been since at least 1979 a "chemical substance or mixture" as defined in TSCA.

66.   Polymeric MDI (PMDI) is and has been since at least 1979 a "chemical substance or mixture" as defined in TSCA.

67.     Indeed, as each defendant has acknowledged, PMDI is "a mixture of MDI and higher molecular weight oligomers of MDI," with MDI representing "[a]pproximately 50%" of that mixture. *Initial Submission: Letter from International Isocyanate Institute to U.S. EPA submitting information on Monomeric and Polymeric MDI*, Submitted March 14, 1984, EPA Document ID: FYI-OTS-0794-1027, EPA00609-00626 at 00615, Exh. 1. Thus, because it is the primary component of PMDI, substantial risk information about MDI (a "substance") is necessarily substantial risk information about PMDI (a "mixture" comprised primarily of MDI).

68.     Each defendant has acknowledged that substantial risk information reportable for MDI is also reportable for PMDI. On March 14, 1984, the III responded to a request for information about MDI from the TSCA Interagency Testing Committee (ITC). Although the ITC had requested information about MDI (CAS numbers 101-68-8 and 26447-40-5), the III also believed it necessary to make a PMDI submission of its MDI information: "However, since MDI is mostly manufactured and sold in its polymeric form, we are also submitting information on this third chemical group [identifying PMDI]." *Id.*, Exh.1 at EPA00613.

69.     Further, because PMDI consists primarily of MDI, substantial risk information about PMDI (a "mixture") is necessarily substantial risk information about MDI, the "substance" that is the primary constituent of PMDI.

70.     Toluene diisocyanate (TDI) is and has been since at least 1979 a "chemical substance or mixture" as defined in TSCA.

71.     Each defendant has acknowledged that, in terms of human health risks, MDI and TDI are "closely related." *Id.*, Exh. 1 at EPA00621.

72.     The term "person" as used in TSCA Section 8(e) includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies." 1 U.S.C. § 1. In its 1978 Policy Statement, the EPA indicates that the term "person" also includes sole proprietorships, associations, or any other business entity. 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit I. The 1978 Policy Statement further provides that the "[p]ersons subject to section 8(e) reporting include both natural persons and business entities engaged in

manufacturing, processing, or distributing in commerce a chemical substance or mixture." 1978 Policy Statement at 11111, Unit II.  That provision is unchanged by the 2003 TSCA Guidance Revisions.  See 2003 TSCA Guidance Revisions at 33137, Unit II.  Defendants BASF, Bayer, Dow, and Huntsman are each "persons" subject to TSCA Section 8(e).

73.    As used in TSCA, "[t]he term 'commerce' means trade, traffic, transportation, or other commerce (A) between a place in a State and any place outside of such State, or (b) which affects trade, traffic, transportation, or commerce described in clause (A)." 15 U.S.C. § 2602(3).

74.    TSCA provides that '[t]he term 'manufacture' means to import into the customs territory of the United States (as defined in general note 2 of the Harmonized Tariff Schedule of the United States), produce, or manufacture." 15 U.S.C. § 2602(7).

75.    TSCA Section 8(e) further provides that, for purposes of that section, "manufacture" means to manufacture "for commercial purposes." 15 U.S.C. § 2607(f).

76.    Since at least 1988, within the meaning of TSCA Section 8(e), BASF has "manufacture[d]" MDI "in commerce,"

77.    Since at least 1988, within the meaning of TSCA Section 8(e), BASF has "manufacture[d]" PMDI "in commerce."

78.    Since at least 1988, within the meaning of TSCA Section 8(e), BASF has "manufacture[d]" TDI "in commerce."

79.    Since at least 1979, within the meaning of TSCA Section 8(e), Bayer either itself or through its predecessors-in-interest Mobay and/or Miles, has "manufacture[d]" MDI "in commerce."

80.    Since at least 1979, within the meaning of TSCA Section 8(e), Bayer either itself or through its predecessors-in-interest Mobay and/or Miles, has "manufacture[d]" PMDI "in commerce."

81.    Since at least 1979, within the meaning of TSCA Section 8(e), Bayer either itself or through its predecessors-in-interest Mobay and/or Miles, has "manufacture[d]" TDI "in commerce."

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

82.   Since at least 1986, within the meaning of TSCA Section 8(e), Dow has "manufacture[d]" MDI "in commerce."

83.   Since at least 1986, within the meaning of TSCA Section 8(e), Dow has "manufacture[d]" PMDI "in commerce."

84.   Since at least 1982, within the meaning of TSCA Section 8(e), Dow has "manufacture[d]" TDI "in commerce."

85.   Since at least 1988, within the meaning of TSCA Section 8(e), Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has "manufacture[d]" MDI "in commerce."

86.   Since at least 1988, within the meaning of TSCA Section 8(e), Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has "manufacture[d]" PMDI "in commerce."

87.   Since at least 1988, within the meaning of TSCA Section 8(e), Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has "manufacture[d]" TDI "in commerce."

88.   TSCA defines "process" as follows:

The term "process" means the preparation of a chemical substance of mixture, after its manufacture, for distribution in commerce—
(A)   in the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such substance or mixture, or
(B)   as part of an article containing the chemical substance or mixture.

15 U.S.C. § 2602(10).

89.   TSCA Section 8(e) further provides that, for purposes of that section, "process" means to process "for commercial purposes." 15 U.S.C. § 2607(f).

90.   Since at least 1988, within the meaning of TSCA Section 8(e), BASF has "processe[d]" MDI "in commerce."

91.   Since at least 1988, within the meaning of TSCA Section 8(e), BASF has "processe[d]" PMDI "in commerce."

92.    Since at least 1988, within the meaning of TSCA Section 8(e), BASF has "processe[d]" TDI "in commerce."

93.    Since at least 1979, within the meaning of TSCA Section 8(e), Bayer either itself or through its predecessors-in-interest Mobay and/or Miles, has "processe[d]" MDI "in commerce."

94.    Since at least 1979, within the meaning of TSCA Section 8(e), Bayer either itself or through its predecessors-in-interest Mobay and/or Miles, has "processe[d]" PMDI "in commerce."

95.    Since at least 1979, within the meaning of TSCA Section 8(e), Bayer either itself or through its predecessors-in-interest Mobay and/or Miles, has "processe[d]" TDI "in commerce."

96.    Since at least 1986, within the meaning of TSCA Section 8(e), Dow has "processe[d]" MDI "in commerce."

97.    Since at least 1986, within the meaning of TSCA Section 8(e), Dow has "processe[d]" PMDI "in commerce."

98.    Since at least 1982, within the meaning of TSCA Section 8(e), Dow has "processe[d]" TDI "in commerce."

99.    Since at least 1988, within the meaning of TSCA Section 8(e), Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has "processe[d]" MDI "in commerce."

100.    Since at least 1988, within the meaning of TSCA Section 8(e), Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has "processe[d]" PMDI "in commerce."

101.    Since at least 1988, within the meaning of TSCA Section 8(e), Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has "processe[d]" TDI "in commerce."

102.    TSCA defines "distribute" as follows:

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

The terms "distribute in commerce" and "distribution in commerce" when used to describe an action taken with respect to a chemical substance or mixture or article containing a substance or mixture mean to sell, or the sale of, the substance, mixture, or article in commerce; to introduce or deliver for introduction into commerce, or the introduction or delivery for introduction into commerce of, the substance, mixture, or article; or to hold, or the holding of, the substance, mixture, or article after its introduction into commerce.

15 U.S.C. § 2602(4).

103.     Since at least 1988, within the meaning of TSCA Section 8(e), BASF has "distribute[d]" MDI "in commerce."

104.     Since at least 1988, within the meaning of TSCA Section 8(e), BASF has "distribute[d]" PMDI "in commerce."

105.     Since at least 1988, within the meaning of TSCA Section 8(e), BASF has "distribute[d]" TDI "in commerce."

106.     Since at least 1979, within the meaning of TSCA Section 8(e), Bayer either itself or through its predecessors-in-interest Mobay and/or Miles, has "distribute[d]" MDI "in commerce."

107.     Since at least 1979, within the meaning of TSCA Section 8(e), Bayer either itself or through its predecessors-in-interest Mobay and/or Miles, has "distribute[d]" PMDI "in commerce."

108.     Since at least 1979, within the meaning of TSCA Section 8(e), Bayer either itself or through its predecessors-in-interest Mobay and/or Miles, has "distribute[d]" TDI "in commerce."

109.     Since at least 1986, within the meaning of TSCA Section 8(e), Dow has "distribute[d]" MDI "in commerce."

110.     Since at least 1986, within the meaning of TSCA Section 8(e), Dow has "distribute[d]" PMDI "in commerce."

111.     Since at least 1982, within the meaning of TSCA Section 8(e), Dow has "distribute[d]" TDI "in commerce."

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

112.   Since at least 1988, within the meaning of TSCA Section 8(e), Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has "distribute[d]" MDI "in commerce."

113.   Since at least 1988, within the meaning of TSCA Section 8(e), Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has "distribute[d]" PMDI "in commerce."

114.   Since at least 1988, within the meaning of TSCA Section 8(e), Huntsman, either itself or through its predecessors-in-interest ICI plc and/or ICI Americas, has "distribute[d]" TDI "in commerce."

115.   Because BASF is and has been since at least 1988 a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and/or TDI, BASF is and has been since at least 1988 obligated to "immediately inform the Administrator [of the EPA]" of information it obtains "which reasonably supports the conclusion that such substance or mixture [MDI, PMDI, and/or TDI] presents a substantial risk of injury to health or the environment," unless BASF "has actual knowledge that the Administrator has been adequately informed of such information." 15 U.S.C. § 2607(e).

116.   Because Bayer either itself or through its predecessors is and has been since at least 1979 a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and/or TDI, Bayer is and has been since at least 1979 obligated to "immediately inform the Administrator [of the EPA]" of information it obtains "which reasonably supports the conclusion that such substance or mixture [MDI, PMDI, and/or TDI] presents a substantial risk of injury to health or the environment," unless Bayer "has actual knowledge that the Administrator has been adequately informed of such information." 15 U.S.C. § 2607(e).

117.   Because Dow is and has been since at least 1986 a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI and PMDI, Dow is and has been since at least 1986 obligated to "immediately inform the

Administrator [of the EPA]" of information it obtains "which reasonably supports the conclusion that such substance or mixture [MDI and/or PMDI] presents a substantial risk of injury to health or the environment," unless Dow "has actual knowledge that the Administrator has been adequately informed of such information." 15 U.S.C. § 2607(e).

118.   Because Dow is and has been since at least 1982 a "person who manufactures, processes, or distributes in commerce [the] chemical substance or mixture" TDI, Dow is and has been since at least 1982 obligated to "immediately inform the Administrator [of the EPA]" of information it obtains "which reasonably supports the conclusion that such substance or mixture [TDI] presents a substantial risk of injury to health or the environment," unless Dow "has actual knowledge that the Administrator has been adequately informed of such information." 15 U.S.C. § 2607(e).

119.   Because Huntsman is and has been since at least 1988 a "person who manufactures, processes, or distributes in commerce a chemical substance or mixture," Huntsman is and has been since at least 1988 obligated to "immediately inform the Administrator [of the EPA]" of information it obtains "which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment," unless Huntsman "has actual knowledge that the Administrator has been adequately informed of such information." 15 U.S.C. § 2607(e).

### 3.   The characteristics of reportable substantial risk information.

120.   TSCA Section 8(e) requires regulated companies immediately to report to the EPA non-exempt substantial risk information. The statute defines substantial risk information as information "which reasonably supports the conclusion that such [chemical] substance or mixture presents a substantial risk of injury to health or the environment," and exempts the regulated company from reporting the information only if the company "has actual knowledge that the Administrator [of the EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

121.   TSCA defines substantial risk information as "information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." 15 U.S.C. § 2607(e).  The 1978 Policy Statement provides that "'reasonably supports the conclusion' of substantial risk is not identical to a conclusive demonstration of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11110, Supplementary Information, ¶ (3).  The 1978 Policy Statement further provides that "[a] person is not to delay reporting until he obtains conclusive information that a substantial risk exists, but is to immediately report any evidence which 'reasonably supports' that conclusion.  Such evidence will generally not be conclusive as to the substantiality of the risk; it should, however, reliably ascribe the effect to the chemical." 1978 Policy Statement at 11112, Unit VI.  The EPA left this guidance unchanged by the 2003 TSCA Guidance Revisions.  2003 TSCA Guidance Revisions at 33139, Unit VI.

122.   The EPA's 1991 Reporting Guide reaffirmed the 1978 policy, providing that "such information need not and most typically does not establish conclusively that a substantial risk exists." 1991 Reporting Guide at 2.  The 1991 Reporting Guide provides that the "decision-making process for Section 8(e)-reportability should focus primarily on whether the toxicity or exposure information offers reasonable support for a conclusion of substantial risk under the criteria described above, but should not focus at all on whether the information is conclusive regarding the risk." 1991 Reporting Guide at 2.  Further, the 1991 Reporting Guide directs that "[t]he evidence that offers reasonable support for a conclusion of substantial risk need not be complete or definitive but should provide a plausible link between 1) an observed serious effect and one or few chemicals (e.g., in a discrete process/operation), or 2) a specific product/activity and a previously unrecognized exposure to a chemical that is known or reasonably anticipated to cause serious adverse health or environmental effects." 1991 Reporting Guide at 7.

123.   The 1978 Policy Statement identifies two factors to weigh in the substantial risk determination: "the seriousness of the effect" and "the fact or probability of its occurrence." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V.  The 1978 Policy provides that these

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

factors are weighed differently for different effects.  If the effects are among the human health

effects identified in unit V(a) of the 1978 Policy Statement, the EPA views the effects as "so

serious that relatively little weight is given to exposure; the mere fact that the implicated

chemical is in commerce constitutes sufficient evidence of exposure."  1978 Policy Statement,

43 Fed. Reg. at 11111, Unit V.  Accordingly, if the information concerns a "serious" health

effect identified in unit V(a) of the 1978 Policy Statement, the information constitutes substantial

risk information.

124.  The "serious" human health effects identified in unit V(a)(1) of the 1978 Policy

include "[a]ny instance of . . . serious or prolonged incapacitation, including the loss of or

inability to use a normal bodily function with a consequent relatively serious impairment of

normal activities, if one (or a few) chemical(s) is strongly implicated."  1978 Policy Statement,

43 Fed. Reg. at 11112, Unit V(a)(1).  The EPA left that provision unchanged by the 2003 TSCA

Guidance Revisions.  See 2003 TSCA Guidance Revisions, 68 Fed. Reg. at 33138, Unit V(a)(1).

Chemically-induced respiratory sensitization, which can lead to occupational asthma and

permanent lung damage, is such a "serious" human health effect.

125.  Accordingly, information about "[a]ny instance" of chemically-induced

respiratory sensitization "must be reported" under TSCA Section 8(e) (unless otherwise

exempted) "if one (or a few) chemical(s) is strongly implicated."  1978 Policy Statement, 43 Fed.

Reg. at 11112, Unit V(a)(1).  Indeed, the EPA's 1978 Policy Statement elsewhere reiterates that

a single instance of such an effect is reportable: "It is anticipated here that reportable effects will

generally occur in a pattern, where a significant common feature is exposure to the chemical.

However, a single instance of . . . serious incapacitation in a human would be reportable if one

(or a few) chemical(s) was strongly implicated."  1978 Policy Statement, 43 Fed. Reg. at 11112,

Unit VI(2).  The EPA left that provision unchanged by the 2003 TSCA Guidance Revisions.

2003 TSCA Guidance Revisions 68 Fed. Reg. at 33138, Unit VI(2).

126.  The "serious" human health effects identified in unit V(a)(2) of the 1978 Policy

also include "[a]ny pattern of effects or evidence which reasonably supports the conclusion that

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

the chemical substance or mixture can produce . . . serious or prolonged incapacitation." 1978

Policy Statement at 11112, Unit V(a)(2).  The EPA left that provision unchanged by the 2003

TSCA Guidance Revisions.  See 2003 TSCA Guidance Revisions, 68 Fed. Reg. at 33138, Unit

V(a)(2).  Chemically-induced respiratory sensitization, which can lead to occupational asthma

and permanent lung damage, is such a human health effect.

127.   Accordingly, "[a]ny pattern of effects or evidence which reasonably supports the

conclusion that the chemical substance or mixture can produce" chemically-induced respiratory

sensitization "must be reported" under TSCA Section 8(e), unless otherwise exempted.  1978

Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1).

### 4.   Sources of substantial risk information.

128.   Congress intended a broad scope for the term "information" as used in TSCA

Section 8.  Congress entitled Section 8 "Reporting and retention of *information*" and authorized

the EPA in Section 8(a)(2) to require regulated companies to maintain and report seven diverse

categories of information.  15 U.S.C. § 2607(a)(2).  Those categories include various types of

information about the chemical substances or mixtures the regulated companies manufacture or

process (15 U.S.C. § 2607(a)(1)(A)-(D)), "all existing data concerning the environmental and

health effects of such substance or mixture" (*id*. at § 2607(a)(1)(E)), and various items of human

exposure information, including estimates of anticipated exposures, to those substances or

mixtures (*id*. at § 2607(a)(1)(F)).

129.   Accordingly, the EPA's 1978 Policy Statement provides that information that is

reportable under Section 8(e) may be obtained from sources other than designed, controlled

studies.  Indeed, in its 1978 Policy Statement, the EPA identifies the sources of information that

"will often 'reasonably support' a conclusion of substantial risk."  1978 Policy Statement, 43

Fed. Reg. at 11112, Unit VI.  These sources include "reports concerning and studies of

undesigned, uncontrolled circumstances."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit

VI(2).  Examples of "[r]eports and studies of undesigned circumstances include: (i) medical and

health surveys, (ii) clinical studies, and (iii) *reports concerning and evidence of effects in*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  *consumers, workers, or the environment.*" 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit

2  VI(2) (emphasis added). The EPA left these provisions unchanged by the 2003 TSCA Guidance

3  Revisions. 2003 TSCA Guidance Revisions, 68 Fed. Reg. at 33139, Units VI and VI(2).

4      130.   As alleged more fully below, defendants obtained much of the reportable

5  substantial risk information that is the subject of this complaint from either written or verbal

6  reports at meetings of the International Isocyanate Institute (III). Those written or verbal reports

7  were "reports concerning . . . effects in consumers, workers, or the environment."

8      131.   Additionally, as alleged more fully below, defendants obtained or developed

9  medical and scientific data that constituted "evidence of effects in consumers, workers, or the

10  environment."

11      132.   Further, the 1978 Policy Statement provides that a report from such "undesigned,

12  uncontrolled circumstances" of "a single instance of . . . serious incapacitation in a human would

13  be reportable if one (or a few) chemical(s) was strongly implicated." 1978 Policy Statement, 43

14  Fed. Reg. at 11112, Unit VI(2). The EPA left this provision unchanged by the 2003 TSCA

15  Guidance Revisions. 2003 TSCA Guidance Revisions, 68 Fed. Reg. at 33139, Unit VI(2).

16  Chemically-induced respiratory sensitization, which can lead to occupational asthma and

17  permanent lung damage, is a human health effect that can involve serious incapacitation.

18      133.   The 1991 Reporting Guide reaffirms the 1978 Policy, providing that "TSCA

19  Section 8(e)-reportable information can come from a variety of sources including, but not limited

20  to draft, interim or final written reports (including study reports, letters, telegrams, telex reports)

21  or verbal reports (received at meetings or by phone) that involve observations (including

22  preliminary observations) from, for example, controlled or uncontrolled: (1) human or animal

23  studies/events (including but not limited to studies/events that involve high dose levels *or non-*

24  *routine routes of exposure*). . . ." 1991 Reporting Guide at 7 (emphasis added).

25      134.   As alleged more fully below, defendants obtained much of the reportable

26  substantial risk information that is the subject of this complaint from either written or verbal

27  reports at meetings of the III. Those written or verbal reports involved observations from human

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

events that involved a "non-routine route of exposure" (either skin contact or low-level inhalation exposure).

**5.** **The Section 8(e) reporting exemption does not exempt defendants' reporting obligation.**

    **a.** **Statutory reporting exemption.**

135.   TSCA Section 8(e) provides a very limited exemption to its reporting obligation. The regulated company must report any substantial risk information it obtains unless the company "has actual knowledge that the Administrator [of the EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

136.   As alleged more full with respect to each specific piece of substantial risk information, none of the defendants had actual knowledge that the EPA had been adequately informed of any of the substantial risk information, and each defendant was therefore required immediately to report the information to the EPA.

137.   Indeed, each defendant has publicly denied the existence of the very substantial risk information that they are concealing, and have made such denials directly to the EPA as recently as February 2013.  None of the defendants can contend that they had actual knowledge that the EPA was adequately informed of information the existence of which each defendant publicly denies.

138.   In a May 2002 III paper entitled "Respiratory sensitization:  the role of dermal contact with MDI and TDI," defendants and other III member companies discussed the animal and human data relevant to the potential link between skin contact with isocyanates and respiratory sensitization.  "Respiratory sensitization:  the role of dermal contact with MDI and TDI," GIL Report, May 2002, CHARM 012422–012446, Exh. 2.  The defendants neither published nor otherwise discussed in that paper any of the substantial risk information at issue here, even though all of that substantial risk information is relevant to the link between isocyanate skin contact and human respiratory sensitization.  Moreover, the defendants concluded the paper by contending that the "available" human data was insufficient to establish

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA Street, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  the link: "The available data do not provide sufficient evidence for a clear correlation between

2  skin exposure and occupational asthma." *Id.* at CHARM 12442, Exh. 2. As shown on the title

3  page of that paper, each defendant or its predecessor-in-interest co-authored the paper. *Id.* at

4  CHARM 12425, Exh. 2. Further, Gilbert International Limited, the paper's publisher, was the III

5  Scientific Office. *Id.* at CHARM 12422-12423.

6      139.    Through the Diisocyanates Panel of the ACC, the defendants recently disputed the

7  potential for dermal induction of respiratory sensitization directly to the EPA. In April 2011, the

8  EPA expressed its heightened interest in MDI and related chemicals by issuing an "MDI Action

9  Plan." *Methylene Diphenyl Diisocyanate (MDI) and Related Compounds Action Plan [RIN*

10  *2070-ZA15]*, U.S. Environmental Protection Agency, April 2011 ("MDI Action Plan"). On

11  February 26, 2013, defendants submitted comments to the EPA's proposed MDI Action Plan

12  through the ACC. Feb. 26, 2013 ACC Comments to MDI Action Plan, Exh. 3. Disputing the

13  EPA's statement in the MDI Action Plan that "[b]oth inhalation and dermal exposures to

14  diisocyanates are thought to contribute to the development of isocyanate asthma" (*id.* at 9, Exh.

15  3), the defendants contended "the role that dermal contact with diisocyanates plays in the

16  development of occupational asthma remains unresolved for humans." *Id.* at 10, Exh. 3.

17      140.    Since defendants each denied as recently as February 2013 that dermal exposures

18  are even "thought to contribute to the development of isocyanate asthma," they cannot contend

19  that they have now or have ever had actual knowledge that the EPA is adequately informed of

20  the substantial risk information that shows and/or strongly suggests that dermal exposures

21  contribute to the development of isocyanate asthma.

22      141.    Defendants have also publicly disputed the possibility that low-level inhalation

23  could cause respiratory sensitization. For example, in October 1993 the defendants, through the

24  Diisocyanates Panel of the CMA (now the ACC), submitted comments to the EPA regarding its

25  risk management process for diisocyanates. The defendants told the EPA that the proposition

26  that "pulmonary function decrement and sensitization can occur at very low concentrations" was

27  "not supported by available data." *Comments of the Chemical Manufacturers Association*

28

1    *Diisocyanate Panel on the RM1 Briefing Document for Diisocyanates*, October 12, 1993,

2    BAY010036-010066 at BAY010037, Exh. 4.   Each defendant or its predecessor-in-interest was

3    a member of the CMA's Diisocyanates Panel, which submitted these comments.  *Id.* at

4    BAY010041, n.1, Exh. 4.

5        142.   More recently, through the Diisocyanates Panel of the ACC, the defendants again

6    disputed the potential for low-level inhalation exposures to cause respiratory sensitization.  In

7    their February 26, 2013 comments to the EPA's proposed MDI Action Plan, the defendants

8    disputed the EPA's statement in the MDI Action Plan that "[b]oth inhalation and dermal

9    exposures to diisocyanates are thought to contribute to the development of isocyanate asthma"

10   (Feb. 26, 2013 ACC Comments to MDI Action Plan at 9, Exh. 3), the defendants contended:

11   "The ability of diisocyanates to induce respiratory sensitization in some individuals, and asthma

12   in some cases, is a known potential adverse health effect in humans *after exposure to*

13   *concentrations above workplace exposure limits.*"  *Id.* at 10 (emphasis added), Exh. 3.

14       143.   Since defendants each denied as recently as February 2013 that low-level

15   inhalation exposures are even "thought to contribute to the development of isocyanate asthma,"

16   they cannot contend that they have now or have ever had actual knowledge that the EPA is

17   adequately informed of the substantial risk information that shows and/or strongly suggests that

18   low-level inhalation exposures contribute to the development of isocyanate asthma.

19       **b.   Exemptions under EPA's guidance documents.**

20       **i.   Published-information and public-scientific-conference**
         **exemptions.**
21

22       144.   Although the EPA's guidance documents could be read to broaden this limited

23   exemption, the EPA's guidance documents cannot alter the scope of the statutory exemption, and

24   each defendant's reporting obligation is exempted only if each had "actual knowledge that the

25   Administrator [of the EPA] has been adequately informed of such information."  15 U.S.C. §

26   2607(e).

27

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

145.   Regardless, however, none of the defendants' reporting obligations are exempted even under a broad reading of the exemptions suggested in the EPA's guidance documents.

146.   The EPA's 1978 Policy Statement provides that substantial risk information is exempted from reporting if the information: "(a) Has been published by EPA in reports; (b) Has been submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA . . .; (c) Has been published in the scientific literature and referenced [by one of several listed abstract services]; (d) Is corroborative of well-established adverse effects already documented in the scientific literature and referenced [by one of the abstract services listed in (c) above]; or (e) [Is contained in an environmental notification of spills]." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VII(a) through (e).

147.   In its 1991 Reporting Guide, EPA added two new exemptions and both clarified and expanded the published-information exemption.  The two new exemptions covered information that (1) is contained in a formal report, publication, or public statement of another Federal agency or (2) constitutes national security information based upon a determination by the President of the United States.  1991 Reporting Guide at 8.  The EPA expanded the exemption for published information to include "information that is obtained from <u>major</u> U.S. news publications (e.g., newspapers or news magazines with national circulation) or nationally broadcast U.S. radio and/or television news reports."  The EPA clarified, however, that the published-information exemption exempted the reporting requirement only if the regulated company "obtained" the information from the published literature:

> With regard to item (2) on the preceding page [that is, "published in the open scientific literature"], EPA believes that for the purposes of Section 8(e) reporting, a subject person need not report information that is *obtained from* well-established/well-recognized scientific journals, such as those typically abstracted in a) major computerized abstract data bases, or 2) [sic] publications such as **Current Contents**, published by the Institute for Scientific Information (ISI), Inc. (Philadelphia, Pennsylvania.  Similarly, information that is *obtained from* <u>major</u> U.S. news publications (e.g., newspapers or news magazines with national circulation) or nationally broadcast U.S. radio and/or television news reports typically need not be submitted to EPA under Section 8(e) of TSCA.  However, with regard to information *obtained from* lesser known scientific journals, or from other magazines, newspapers, radio, or television reports, a subject person must

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

have actual knowledge that EPA has been adequately informed about such information [to be exempt from the reporting obligation].

1991 Reporting Guide at 9 (italicized emphases added, other emphases in original).

148.    In its 1991 Reporting Guide, the EPA also provided that information obtained at public scientific conferences or meetings is exempt from reporting if there is a written record of the meeting that adequately describes the information and is released to the public in a reasonable time frame.  The EPA indicated, however, that information obtained at a private conference or meeting is not exempt and should be considered for reporting.  1991 Reporting Guide at 7.

149.    In its 1993 Proposed Policy Clarification, the EPA confirmed that the prior-publication exemption applied to information that the regulated company "obtained solely from" one of several sources.  1993 Proposed Policy Clarification, 58 Fed. Reg. at 37739.  Those sources include official federal reports, certain scientific publications, certain databases to which EPA has access, major written news publications, nationally-broadcast radio and television reports, or certain national public scientific conferences.  1993 Proposed Policy Clarification, 58 Fed. Reg. at 37739 and 37741, Unit VII(a)(1)-(6).  Because none of the defendants obtained the substantial risk information at issue here from official federal reports, scientific publications, databases to which EPA has access, or news reports, the prior-publication exemption does not apply.  Further, because none of the meetings at which defendants obtained the information at issue here were public scientific conferences, and because none of the minutes of those meetings were published or abstracted as contemplated by the 1993 Proposed Policy Clarification, the public-scientific-meeting exemption does not apply.

150.    In its 1993 Proposed Policy Clarification, the EPA also provided additional explanation of the corroborative-of-a-well-established-adverse-effect exemption, as alleged more fully below.  1993 Proposed Policy Clarification, 58 Fed. Reg. at 37739-37740.

151.    In its 2003 TSCA Guidance Revisions, the EPA confirmed its 1993 Proposed Policy Clarification that the prior-publication exemption applied to information that the regulated

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   company "obtained in its entirety from" one of several sources. 2003 TSCA Guidance

2   Revisions, 68 Fed. Reg. at 33139, Unit VII(a)(1)-(8). The EPA expanded and clarified some of

3   the sources that it had listed in its 1993 Proposed Policy Clarification., expanding the TV, radio,

4   and news reports exemptions it had proposed in 1993; adding an exemption for information

5   developed by another federal agency in collaboration with EPA (as opposed to reports published

6   by other federal agencies); and adding an exemption for public scientific conferences sponsored

7   or co-sponsored by EPA. 2003 TSCA Guidance Revisions, 68 Fed. Reg. at 33139-33140, Unit

8   VII(a)(1)-(8). Because none of the defendants obtained any of the information at issue here from

9   TV, radio, or news reports, the 2003 revisions to those exemptions do not apply. Further,

10  because none of the defendants obtained any of the information at issue here from information

11  developed by EPA or by another Federal agency in collaboration with the EPA, the new 2003

12  exemption for such information do not apply.

13       152.    The 2003 revisions to the public-scientific-conference exemption provide that

14  reportable information obtained at a public scientific conference is exempt from reporting if

15  there is a written record of the meeting that adequately describes the information and is

16  published or abstracted within 90 days in a scientific publication, bibliographic database, or

17  scientific database of the type referenced in the guidance. 2003 TSCA Guidance Revisions, 68

18  Fed. Reg. at 33139, Unit VII(a)(7). Because none of the meetings at which defendants obtained

19  the information at issue here were public scientific conferences, and because none of the minutes

20  of those meetings were published or abstracted as contemplated by the 2003 TSCA Guidance

21  Revisions, this exemption does not apply.

22       153.    As alleged more fully below, the EPA's 2003 TSCA Guidance Revisions

23  specified the corroborative-of-a-well-established-adverse-effect exemption in terms virtually

24  identical to those contained in its 1993 Proposed Policy Clarification.

25       154.    Thus, the EPA's guidance documents provide for three main categories of

26  exempted information: (1) information obtained from the open scientific literature, the public

27

28

1    media, or a public scientific conference; (2) information obtained from an EPA or other federal

2    agency report; or (3) information that is corroborative of a well-established adverse effect.

3        155.   None of the substantial risk information obtained by defendants here is exempt

4    from reporting under the EPA's guidance documents.  Defendants obtained the reportable

5    substantial risk information that is the subject of this complaint from either written or verbal

6    reports at non-public meetings of the III, or from non-public medical and scientific data obtained

7    or developed by III member companies and then shared privately with other III member

8    companies.  Accordingly, defendants did not obtain this information from the open scientific

9    literature, through the public media, at a public scientific conference, or from an EPA or other

10   federal agency report, and neither the first category of exempt information (information obtained

11   from the open scientific literature, through the public media, or at a public scientific conference),

12   nor the second category of exempt information (information obtained from an EPA or other

13   federal agency report), apply.

14       156.   Moreover, neither of these two exemptions apply even if the exemptions are read,

15   prior to the EPA's issuance of the 1991 Reporting Guide, to apply to published information

16   regardless of whether defendant obtained the information from the published source, or, prior to

17   the EPA's issuance of the 1993 Proposed Policy Clarification, to apply to published information

18   regardless of whether defendant obtained the information "solely" or "in its entirety" from the

19   published information.  KBT&F or its agents have analyzed the scientific literature and relevant

20   reports issues by EPA or other federal agencies, and allege on information and belief that none of

21   the substantial risk information obtained by defendants here was published in the open scientific

22   literature, published or broadcast by the national public media, or published in an EPA or other

23   federal agency report prior to the EPA's 1991 Reporting Guide (issued in June 1991).

24       **ii.   Corroborative-of-a-well-established-adverse-effect exemption.**

25       157.   The third category of exempt information under the EPA's guidance documents is

26   information that is corroborative of a well-established adverse effect.  The 1978 Policy Statement

27   provides "Information need not be reported if it . . . [i]s corroborative of well-established adverse

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

effect already documented in the scientific literature and referenced [in one of the listed abstract services]." 1978 Policy Statement, Unit VII(d).

158.   The 1991 Reporting Guide reaffirms the 1978 policy by providing that to be exempt from the reporting requirement the new information must be "corroborative (in terms of, for example, route of exposure, dose, species, time to onset, severity, species, strain, etc.) of a well-established adverse effect." 1991 Reporting Guide at 8 (emphasis in original).  The EPA stated further: "It is important to note, however, that information that newly identifies a serious toxic effect at a lower dose level for example, or confirms a serious effect that was previously only suspected, is not considered by EPA to be corroborative and should be reported under Section 8(e) of TSCA." 1991 Reporting Guide at 8.

159.   Thus, consistent with the statutory requirement to report information reasonably supporting a conclusion that the chemical presents a substantial *risk* of injury, the EPA defined "adverse effect" in the context of "risk"—not only whether a chemical causes an adverse effect but how (route of exposure) or under what circumstances (dose levels or time to onset).  As one company commented in response to the EPA's proposals that preceded its 1978 Policy Statement, "[a] determination that information 'reasonably supports the conclusion' of substantial risk cannot be made independently of consideration of use, since the method and manner of using a chemical may influence the occurrence of an effect."  1978 Policy Statement, 43 Fed. Reg. at 11115, Comment 19.  Although the company apparently offered the comment in the context of normal versus abnormal use (*id.*), the EPA agreed that "[t]he method and manner of using a chemical is one of several factors determining its exposure potential," and further observed that "a definition of 'normal' use for a particular chemical will often depend upon a *knowledge of the risks* associated with the chemical." *Id.* at 11115, Response to Comment 19. The EPA's 1991 Reporting Guide confirmed that "the method and manner of use"—route of exposure and dose—was an integral part of the "adverse effect" being considered.

160.   EPA further confirmed this policy in its 1993 Proposed Policy Clarification:

> EPA maintains its position under Part VII(c) of the 1978 Policy Statement that information need not be reported under section 8(e) of TSCA if the information

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

corroborates well established, serious adverse effects that are already documented. The term "corroborates," in the context of this particular reporting exclusion, means that the information *essentially duplicates and/or confirms an existing and well-documented understanding of a serious adverse effect* of a particular chemical substance or mixture. EPA has correctly received, and expects to continue to receive, substantial risk reports that show adverse effects of a more serious degree or of a different kind than are already established. In other words, the Agency expects subject persons to immediately consider reporting information on serious toxic effects (including but not limited to cancer, developmental, reproductive toxicity, or neurotoxicity) if, for example: such effects are substantially more serious in terms of the severity of the effects or the number of animals affected; occur within a significantly shorter time frame following exposure; *occur via a different route of exposure*; *occur at a significantly lower dose or concentration*; or occur in a different species, strain, or sex.

1993 Proposed Policy Clarification, 58 Fed. Reg. at 37739 (emphasis added).

161.    In 2003, EPA further reaffirmed the 1978 policy by explaining that corroborative information is information that "substantially duplicates or confirms" a "well-recognized/well-established serious adverse effect for the chemical(s) under consideration." 2003 TSCA Guidance Revisions at 33139, Unit VII(b).

162.    The potential for inhalation of isocyanates, at levels above established "permissible exposure limits" (PELs), "threshold limit values" (TLVs), or "short-term exposure limits (STELS) to cause respiratory sensitization has been well-established in the scientific literature for decades. However, the potential for dermal exposure to isocyanates to cause human respiratory sensitization was not "well-established" in the open scientific literature at the time defendants obtained the substantial risk information at issue in this case, and indeed is still today presented in the open scientific literature as merely a possibility. There was not and is not today "an existing and well-documented understanding" in the open scientific literature that the dermal induction of isocyanates can cause human respiratory sensitization. 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37739. Accordingly, the substantial risk information that defendants obtained was not then (and is not today) "corroborative of well-established adverse effects already documented in the scientific literature and referenced [in one of the listed abstract services]." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VII(d).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

163.   Similarly, while the potential for inhalation of isocyanates, at levels above established PELs, TLVs, or STELs to cause respiratory sensitization has been well-established in the scientific literature for decades, the potential for inhalation of isocyanates at levels below the PELs, TLVs, or STELs to cause human respiratory sensitization (low-level inhalation) was not "well-established" in the open scientific literature at the time defendants obtained the substantial risk information at issue in this case, and indeed is still today presented in the open scientific literature as merely a possibility.  There was not and is not today "an existing and well-documented understanding" in the open scientific literature that low-level inhalation of isocyanates can cause human respiratory sensitization. 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37739.  Accordingly, the substantial risk information that defendants obtained was not then (and is not today) "corroborative of well-established adverse effects already documented in the scientific literature and referenced [in one of the listed abstract services]." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VII(d).

164.   Moreover, since obtaining the substantial risk information, the defendants, individually and in conspiracy through and with the III, the CMA, the ACC, and other industry organizations, have publicly disputed the potential for both dermal induction of respiratory sensitization and low-level-inhalation-induction of respiratory sensitization.

165.   As alleged more thoroughly below, each defendant either omitted from their isocyanate products' hazard warnings the possibility of dermal induction of respiratory sensitization or downplayed the possibility in those "warnings."

166.   Further, defendants have publicly contended that the scant publicly-available information that suggests such a possibility is anecdotal, inconclusive, and unreliable.  For example, in their May 2002 III paper entitled "Respiratory sensitization:  the role of dermal contact with MDI and TDI," defendants and other III member companies discussed the animal and human data relevant to the potential link between skin contact with MDI and respiratory sensitization.  Exh. 2 at CHARM 012422–012446.  The defendants neither published nor otherwise discussed in that paper any of the substantial risk information at issue here, even

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

though all of that substantial risk information is relevant to the link between human isocyanate skin contact and respiratory sensitization. Moreover, the defendants concluded the paper by contending that the link between respiratory sensitization and isocyanate skin contact was <u>not</u> well-established and that the "available" human data was insufficient to establish the link: "The available data do not provide sufficient evidence for a clear correlation between skin exposure and occupational asthma." *Id.* at CHARM 12442, Exh. 2.

167.   Furthermore, through the Diisocyanates Panel of the ACC, the defendants have recently represented disputed the potential for dermal induction of respiratory sensitization directly to the EPA.  In April 2011, the EPA expressed its heightened interest in MDI and related chemicals by issuing an "MDI Action Plan." *Methylene Diphenyl Diisocyanate (MDI) and Related Compounds Action Plan [RIN 2070-ZA15]*, U.S. Environmental Protection Agency, April 2011 ("MDI Action Plan").  On February 26, 2013, defendants submitted comments to the EPA's proposed MDI Action Plan through the ACC.  Feb. 26, 2013 ACC Comments to MDI Action Plan, Exh. 3.  Disputing the EPA's statement in the MDI Action Plan that "[b]oth inhalation and dermal exposures to diisocyanates are thought to contribute to the development of isocyanate asthma" (*id.* at 9, Exh. 3), the defendants contended "the role that dermal contact with diisocyanates plays in the development of occupational asthma remains unresolved for humans." *Id.* at 10, Exh. 3.

168.   Since defendants each contended as recently as February 2013 that there is no established link, much less a well-established link, between isocyanate skin contact and respiratory sensitization, the reporting exemption for information that corroborates a well-established adverse effect can not apply to the substantial risk information they obtained.

169.   Similarly, since obtaining the substantial risk information, the defendants, individually and in conspiracy through and with the III, the CMA, the ACC, and other industry organizations, have publicly disputed the potential for low-level inhalation to cause respiratory sensitization.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

170.   As alleged more thoroughly below, each defendant omitted this possibility from, or downplayed the possibility in, their isocyanate products' hazard "warnings."

171.   Further, defendants have publicly disputed the possibility that low-level inhalation could cause respiratory sensitization. For example, in October 1993 the defendants, through the Diisocyanates Panel of the CMA (now the ACC), submitted comments to the EPA regarding its risk management process for diisocyanates. The defendants told the EPA that the proposition that "pulmonary function decrement and sensitization can occur at very low concentrations" was "not supported by available data." *Comments of the Chemical Manufacturers Association Diisocyanate Panel on the RM1 Briefing Document for Diisocyanates*, October 12, 1993, at BAY010037, Exh. 4. Each defendant or its predecessor-in-interest was a member of the CMA's Diisocyanates Panel, which submitted these comments. *Id.* at BAY010041, n.1, Exh. 4.

172.   Furthermore, through the Diisocyanates Panel of the ACC, the defendants have recently disputed the potential for low-level inhalation exposures to cause respiratory sensitization. In their February 26, 2013 comments to the EPA's proposed MDI Action Plan, the defendants disputed the EPA's statement in the MDI Action Plan that "[b]oth inhalation and dermal exposures to diisocyanates are thought to contribute to the development of isocyanate asthma" (Feb. 26, 2013 ACC Comments to MDI Action Plan at 9, Exh. 3), the defendants contended: "The ability of diisocyanates to induce respiratory sensitization in some individuals, and asthma in some cases, is a known potential adverse health effect in humans *after exposure to concentrations above workplace exposure limits.*" *Id.* at 10 (emphasis added), Exh. 3.

173.   Since defendants each contended as late as February 2013 that there is no established link, much less a well-established link, between respiratory sensitization and low-level inhalation exposures, the reporting exemption for information that corroborates a well-established adverse effect can not apply to the substantial risk information they obtained.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

**C.     Defendants Obtained but Failed to Report Substantial Risk Information.**

    **1.     Historical understanding of isocyanate hazards.**

174.     There are several exposure standards applicable to MDI and PMDI inhalation exposure.

    a.     The first, promulgated by the U.S. Occupational Safety and Health Administration (OSHA), is a ceiling limit, or maximum allowable concentration, of 20 parts per billion (ppb), sometimes expressed as 0.02 parts per million (ppm) or 0.20 mg/m$^3$. The ceiling limit is commonly referred to as the Permissible Exposure Limit (PEL).

    b.     The second standard is recommended by the National Institute for Occupational Safety and Health (NIOSH). This recommendation, called the Recommended Exposure Limit (REL), is expressed as a time-weighted average (TWA) of 0.05 mg/m$^3$ (0.005 ppm or 5 ppb), and as a 10-minute ceiling of 0.2 mg/m3 (0.02 ppm or 20 ppb). The NIOSH TWA recommendation "indicates a time-weighted average concentration for up to a 10-hour workday over a 40-hour workweek." http://www.cdc.gov/niosh/npg/pgintrod.html (last visited April 21, 2015).

    c.     The third standard is a recommendation set by the American Conference of Governmental Industrial Hygienists ("ACGIH"). This recommendation, called the Threshold Limit Value (TLV), is expressed as a TWA of 5 ppb over an eight-hour period, and as a Short-Term Exposure Limit (STEL) of 20 ppb measured over a 15 minute period.

175.     There are several exposure standards applicable to TDI inhalation exposure.

    a.     The first, promulgated by OSHA, is a ceiling limit, or maximum allowable concentration, of 20 ppb, sometimes expressed as 0.02 ppm or 0.14 mg/m$^3$. This ceiling limit is the PEL. Previously, OSHA had expressed

its TDI PEL as a TWA of 0.005 ppm (5 ppb or 0.04 mg/m$^3$) and a STEL of 0.02 ppm (0.15 mg/m$^3$ or 20 ppb).

b. The second standard is the ACGIH's TLV recommendation of a TWA of 0.005 ppm (0.036 mg/m3 or 5 ppb) over an eight-hour period, and a STEL of 0.02 ppm (0.14 mg/m$^3$ or 20 ppb).

c. NIOSH has not established an REL for TDI.

176. The defendants have long known, and the scientific literature has documented for decades, that inhalation of isocyanates, including TDI, MDI, and PMDI, at levels that exceed these regulatory and recommended exposure limits, can cause respiratory sensitization and/or other respiratory injury, including occupational asthma.

177. In the early 1970s, some researchers, particularly Dr. John Peters of the Harvard School of Public Health, began suggesting that isocyanates, TDI in particular, could cause respiratory sensitization and/or other respiratory injury from inhalation exposures at levels below the regulatory and recommended exposure limits (low-level inhalation). Both NIOSH and the ACGIH thereafter initiated proceedings to consider lowering the regulatory and recommended exposure limits for isocyanates. The isocyanate industry, including each defendant, criticized and attacked the studies that suggested the low-level inhalation risk, while they simultaneously undertook significant and ultimately successful efforts to oppose a lowering of the regulatory and recommended exposure limits for isocyanates. Those efforts included each defendant's concealment of information that it obtained and/or developed that reasonably supported a conclusion that low-level inhalation of isocyanates, including particularly TDI, MDI, and/or PMDI, could cause respiratory sensitization and/or other respiratory injury.

178. For example, in their March 14, 1984 submission to the EPA's ITC regarding MDI and PMDI, each defendant, through the III, represented to the EPA:

> In man, chemically-induced bronchitis and bronchopnemonia and conjunctivitis may occur after exposure to high concentrations. *Repeated exposure to low concentrations can cause only subjective symptoms such as burning eyes, dry throat and coughing.* Besides the effects due to the specific irritant action of the isocyanate, sensitization leading to bronchial asthma has been observed in some

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

workers.  Recognition of this action serves as the basis of the present TLV of 0.2 mg/m$^3$ (ceiling).

Exh. 1 at EPA00621 (emphasis added).  Thus, each defendant represented to the EPA in March 1984 that inhalation exposures to MDI and/or PMDI at "low" concentrations—below the recommended ceiling of 0.2 mg/m$^3$—would not cause sensitization and permanent injury, but rather only minor, transient irritation.

179.    In the mid-to-late 1970s, some researchers, including particularly Dr. Meryl Karol, a leading researcher at the University of Pittsburgh, began to suspect that isocyanate skin contact, rather than inhalation exposure, might be causing human respiratory injury in the industrial setting.  In 1981, Dr. Karol published a seminal study in which she demonstrated that a minimal amount (as small as a single drop) of TDI on the skin of guinea pigs resulted in respiratory hypersensitivity in the animal model she developed.  Karol, M.H., et al., "Dermal Contact with Toluene Diisocyanate (TDI) Produces Respiratory Tract Hypersensitivity in Guinea Pigs," 58 Toxicology and Applied Pharmacology, 221-230 (1981).  Dr. Karol commented in her article that she commenced the study in part to investigate suspicions that skin contact in the industrial setting, rather than inhalation exposure, was causing human respiratory injury. *Id*. at 222 and 228.

180.    Prior to publishing her study, and during a December 8-9, 1980 III symposium, Dr. Karol presented her findings to III member companies, including representatives from defendants BASF, Bayer, and Dow.  May 6, 2008 Deposition of Dow through its Rule 30(b)(6) witness Michael Woolhiser at 120-121 (May 6, 2008 Dow-Woolhiser Depo), Exh. 5.  KBT&F alleges on information and belief that one of Huntsman's predecessors-in-interest also had representatives at this meeting.

181.    After presenting the results of her animal study to the III member representatives, Dr. Karol responded to a question in which one of the attendees suggested that Dr. Karol's TDI animal results should prompt efforts to protect against human workers having skin exposure not only for TDI, but also for MDI.  Dr. Karol responded that the study's findings indicated that

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

users should avoid skin contact with any of these isocyanates.  May 6, 2008 Dow-Woolhiser Depo at 131, Exh. 5.

182.    Thus, each defendant was aware by December 1980 that Dr. Karol's TDI animal findings were relevant to human exposures to MDI and/or PMDI.

183.    At least one of the defendants, however, already possessed information reasonably supporting the conclusion that skin contact with MDI and/or PMDI could cause respiratory injury to humans, and the others would soon obtain such information.

**2.    By the end of 1979, Bayer had obtained "Bayer's 1979 Skin Contact SRI," which comprised substantial risk information about MDI skin contact.**

**a.    Bayer obtained the information by 1979.**

184.    By "sometime in 1979" Bayer had obtained information that reasonably supported a conclusion that skin contact with MDI or PMDI could cause respiratory sensitization and other respiratory injury.  Mr. Dave Hussey, who was employed by Bayer's predecessor-in-interest Mobay during the late 1970s and early 1980s, testified that he received isocyanate hazard training at Mobay in 1979.  He testified that Mobay's industrial hygienists told him during that training, which occurred "sometime in 1979," that skin contact with MDI could cause respiratory sensitization ("becoming allergic to the chemical") and "reduced lung function."  April 21, 2005 Deposition of David Hussey at 56-62, 66, Exh. 6.

185.    Mr. Hussey testified that the Mobay industrial hygienists instructed him that safe handling of isocyanates required "having protective clothing, keeping it off of your skin, and particularly high protection equipment and practicing good hygiene in general using the chemical, keeping splashes off of you, primarily personal hygiene around the use of the chemical."  April 21, 2005 Deposition of David Hussey at 57:20-58:3, Exh. 6.  Mobay's industrial hygienists told him that if he failed to employ these safeguards, "skin rashes, eye irritation, if it got in your eyes, could occur, and possibly becoming allergic to the chemical."  *Id.* at 58:7-10, Exh. 6.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

186.   Those industrial hygienists explained the consequences of "becoming allergic to the chemical": "That you would no longer be able to work around the chemical, that you would develop antibodies that would activate the immune system. And in turn, you would have severe – mild to severe reaction to the chemical." *Id.* at 58:22-59:4, Exh. 6. The industrial hygienists described the "mild reaction" as "[r]ashes, skin rashes, irritation. Even in amounts below the TLVs that you could have shortness of breath." *Id.* at 59:7-9, Exh. 6. The person having such a reaction "would be someone who became sensitized . . . . [s]ome people after contact with – mild contact with – through skin absorption can get – start to develop antibodies." *Id.* at 61:12-13, 18-21, Exh. 6. Such a person could also sustain "reduced lung function" from such exposure. *Id.* at 66:3-14, Exh. 6.

   **b.   Bayer's 1979 Skin Contact SRI was "substantial risk information."**

187.   This information that Bayer had obtained by 1979 ("Bayer's 1979 Skin Contact SRI") reasonably supported a conclusion of substantial risk or injury. The EPA's 1978 Policy Statement provides that "'reasonably supports the conclusion' of substantial risk is not identical to a conclusive demonstration of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11110, Supplementary Information, ¶ (3). The 1978 Policy Statement further provides that "[a] person is not to delay reporting until he obtains conclusive information that a substantial risk exists, but is to immediately report any evidence which 'reasonably supports' that conclusion. Such evidence will generally not be conclusive as to the substantiality of the risk; it should, however, reliably ascribe the effect to the chemical." 1978 Policy Statement at 11112, Unit VI. Bayer's 1979 Skin Contact SRI may not have been "conclusive," but it "reliably ascribe[d] the effect to the chemical" to such a degree that Bayer's industrial hygiene department instructed its employees that skin contact with isocyanates could cause respiratory sensitization and/or reduced lung function.

   **c.   Bayer obtained Bayer's Skin Contact SRI by December 31, 1979**

188.   Mr. Hussey testified that Mobay's industrial hygienists provided Bayer's 1979 Skin Contact SRI to him "sometime in 1979." April 21, 2005 Deposition of David Hussey at

62:14-16. Thus, defendant Bayer had obtained Bayer's 1979 Skin Contact SRI by December 31, 1979 at the very latest.

### d.   TSCA required Bayer to report Bayer's Skin Contact SRI by January 22, 1980.

189.    The EPA's 1978 Policy Statement provides that "a person has 'immediately informed' the Administrator if information is received by EPA not later than the 15th working day after the date the person obtained such information."  1978 Policy Statement, 43 Fed. Reg. at 11111, Unit IV.  Thus, TSCA required that Bayer report Bayer's 1979 Skin Contact SRI to the EPA by January 22, 1980, the fifteenth working day after the date that Bayer obtained the information.

### e.   Bayer was subject to TSCA's reporting requirement when it obtained Bayer's Skin Contact SRI.

190.    At the time that it obtained Bayer's 1979 Skin Contact SRI, Bayer was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

### f.   Bayer failed to report Bayer's Skin Contact SRI, even though TSCA did not exempt its reporting obligation.

191.    Bayer did not report Bayer's 1979 Skin Contact SRI to the EPA "immediately" after obtaining it.

192.    Bayer has never reported Bayer's 1979 Skin Contact SRI to the EPA.

193.    Bayer did not have knowledge as of January 22, 1980 that some entity other than Bayer had submitted Bayer's 1979 Skin Contact SRI to the EPA.

194.    Bayer has not acquired knowledge since January 22, 1980 that some entity other than Bayer has submitted Bayer's 1979 Skin Contact SRI to the EPA.

195.    Bayer did not have actual knowledge as of January 22, 1980 that the EPA was adequately informed of Bayer's 1979 Skin Contact SRI.

196.    Bayer has not acquired actual knowledge since January 22, 1980 that the EPA has become adequately informed of Bayer's 1979 Skin Contact SRI.

197.    Therefore, TSCA did not exempt Bayer from its obligation to report Bayer's 1979 Skin Contact SRI.

g.    **The EPA's guidance documents did not exempt Bayer's obligation to report Bayer's 1979 Skin Contact SRI.**

198.    Although the EPA's guidance documents could be read to broaden TSCA's limited exemption, the EPA's guidance documents cannot alter the scope of the statutory exemption, and each defendant's separate reporting obligation is exempted only if it had "actual knowledge that the Administrator [of the EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

199.    Regardless, however, the EPA's guidance documents did not exempt Bayer from the obligation to report Bayer's 1979 Skin Contact SRI.

200.    As of January 22, 1980, the latest date by which TSCA required Bayer to report Bayer's 1979 Skin Contact SRI, the EPA's 1978 Policy Statement provided that substantial risk information was exempted from reporting if the information: "(a) Has been published by EPA in reports; (b) Has been submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA . . .; (c) Has been published in the scientific literature and referenced [by one of several listed abstract services]; (d) Is corroborative of well-established adverse effects already documented in the scientific literature and referenced [by one of the abstract services listed in (c) above]; or (e) [Is contained in an environmental notification of spills]." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VII(a) through (e).

201.    As of January 22, 1980, Bayer's 1979 Skin Contact SRI had not been "published by EPA in reports."

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    202.    As of January 22, 1980, Bayer's 1979 Skin Contact SRI had not been "submitted

2    in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other

3    authority administered by EPA."

4    203.    As of January 22, 1980, Bayer's 1979 Skin Contact SRI had not been "published

5    in the scientific literature and referenced [by one of several listed abstract services]."

6    204.    As of January 22, 1980, Bayer's 1979 Skin Contact SRI was not "corroborative of

7    well-established adverse effects already documented in the scientific literature and referenced

8    [by one of the abstract services listed in (c) above]."   To the contrary, a little more than four

9    years after obtaining Bayer's 1979 Skin Contact SRI, Bayer joined with the III in omitting any

10   reference to this health effect from the III's submission to the EPA about MDI and PMDI.   The

11   III first discussed the serious pulmonary health effects associated with inhalation exposures:

> The main risk to health of man is via inhalation. . . .   In man, chemically-induced
> bronchitis and bronchopneumonia and conjunctivitis may occur after exposure to
> high concentrations. . . . Besides the effects due to the specific irritant action of
> the isocyanate, sensitization leading to bronchial asthma has been observed in
> some workers. . . .

*Initial Submission:  Letter from International Isocyanate Institute to U.S. EPA submitting*

*information on Monomeric and Polymeric MDI*, Submitted March 14, 1984, EPA Document ID:

FYI-OTS-0794-1027, EPA00609-00626 at 00621, Exh. 1.   After documenting these serious

pulmonary health effects associated with inhalation exposures, the III limited the health effects

associated with dermal contact to "irritancy":   *"Dermal and eye contact is of concern with*

*regard to irritancy."  Id.*

21   205.    Bayer was a member of the III on March 14, 1984 and had a representative on the

22   III's Board of Directors.   Bayer, through the III, represented to the EPA on March 14, 1984 that

23   the "concern" about MDI or PMDI skin contact was "irritancy," but Bayer's 1979 Skin Contact

24   SRI indicated that skin contact with MDI could cause respiratory sensitization and reduced lung

25   function, and Bayer's industrial hygienists communicated that information to Bayer's employees

26   as part of their isocyanate hazard training.   Bayer cannot contend that Bayer's 1979 Skin Contact

27   SRI was "corroborative of well-established adverse effects already documented in the scientific

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

literature," because it represented to the EPA on March 14, 1984 that the only health "concern" related to MDI or PMDI skin contact was "irritancy."

**3.  By April 1982, Bayer and Dow had each obtained the "1982 Japanese Skin Contact SRI," which comprised substantial risk information about TDI and MDI skin contact.**

**a.  Bayer and Dow obtained the information by April 1982.**

206.  In April 1982, Bayer and Dow obtained substantial risk information about "whether skin absorption [of MDI or TDI] can lead to pulmonary sensitisation [European spelling of sensitization]." The minutes of the III Safety Committee Meeting of April 19 and 20, 1982, indicate that, during their discussion of the topic "Dermal toxicity of TDI and MDI," the attendees acknowledged that "[o]nce [sic, read "one"] concern is whether skin absorption can lead to pulmonary sensitisation. *Some relevant Japanese work is available.*" Minutes of the meeting of the III Safety Committee, April 19-20, 1982, III(Bice)003123-003134 at 003127 (emphasis added), Exh. 7. These minutes indicate that the "Japanese work" (the "1982 Japanese Skin Contact SRI") was relevant to the "concern" of pulmonary sensitization induced by MDI or TDI skin contact.

**b.  The 1982 Japanese Skin Contact SRI was "substantial risk information."**

207.  The 1982 Japanese Skin Contact SRI reasonably supported a conclusion of substantial risk or injury. Because neither Bayer nor Dow (nor any other entity) reported the 1982 Japanese Skin Contact SRI to the EPA, and because neither Bayer nor Dow produced the 1982 Japanese Skin Contact SRI during the *Bice* litigation, despite the *Bice* plaintiffs requests for such information, Bayer and Dow have prevented KBT&F and the U.S. government, including the EPA, from examining the information. Nonetheless, the minutes indicate that the 1982 Japanese Skin Contact SRI comprised "work," which indicates some degree of analysis of underlying data. And the minutes further indicate that the underlying data being analyzed concerned—indeed was "relevant" to—"whether skin absorption can lead to pulmonary

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  sensitization." Minutes of the meeting of the III Safety Committee, April 19-20, 1982,

2  III(Bice)003123-003134 at 003127, Exh. 7.

3      208.    The 1978 Policy Statement identifies two factors to weigh in the substantial risk

4  determination: "the seriousness of the effect" and "the fact or probability of its occurrence."

5  1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V.  The 1978 Policy provides that these

6  factors are weighed differently for different effects.  If the effects are among the human health

7  effects identified in unit V(a) of the 1978 Policy Statement, the EPA views the effects as "so

8  serious that relatively little weight is given to exposure; the mere fact that the implicated

9  chemical is in commerce constitutes sufficient evidence of exposure."  1978 Policy Statement,

10 43 Fed. Reg. at 11111, Unit V.  Accordingly, if the information concerns a "serious" health

11 effect identified in unit V(a) of the 1978 Policy Statement, the information constitutes substantial

12 risk information.

13     209.    The "serious" human health effects identified in unit V(a)(1) of the 1978 Policy

14 include "[a]ny instance of . . . serious or prolonged incapacitation, including the loss of or

15 inability to use a normal bodily function with a consequent relatively serious impairment of

16 normal activities, if one (or a few) chemical(s) is strongly implicated."  1978 Policy Statement,

17 43 Fed. Reg. at 11112, Unit V(a)(1).  "Pulmonary sensitization," which can lead to occupational

18 asthma and permanent lung damage, is such a "serious" human health effect.

19     210.    Accordingly, information about "[a]ny instance" of "pulmonary sensitization"

20 "must be reported" under TSCA Section 8(e) (unless otherwise exempted) "if one (or a few)

21 chemical(s) is strongly implicated."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1).

22 Indeed, the EPA's 1978 Policy Statement elsewhere reiterates that a single instance of such an

23 effect is reportable:  "It is anticipated here that reportable effects will generally occur in a

24 pattern, where a significant common feature is exposure to the chemical.  However, a single

25 instance of . . . serious incapacitation in a human would be reportable if one (or a few)

26 chemical(s) was strongly implicated."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit

27 VI(2).

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

211.   The "serious" human health effects identified in unit V(a)(2) of the 1978 Policy also include "[a]ny pattern of effects or evidence which reasonably supports the conclusion that the chemical substance or mixture can produce . . . serious or prolonged incapacitation." 1978 Policy Statement at 11112, Unit V(a)(2). "Pulmonary sensitization," which can lead to occupational asthma and permanent lung damage, is such a human health effect.

212.   Accordingly, "[a]ny pattern of effects or evidence which reasonably supports the conclusion that the chemical substance or mixture can produce" pulmonary sensitization "must be reported" under TSCA Section 8(e), unless otherwise exempted.  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1).

213.   Thus, the 1982 Japanese Skin Contact SRI constituted reportable substantial risk information. As the minutes from the April 1982 meeting confirm, the "Japanese work" or data analysis was "relevant" to whether skin exposure to TDI or MDI could produce a serious health effect, pulmonary sensitization.

**c.   Bayer and Dow separately obtained the 1982 Japanese Skin Contact SRI.**

214.   Both Bayer and Dow had representatives present at this April 19-20, 1982 meeting of the III Safety Committee. *Id.* at III(Bice)003124.  By sending these representatives on their behalf to attend and participate in the meeting of the III's Safety Committee, both Bayer and Dow indicated their confidence in these employees' respective capabilities to appreciate the significance of isocyanate safety information that they would obtain at the meeting.  Under TSCA, a "business organization is considered to have obtained any information which any officer or employee capable of appreciating the significance of that information has obtained." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit II.  Thus, both Bayer and Dow obtained the 1982 Japanese Skin Contact SRI by April 20, 1982, the final day of the III Safety Committee meeting.

1

2

**d.   TSCA required that Bayer and Dow each report the 1982 Japanese Skin Contact SRI by May 11, 1982.**

215.   The EPA's 1978 Policy Statement provides that "a person has 'immediately informed' the Administrator if information is received by EPA not later than the 15th working day after the date the person obtained such information." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit IV. Thus, TSCA required that both Bayer and Dow report the 1982 Japanese Skin Contact SRI to the EPA by May 11, 1982, the fifteenth working day after the date that Bayer and Dow each obtained the information.

**e.   Bayer and Dow were subject to TSCA's reporting requirement when they separately obtained the 1982 Japanese Skin Contact SRI.**

216.   At the time that it obtained the 1982 Japanese Skin Contact SRI, Bayer was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned each MDI, PMDI, and TDI.

217.   At the time that it obtained the 1982 Japanese Skin Contact SRI, Dow was a "person who manufactures, processes, or distributes in commerce [the] chemical substance or mixture" TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned TDI.

**f.   Bayer and Dow each failed to report the 1982 Japanese Skin Contact SRI, even though TSCA did not exempt their reporting obligations.**

218.   Bayer did not report the 1982 Japanese Skin Contact SRI to the EPA "immediately" after obtaining it.

219.   Bayer has never reported the 1982 Japanese Skin Contact SRI to the EPA.

220.   Bayer did not have knowledge as of May 11, 1982 that some entity other than Bayer had submitted the 1982 Japanese Skin Contact SRI to the EPA.

221.   Bayer has not acquired knowledge since May 11, 1982 that some entity other than Bayer has submitted the 1982 Japanese Skin Contact SRI to the EPA.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

222. Bayer did not have actual knowledge as of May 11, 1982 that the EPA was adequately informed of the 1982 Japanese Skin Contact SRI.

223. Bayer has not acquired actual knowledge since May 11, 1982 that the EPA has become adequately informed of the 1982 Japanese Skin Contact SRI.

224. Therefore, TSCA did not exempt Bayer from its obligation to report the 1982 Japanese Skin Contact SRI.

225. Dow did not report the 1982 Japanese Skin Contact SRI to the EPA "immediately" after obtaining it.

226. Dow has never reported the 1982 Japanese Skin Contact SRI to the EPA.

227. Dow did not have knowledge as of May 11, 1982 that some entity other than Dow had submitted the 1982 Japanese Skin Contact SRI to the EPA.

228. Dow has not acquired knowledge since May 11, 1982 that some entity other than Dow has submitted the 1982 Japanese Skin Contact SRI to the EPA.

229. Dow did not have actual knowledge as of May 11, 1982 that the EPA was adequately informed of the 1982 Japanese Skin Contact SRI.

230. Dow has not acquired actual knowledge since May 11, 1982 that the EPA has become adequately informed of the 1982 Japanese Skin Contact SRI.

231. Therefore, TSCA did not exempt Dow from its obligation to report the 1982 Japanese Skin Contact SRI.

g. **The EPA's guidance documents did not exempt Bayer or Dow's obligation to report the 1982 Japanese Skin Contact SRI.**

232. Although the EPA's guidance documents could be read to broaden TSCA's limited exemption, the EPA's guidance documents cannot alter the scope of the statutory exemption, and each defendant's separate reporting obligation is exempted only if it had "actual knowledge that the Administrator [of the EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 California Street, Suite 2300
SAN FRANCISCO, CALIFORNIA 94111

233.   Regardless, however, the EPA's guidance documents did not exempt either Bayer or Dow from the obligation to report the 1982 Japanese Skin Contact SRI.

234.   As of May 11, 1982, the latest date by which TSCA required Bayer and Dow to report the 1982 Japanese Skin Contact SRI, the EPA's 1978 Policy Statement provided that substantial risk information was exempted from reporting if the information: "(a) Has been published by EPA in reports; (b) Has been submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA . . .; (c) Has been published in the scientific literature and referenced [by one of several listed abstract services]; (d) Is corroborative of well-established adverse effects already documented in the scientific literature and referenced [by one of the abstract services listed in (c) above]; or (e) [Is contained in an environmental notification of spills]."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VII(a) through (e).

235.   As of May 11, 1982, the 1982 Japanese Skin Contact SRI had not been "published by EPA in reports."

236.   As of May 11, 1982, the 1982 Japanese Skin Contact SRI had not been "submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA."

237.   As of May 11, 1982, the 1982 Japanese Skin Contact SRI had not been "published in the scientific literature and referenced [by one of several listed abstract services]."

238.   As of May 11, 1982, the Japanese Skin Contact SRI was not "corroborative of well-established adverse effects already documented in the scientific literature and referenced [by one of the abstract services listed in (c) above]."  To the contrary, less than two years after obtaining the Japanese Skin Contact SRI, the III omitted any reference to this health effect from its submission to the EPA about MDI and PMDI.  The III first discussed the serious pulmonary health effects associated with inhalation exposures:

> The main risk to health of man is via inhalation. . . .  In man, chemically-induced bronchitis and bronchopneumonia and conjunctivitis may occur after exposure to high concentrations. . . .  Besides the effects due to the specific irritant action of

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

the isocyanate, sensitization leading to bronchial asthma has been observed in some workers. . . .

*Initial Submission: Letter from International Isocyanate Institute to U.S. EPA submitting information on Monomeric and Polymeric MDI*, Submitted March 14, 1984, EPA Document ID: FYI-OTS-0794-1027, EPA00609-00626 at 00621, Exh. 1. After documenting these serious pulmonary health effects associated with inhalation exposures, the III limited the health effects associated with dermal contact to "irritancy": *"Dermal and eye contact is of concern with regard to irritancy." Id.*

239.    Bayer was a member of the III on March 14, 1984 and had a representative on the III's Board of Directors. Bayer, through the III, represented to the EPA on March 14, 1984 that the "concern" about MDI or PMDI skin contact was "irritancy," but Bayer's 1979 Skin Contact SRI indicated that skin contact with MDI could cause respiratory sensitization and reduced lung function, and Bayer's industrial hygienists communicated that information to Bayer's employees as part of their isocyanate hazard training. Bayer cannot contend that Bayer's 1979 Skin Contact SRI was "corroborative of well-established adverse effects already documented in the scientific literature," because it represented to the EPA on March 14, 1984 that the only health "concern" related to MDI or PMDI skin contact was "irritancy."

240.    Both Bayer and Dow were members of the III on March 14, 1984, and each had a representative on the III's Board of Directors. Both Bayer and Dow, through the III, represented to the EPA on March 14, 1984 that the "concern" about MDI or PMDI skin contact was "irritancy," but the 1982 Japanese Skin Contact SRI, dealt with the "concern" of "whether skin absorption can lead to pulmonary sensitisation." Bayer and Dow cannot contend that the 1982 Japanese Skin Contact SRI was "corroborative of well-established adverse effects already documented in the scientific literature," because they each represented to the EPA on March 14, 1984 that the only health "concern" related to MDI or PMDI skin contact was "irritancy."

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

4.      **In or shortly after September 1988, each defendant had separately obtained "the 1988 Mineworkers SRI," which comprised substantial risk information about PMDI skin contact and low-level inhalation exposure.**

a.      **Each defendant separately obtained the information in or shortly after September 1988.**

241.    In or shortly after September 1988, each defendant separately obtained substantial risk information about respiratory sensitization in humans caused either by skin contact with or low-level inhalation of PMDI.  The minutes of the III Safety Committee's September 6-8, 1988 meeting memorialize the attendees' discussion of "Respiratory Studies."  Minutes of the September 6-8, 1988 meeting of the III Safety Committee, III(Bice)007155-007186 at 007178, Item 10.6, Exh. 8.  In the context of discussing a potential "project on the possible respiratory effects resulting from dermal (only) exposure to MDI," the minutes indicate:

> Mann [Safety Committee Chairman, from Bayer AG] referred to cases of sensitization found in miners who had no access to other isocyanates. *Sensitization had thus resulted from either dermal exposure or exposure to very low levels of airborne polymeric MDI.*

*Id.* (emphasis added).  Dr. Mann made his comments in the context of a discussion of "Respiratory Studies," and specifically a study to investigate the potential for MDI skin contact to produce "respiratory effects."  This context indicates that the "sensitization" that Dr. Mann indicated had resulted from skin contact or low-level inhalation was *respiratory* sensitization.

242.    The multiple "cases," plural, to which Dr. Mann referred involved human, not animal, respiratory sensitization.

243.    And Dr. Mann characterized as conclusive the causal link between PMDI skin contact or low-level inhalation exposure and respiratory sensitization:  "Sensitization *had thus resulted from either* dermal exposure or exposure to very low levels of airborne polymeric MDI."  *Id.*, Exh. 8.

b.      **The 1988 Mineworkers SRI was "substantial risk information."**

244.    This information, the "1988 Mineworkers SRI," was reportable substantial risk information.

245.    TSCA defines substantial risk information as "information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." 15 U.S.C. § 2607(e).  The 1978 Policy Statement provides that "'reasonably supports the conclusion' of substantial risk is not identical to a conclusive demonstration of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11110, Supplementary Information, ¶ (3).  The 1978 Policy Statement further provides that "[a] person is not to delay reporting until he obtains conclusive information that a substantial risk exists, but is to immediately report any evidence which 'reasonably supports' that conclusion.  Such evidence will generally not be conclusive as to the substantiality of the risk; it should, however, reliably ascribe the effect to the chemical." 1978 Policy Statement at 11112, Unit VI.

246.    The minutes indicate that the 1988 Mineworkers SRI conclusively ascribed the health effect to the chemical, either through skin contact or low-level inhalation.  At a minimum, however, the 1988 Mineworkers SRI "reliably ascribe[s] the effect to the chemical." Accordingly, the 1988 Mineworkers SRI was reportable substantial risk information.

c.    **Each defendant separately obtained the 1988 Mineworkers SRI.**

247.    Dow and Huntsman (through its predecessor-in-interest ICI Americas) each had representatives present at this September 6-8, 1988 meeting of the III Safety Committee.  Larry Rampy represented Dow and R.F. Hoffman represented ICI Americas.  Minutes of the September 6-8, 1988 III Safety Committee, Exh. 8 at III(Bice)007156.  By sending these representatives on their behalf to attend and participate in the meeting of the III's Safety Committee, Dow and Huntsman each indicated their respective confidence in their employee's capability to appreciate the significance of isocyanate safety information that they would obtain at the meeting.  Under TSCA, a "business organization is considered to have obtained any information which any officer or employee capable of appreciating the significance of that information has obtained." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit II.  Thus, Dow and Huntsman each obtained the 1988 Mineworkers SRI as of September 8, 1988, the last day of the meeting.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    248.   The minutes indicate that the III distributed copies to the "III Members Present"

2   (which included defendants Dow and Huntsman), to the "Members of the Executive," and to

3   "Sub Committee Chairmen." Exh. 8 at III(Bice)007156.

4    249.   As of June 1988, the III's Executive Committee included a representative from

5   defendant BASF (M. Buller) and from Huntsman's predecessor-in-interest, ICI Americas (R.

6   Gadsby). Attendance List from May 11, 1988 III Executive Committee Meeting,

7   III(Bice)006990, Exh. 9. Both M. Buller from BASF and R. Gadsby from ICI Americas were

8   still on the Executive Committee as of January 1989. III Organization Chart, January 1989,

9   III(Bice)007025-007026 at 007026, Exh. 10. Thus, on the dates of the September 6-8, 1988 III

10   Safety Committee meeting and in the four-month period following the meeting, both BASF and

11   Huntsman had representatives on the Executive Committee to whom the minutes of this meeting

12   were distributed. By appointing these individuals as their representatives on the III's Executive

13   Committee, both BASF and Huntsman indicated their confidence in these employees' respective

14   capabilities to appreciate the significance of isocyanate safety information that they would obtain

15   as members of the Executive Committee. Through these representatives, both BASF and

16   Huntsman obtained the 1988 Mineworkers SRI when those representatives received copies of

17   these minutes. Although the minutes do not indicate when they were distributed, a conservative

18   estimate of 60 days after the meeting would place BASF and Huntsman as obtaining the 1988

19   Mineworkers SRI as of November 7, 1988. (Huntsman first obtained the information at the

20   meeting through the attendance of its representative.)

21    250.   As of June 15, 1988, Bayer's predecessor-in-interest, Mobay, chaired the III's

22   Americas Region Transportation and Handling Subcommittee through its employee, William

23   Niggel. Minutes of the June 15, 1988 III Americas Region Transportation and Handling

24   Subcommittee, III(Bice)007108-007113 at 007113, Exh. 11. As of January 1989, Mr. Niggel

25   was still Chairman of that subcommittee. III Organization Chart, January 1989, Exh. 10 at

26   III(Bice)007025. Thus, on the dates of the September 6-8, 1988 III Safety Committee meeting

27   and in the four-month period following the meeting, Bayer's predecessor-in-interest Mobay

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  chaired a III Sub-Committee through its employee William Niggel, to whom the minutes of this

2  meeting were distributed.  By appointing Mr. Niggel as its representative to chair the III's

3  Americas Region Transportation and Handling Committee, Bayer's predecessor-in-interest

4  Mobay indicated its confidence in Mr. Niggel's capability to appreciate the significance of

5  isocyanate safety information that he would obtain as chairman of that sub-committee. Through

6  Mr. Niggel, Bayer obtained the 1988 Mineworkers SRI when Mr. Niggel received a copy of

7  these minutes.  Although the minutes do not indicate when they were distributed, a conservative

8  estimate of 60 days after the meeting would place Bayer as obtaining the 1988 Mineworkers SRI

9  as of November 7, 1988.

> **d.   TSCA required that Dow and Huntsman report the 1988
>        Mineworkers SRI by September 29, 1988, and that BASF and Bayer
>        report the information by November 30, 1988.**

251.   The EPA's 1978 Policy Statement provides that "a person has 'immediately

informed' the Administrator if information is received by EPA not later than the 15th working

day after the date the person obtained such information." 1978 Policy Statement, 43 Fed. Reg. at

11111, Unit IV.  Both Dow and Huntsman obtained the 1988 Mineworkers SRI on September 8,

1988 and TSCA required that both Dow and Huntsman report the 1988 Mineworkers SRI to the

EPA by September 29, 1988, the fifteenth working day after the date that Dow and Huntsman

obtained the information.

252.   Both BASF and Bayer obtained the 1988 Mineworkers SRI through distribution

of the minutes of the meeting, and based on a conservative estimate that the minutes were

distributed within sixty-days after the meeting, they obtained the 1988 Mineworkers SRI by

November 7, 1988.  TSCA required that both BASF and Bayer report the 1988 Mineworkers SRI

to the EPA by November 30, 1988, the fifteenth working day after the date that BASF and Bayer

obtained the information.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

e.    **Each defendant was subject to TSCA's reporting requirement when it obtained the 1988 Mineworkers SRI.**

253.    At the time that it obtained the 1988 Mineworkers SRI, Bayer was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

254.    At the time that it obtained the 1988 Mineworkers SRI, BASF was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

255.    At the time that it obtained the 1988 Mineworkers SRI, Dow was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

256.    At the time that it obtained the 1988 Mineworkers SRI, Huntsman was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

f.    **Each defendant failed to report the 1988 Mineworkers SRI, even though TSCA did not exempt its reporting obligation.**

257.    BASF did not report the 1988 Mineworkers SRI to the EPA "immediately" after obtaining it.

258.    BASF has never reported the 1988 Mineworkers SRI to the EPA.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

259.   BASF did not have knowledge as of November 30, 1988 that some entity other than BASF had submitted the 1988 Mineworkers SRI to the EPA.

260.   BASF has not acquired knowledge since November 30, 1988 that some entity other than BASF has submitted the 1988 Mineworkers SRI to the EPA.

261.   BASF did not have actual knowledge as of November 30, 1988 that the EPA was adequately informed of the 1988 Mineworkers SRI.

262.   BASF has not acquired actual knowledge since November 30, 1988 that the EPA has become adequately informed of the 1988 Mineworkers SRI.

263.   Therefore, TSCA did not exempt BASF from its obligation to report the 1988 Mineworkers SRI.

264.   Bayer did not report the 1988 Mineworkers SRI to the EPA "immediately" after obtaining it.

265.   Bayer has never reported the 1988 Mineworkers SRI to the EPA.

266.   Bayer did not have knowledge as of November 30, 1988 that some entity other than Bayer had submitted the 1988 Mineworkers SRI to the EPA.

267.   Bayer has not acquired knowledge since November 30, 1988 that some entity other than Bayer has submitted the 1988 Mineworkers SRI to the EPA.

268.   Bayer did not have actual knowledge as of November 30, 1988 that the EPA was adequately informed of the 1988 Mineworkers SRI.

269.   Bayer has not acquired actual knowledge since November 30, 1988 that the EPA has become adequately informed of the 1988 Mineworkers SRI.

270.   Therefore, TSCA did not exempt Bayer from its obligation to report the 1988 Mineworkers SRI.

271.   Dow did not report the 1988 Mineworkers SRI to the EPA "immediately" after obtaining it.

272.   Dow has never reported the 1988 Mineworkers SRI to the EPA.

273. Dow did not have knowledge as of September 29, 1988 that some entity other than Dow had submitted the 1988 Mineworkers SRI to the EPA.

274. Dow has not acquired knowledge since September 29, 1988 that some entity other than Dow has submitted the 1988 Mineworkers SRI to the EPA.

275. Dow did not have actual knowledge as of September 29, 1988 that the EPA was adequately informed of the 1988 Mineworkers SRI.

276. Dow has not acquired actual knowledge since September 29, 1988 that the EPA has become adequately informed of the 1988 Mineworkers SRI.

277. Therefore, TSCA did not exempt Dow from its obligation to report the 1988 Mineworkers SRI.

278. Huntsman did not report the 1988 Mineworkers SRI to the EPA "immediately" after obtaining it.

279. Huntsman has never reported the 1988 Mineworkers SRI to the EPA.

280. Huntsman did not have knowledge as of September 29, 1988 that some entity other than Huntsman had submitted the 1988 Mineworkers SRI to the EPA.

281. Huntsman has not acquired knowledge since September 29, 1988 that some entity other than Huntsman has submitted the 1988 Mineworkers SRI to the EPA.

282. Huntsman did not have actual knowledge as of September 29, 1988 that the EPA was adequately informed of the 1988 Mineworkers SRI.

283. Huntsman has not acquired actual knowledge since September 29, 1988 that the EPA has become adequately informed of the 1988 Mineworkers SRI.

284. Therefore, TSCA did not exempt Huntsman from its obligation to report the 1988 Mineworkers SRI.

g.   **The EPA's guidance documents did not exempt any defendant's obligation to report the 1988 Mineworkers SRI.**

285. Although the EPA's guidance documents could be read to broaden TSCA's limited exemption, the EPA's guidance documents cannot alter the scope of the statutory

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   exemption, and each defendant's separate reporting obligation is exempted only if it had "actual

2   knowledge that the Administrator [of the EPA] has been adequately informed of such

3   information." 15 U.S.C. § 2607(e).

4       286.   Regardless, however, the EPA's guidance documents did not exempt BASF,

5   Bayer, Dow, or Huntsman from the obligation to report the 1988 Mineworkers SRI.

6       287.   As of both September 29, 1988, the latest date by which TSCA required Dow and

7   Huntsman to report the 1988 Mineworkers SRI, and November 30, 1988, the latest date by which

8   TSCA required BASF and Bayer to report the information, the EPA's 1978 Policy Statement

9   provided that substantial risk information was exempted from reporting if the information: "(a)

10  Has been published by EPA in reports; (b) Has been submitted in writing to EPA pursuant to

11  mandatory reporting requirements under TSCA or any other authority administered by EPA . . .;

12  (c) Has been published in the scientific literature and referenced [by one of several listed abstract

13  services]; (d) Is corroborative of well-established adverse effects already documented in the

14  scientific literature and referenced [by one of the abstract services listed in (c) above]; or (e) [Is

15  contained in an environmental notification of spills]." 1978 Policy Statement, 43 Fed. Reg. at

16  11112, Unit VII(a) through (e).

17      288.   As of November 30, 1988, the 1988 Mineworkers SRI had not been "published by

18  EPA in reports."

19      289.   As of November 30, 1988, the 1988 Mineworkers SRI had not been "submitted in

20  writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority

21  administered by EPA."

22      290.   As of November 30, 1988, the 1988 Mineworkers SRI had not been "published in

23  the scientific literature and referenced [by one of several listed abstract services]."

24      291.   As of November 30, 1988, the 1988 Mineworkers SRI was not "corroborative of

25  well-established adverse effects already documented in the scientific literature and referenced

26  [by one of the abstract services listed in (c) above]." To the contrary, each defendant has

27  publicly contended that the scant publicly-available information that suggests that the possibility

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

for isocyanate skin contact to cause respiratory sensitization is anecdotal, inconclusive, and unreliable. For example, in a May 2002 III paper entitled "Respiratory sensitization: the role of dermal contact with MDI and TDI," defendants and other III member companies discussed the animal and human data relevant to the potential link between skin contact with MDI and respiratory sensitization. Exh. 2, at CHARM 012422–012446. The defendants neither published nor otherwise discussed in that paper the 1988 Mineworkers SRI, even though that substantial risk information is relevant to the link between human isocyanate skin contact and respiratory sensitization. Moreover, the defendants concluded their May 2002 paper by contending that the link between respiratory sensitization and MDI skin contact was <u>not</u> well-established and that the "available" human data was insufficient to establish the link: "The available data do not provide sufficient evidence for a clear correlation between skin exposure and occupational asthma." *Id.* at CHARM 12442, Exh. 2. Each defendant was a co-author of that 2002 III paper. *Id.* at CHARM 12425, Exh. 2.

292.   None of the defendants can contend that the 1988 Mineworkers SRI was "corroborative of well-established adverse effects already documented in the scientific literature," because they contended afterwards, in May 2002, that "[t]he available data do not provide sufficient evidence for a clear correlation between skin exposure and occupational asthma." *Id.* at CHARM 12442, Exh. 2.

293.   Defendants have also publicly disputed the possibility that low-level inhalation could cause respiratory sensitization. For example, in October 1993 the defendants, through the Diisocyanates Panel of the CMA (now the ACC), submitted comments to the EPA regarding its risk management process for diisocyanates. The defendants told the EPA that the proposition that "pulmonary function decrement and sensitization can occur at very low concentrations" was "not supported by available data." *Comments of the Chemical Manufacturers Association Diisocyanate Panel on the RM1 Briefing Document for Diisocyanates*, October 12, 1993, at BAY010037, Exh. 4. Each defendant or its predecessor-in-interest was a member of the CMA's Diisocyanates Panel, which submitted these comments. *Id.* at BAY010041, n.1, Exh. 4.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

294.   None of the defendants can contend that the 1988 Mineworkers SRI was "corroborative of well-established adverse effects already documented in the scientific literature," because they contended afterwards, in October 1993, that the proposition that "pulmonary function decrement and sensitization can occur at very low concentrations" was "not supported by available data." *Id.* at BAY010037, Exh. 4.

5.   **In or shortly after March 1989, each defendant had separately obtained the "1989 Human Cases SRI," which comprised substantial risk information about MDI and PMDI skin contact and low-level inhalation exposure.**

a.   **Each defendant separately obtained the information in or shortly after March 1989.**

295.   In or shortly after March 1989, each defendant obtained substantial risk information about respiratory sensitization in humans caused either by skin contact with or low-level inhalation of PMDI.  The minutes of the III Scientific Committee's March 6-9, 1989 meeting establish that the meeting's attendees discussed the anticipated efforts of the III's newly-formed Medical Advisory Group (MAG).  III(Bice)007421-007468 at III(Bice)007425, Exh. 12. The attendees reviewed a "list of areas to be addressed," prepared by the MAG during its inaugural meeting.  The first item concerned "Sensitization":

> There was still a pressing need to investigate respiratory effects resulting from percutaneous administration of MDI in animals, *with a view to explaining certain human cases of MDI sensitization in which inhalation exposure appeared to have been negligible.*  From current *evidence* sensitization remains the major issue to be addressed.

Exh. 12 at III(Bice)007425, Item 7.0(A) (emphasis added).

296.   This information, the "1989 Human Cases SRI," comprised "evidence" relating to multiple "cases," plural, of MDI respiratory sensitization in humans, caused by MDI exposure in what appeared to be a low-level ("negligible") inhalation exposure environment.  The minutes indicate that this "evidence" caused the III's Medical Advisory Group to associate the human respiratory sensitization with skin exposure, as the MAG observed the "pressing need" to investigate the dermal induction route in animals.  *Id.*, Exh. 12 at III(Bice)007425, Item 7.0(A).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

b.   **The 1989 Human Cases SRI was "substantial risk information."**

297.   TSCA defines substantial risk information as "information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." 15 U.S.C. § 2607(e).   The 1978 Policy Statement provides that "'reasonably supports the conclusion' of substantial risk is not identical to a conclusive demonstration of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11110, Supplementary Information, ¶ (3).   The 1978 Policy Statement further provides that "[a] person is not to delay reporting until he obtains conclusive information that a substantial risk exists, but is to immediately report any evidence which 'reasonably supports' that conclusion. Such evidence will generally not be conclusive as to the substantiality of the risk; it should, however, reliably ascribe the effect to the chemical." 1978 Policy Statement at 11112, Unit VI.

298.   The 1989 Human Cases SRI "reliably ascribe[d] the effect to the chemical," and was therefore reportable substantial risk information.   The minutes establish that the III's Medical Advisory Group viewed the 1989 Human Cases SRI "evidence" as conclusive that these humans had "MDI sensitization"—in other words, respiratory sensitization caused by MDI exposure.   Moreover, the minutes establish that the MAG associated the human respiratory sensitization with either MDI skin contact or low-level ("negligible") MDI inhalation exposure. Thus, the 1989 Human Cases SRI not only "reliably ascribe[d] the effect to the chemical [MDI]," but it also characterized the effect in terms of two alternative MDI exposure routes, neither of which was known by the EPA to cause respiratory sensitization.   The 1989 Human Cases SRI was therefore reportable substantial risk information.

299.   The 1978 Policy Statement identifies two factors to weigh in the substantial risk determination: "the seriousness of the effect" and "the fact or probability of its occurrence." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V.   The 1978 Policy provides that these factors are weighed differently for different effects.   If the effects are among the human health effects identified in unit V(a) of the 1978 Policy Statement, the EPA views the effects as "so serious that relatively little weight is given to exposure; the mere fact that the implicated

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

chemical is in commerce constitutes sufficient evidence of exposure." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V. Accordingly, if the information concerns a "serious" health effect identified in unit V(a) of the 1978 Policy Statement, the information constitutes substantial risk information.

300.   The "serious" human health effects identified in unit V(a)(1) of the 1978 Policy include "[a]ny instance of . . . serious or prolonged incapacitation, including the loss of or inability to use a normal bodily function with a consequent relatively serious impairment of normal activities, if one (or a few) chemical(s) is strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1). Respiratory sensitization, which can lead to occupational asthma and permanent lung damage, is such a "serious" human health effect.

301.   Accordingly, information about "[a]ny instance" of respiratory sensitization "must be reported" under TSCA Section 8(e) (unless otherwise exempted) "if one (or a few) chemical(s) is strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1). Indeed, the EPA's 1978 Policy Statement elsewhere reiterates that a single instance of such an effect is reportable: "It is anticipated here that reportable effects will generally occur in a pattern, where a significant common feature is exposure to the chemical. However, a single instance of . . . serious incapacitation in a human would be reportable if one (or a few) chemical(s) was strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2).

302.   The 1989 Human Cases SRI, which concerned the human health effect of respiratory sensitization caused either by MDI skin contact or low-level MDI inhalation exposure, was therefore reportable substantial risk information. The 1989 Human Cases SRI involved effects that "occur[red] in a pattern, where a significant common feature [was] exposure to the chemical," here, exposure in an environment of "negligible" inhalation exposure to MDI. And, as the III's MAG Group viewed the 1989 Human Cases SRI "evidence" as conclusive that these humans had "MDI sensitization"—in other words, respiratory sensitization caused by MDI

1   exposure, "one . . . chemical[] is strongly implicated." The 1989 Human Cases SRI was

2   reportable substantial risk information.

3       303.   The EPA's 1978 Policy Statement provides that information that is reportable

4   under Section 8(e) may be obtained from sources other than designed, controlled studies.

5   Indeed, in its 1978 Policy Statement, the EPA identifies the sources of information that "will

6   often 'reasonably support' a conclusion of substantial risk." 1978 Policy Statement, 43 Fed.

7   Reg. at 11112, Unit VI. These sources include "reports concerning and studies of undesigned,

8   uncontrolled circumstances." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2).

9   Examples of "[r]eports and studies of undesigned circumstances include: (i) medical and health

10   surveys, (ii) clinical studies, and (iii) *reports concerning and evidence of effects in consumers,*

11   *workers, or the environment.*" 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2)

12   (emphasis added).

13       304.   The defendants obtained the 1989 Human Cases SRI from "reports concerning . . .

14   undesigned, uncontrolled circumstances," including "reports concerning and evidence of effects

15   in consumers, workers, or the environment." The 1989 Human Cases SRI therefore comprises

16   information that is reportable under TSCA Section 8(e).

17       **c.**   **Each defendant separately obtained the 1989 Human Cases SRI.**

18       305.   BASF, Dow, and Huntsman (through its predecessor-in-interest ICI Americas)

19   had representatives present at this March 6-9, 1989 meeting of the III Scientific Committee.

20   K.S. Brenner represented BASF, Larry Rampy and C. Bastian represented Dow, and R.F.

21   Hoffman represented ICI Americas. Minutes of the March 6-9, 1989 III Scientific Committee

22   meeting, Exh. 12 at III(Bice)007421. By sending these representatives on their behalf to attend

23   and participate in the meeting of the III's Scientific Committee, BASF, Dow, and Huntsman

24   each indicated their confidence in their respective employees' capabilities to appreciate the

25   significance of isocyanate safety and/or scientific information that they would obtain at the

26   meeting. Under TSCA, a "business organization is considered to have obtained any information

27   which any officer or employee capable of appreciating the significance of that information has

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    obtained." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit II. Thus, BASF, Dow, and

2    Huntsman each obtained the 1989 Human Cases SRI as of March 9, 1989, the last day of the

3    meeting.

4         306.    The minutes indicate that the III distributed copies to the "III Members Present"

5    (which included defendants BASF, Dow, and Huntsman), to the "Members of the Executive,"

6    and to "Sub Committee Chairmen." Exh. 12 at III(Bice)007421.

7         307.    As of January 1989, Bayer's predecessor-in-interest, Mobay, chaired the III's

8    Americas Region Transportation and Handling Sub-Committee through its employee, William

9    Niggel. III Organization Chart, January 1989, Exh. 10 at III(Bice)007025. As of June 1989, Mr.

10    Niggel was still chairman of the sub-committee. Minutes of the June 6, 1989 meeting of the

11    Americas Region Transportation and Handling Sub-Committee, III(Bice)007672-007679 at

12    007679, Exh. 13. Indeed, Mr. Niggel had been elected to a two-year term as chairman of the

13    subcommittee in June 1988, so his chairmanship of the sub-committee ran through June 1990.

14    Minutes of the June 7, 1988 meeting of the Americas Region Transportation and Handling Sub-

15    Committee, III(Bice)007108-007113 at 7110, Exh. 14.

16         308.    Thus, on the dates of the March 6-9, 1989 III Scientific Committee meeting and in

17    the four-month period following the meeting, Bayer's predecessor-in-interest Mobay chaired a

18    III Sub-Committee through its employee William Niggel, to whom the minutes of this meeting

19    were distributed. By appointing Mr. Niggel as its representative to chair the III's Americas

20    Region Transportation and Handling Committee, Bayer's predecessor-in-interest Mobay

21    indicated its confidence in Mr. Niggel's capability to appreciate the significance of isocyanate

22    safety information that he would obtain as chairman of that sub-committee. Through Mr. Niggel,

23    Bayer obtained the 1989 Human Cases SRI when Mr. Niggel received a copy of these minutes.

24    Although the minutes do not indicate when they were distributed, a conservative estimate of 60

25    days after the meeting would place Bayer as obtaining the 1989 Human Cases SRI as of May 8,

26    1989.

27

28

*Qui Tam* Complaint

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

### d. TSCA required that BASF, Dow, and Huntsman each report the 1989 Human Cases SRI by March 30, 1989, and that Bayer report the information by May 30, 1989.

309.   The EPA's 1978 Policy Statement provides that "a person has 'immediately informed' the Administrator if information is received by EPA not later than the 15th working day after the date the person obtained such information." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit IV.

310.   As alleged more thoroughly above, BASF, Dow, and Huntsman each obtained the 1989 Human Cases SRI on March 9, 1989, and TSCA required that BASF, Dow, and Huntsman each report the 1989 Human Cases SRI to the EPA by March 30, 1989, the fifteenth working day after the date that BASF, Dow, and Huntsman each obtained the information.

311.   As alleged more thoroughly above, Bayer obtained the 1989 Human Cases SRI by May 8, 1989, and TSCA required that Bayer report the 1989 Human Cases SRI to the EPA by May 30, 1989, the fifteenth working day after the date that Bayer obtained the information.

### e. Each defendant was subject to TSCA's reporting requirement when it separately obtained the 1989 Human Cases SRI.

312.   At the time that it obtained the 1989 Human Cases SRI, Bayer was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

313.   At the time that it obtained the 1989 Human Cases SRI, BASF was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

314.   At the time that it obtained the 1989 Human Cases SRI, Dow was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]"

MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

315.   At the time that it obtained the 1989 Human Cases SRI, Huntsman was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

f.   **Each defendant failed to report the 1989 Human Cases SRI, even though TSCA did not exempt its reporting obligation.**

316.   BASF did not report the 1989 Human Cases SRI to the EPA "immediately" after obtaining it.

317.   BASF has never reported the 1989 Human Cases SRI to the EPA.

318.   BASF did not have knowledge as of March 30, 1989 that some entity other than BASF had submitted the 1989 Human Cases SRI to the EPA.

319.   BASF has not acquired knowledge since March 30, 1989 that some entity other than BASF has submitted the 1989 Human Cases SRI to the EPA.

320.   BASF did not have actual knowledge as of March 30, 1989 that the EPA was adequately informed of the 1989 Human Cases SRI.

321.   BASF has not acquired actual knowledge since March 30, 1989 that the EPA has become adequately informed of the 1989 Human Cases SRI.

322.   Therefore, TSCA did not exempt BASF from its obligation to report the 1989 Human Cases SRI.

323.   Bayer did not report the 1989 Human Cases SRI to the EPA "immediately" after obtaining it.

324.   Bayer has never reported the 1989 Human Cases SRI to the EPA.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

325.   Bayer did not have knowledge as of May 30, 1989 that some entity other than Bayer had submitted the 1989 Human Cases SRI to the EPA.

326.   Bayer has not acquired knowledge since May 30, 1989 that some entity other than Bayer has submitted the 1989 Human Cases SRI to the EPA.

327.   Bayer did not have actual knowledge as of May 30, 1989 that the EPA was adequately informed of the 1989 Human Cases SRI.

328.   Bayer has not acquired actual knowledge since May 30, 1989 that the EPA has become adequately informed of the 1989 Human Cases SRI.

329.   Therefore, TSCA did not exempt Bayer from its obligation to report the 1989 Human Cases SRI.

330.   Dow did not report the 1989 Human Cases SRI to the EPA "immediately" after obtaining it.

331.   Dow has never reported the 1989 Human Cases SRI to the EPA.

332.   Dow did not have knowledge as of March 30, 1989 that some entity other than Dow had submitted the 1989 Human Cases SRI to the EPA.

333.   Dow has not acquired knowledge since March 30, 1989 that some entity other than Dow has submitted the 1989 Human Cases SRI to the EPA.

334.   Dow did not have actual knowledge as of March 30, 1989 that the EPA was adequately informed of the 1989 Human Cases SRI.

335.   Dow has not acquired actual knowledge since March 30, 1989 that the EPA has become adequately informed of the 1989 Human Cases SRI.

336.   Therefore, TSCA did not exempt Dow from its obligation to report the 1989 Human Cases SRI.

337.   Huntsman did not report the 1989 Human Cases SRI to the EPA "immediately" after obtaining it.

338.   Huntsman has never reported the 1989 Human Cases SRI to the EPA.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

339.   Huntsman did not have knowledge as of March 30, 1989 that some entity other than Huntsman had submitted the 1989 Human Cases SRI to the EPA.

340.   Huntsman has not acquired knowledge since March 30, 1989 that some entity other than Huntsman has submitted the 1989 Human Cases SRI to the EPA.

341.   Huntsman did not have actual knowledge as of March 30, 1989 that the EPA was adequately informed of the 1989 Human Cases SRI.

342.   Huntsman has not acquired actual knowledge since March 30, 1989 that the EPA has become adequately informed of the 1989 Human Cases SRI.

343.   Therefore, TSCA did not exempt Huntsman from its obligation to report the 1989 Human Cases SRI.

g.   **The EPA's guidance documents did not exempt any defendant's obligation to report the 1989 Human Cases SRI.**

344.   Although the EPA's guidance documents could be read to broaden TSCA's limited exemption, the EPA's guidance documents cannot alter the scope of the statutory exemption, and each defendant's separate reporting obligation is exempted only if it had "actual knowledge that the Administrator [of the EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

345.   Regardless, however, the EPA's guidance documents did not exempt BASF, Bayer, Dow, or Huntsman from the obligation to report the 1989 Human Cases SRI.

346.   As of both March 30, 1989, the latest date by which TSCA required BASF, Dow, and Huntsman to report the 1989 Human Cases SRI, and May 30, 1989, the latest date by which TSCA required Bayer to report the information, the EPA's 1978 Policy Statement provided that substantial risk information was exempted from reporting if the information: "(a) Has been published by EPA in reports; (b) Has been submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA . . .; (c) Has been published in the scientific literature and referenced [by one of several listed abstract services]; (d) Is corroborative of well-established adverse effects already documented in the

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

scientific literature and referenced [by one of the abstract services listed in (c) above]; or (e) [Is

contained in an environmental notification of spills]." 1978 Policy Statement, 43 Fed. Reg. at

11112, Unit VII(a) through (e).

347.    As of May 30, 1989, the 1989 Human Cases SRI had not been "published by EPA

in reports."

348.    As of May 30, 1989, the 1989 Human Cases SRI had not been "submitted in

writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority

administered by EPA."

349.    As of May 30, 1989, the 1989 Human Cases SRI had not been "published in the

scientific literature and referenced [by one of several listed abstract services]."

350.    As of May 30, 1989, the 1989 Human Cases SRI was not "corroborative of well-

established adverse effects already documented in the scientific literature and referenced [by one

of the abstract services listed in (c) above]." To the contrary, each defendant has publicly

contended that the scant publicly-available information that suggests that the possibility for

isocyanate skin contact to cause respiratory sensitization is anecdotal, inconclusive, and

unreliable. For example, in a May 2002 III paper entitled "Respiratory sensitization:  the role of

dermal contact with MDI and TDI," defendants and other III member companies discussed the

animal and human data relevant to the potential link between skin contact with MDI and

respiratory sensitization. Exh. 2, at CHARM 012422–012446. The defendants neither published

nor otherwise discussed in that paper the 1989 Human Cases SRI, even though that substantial

risk information is relevant to the link between human isocyanate skin contact and respiratory

sensitization. Moreover, the defendants concluded their May 2002 paper by contending that the

link between respiratory sensitization and MDI skin contact was not well-established and that the

"available" human data was insufficient to establish the link:  "The available data do not provide

sufficient evidence for a clear correlation between skin exposure and occupational asthma." *Id.*

at CHARM 12442, Exh. 2. Each defendant was a co-author of that 2002 III paper. *Id.* at

CHARM 12425, Exh. 2.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

351.    None of the defendants can contend that the 1989 Human Cases SRI was "corroborative of well-established adverse effects already documented in the scientific literature," because they contended afterwards, in May 2002, that "[t]he available data do not provide sufficient evidence for a clear correlation between skin exposure and occupational asthma." *Id.* at CHARM 12442, Exh. 2.

352.    Defendants have also publicly disputed the possibility that low-level inhalation could cause respiratory sensitization.  For example, in October 1993 the defendants, through the Diisocyanates Panel of the CMA (now the ACC), submitted comments to the EPA regarding its risk management process for diisocyanates.  The defendants told the EPA that the proposition that "pulmonary function decrement and sensitization can occur at very low concentrations" was "not supported by available data." *Comments of the Chemical Manufacturers Association Diisocyanate Panel on the RM1 Briefing Document for Diisocyanates*, October 12, 1993, at BAY010037, Exh. 4.  Each defendant or its predecessor-in-interest was a member of the CMA's Diisocyanates Panel, which submitted these comments. *Id.* at BAY010041, n.1, Exh. 4.

353.    None of the defendants can contend that the 1989 Human Cases SRI was "corroborative of well-established adverse effects already documented in the scientific literature," because they contended afterwards, in October 1993, that the proposition that "pulmonary function decrement and sensitization can occur at very low concentrations" was "not supported by available data." *Id.* at BAY010037, Exh. 4.

      6.    **In or shortly after March 1989, each defendant had separately obtained the "1989 German Mine SRI," which comprised substantial risk information about MDI skin contact and low-level inhalation exposure.**

        a.    **Each defendant separately obtained the information in or shortly after March 1989.**

354.    In or shortly after March 1989, each defendant obtained substantial risk information about respiratory sensitization in humans caused either by skin contact with or low-level inhalation of PMDI.  The minutes of the III Scientific Committee's March 6-9, 1989 meeting memorialize a discussion at the meeting under the heading "Respiratory Effects from

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Dermal Contact with Polymeric MDI (Karol)." III(Bice)007421-007468 at III(Bice)007436

(emphasis in original), Exh. 12. In addition to discussing Dr. Meryl Karol's proposal "to

investigate the effect of polymeric MDI in guinea pigs, by intradermal application," the attendees

discussed human evidence of MDI and/or PMDI respiratory sensitization:

> There are situations (notably is a well-monitored W. German mine) where MDI
> respiratory sensitization appears to have resulted either from inordinately low
> levels of airborne MDI or from skin contact.

Exh. 12 at III(Bice)007436.

355.    This information, the "1989 German Mine SRI," comprised information relating

to multiple "situations," plural, of "MDI respiratory sensitization" in humans, caused either by

MDI skin contact or by low-level ("inordinately low") MDI inhalation exposure. The minutes

indicate that air-monitoring data from "a well-monitored W. German mine" established the

"inordinately low levels of airborne MDI" associated with at least some of these "situations" that

involved "MDI respiratory sensitization." *Id.*, Ex. 12 at III(Bice)007436.

### b.    The 1989 German Mine SRI was "substantial risk information."

356.    TSCA defines substantial risk information as "information which reasonably

supports the conclusion that such substance or mixture presents a substantial risk of injury to

health or the environment." 15 U.S.C. § 2607(e). The 1978 Policy Statement provides that

"'reasonably supports the conclusion' of substantial risk is not identical to a conclusive

demonstration of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11110,

Supplementary Information, ¶ (3). The 1978 Policy Statement further provides that "[a] person

is not to delay reporting until he obtains conclusive information that a substantial risk exists, but

is to immediately report any evidence which 'reasonably supports' that conclusion. Such

evidence will generally not be conclusive as to the substantiality of the risk; it should, however,

reliably ascribe the effect to the chemical." 1978 Policy Statement at 11112, Unit VI.

357.    The 1989 German Mine SRI "reliably ascribe[d] the effect to the chemical," and

was therefore reportable substantial risk information. The minutes establish that the III's

Scientific Committee viewed the 1989 German Mine SRI as conclusive that these humans had

1  "MDI respiratory sensitization"—in other words, respiratory sensitization caused by MDI

2  exposure.

3      358.   Moreover, the minutes establish that the Scientific Committee closely associated

4  the human respiratory sensitization with either MDI skin contact or "inordinately low levels of

5  airborne MDI." Specifically, the Scientific Committee used air-monitoring data from "a well-

6  monitored W. German mine" to establish that at least some of those sensitized (those who

7  worked in this particular mine) had experienced only "inordinately low levels of airborne MDI"

8  exposure. And based at least in part on the confidence that data provided about the workers'

9  exposures, the Scientific Committee indicated an apparent ("appears to have resulted") causal

10  link between the MDI respiratory sensitization and either MDI skin contact or low-level

11  inhalation exposure.

12      359.   Thus, the 1989 German Mine SRI not only "reliably ascribe[d] the effect to the

13  chemical [PMDI and MDI]," but it also characterized the effect in terms of two alternative MDI

14  exposure routes, neither of which was known by the EPA to cause respiratory sensitization. The

15  1989 German Mine SRI was therefore reportable substantial risk information.

16      360.   The 1978 Policy Statement identifies two factors to weigh in the substantial risk

17  determination: "the seriousness of the effect" and "the fact or probability of its occurrence."

18  1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V. The 1978 Policy provides that these

19  factors are weighed differently for different effects. If the effects are among the human health

20  effects identified in unit V(a) of the 1978 Policy Statement, the EPA views the effects as "so

21  serious that relatively little weight is given to exposure; the mere fact that the implicated

22  chemical is in commerce constitutes sufficient evidence of exposure." 1978 Policy Statement,

23  43 Fed. Reg. at 11111, Unit V. Accordingly, if the information concerns a "serious" health

24  effect identified in unit V(a) of the 1978 Policy Statement, the information constitutes substantial

25  risk information.

26      361.   The "serious" human health effects identified in unit V(a)(1) of the 1978 Policy

27  include "[a]ny instance of . . . serious or prolonged incapacitation, including the loss of or

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

73

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

inability to use a normal bodily function with a consequent relatively serious impairment of normal activities, if one (or a few) chemical(s) is strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1).  Respiratory sensitization, which can lead to occupational asthma and permanent lung damage, is such a "serious" human health effect.

362.    Accordingly, information about "[a]ny instance" of respiratory sensitization "must be reported" under TSCA Section 8(e) (unless otherwise exempted) "if one (or a few) chemical(s) is strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1). Indeed, the EPA's 1978 Policy Statement elsewhere reiterates that a single instance of such an effect is reportable:  "It is anticipated here that reportable effects will generally occur in a pattern, where a significant common feature is exposure to the chemical.  However, a single instance of . . . serious incapacitation in a human would be reportable if one (or a few) chemical(s) was strongly implicated."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2).

363.    The 1989 German Mine SRI, which concerned the human health effect of respiratory sensitization caused either by MDI skin contact or inordinately low-level MDI inhalation exposure, was therefore reportable substantial risk information.  The 1989 German Mine SRI involved effects that "occur[red] in a pattern, where a significant common feature [was] exposure to the chemical," here, exposure in an environment of "inordinately low" inhalation exposure to MDI, as established at least in some of the "situations" with air-monitoring data.  And, as the III's Scientific Committee viewed the 1989 German Mine SRI data as conclusive that these humans had "MDI respiratory sensitization"—in other words, respiratory sensitization caused by MDI exposure, "one . . . chemical[] is strongly implicated."  The 1989 German Mine SRI was reportable substantial risk information.

364.    The EPA's 1978 Policy Statement provides that information that is reportable under Section 8(e) may be obtained from sources other than designed, controlled studies. Indeed, in its 1978 Policy Statement, the EPA identifies the sources of information that "will often 'reasonably support' a conclusion of substantial risk." 1978 Policy Statement, 43 Fed.

Reg. at 11112, Unit VI.  These sources include "reports concerning and studies of undesigned, uncontrolled circumstances."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2).  Examples of "[r]eports and studies of undesigned circumstances include: (i) medical and health surveys, (ii) clinical studies, and (iii) *reports concerning and evidence of effects in consumers, workers, or the environment.*"  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2) (emphasis added).

365.    The defendants obtained the 1989 German Mine SRI from "reports concerning. . . undesigned, uncontrolled circumstances," including "reports concerning and evidence of effects in consumers, workers, or the environment."  The 1989 German Mine SRI therefore comprises information that is reportable under TSCA Section 8(e).

c.    **Each defendant separately obtained the 1989 German Mine SRI.**

366.    BASF, Dow, and Huntsman (through its predecessor-in-interest ICI Americas) had representatives present at this March 6-9, 1989 meeting of the III Scientific Committee.  K.S. Brenner represented BASF, Larry Rampy and C. Bastian represented Dow, and R.F. Hoffman represented ICI Americas.  Minutes of the March 6-9, 1989 III Scientific Committee meeting, Exh. 12 at III(Bice)007421.  By sending these representatives on their behalf to attend and participate in the meeting of the III's Scientific Committee, BASF, Dow, and Huntsman each indicated their confidence in their respective employees' capabilities to appreciate the significance of isocyanate safety and/or scientific information that they would obtain at the meeting.  Under TSCA, a "business organization is considered to have obtained any information which any officer or employee capable of appreciating the significance of that information has obtained."  1978 Policy Statement, 43 Fed. Reg. at 11111, Unit II.  Thus, BASF, Dow, and Huntsman each obtained the 1989 German Mine SRI as of March 9, 1989, the last day of the meeting.

367.    The minutes indicate that the III distributed copies to the "III Members Present" (which included defendants BASF, Dow, and Huntsman), to the "Members of the Executive," and to "Sub Committee Chairmen."  Exh. 12 at III(Bice)007421.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

368.   As of January 1989, Bayer's predecessor-in-interest, Mobay, chaired the III's Americas Region Transportation and Handling Subcommittee through its employee, William Niggel. III Organization Chart, January 1989, Exh. 10 at III(Bice)007025. As of June 1989, Mr. Niggel was still chairman of the sub-committee. Minutes of the June 6, 1989 meeting of the III's Americas Region Transportation and Handling Subcommittee, III(Bice)007672-007679 at 007679, Exh. 13. Indeed, Mr. Niggel had been elected to a two-year term as chairman of the subcommittee in June 1988, so his chairmanship of the sub-committee ran through June 1990. Minutes of the June 7, 1988 meeting of the III's Americas Region Transportation and Handling Subcommittee, III(Bice)007108-007113 at 7110, Exh. 14.

369.   Thus, on the dates of the March 6-9, 1989 III Scientific Committee meeting and in the four-month period following the meeting, Bayer's predecessor-in-interest Mobay chaired a III Sub-Committee through its employee William Niggel, to whom the minutes of this meeting were distributed. By appointing Mr. Niggel as its representative to chair the III's Americas Region Transportation and Handling Committee, Bayer's predecessor-in-interest Mobay indicated its confidence in Mr. Niggel's capability to appreciate the significance of isocyanate safety information that he would obtain as chairman of that sub-committee. Through Mr. Niggel, Bayer obtained the 1989 German Mine SRI when Mr. Niggel received a copy of these minutes. Although the minutes do not indicate when they were distributed, a conservative estimate of 60 days after the meeting would place Bayer as obtaining the 1989 German Mine SRI as of May 8, 1989.

        **d.**    **TSCA required that BASF, Dow, and Huntsman each report the 1989 German Mine SRI by March 30, 1989, and that Bayer report the information by May 30, 1989.**

370.   The EPA's 1978 Policy Statement provides that "a person has 'immediately informed' the Administrator if information is received by EPA not later than the 15th working day after the date the person obtained such information." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit IV.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

371.    As alleged more thoroughly above, BASF, Dow, and Huntsman each obtained the 1989 German Mine SRI on March 9, 1989, and TSCA required that BASF, Dow, and Huntsman each report the 1989 German Mine SRI to the EPA by March 30, 1989, the fifteenth working day after the date that BASF, Dow, and Huntsman each obtained the information.

372.    As alleged more thoroughly above, Bayer obtained the 1989 German Mine SRI by May 8, 1989, and TSCA required that Bayer report the 1989 German Mine SRI to the EPA by May 30, 1989, the fifteenth working day after the date that Bayer obtained the information.

   e.   **Each defendant was subject to TSCA's reporting requirement when it separately obtained the 1989 German Mine SRI.**

373.    At the time that it obtained the 1989 German Mine SRI, Bayer was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

374.    At the time that it obtained the 1989 German Mine SRI, BASF was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

375.    At the time that it obtained the 1989 German Mine SRI, Dow was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

376.    At the time that it obtained the 1989 German Mine SRI, Huntsman was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the

1    Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI

2    and PMDI, and which concerned TDI either directly or as a closely related chemical.

3              f.      **Each defendant failed to report the 1989 German Mine SRI, even**
                       **though TSCA did not exempt its reporting obligation.**

4

5         377.   BASF did not report the 1989 German Mine SRI to the EPA "immediately" after

6    obtaining it.

7         378.   BASF has never reported the 1989 German Mine SRI to the EPA.

8         379.   BASF did not have knowledge as of March 30, 1989 that some entity other than

9    BASF had submitted the 1989 German Mine SRI to the EPA.

10        380.   BASF has not acquired knowledge since March 30, 1989 that some entity other

11   than BASF has submitted the 1989 German Mine SRI to the EPA.

12        381.   BASF did not have actual knowledge as of March 30, 1989 that the EPA was

13   adequately informed of the 1989 German Mine SRI.

14        382.   BASF has not acquired actual knowledge since March 30, 1989 that the EPA has

15   become adequately informed of the 1989 German Mine SRI.

16        383.   Therefore, TSCA did not exempt BASF from its obligation to report the 1989

17   German Mine SRI.

18        384.   Bayer did not report the 1989 German Mine SRI to the EPA "immediately" after

19   obtaining it.

20        385.   Bayer has never reported the 1989 German Mine SRI to the EPA.

21        386.   Bayer did not have knowledge as of May 30, 1989 that some entity other than

22   Bayer had submitted the 1989 German Mine SRI to the EPA.

23        387.   Bayer has not acquired knowledge since May 30, 1989 that some entity other than

24   Bayer has submitted the 1989 German Mine SRI to the EPA.

25        388.   Bayer did not have actual knowledge as of May 30, 1989 that the EPA was

26   adequately informed of the 1989 German Mine SRI.

27

28

*Qui Tam* Complaint

1  389. Bayer has not acquired actual knowledge since May 30, 1989 that the EPA has

2 become adequately informed of the 1989 German Mine SRI.

3  390. Therefore, TSCA did not exempt Bayer from its obligation to report the 1989

4 German Mine SRI.

5  391. Dow did not report the 1989 German Mine SRI to the EPA "immediately" after

6 obtaining it.

7  392. Dow has never reported the 1989 German Mine SRI to the EPA.

8  393. Dow did not have knowledge as of March 30, 1989 that some entity other than

9 Dow had submitted the 1989 German Mine SRI to the EPA.

10  394. Dow has not acquired knowledge since March 30, 1989 that some entity other

11 than Dow has submitted the 1989 German Mine SRI to the EPA.

12  395. Dow did not have actual knowledge as of March 30, 1989 that the EPA was

13 adequately informed of the 1989 German Mine SRI.

14  396. Dow has not acquired actual knowledge since March 30, 1989 that the EPA has

15 become adequately informed of the 1989 German Mine SRI.

16  397. Therefore, TSCA did not exempt Dow from its obligation to report the 1989

17 German Mine SRI.

18  398. Huntsman did not report the 1989 German Mine SRI to the EPA "immediately"

19 after obtaining it.

20  399. Huntsman has never reported the 1989 German Mine SRI to the EPA.

21  400. Huntsman did not have knowledge as of March 30, 1989 that some entity other

22 than Huntsman had submitted the 1989 German Mine SRI to the EPA.

23  401. Huntsman has not acquired knowledge since March 30, 1989 that some entity

24 other than Huntsman has submitted the 1989 German Mine SRI to the EPA.

25  402. Huntsman did not have actual knowledge as of March 30, 1989 that the EPA was

26 adequately informed of the 1989 German Mine SRI.

27

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

403. Huntsman has not acquired actual knowledge since March 30, 1989 that the EPA has become adequately informed of the 1989 German Mine SRI.

404. Therefore, TSCA did not exempt Huntsman from its obligation to report the 1989 German Mine SRI.

g. **The EPA's guidance documents did not exempt any defendant's obligation to report the 1989 German Mine SRI.**

405. Although the EPA's guidance documents could be read to broaden TSCA's limited exemption, the EPA's guidance documents cannot alter the scope of the statutory exemption, and each defendant's separate reporting obligation is exempted only if it had "actual knowledge that the Administrator [of the EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

406. Regardless, however, the EPA's guidance documents did not exempt BASF, Bayer, Dow, or Huntsman from the obligation to report the 1989 German Mine SRI.

407. As of both March 30, 1989, the latest date by which TSCA required BASF, Dow, and Huntsman to report the 1989 German Mine SRI, and May 30, 1989, the latest date by which TSCA required Bayer to report the information, the EPA's 1978 Policy Statement provided that substantial risk information was exempted from reporting if the information: "(a) Has been published by EPA in reports; (b) Has been submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA . . .; (c) Has been published in the scientific literature and referenced [by one of several listed abstract services]; (d) Is corroborative of well-established adverse effects already documented in the scientific literature and referenced [by one of the abstract services listed in (c) above]; or (e) [Is contained in an environmental notification of spills]." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VII(a) through (e).

408. As of May 30, 1989, the 1989 German Mine SRI had not been "published by EPA in reports."

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

409.    As of May 30, 1989, the 1989 German Mine SRI had not been "submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA."

410.    As of May 30, 1989, the 1989 German Mine SRI had not been "published in the scientific literature and referenced [by one of several listed abstract services]."

411.    As of May 30, 1989, the 1989 German Mine SRI was not "corroborative of well-established adverse effects already documented in the scientific literature and referenced [by one of the abstract services listed in (c) above]." To the contrary, each defendant has publicly contended that the scant publicly-available information that suggests that the possibility for isocyanate skin contact to cause respiratory sensitization is anecdotal, inconclusive, and unreliable. For example, in a May 2002 III paper entitled "Respiratory sensitization: the role of dermal contact with MDI and TDI," defendants and other III member companies discussed the animal and human data relevant to the potential link between skin contact with MDI and respiratory sensitization. Exh. 2, at CHARM 012422–012446. The defendants neither published nor otherwise discussed in that paper the 1989 German Mine SRI, even though that substantial risk information is relevant to the link between human isocyanate skin contact and respiratory sensitization. Moreover, the defendants concluded their May 2002 paper by contending that the link between respiratory sensitization and MDI skin contact was not well-established and that the "available" human data was insufficient to establish the link: "The available data do not provide sufficient evidence for a clear correlation between skin exposure and occupational asthma." *Id.* at CHARM 12442, Exh. 2. Each defendant was a co-author of that 2002 III paper. *Id.* at CHARM 12425, Exh. 2.

412.    None of the defendants can contend that the 1989 German Mine SRI was "corroborative of well-established adverse effects already documented in the scientific literature," because they contended afterwards, in May 2002, that "[t]he available data do not provide sufficient evidence for a clear correlation between skin exposure and occupational asthma." *Id.* at CHARM 12442, Exh. 2.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

413.    Defendants have also publicly disputed the possibility that low-level inhalation could cause respiratory sensitization.  For example, in October 1993 the defendants, through the Diisocyanates Panel of the CMA (now the ACC), submitted comments to the EPA regarding its risk management process for diisocyanates.  The defendants told the EPA that the proposition that "pulmonary function decrement and sensitization can occur at very low concentrations" was "not supported by available data."  *Comments of the Chemical Manufacturers Association Diisocyanate Panel on the RM1 Briefing Document for Diisocyanates*, October 12, 1993, at BAY010037, Exh. 4.  Each defendant or its predecessor-in-interest was a member of the CMA's Diisocyanates Panel, which submitted these comments.  *Id.* at BAY010041, n.1, Exh. 4.

414.    None of the defendants can contend that the 1989 German Mine SRI was "corroborative of well-established adverse effects already documented in the scientific literature," because they contended afterwards, in October 1993, that the proposition that "pulmonary function decrement and sensitization can occur at very low concentrations" was "not supported by available data."  *Id.* at BAY010037, Exh. 4.

**7.    In or shortly after March 1989, each defendant had separately obtained the "1989 Nakata Papers SRI," which comprised substantial risk information about MDI skin contact or low-level inhalation exposure.**

**a.    Each defendant separately obtained the information in or shortly after March 1989.**

415.    In or shortly after March 1989, each defendant obtained substantial risk information about respiratory sensitization in humans caused by skin contact with MDI.  The minutes of the III Scientific Committee's March 6-9, 1989 meeting memorialize a discussion at the meeting under the heading "Respiratory Effects from Dermal Contact with Polymeric MDI (Karol)."  III(Bice)007421-007468 at III(Bice)007436 (emphasis in original), Exh. 12.  In the context of the attendees' discussion of the German Mine SRI, which comprised information about multiple "situations" of "MDI respiratory sensitization" caused by MDI skin contact or low-level inhalation exposure, and Dr. Meryl Karol's proposal "to investigate the effect of

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

polymeric MDI in guinea pigs, by intradermal application," the attendees noted the III's receipt

of several related studies:

> Nakata submitted to the Scientific Office several papers relating to sensitization
> following MDI contact.  He saw pressure moving from TDI exposure situations to
> those involving MDI.  Both Karol and Newman Taylor indicated that the
> incidence of MDI sensitization is now much higher than that of TDI.

Exh. 12 at III(Bice)007436.

416.   Mr. Nakata, who submitted the papers to the III's Scientific Office, is M. Nakata

of SBU (Sumitomo Bayer Urethane). *Id.*, Exh. 12 at III(Bice)007421.  Sumitomo Bayer

Urethane was a III member company and held a seat on the III's Board of Directors in 1989.

1989 III Organizational Chart, Exh. 10 at III(Bice)007026.

**b.    The 1989 Nakata Papers SRI was "substantial risk information."**

417.   This information, the "1989 Nakata Papers SRI," comprised "several" papers

about "sensitization following MDI contact."  None of the defendants (nor any other entity)

reported the 1989 Nakata Papers SRI to the EPA, and BASF, Bayer, and Dow each failed to

produce the 1989 Nakata Papers SRI during the *Bice* litigation, despite the *Bice* plaintiffs'

requests for such information.  Thus, the defendants have prevented KBT&F and the U.S.

government, including the EPA, from examining the information.  Nonetheless, the minutes

establish several important facts about the information.

418.   First, the context of the discussion indicates that the "several" papers that

comprise the 1989 Nakata Papers SRI addressed *respiratory* sensitization.  The minutes' topical

header for this portion of the meeting, "Respiratory Effects from Dermal Contact with Polymeric

MDI (Karol)," establish that Mr. Nakata's discussion of these papers occurred in the context of

the attendees' discussion "respiratory effects."  Exh. 12, at III(Bice)007436 (emphasis in

original).  Mr. Nakata discussed the papers after the attendees had discussed the 1989 German

Mine SRI, which involved respiratory sensitization, and Dr. Karol's proposal for animal studies

to further investigate respiratory sensitization.  This context strongly urges the conclusion that

the 1989 Nakata Papers SRI also addressed respiratory sensitization, the topic under discussion when Mr. Nakata submitted, or discussed his submission of, the papers.

419.     Second, the context of the discussion indicates that the 1989 Nakata Papers SRI addressed *human* respiratory sensitization.  When he submitted the papers, Mr. Nakata indicated that he "saw pressure moving from TDI exposure situations to those involving MDI," a clear reference to human exposure situations.  Human work environments, not animal studies, involve "exposure situations," such as the human work "situations" that were the subject of the 1989 German Mine SRI the attendees had just discussed.  Exh. 12, at III(Bice)007436.

420.     Further, the attendees noted information from isocyanate researchers Dr. Meryl Karol and Anthony J. Newman-Taylor that "the incidence of MDI sensitization is now much higher than that of TDI," another clear reference to human respiratory sensitization.  Reading the paragraph cohesively, this noted increase in the human MDI respiratory sensitization rate logically serves as the impetus for the "pressure" that is moving from TDI to MDI exposure situations.

421.     Third, the context also indicates that the 1989 Nakata Papers SRI addressed human respiratory sensitization associated with MDI *skin* contact.  The minutes' topical header for this portion of the meeting, "<u>Respiratory Effects from Dermal Contact with Polymeric MDI (Karol)</u>," establish that Mr. Nakata's discussion of these papers occurred in the context of the attendees' discussion of the "dermal contact" exposure route as a cause of respiratory effects.  Exh. 12, at III(Bice)007436 (emphasis in original).  Further, when describing the MDI respiratory sensitization "situations" involved in the 1989 German Mines SRI, the minutes distinguish between the exposure routes: "from inordinately low levels of airborne MDI or from skin contact." *Id.*, Exh. 12.  In both instances, "contact" exposure meant skin exposure.  Logically, then, the minutes' indication that the papers related to "sensitization following MDI *contact*" meant sensitization following MDI *skin* contact.

422.     Fourth, the 1989 Nakata Papers SRI comprised "several papers," with "papers" indicating a written analysis of underlying data.  This underlying data involved both medical data

(a determination of human MDI respiratory sensitization) and industrial hygiene data (information that the subjects were exposed by skin contact).

423.   Finally, the papers analyzed causation—"sensitization *following* MDI contact." Exh. 12 at III(Bice)007436.  The syntax strongly suggests a positive causation finding, and excludes a negative causation finding.  Indeed, in the context of the surrounding discussion, the absence of a negative causation statement in the minutes constitutes strong evidence that the findings were positive.  The III's Scientific Committee had just discussed multiple cases, including in a well-monitored work environment, where "MDI respiratory sensitization appears to have resulted either from inordinately low levels of airborne MDI or from skin contact." *Id.*, Exh. 12 at III(Bice)007436.  Logic indicates that Mr. Nakata would have emphasized any contrary negative findings in the papers he submitted, especially as the committee discussed whether to fund animal studies to investigate the dermal induction route. *Id.*  Yet the minutes establish that the attendees characterized causation as likely ("appears to have resulted from") in the multiple cases that comprised the 1989 German Mineworkers SRI, and contain no suggestion that the attendees viewed the 1989 Nakata Papers SRI to contain contrary information. *Id.*

424.   The minutes therefore establish that the 1989 Nakata Papers SRI comprised several papers that analyzed medical and industrial hygiene data and determined, based on that analysis, an apparent causal relationship between documented MDI skin contact and confirmed human cases of MDI respiratory sensitization.

425.   TSCA defines substantial risk information as "information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." 15 U.S.C. § 2607(e).  The 1978 Policy Statement provides that "'reasonably supports the conclusion' of substantial risk is not identical to a conclusive demonstration of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11110, Supplementary Information, ¶ (3).  The 1978 Policy Statement further provides that "[a] person is not to delay reporting until he obtains conclusive information that a substantial risk exists, but is to immediately report any evidence which 'reasonably supports' that conclusion.  Such

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    evidence will generally not be conclusive as to the substantiality of the risk; it should, however,

2    reliably ascribe the effect to the chemical." 1978 Policy Statement at 11112, Unit VI.

3        426.    As established above, the 1989 Nakata Papers SRI "reliably ascribe[d] the effect

4    to the chemical," and was therefore reportable substantial risk information. The minutes

5    establish that the 1989 Nakata Papers were several papers that analyzed medical and industrial

6    hygiene data and determined, based on that analysis, an apparent causal relationship between

7    documented MDI skin contact and confirmed human cases of MDI respiratory sensitization.

8        427.    The 1989 Nakata Papers SRI not only "reliably ascribe[d] the effect to the

9    chemical [PMDI and MDI]," but it also characterized the effect in terms of MDI skin contact,

10   which was not known by the EPA to cause respiratory sensitization. The 1989 Nakata Papers

11   SRI was therefore reportable substantial risk information.

12       428.    The 1978 Policy Statement identifies two factors to weigh in the substantial risk

13   determination: "the seriousness of the effect" and "the fact or probability of its occurrence."

14   1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V. The 1978 Policy provides that these

15   factors are weighed differently for different effects. If the effects are among the human health

16   effects identified in unit V(a) of the 1978 Policy Statement, the EPA views the effects as "so

17   serious that relatively little weight is given to exposure; the mere fact that the implicated

18   chemical is in commerce constitutes sufficient evidence of exposure." 1978 Policy Statement,

19   43 Fed. Reg. at 11111, Unit V. Accordingly, if the information concerns a "serious" health

20   effect identified in unit V(a) of the 1978 Policy Statement, the information constitutes substantial

21   risk information.

22       429.    The "serious" human health effects identified in unit V(a)(1) of the 1978 Policy

23   include "[a]ny instance of . . . serious or prolonged incapacitation, including the loss of or

24   inability to use a normal bodily function with a consequent relatively serious impairment of

25   normal activities, if one (or a few) chemical(s) is strongly implicated." 1978 Policy Statement,

26   43 Fed. Reg. at 11112, Unit V(a)(1). Respiratory sensitization, which can lead to occupational

27   asthma and permanent lung damage, is such a "serious" human health effect.

28

430.   Accordingly, information about "[a]ny instance" of respiratory sensitization "must be reported" under TSCA Section 8(e) (unless otherwise exempted) "if one (or a few) chemical(s) is strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1). Indeed, the EPA's 1978 Policy Statement elsewhere reiterates that a single instance of such an effect is reportable: "It is anticipated here that reportable effects will generally occur in a pattern, where a significant common feature is exposure to the chemical. However, a single instance of . . . serious incapacitation in a human would be reportable if one (or a few) chemical(s) was strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2).

431.   The 1989 Nakata Papers SRI, which concerned the human health effect of respiratory sensitization caused by MDI skin contact was therefore reportable substantial risk information. The 1989 Nakata Papers SRI involved effects that "occur[red] in a pattern, where a significant common feature [was] exposure to the chemical," here, exposure through skin contact. And, as the III's Scientific Committee viewed the 1989 Nakata Papers SRI data as conclusive that these humans had "MDI respiratory sensitization"—in other words, respiratory sensitization caused by MDI exposure, "one . . . chemical[] is strongly implicated." The 1989 Nakata Papers SRI was reportable substantial risk information.

432.   The EPA's 1978 Policy Statement provides that information that is reportable under Section 8(e) may be obtained from sources other than designed, controlled studies, although designed, controlled studies must be reported. 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(1). Indeed, in its 1978 Policy Statement, the EPA identifies the sources of information that "will often 'reasonably support' a conclusion of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI. These sources include "reports concerning and studies of undesigned, uncontrolled circumstances." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2). Examples of "[r]eports and studies of undesigned circumstances include: (i) medical and health surveys, (ii) clinical studies, and (iii) *reports concerning and evidence of*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

*effects in consumers, workers, or the environment."* 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2) (emphasis added).

433.    The 1989 Nakata Papers SRI may constitute reports of designed, controlled studies. At a minimum, however, the defendants obtained the 1989 Nakata Papers SRI from "reports concerning. . . undesigned, uncontrolled circumstances," including "reports concerning and evidence of effects in consumers, workers, or the environment." The 1989 Nakata Papers SRI therefore comprises information that is reportable under TSCA Section 8(e).

### c.    **Each defendant separately obtained the 1989 Nakata Papers SRI.**

434.    BASF, Dow, and Huntsman (through its predecessor-in-interest ICI Americas) had representatives present at this March 6-9, 1989 meeting of the III Scientific Committee. K.S. Brenner represented BASF, Larry Rampy and C. Bastian represented Dow, and R.F. Hoffman represented ICI Americas. Minutes of the March 6-9, 1989 III Scientific Committee meeting, Exh. 12 at III(Bice)007421. By sending these representatives on their behalf to attend and participate in the meeting of the III's Scientific Committee, BASF, Dow, and Huntsman each indicated their confidence in their respective employees' capabilities to appreciate the significance of isocyanate safety and/or scientific information that they would obtain at the meeting. Under TSCA, a "business organization is considered to have obtained any information which any officer or employee capable of appreciating the significance of that information has obtained." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit II. Thus, BASF, Dow, and Huntsman each obtained the 1989 Nakata Papers SRI as of March 9, 1989, the last day of the meeting.

435.    The minutes indicate that the III distributed copies to the "III Members Present" (which included defendants BASF, Dow, and Huntsman), to the "Members of the Executive," and to "Sub Committee Chairmen." Exh. 12 at III(Bice)007421.

436.    As of January 1989, Bayer's predecessor-in-interest, Mobay, chaired the III's Americas Region Transportation and Handling Subcommittee through its employee, William Niggel. III Organization Chart, January 1989, Exh. 10 at III(Bice)007025. As of June 1989, Mr.

Niggel was still chairman of the sub-committee. Minutes of the June 6, 1989 meeting of the III's Americas Region Transportation and Handling Subcommittee, III(Bice)007672-007679 at 007679, Exh. 13. Indeed, Mr. Niggel had been elected to a two-year term as chairman of the subcommittee in June 1988, so his chairmanship of the sub-committee ran through June 1990. Minutes of the June 7, 1988 meeting of the III's Americas Region Transportation and Handling Subcommittee, III(Bice)007108-007113 at 7110, Exh. 14. Thus, on the dates of the March 6-9, 1989 III Scientific Committee meeting and in the four-month period following the meeting, Bayer's predecessor-in-interest Mobay chaired a III Sub-Committee through its employee William Niggel, to whom the minutes of this meeting were distributed. By appointing Mr. Niggel as its representative to chair the III's Americas Region Transportation and Handling Committee, Bayer's predecessor-in-interest Mobay indicated its confidence in Mr. Niggel's capability to appreciate the significance of isocyanate safety information that he would obtain as chairman of that sub-committee. Through Mr. Niggel, Bayer obtained the 1989 Nakata Papers SRI when Mr. Niggel received a copy of these minutes. Although the minutes do not indicate when they were distributed, a conservative estimate of 60 days after the meeting would place Bayer as obtaining the 1989 Nakata Papers SRI as of May 8, 1989.

> **d.    TSCA required that BASF, Dow, and Huntsman each report the 1989 Nakata Papers SRI by March 30, 1989, and that Bayer report the information by May 30, 1989.**

437.    The EPA's 1978 Policy Statement provides that "a person has 'immediately informed' the Administrator if information is received by EPA not later than the 15th working day after the date the person obtained such information." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit IV.

438.    As alleged more thoroughly above, BASF, Dow, and Huntsman each obtained the 1989 Nakata Papers SRI on March 9, 1989, and TSCA required that BASF, Dow, and Huntsman each report the 1989 Nakata Papers SRI to the EPA by March 30, 1989, the fifteenth working day after the date that BASF, Dow, and Huntsman each obtained the information.

439.   As alleged more thoroughly above, Bayer obtained the 1989 Nakata Papers SRI by May 8, 1989, and TSCA required that Bayer report the 1989 Nakata Papers SRI to the EPA by May 30, 1989, the fifteenth working day after the date that Bayer obtained the information.

**e.   Each defendant was subject to TSCA's reporting requirement when it separately obtained the 1989 Nakata Papers SRI.**

440.   At the time that it obtained the 1989 Nakata Papers SRI, Bayer was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

441.   At the time that it obtained the 1989 Nakata Papers SRI, BASF was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

442.   At the time that it obtained the 1989 Nakata Papers SRI, Dow was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

443.   At the time that it obtained the 1989 Nakata Papers SRI, Huntsman was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

f.   **Each defendant failed to report the 1989 Nakata Papers SRI, even though TSCA did not exempt its reporting obligation.**

444.   BASF did not report the 1989 Nakata Papers SRI to the EPA "immediately" after obtaining it.

445.   BASF has never reported the 1989 Nakata Papers SRI to the EPA.

446.   BASF did not have knowledge as of March 30, 1989 that some entity other than BASF had submitted the 1989 Nakata Papers SRI to the EPA.

447.   BASF has not acquired knowledge since March 30, 1989 that some entity other than BASF has submitted the 1989 Nakata Papers SRI to the EPA.

448.   BASF did not have actual knowledge as of March 30, 1989 that the EPA was adequately informed of the 1989 Nakata Papers SRI.

449.   BASF has not acquired actual knowledge since March 30, 1989 that the EPA has become adequately informed of the 1989 Nakata Papers SRI.

450.   Therefore, TSCA did not exempt BASF from its obligation to report the 1989 Nakata Papers SRI.

451.   Bayer did not report the 1989 Nakata Papers SRI to the EPA "immediately" after obtaining it.

452.   Bayer has never reported the 1989 Nakata Papers SRI to the EPA.

453.   Bayer did not have knowledge as of May 30, 1989 that some entity other than Bayer had submitted the 1989 Nakata Papers SRI to the EPA.

454.   Bayer has not acquired knowledge since May 30, 1989 that some entity other than Bayer has submitted the 1989 Nakata Papers SRI to the EPA.

455.   Bayer did not have actual knowledge as of May 30, 1989 that the EPA was adequately informed of the 1989 Nakata Papers SRI.

456.   Bayer has not acquired actual knowledge since May 30, 1989 that the EPA has become adequately informed of the 1989 Nakata Papers SRI.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

457.   Therefore, TSCA did not exempt Bayer from its obligation to report the 1989 Nakata Papers SRI.

458.   Dow did not report the 1989 Nakata Papers SRI to the EPA "immediately" after obtaining it.

459.   Dow has never reported the 1989 Nakata Papers SRI to the EPA.

460.   Dow did not have knowledge as of March 30, 1989 that some entity other than Dow had submitted the 1989 Nakata Papers SRI to the EPA.

461.   Dow has not acquired knowledge since March 30, 1989 that some entity other than Dow has submitted the 1989 Nakata Papers SRI to the EPA.

462.   Dow did not have actual knowledge as of March 30, 1989 that the EPA was adequately informed of the 1989 Nakata Papers SRI.

463.   Dow has not acquired actual knowledge since March 30, 1989 that the EPA has become adequately informed of the 1989 Nakata Papers SRI.

464.   Therefore, TSCA did not exempt Dow from its obligation to report the 1989 Nakata Papers SRI.

465.   Huntsman did not report the 1989 Nakata Papers SRI to the EPA "immediately" after obtaining it.

466.   Huntsman has never reported the 1989 Nakata Papers SRI to the EPA.

467.   Huntsman did not have knowledge as of March 30, 1989 that some entity other than Huntsman had submitted the 1989 Nakata Papers SRI to the EPA.

468.   Huntsman has not acquired knowledge since March 30, 1989 that some entity other than Huntsman has submitted the 1989 Nakata Papers SRI to the EPA.

469.   Huntsman did not have actual knowledge as of March 30, 1989 that the EPA was adequately informed of the 1989 Nakata Papers SRI.

470.   Huntsman has not acquired actual knowledge since March 30, 1989 that the EPA has become adequately informed of the 1989 Nakata Papers SRI.

471.   Therefore, TSCA did not exempt Huntsman from its obligation to report the 1989 Nakata Papers SRI.

g.   **The EPA's guidance documents did not exempt any defendant's obligation to report the 1989 Nakata Papers SRI.**

472.   Although the EPA's guidance documents could be read to broaden TSCA's limited exemption, the EPA's guidance documents cannot alter the scope of the statutory exemption, and each defendant's separate reporting obligation is exempted only if it had "actual knowledge that the Administrator [of the EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

473.   Regardless, however, the EPA's guidance documents did not exempt BASF, Bayer, Dow, or Huntsman from the obligation to report the 1989 Nakata Papers SRI.

474.   As of both March 30, 1989, the latest date by which TSCA required BASF, Dow, and Huntsman to report the 1989 Nakata Papers SRI, and May 30, 1989, the latest date by which TSCA required Bayer to report the information, the EPA's 1978 Policy Statement provided that substantial risk information was exempted from reporting if the information: "(a) Has been published by EPA in reports; (b) Has been submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA . . .; (c) Has been published in the scientific literature and referenced [by one of several listed abstract services]; (d) Is corroborative of well-established adverse effects already documented in the scientific literature and referenced [by one of the abstract services listed in (c) above]; or (e) [Is contained in an environmental notification of spills]." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VII(a) through (e).

475.   As of May 30, 1989, the 1989 Nakata Papers SRI had not been "published by EPA in reports."

476.   As of May 30, 1989, the 1989 Nakata Papers SRI had not been "submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA."

477.    As of May 30, 1989, the 1989 Nakata Papers SRI had not been "published in the scientific literature and referenced [by one of several listed abstract services]."

478.    As of May 30, 1989, the 1989 Nakata Papers SRI was not "corroborative of well-established adverse effects already documented in the scientific literature and referenced [by one of the abstract services listed in (c) above]." To the contrary, each defendant has publicly contended that the scant publicly-available information that suggests that the possibility for isocyanate skin contact to cause respiratory sensitization is anecdotal, inconclusive, and unreliable. For example, in a May 2002 III paper entitled "Respiratory sensitization: the role of dermal contact with MDI and TDI," defendants and other III member companies discussed the animal and human data relevant to the potential link between skin contact with MDI and respiratory sensitization. Exh. 2, at CHARM 012422–012446. The defendants neither published nor otherwise discussed in that paper the 1989 Nakata Papers SRI, even though that substantial risk information is relevant to the link between human isocyanate skin contact and respiratory sensitization. Moreover, the defendants concluded their May 2002 paper by contending that the link between respiratory sensitization and MDI skin contact was _not_ well-established and that the "available" human data was insufficient to establish the link: "The available data do not provide sufficient evidence for a clear correlation between skin exposure and occupational asthma." _Id._ at CHARM 12442, Exh. 2. Each defendant was a co-author of that 2002 III paper. _Id._ at CHARM 12425, Exh. 2.

479.    None of the defendants can contend that the 1989 Nakata Papers SRI was "corroborative of well-established adverse effects already documented in the scientific literature," because they contended afterwards, in May 2002, that "[t]he available data do not provide sufficient evidence for a clear correlation between skin exposure and occupational asthma." _Id._ at CHARM 12442, Exh. 2.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

8.    **In or shortly after January 1992, each defendant obtained the "1992 Human Cases SRI," which comprised substantial risk information about MDI skin contact.**

a.    **Each defendant separately obtained the information in or shortly after January 1992.**

480.   In or shortly after January 1992, BASF, Bayer, Dow, and Huntsman each obtained substantial risk information about respiratory sensitization in humans caused by skin contact with MDI. The minutes of the III European Med-Tox (EU-MTX) Sub-Committee's January 16, 1992 meeting memorialize a discussion at the meeting under the general heading "SENSITISATION AND ASTHMA." III(Bice)009470-009485 at 009472, Item 5.0 (emphasis in original), Exh. 15. Under the sub-heading "5.1 Project E-AB-82 – Animal Model for MDI (Kimber)," the minutes indicate that "Members cited cases where dermal contact was *the likely source* of human sensitisation to MDI, supporting the conclusion of the animal model." *Id.*, Exh. 15 at III(Bice)009472, Item 5.1 (emphasis added).

481.   This information, the "1992 Human Cases SRI," comprised human cases of respiratory sensitization to MDI, where the member companies analyzed the data and concluded that skin contact with MDI was "the likely source" of the sensitization.

b.    **The 1992 Human Cases SRI was "substantial risk information."**

482.   The context establishes that the 1992 Human Cases SRI involved the dermal induction of human *respiratory* sensitization. The attendees discussed these human cases in the context of III Project E-AB-82. *Id.*, Exh. 15 at III(Bice)009472, Item 5.1. That project, led by Dr. Ian Kimber of ICI Central Toxicology Laboratory in the United Kingdom, investigated the potential for dermal MDI exposure to induce respiratory hypersensitivity in guinea pigs. June 11, 1992 letter from III Managing Director R.K. Rigger to TSCA Section 8(e) Coordinator at United States EPA, Bice/Dow12306, Exh. 16. As the III reported to the EPA in June 1992, that study indicated "that respiratory hypersensitivity in guinea pigs may result from dermal exposure to MDI." *Id.*, Exh. 16. The minutes of the January 16, 1992 minutes indicate that the human cases that the members cited, in which "dermal conduct was the likely source of human

1  sensitisation to MDI," "support[ed] the conclusion of the animal model." January 16, 1992

2  Minutes of EU-MTX Sub-Committee Meeting, Exh.15 at III(Bice)009472. Since the

3  "conclusion of the animal model" was that dermal contact could cause respiratory

4  hypersensitivity, the human sensitization which dermal contact had induced was necessarily

5  *respiratory* sensitization.

6      483.   The 1992 Human Cases SRI comprised multiple "cases," plural, in which "dermal

7  contact [with MDI] was the likely source" of human respiratory sensitization. Moreover, the

8  minutes indicate that "Members," plural, cited these multiple cases. That multiple members

9  cited to multiple cases suggests that these various cases arose in multiple situations.

10     484.   Importantly, the III members at the meeting expressed a high degree of

11  confidence that MDI skin contact had caused the respiratory sensitization sustained by the

12  multiple subjects: "dermal contact *was the likely source* of human sensitisation to MDI." *Id.*,

13  Exh. 15 at III(Bice)009472 (emphasis added). This confidence indicates that the III members

14  had analyzed the underlying data concerning these cases, or had reviewed (and agreed with)

15  analysis conducted by someone else. This underlying data involved both medical data (a

16  determination of human MDI respiratory sensitization) and industrial hygiene data (information

17  that the subjects were exposed by skin contact).

18     485.   The minutes therefore establish that the 1992 Human Cases SRI comprised

19  underlying medical and industrial hygiene data from which various III member companies had

20  concluded a "likely" causal relationship between documented MDI skin contact and confirmed

21  human cases of MDI respiratory sensitization.

22     486.   TSCA defines substantial risk information as "information which reasonably

23  supports the conclusion that such substance or mixture presents a substantial risk of injury to

24  health or the environment." 15 U.S.C. § 2607(e). The 1978 Policy Statement provides that

25  "'reasonably supports the conclusion' of substantial risk is not identical to a conclusive

26  demonstration of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11110,

27  Supplementary Information, ¶ (3). The 1978 Policy Statement further provides that "[a] person

28

*Qui Tam* Complaint

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

is not to delay reporting until he obtains conclusive information that a substantial risk exists, but is to immediately report any evidence which 'reasonably supports' that conclusion.  Such evidence will generally not be conclusive as to the substantiality of the risk; it should, however, reliably ascribe the effect to the chemical." 1978 Policy Statement at 11112, Unit VI.

487.     In its June 1991 Reporting Guide, the EPA reaffirmed the 1978 policy, providing that "such information need not and most typically does not establish conclusively that a substantial risk exists." 1991 Reporting Guide at 2.  The 1991 Reporting Guide provides that the "decision-making process for Section 8(e)-reportability should focus primarily on whether the toxicity or exposure information offers reasonable support for a conclusion of substantial risk under the criteria described above, but should not focus at all on whether the information is conclusive regarding the risk." 1991 Reporting Guide at 2.  Further, the 1991 Reporting Guide directs that "[t]he evidence that offers reasonable support for a conclusion of substantial risk need not be complete or definitive but should provide a plausible link between 1) an observed serious effect and one or few chemicals (e.g., in a discrete process/operation), or 2) a specific product/activity and a previously unrecognized exposure to a chemical that is known or reasonably anticipated to cause serious adverse health or environmental effects." 1991 Reporting Guide at 7.

488.     As established above, the 1992 Human Cases SRI "reliably ascribe[d] the effect to the chemical," and was therefore reportable substantial risk information.  1978 Policy Statement at 11112, Unit VI.  The minutes establish that the 1992 Human Cases SRI comprised underlying medical and industrial hygiene data from which various III member companies had concluded a "likely" causal relationship between documented MDI skin contact and confirmed human cases of MDI respiratory sensitization.

489.     The 1992 Human Cases SRI not only "reliably ascribe[d] the effect to the chemical [PMDI and MDI]," but it also characterized the effect in terms of MDI skin contact, which was not known by the EPA to cause respiratory sensitization in humans.  Thus, the information "provide[d] a plausible link between . . . 2) a specific product/activity [here, MDI

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

and/or MDI skin contact] and a previously *unrecognized exposure* to a chemical [here, human skin contact] that is known or reasonably anticipated to cause serious adverse health or environmental effects." 1991 Reporting Guide at 7 (emphasis added). The 1992 Human Cases SRI was therefore reportable substantial risk information under the 1991 Reporting Guide.

490. Indeed, each defendant expressly demonstrated its recognition that such information constitutes reportable substantial risk information. As referenced briefly above, on June 11, 1992, each defendant, through the III, reported to the EPA's TSCA Section 8(e) Coordinator the then-unpublished results of Dr. Ian Kimber's study of the dermal induction of respiratory hypersensitivity in guinea pigs. Exh. 16, Bice/Dow12306. According to the III's June 11, 1992 TSCA Section 8(e) submission, the animal data "indicate that respiratory hypersensitivity in guinea pigs *may result* from dermal exposure to MDI." *Id.* (emphasis added). Yet during the six months prior to this submission, these defendants failed to report information about *human* cases in which certain III member companies had determined that "dermal contact *was the likely source* of human sensitisation to MDI." January 16, 1992 EU-MTX meeting minutes, Exh. 15 at III(Bice)009472 (emphasis added). Since the defendants correctly recognized the reportability of information that they claimed indicated the *possible* dermal induction of respiratory hypersensitivity in *animals*, they necessarily recognized the reportability of information that indicated the "*likely*" dermal induction of respiratory sensitization in *humans*.

491. Further, the III member companies that had analyzed the 1992 Human Cases SRI had concluded that it "support[ed] the conclusion of the animal model." *Id.*, Exh. 15 at III(Bice)009472. Remarkably, the defendants reported to the EPA "the conclusion of the animal model," but then failed (or rather refused) to report the more certain human data that certain III member companies had determined "support[ed]" the very animal model they reported.

492. In other words, the defendants knowingly concealed the existence of the 1992 Human Cases SRI from the EPA.

493. The 1978 Policy Statement identifies two factors to weigh in the substantial risk determination: "the seriousness of the effect" and "the fact or probability of its occurrence."

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V.  The 1978 Policy provides that these

2  factors are weighed differently for different effects.  If the effects are among the human health

3  effects identified in unit V(a) of the 1978 Policy Statement, the EPA views the effects as "so

4  serious that relatively little weight is given to exposure; the mere fact that the implicated

5  chemical is in commerce constitutes sufficient evidence of exposure."  1978 Policy Statement,

6  43 Fed. Reg. at 11111, Unit V.  Accordingly, if the information concerns a "serious" health

7  effect identified in unit V(a) of the 1978 Policy Statement, the information constitutes substantial

8  risk information.

9          494.    The "serious" human health effects identified in unit V(a)(1) of the 1978 Policy

10  include "[a]ny instance of . . . serious or prolonged incapacitation, including the loss of or

11  inability to use a normal bodily function with a consequent relatively serious impairment of

12  normal activities, if one (or a few) chemical(s) is strongly implicated."  1978 Policy Statement,

13  43 Fed. Reg. at 11112, Unit V(a)(1).  Respiratory sensitization, which can lead to occupational

14  asthma and permanent lung damage, is such a "serious" human health effect.

15          495.    Accordingly, information about "[a]ny instance" of respiratory sensitization

16  "must be reported" under TSCA Section 8(e) (unless otherwise exempted) "if one (or a few)

17  chemical(s) is strongly implicated."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1).

18  Indeed, the EPA's 1978 Policy Statement elsewhere reiterates that a single instance of such an

19  effect is reportable: "It is anticipated here that reportable effects will generally occur in a

20  pattern, where a significant common feature is exposure to the chemical.  However, a single

21  instance of . . . serious incapacitation in a human would be reportable if one (or a few)

22  chemical(s) was strongly implicated."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit

23  VI(2).

24          496.    The 1992 Human Cases SRI, which concerned the human health effect of

25  respiratory sensitization caused by MDI skin contact was therefore reportable substantial risk

26  information.  The 19992 Human Cases SRI involved effects that "occur[ed] in a pattern, where a

27  significant common feature [was] exposure to the chemical," here, exposure through skin

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

contact.  And, as the III's European Med-Tox Sub-Committee viewed the 1992 Human Cases SRI data as conclusive that these humans had MDI respiratory sensitization—in other words, respiratory sensitization caused by MDI exposure, "one . . . chemical[] is strongly implicated." The 1992 Human Cases SRI was reportable substantial risk information.

497.    The EPA's 1978 Policy Statement provides that information that is reportable under Section 8(e) may be obtained from sources other than designed, controlled studies, although designed, controlled studies must be reported.  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(1).  Indeed, in its 1978 Policy Statement, the EPA identifies the sources of information that "will often 'reasonably support' a conclusion of substantial risk."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI.  These sources include "reports concerning and studies of undesigned, uncontrolled circumstances."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2).  Examples of "[r]eports and studies of undesigned circumstances include: (i) medical and health surveys, (ii) clinical studies, and (iii) *reports concerning and evidence of effects in consumers, workers, or the environment.*"  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2) (emphasis added).

498.    The 1992 Human Cases SRI may constitute reports of designed, controlled studies.  At a minimum, however, the defendants obtained the 1992 Human Cases SRI from "reports concerning. . . undesigned, uncontrolled circumstances," including "reports concerning and evidence of effects in consumers, workers, or the environment."  The 1992 Human Cases SRI therefore comprises information that is reportable under TSCA Section 8(e).

     c.    **Each defendant separately obtained the 1992 Human Cases SRI.**

499.    Under TSCA, a "business organization is considered to have obtained any information which any officer or employee capable of appreciating the significance of that information has obtained."  1978 Policy Statement, 43 Fed. Reg. at 11111, Unit II.

500.    Although none of the defendants had representatives present at this January 16, 1992 meeting of the III European Medical Toxicology Sub-Committee, the minutes indicate that the III distributed copies of the minutes to the "Scientific Committee," the "AM-MTX Chairman

1  [American Medical Toxicology Sub-Committee Chairman]," and through an "Alerting Note to

2  AM-MTX Sub-Committee." Exh. 15, at III(Bice)009470.

3       501.    As of January 2, 1992, defendant Huntsman's predecessor-in-interest, ICI

4  Americas, chaired the III's AM-MTX Sub-Committee through its employee, J.P. Lyon. January

5  2, 1992 III Organizational Chart, BASF-038606-038607, at 038606, Exh. 17. As of June 9,

6  1992, Mr. Lyon was still chairman of the sub-committee. June 9, 1992 III Organizational Chart,

7  BASF-038667-038668 at 038667, Exh. 18. Thus, on the date of the January 16, 1992 EU-MTX

8  sub-committee meeting, and in the nearly five-month period following the meeting, Huntsman's

9  predecessor-in-interest ICI Americas chaired the AM-MTX sub-committee through its employee

10  J.P. Lyon, to whom  the minutes of this meeting were distributed. By appointing Mr. Lyon as its

11  representative to chair the III's AM-MTX Sub-Committee, Huntsman's predecessor-in-interest

12  ICI Americas indicated its confidence in Mr. Lyon's capability to appreciate the significance of

13  isocyanate safety information that he would obtain as chairman of that sub-committee. Through

14  Mr. Lyon, Huntsman obtained the 1992 Human Cases SRI when Mr. Niggel received a copy of

15  these minutes. Although the minutes do not indicate when they were distributed, a conservative

16  estimate of 60 days after the meeting would place Mr. Lyon as receiving the minutes as of March

17  16, 1992. Under TSCA, a "business organization is considered to have obtained any information

18  which any officer or employee capable of appreciating the significance of that information has

19  obtained." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit II. Thus, Huntsman obtained

20  1992 Human Cases SRI as of March 16, 1992.

21       502.    The January 16, 1992 EU-MTX Sub-Committee meeting minutes also indicate

22  that the III distributed copies of the minutes through an "Alerting Note to AM-MTX Sub-

23  Committee." Exh. 15, at III(Bice)009470.

24       503.    As of January 2, 1992, the AM-MTX Sub-Committee, to which the minutes were

25  distributed, included representatives of BASF (W. Hartz and D.C. Steinmetz), Bayer's

26  predecessor-in-interest Mobay (J.H. Chapman and G.K. Sangha), Dow (M.K. Lee and C.

27  Timchalk), and, as alleged above, Huntsman's predecessor-in-interest, ICI Americas (Chairman

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

101

*Qui Tam* Complaint

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

J.P. Lyon). January 2, 1992 III Organizational Chart, Exh. 17 at BASF-038606. As of June 9, 1992, the AM-MTX Sub-Committee still included representatives of all four defendants: BASF (W. Hartz and D.C. Steinmetz), Bayer's predecessor-in-interest Miles (J.H. Chapman and G.K. Sangha), Dow (M.K. Lee and C. Timchalk), and, as alleged above, Huntsman's predecessor-in-interest, ICI Americas (Chairman J.P. Lyon). June 9, 1992 III Organizational Chart, Exh. 18 at BASF-038667.

504.   Thus, on the date of the January 16, 1992 EU-MTX sub-committee meeting, and in the nearly five-month period following the meeting, each defendant had representatives on the AM-MTX sub-committee to whom the minutes of this meeting were distributed.  By appointing these individuals as their representatives on the AM-MTX Sub-Committee each defendant indicated its confidence in their respective employees' capability to appreciate the significance of isocyanate safety information that they would obtain as members of the AM-MTX Sub-Committee. Through these representatives, each defendant separately obtained the 1992 Human Cases SRI when those representatives received copies of these minutes.  Although the minutes do not indicate when they were distributed, a conservative estimate of 60 days after the meeting would place each defendant as obtaining the 1992 Human Cases SRI as of March 16, 1992.

505.   The January 16, 1992 EU-MTX Sub-Committee meeting minutes also indicate that the III distributed copies of the minutes to the "Scientific Committee." Exh. 15, at III(Bice)009470.

506.   As of January 2, 1992, the III Scientific Committee, to which the minutes were distributed, included a representative of Dow (L.W. Rampy) and Huntsman's predecessor-in-interest ICI Americas (R.F. Hoffman).  January 2, 1992 III Organizational Chart, Exh. 17 at BASF-038607.  As of June 9, 1992, the III Scientific Committee still included a representative of Dow (L.W. Rampy) and Huntsman's predecessor-in-interest ICI Americas (R.F. Hoffman).  June 9, 1992 III Organizational Chart, Exh. 18 at BASF-038668.

507.   Thus, on the date of the January 16, 1992 EU-MTX sub-committee meeting, and in the nearly five-month period following the meeting, Dow and Huntsman each had

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   representatives on the III Scientific Committee to whom the minutes of this meeting were

2   distributed.  By appointing these individuals as their representatives on the Scientific Committee,

3   Dow and Huntsman each indicated its confidence in their respective employees' capability to

4   appreciate the significance of isocyanate safety information that they would obtain as members

5   of the Scientific Committee.  Through these representatives, Dow and Huntsman separately

6   obtained the 1992 Human Cases SRI when those representatives received copies of these

7   minutes.  Although the minutes do not indicate when they were distributed, a conservative

8   estimate of 60 days after the meeting would place Dow and Huntsman as obtaining the 1992

9   Human Cases SRI as of March 16, 1992.

10            **d.    TSCA required that each defendant report the 1992 Human Cases SRI by April 6, 1992.**

11        508.    The EPA's 1978 Policy Statement provides that "a person has 'immediately

12   informed' the Administrator if information is received by EPA not later than the 15th working

13   day after the date the person obtained such information."  1978 Policy Statement, 43 Fed. Reg. at

14   11111, Unit IV.

15        509.    As alleged more thoroughly above, each defendant obtained the 1992 Human

16   Cases SRI by March 16, 1992, and TSCA required that each defendant report the 1992 Human

17   Cases SRI to the EPA by April 6, 1992, the fifteenth working day after the date that each

18   defendant separately obtained the information.

19            **e.    Each defendant was subject to TSCA's reporting requirement when it separately obtained the 1992 Human Cases SRI.**

20    

21        510.    At the time that it obtained the 1992 Human Cases SRI, Bayer was a "person who

22   manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]"

23   MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the

24   EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which

25   concerned TDI either directly or as a closely related chemical.

26        511.    At the time that it obtained the 1992 Human Cases SRI, BASF was a "person who

27   manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]"

28

MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

512. At the time that it obtained the 1992 Human Cases SRI, Dow was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

513. At the time that it obtained the 1992 Human Cases SRI, Huntsman was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

f.   **Each defendant failed to report the 1992 Human Cases SRI, even though TSCA did not exempt its reporting obligation.**

514. BASF did not report the 1992 Human Cases SRI to the EPA "immediately" after obtaining it.

515. BASF has never reported the 1992 Human Cases SRI to the EPA.

516. BASF did not have knowledge as of April 6, 1992 that some entity other than BASF had submitted the 1992 Human Cases SRI to the EPA.

517. BASF has not acquired knowledge since April 6, 1992 that some entity other than BASF has submitted the 1992 Human Cases SRI to the EPA.

518. BASF did not have actual knowledge as of April 6, 1992 that the EPA was adequately informed of the 1992 Human Cases SRI.

519. BASF has not acquired actual knowledge since April 6, 1992 that the EPA has become adequately informed of the 1992 Human Cases SRI.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

520.   Therefore, TSCA did not exempt BASF from its obligation to report the 1992 Human Cases SRI.

521.   Bayer did not report the 1992 Human Cases SRI to the EPA "immediately" after obtaining it.

522.   Bayer has never reported the 1992 Human Cases SRI to the EPA.

523.   Bayer did not have knowledge as of April 6, 1992 that some entity other than Bayer had submitted the 1992 Human Cases SRI to the EPA.

524.   Bayer has not acquired knowledge since April 6, 1992 that some entity other than Bayer has submitted the 1992 Human Cases SRI to the EPA.

525.   Bayer did not have actual knowledge as of April 6, 1992 that the EPA was adequately informed of the 1992 Human Cases SRI.

526.   Bayer has not acquired actual knowledge since April 6, 1992 that the EPA has become adequately informed of the 1992 Human Cases SRI.

527.   Therefore, TSCA did not exempt Bayer from its obligation to report the 1992 Human Cases SRI.

528.   Dow did not report the 1992 Human Cases SRI to the EPA "immediately" after obtaining it.

529.   Dow has never reported the 1992 Human Cases SRI to the EPA.

530.   Dow did not have knowledge as of April 6, 1992 that some entity other than Dow had submitted the 1992 Human Cases SRI to the EPA.

531.   Dow has not acquired knowledge since April 6, 1992 that some entity other than Dow has submitted the 1992 Human Cases SRI to the EPA.

532.   Dow did not have actual knowledge as of April 6, 1992 that the EPA was adequately informed of the 1992 Human Cases SRI.

533.   Dow has not acquired actual knowledge since April 6, 1992 that the EPA has become adequately informed of the 1992 Human Cases SRI.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

534.   Therefore, TSCA did not exempt Dow from its obligation to report the 1992 Human Cases SRI.

535.   Huntsman did not report the 1992 Human Cases SRI to the EPA "immediately" after obtaining it.

536.   Huntsman has never reported the 1992 Human Cases SRI to the EPA.

537.   Huntsman did not have knowledge as of April 6, 1992 that some entity other than Huntsman had submitted the 1992 Human Cases SRI to the EPA.

538.   Huntsman has not acquired knowledge since April 6, 1992 that some entity other than Huntsman has submitted the 1992 Human Cases SRI to the EPA.

539.   Huntsman did not have actual knowledge as of April 6, 1992 that the EPA was adequately informed of the 1992 Human Cases SRI.

540.   Huntsman has not acquired actual knowledge since April 6, 1992 that the EPA has become adequately informed of the 1992 Human Cases SRI.

541.   Therefore, TSCA did not exempt Huntsman from its obligation to report the 1992 Human Cases SRI.

g.   **The EPA's guidance documents did not exempt any defendant's obligation to report the 1992 Human Cases SRI.**

542.   Although the EPA's guidance documents could be read to broaden TSCA's limited exemption, the EPA's guidance documents cannot alter the scope of the statutory exemption, and each defendant's separate reporting obligation is exempted only if it had "actual knowledge that the Administrator [of the EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

543.   Regardless, however, the EPA's guidance documents did not exempt BASF, Bayer, Dow, or Huntsman from the obligation to report the 1992 Human Cases SRI.

544.   The EPA's 1978 Policy Statement provided that substantial risk information was exempted from reporting if the information: "(a) Has been published by EPA in reports; (b) Has been submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    any other authority administered by EPA . . .; (c) Has been published in the scientific literature

2    and referenced [by one of several listed abstract services]; (d) Is corroborative of well-

3    established adverse effects already documented in the scientific literature and referenced [by one

4    of the abstract services listed in (c) above]; or (e) [Is contained in an environmental notification

5    of spills]." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VII(a) through (e).

6        545.    In its June 1991 Reporting Guide, EPA added two new exemptions, covering

7    information that (1) is contained in a formal report, publication, or public statement of another

8    Federal agency or (2) constitutes national security information based upon a determination by the

9    President of the United States.  1991 Reporting Guide at 8.

10        546.    As of April 6, 1992, the latest date by which TSCA required BASF, Bayer,  Dow,

11   and Huntsman to report the 1992 Human Cases SRI, the EPA's 1991 Reporting Guide provided

12   that substantial risk information was exempted from reporting if the information:

| (1) | is contained in an EPA study or report. |
|-----|------------------------------------------|
| (2) | is published in the open scientific literature. |
| (3) | has been submitted already to EPA under another mandatory reporting provision of 1) TSCA, or 2) some other authority that is administered by EPA. |
| (4) | is contained in a formal publication/report or a formal statement made available to the general public by another Federal agency. |
| (5) | is corroborative (in terms of, for example, route of exposure, dose, species, time to onset, severity, species, strain, etc.) of a **well-established** adverse effect. |
|     | It is important to note, however, that information that newly identifies a serious toxic effect **at a lower dose level for example, or confirms a serious effect that was previously only suspected,** is **not** considered by EPA to be corroborative and should be reported under Section 8(e) of TSCA. |
| (6) | [constitutes national security information based upon a determination of the President of the United States.] |

23   1991 Reporting Guide at 8 (emphasis in original).  The EPA noted in a separate section of the

24   1991 Reporting Guide that information obtained at public scientific conferences or meetings is

25   exempt from reporting if there is a written record of the meeting that adequately describes the

26   information and is released to the public in a reasonable time frame.  The EPA indicated,

27

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  however, that information obtained at a private conference or meeting is not exempt and should

2  be considered for reporting.  1991 Reporting Guide at 7.

3       547.    The EPA's 1991 Reporting Guide expanded the exemption for published

4  information to include "information that is obtained from <u>major</u> U.S. news publications (e.g.,

5  newspapers or news magazines with national circulation) or nationally broadcast U.S. radio

6  and/or television news reports." 1991 Reporting Guide at 9.  The EPA clarified, however, that

7  the published-information exemption exempted the reporting requirement only if the regulated

8  company "obtained" the information from the published literature:

> With regard to item (2) on the preceding page [that is, "published in the open
> scientific literature"], EPA believes that for the purposes of Section 8(e)
> reporting, a subject person need not report information that is *obtained from* well-
> established/well-recognized scientific journals, such as those typically abstracted
> in a) major computerized abstract data bases, or 2) [sic] publications such as
> <u>Current Contents</u>, published by the Institute for Scientific Information (ISI), Inc.
> (Philadelphia, Pennsylvania.  Similarly, information that is *obtained from* <u>major</u>
> U.S. news publications (e.g., newspapers or news magazines with national
> circulation) or nationally broadcast U.S. radio and/or television news reports
> typically need not be submitted to EPA under Section 8(e) of TSCA.  However,
> with regard to information *obtained from* lesser known scientific journals, or from
> other magazines, newspapers, radio, or television reports, a subject person must
> have actual knowledge that EPA has been adequately informed about such
> information [to be exempt from the reporting obligation].

1991 Reporting Guide at 9 (italicized emphases added, other emphases in original).

     548.    The EPA's 1991 Reporting Guide did not exempt any defendant from its

obligation to report the 1992 Human Cases SRI.

     549.    As of April 6, 1992, the 1992 Human Cases SRI was not "contained in an EPA

study or report." 1991 Reporting Guide at 8, Item 1.

     550.    As of April 6, 1992, none of the defendants had "obtained" the 1992 Human

Cases SRI from "well-established/well-recognized scientific journals," or "<u>major</u> U.S. news

publications (e.g., newspapers or news magazines with national circulation) or nationally

broadcast U.S. radio and/or television news reports." 1991 Reporting Guide at 9, clarifying Item

2 on page 8.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

551.   As of April 6, 1992, the 1992 Human Cases SRI had not been "submitted already to EPA under another mandatory reporting provision of 1) TSCA, or 2) some other authority that is administered by EPA." 1991 Reporting Guide at 8, Item 3.

552.   As of April 6, 1992, the 1992 Human Cases SRI was not "contained in a formal publication/report or a formal statement made available to the general public by another Federal agency." 1991 Reporting Guide at 8, Item 4.

553.   As of April 6, 1992, the President of the United States had not determined that the 1992 Human Cases SRI was national security information.  1991 Reporting Guide at 8, Item 6.

554.   As of April 6, 1992, the 1992 Human Cases SRI was not obtained from a *public* scientific conference or meeting, and the 1992 Human Cases SRI was not "captured accurately/adequately in a meeting transcript, abstract or other such written record or document *that is to be formally released to the public within a reasonable time frame*." 1991 Reporting Guide at 7 (emphasis added).

555.   The remaining exemption provided in the EPA's 1991 Reporting Guide is for information that "is corroborative (in terms of, for example, route of exposure, dose, species, time to onset, severity, species, strain, etc.) of a **well-established** adverse effect." 1991 Reporting Guide at 8, Item 5 (emphasis in original).  The EPA explained: "It is important to note, however, that information that newly identifies a serious toxic effect at a lower dose level for example, or confirms a serious effect that was previously only suspected, is not considered by EPA to be corroborative and should be reported under Section 8(e) of TSCA." 1991 Reporting Guide at 8.

556.   Thus, consistent with the statutory requirement to report information reasonably supporting a conclusion that the chemical presents a substantial *risk* of injury, the EPA defined "adverse effect" in the context of "risk"—not only whether a chemical causes a particular adverse effect, but how (route of exposure) or under what circumstances (dose levels or time to onset).  As one company commented in response to the EPA's proposals that preceded its 1978 Policy Statement, "[a] determination that information 'reasonably supports the conclusion' of

109

*Qui Tam* Complaint

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    substantial risk cannot be made independently of consideration of use, since the method and

2    manner of using a chemical may influence the occurrence of an effect." 1978 Policy Statement,

3    43 Fed. Reg. at 11115, Comment 19. Although the company apparently offered the comment in

4    the context of normal versus abnormal use (*id.*), the EPA agreed that "[t]he method and manner

5    of using a chemical is one of several factors determining its exposure potential," and further

6    observed that "a definition of 'normal' use for a particular chemical will often depend upon a

7    *knowledge of the risks* associated with the chemical." *Id.* at 11115, Response to Comment 19.

8    The EPA's 1991 Reporting Guide confirmed that "the method and manner of use"—route of

9    exposure and dose—was an integral part of the "adverse effect" being considered.

10        557.    As of April 6, 1992, the 1992 Human Cases SRI was not corroborative (in terms

11   of, for example, route of exposure, dose, species, time to onset, severity, species, strain, etc.) of a

12   **well-established** adverse effect." 1991 Reporting Guide at 8, Item 5. Indeed, a little more than

13   two months after April 6, 1992, the latest date by which TSCA required BASF, Bayer, Dow, and

14   Huntsman to report the 1992 Human Cases SRI, those defendants, through the III, reported

15   animal data that they claimed indicated the possibility that MDI dermal exposure could cause

16   respiratory hypersensitivity in guinea pigs. June 11, 1992 TSCA Section 8(e) Submission, Exh.

17   16 at Bice/Dow12306. By reporting the supposedly uncertain animal data, the defendants

18   indicated that the effect they were reporting was *not* "corroborative . . . of a well-established

19   adverse effect." None of the defendants can contend that the 1992 Human Cases SRI

20   corroborated a well-established adverse effect as of April 6, 1992, because they conceded on

21   June 11, 1992 that that same adverse effect was not well-established, even at the animal level.

22       558.    Further, each defendant has since publicly contended that the scant publicly-

23   available information that suggests that the possibility for isocyanate skin contact to cause

24   respiratory sensitization is anecdotal, inconclusive, and unreliable. For example, in a May 2002

25   III paper entitled "Respiratory sensitization: the role of dermal contact with MDI and TDI,"

26   defendants and other III member companies discussed the animal and human data relevant to the

27   potential link between skin contact with MDI and respiratory sensitization. Exh. 2, at CHARM

28

012422–012446. Each defendant was a co-author of that 2002 III paper. *Id.* at CHARM 12425, Exh. 2.

559.    The defendants neither published nor otherwise discussed in that paper the 1992 Human Cases SRI, even though that substantial risk information is directly relevant to the link between human isocyanate skin contact and respiratory sensitization.  Moreover, the defendants concluded their May 2002 paper by contending that the link between respiratory sensitization and MDI skin contact was <u>not</u> well-established and that the "available" human data was insufficient to establish the link: "The available data do not provide sufficient evidence for a clear correlation between skin exposure and occupational asthma." *Id.* at CHARM 12442, Exh. 2. That statement directly contradicts the 1992 Human Cases SRI, which defendants knowingly failed to report to the EPA and are continuing to conceal.

560.    Furthermore, through the Diisocyanates Panel of the ACC, the defendants have recently disputed the potential for dermal induction of respiratory sensitization directly to the EPA.  In April 2011, the EPA expressed its heightened interest in MDI and related chemicals by issuing an "MDI Action Plan." *Methylene Diphenyl Diisocyanate (MDI) and Related Compounds Action Plan [RIN 2070-ZA15]*, U.S. Environmental Protection Agency, April 2011 ("MDI Action Plan").  On February 26, 2013, defendants submitted comments to the EPA's proposed MDI Action Plan through the ACC.  Feb. 26, 2013 ACC Comments to MDI Action Plan, Exh. 3.  Disputing the EPA's statement in the MDI Action Plan that "[b]oth inhalation and dermal exposures to diisocyanates are thought to contribute to the development of isocyanate asthma" (*id.* at 9, Exh. 3), the defendants contended "the role that dermal contact with diisocyanates plays in the development of occupational asthma remains unresolved for humans." *Id.* at 10, Exh. 3.  That statement directly contradicts the 1992 Human Cases SRI, which defendants knowingly failed to report to the EPA and are continuing to conceal.

561.    None of the defendants can contend that the 1992 Human Cases SRI was "corroborative . . . of **well-established** adverse effects," because they have contended afterward, and directly to the EPA, that the effect is not well-established.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

9.    **In or shortly after April 1992, each defendant obtained the "1992 Specific Scenario SRI," substantial risk information about MDI skin contact and low-level inhalation.**

   a.    **Each defendant separately obtained the information in or shortly after April 1992.**

562.    In or shortly after April 1992, BASF, Bayer, Dow, and Huntsman each obtained substantial risk information about respiratory sensitization in humans caused by skin contact with or low-level inhalation of MDI.  In April 1992, the III's Scientific Director, D.S. Gilbert, provided a report to the III's Board of Directors.  Report to Board, 1992, BASF-040033-040073 at 040034, Exh. 19.  In Section 4.1 of his report, Dr. Gilbert addressed "Sensitisation" under the general hearing "MEDTOX ISSUES." *Id.*, Exh. 19 at BASF-040043-040045.  Under the subheading "MDI," Dr. Gilbert stated:

> The importance of mode of exposure has been questioned in a specific scenario: workers using MDI appear to have been subject to respiratory sensitization when occupied with a process giving rise to extremely low exposures of airborne MDI. This has again raised the question of such responses arising from <u>skin</u> contact.  In terms of local concentrations there is a much higher potential for exposure via the skin than via the lung.

*Id.*, Exh. 19 at BASF-040044 (emphasis in original).

   b.    **The 1992 Specific Scenario SRI was "substantial risk information."**

563.    This information, the "1992 Specific Scenario SRI," comprised information relating to multiple "workers," plural, whose MDI respiratory sensitization arose in a "specific scenario":  their MDI exposure occurred in the context of "a process giving rise to extremely low exposures of airborne MDI."  The III suspected that skin contact may have caused the respiratory sensitization, since the "local concentrations" provided "a much higher potential for exposure via the skin than via the lung." *Id.*, Exh. 19 at BASF-040044.

564.    The III's Scientific Director indicated to the III's Board of Directors that these workers' respiratory sensitization had apparently been caused either by MDI skin contact or by "extremely" low-level inhalation exposures. *Id.*, Exh. 19 at BASF-040044.  The Scientific

112

1   Director's confidence in the diagnosis of MDI respiratory sensitization indicates the analysis of

2   underlying medical data.

3   565.   Further, the Scientific Director indicated knowledge about "local concentrations"

4   in the work environment that provided "a much higher potential for exposure via the skin than

5   via the lung." *Id.*, Exh. 19 at BASF-040044.  The knowledge of these "local concentrations,"

6   and the exposure conclusions that the Scientific Director reached as a result of that knowledge,

7   indicates the analysis of underlying industrial hygiene data.  Indeed, the Scientific Director stated

8   that the knowledge of airborne concentrations ("extremely low exposures of airborne MDI") had

9   "raised the question of such responses [respiratory sensitization] arising from <u>skin</u> contact." *Id.*,

10   Exh. 19 at BASF-040044.

11   566.   The Report to the Board therefore establishes that the 1992 Specific Scenario SRI

12   comprised underlying medical and industrial hygiene data reported to the III's Board of

13   Directors as indicating an apparent causal relationship between confirmed human cases of MDI

14   respiratory sensitization and either MDI skin contact or inhalation of "extremely low exposures

15   of airborne MDI." *Id.*, Exh. 19 at BASF-040044.

16   567.   TSCA defines substantial risk information as "information which reasonably

17   supports the conclusion that such substance or mixture presents a substantial risk of injury to

18   health or the environment." 15 U.S.C. § 2607(e).  The 1978 Policy Statement provides that

19   "'reasonably supports the conclusion' of substantial risk is not identical to a conclusive

20   demonstration of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11110,

21   Supplementary Information, ¶ (3).  The 1978 Policy Statement further provides that "[a] person

22   is not to delay reporting until he obtains conclusive information that a substantial risk exists, but

23   is to immediately report any evidence which 'reasonably supports' that conclusion.  Such

24   evidence will generally not be conclusive as to the substantiality of the risk; it should, however,

25   reliably ascribe the effect to the chemical." 1978 Policy Statement at 11112, Unit VI.

26   568.   In its June 1991 Reporting Guide, the EPA reaffirmed the 1978 policy, providing

27   that "such information need not and most typically does not establish conclusively that a

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

substantial risk exists." 1991 Reporting Guide at 2. The 1991 Reporting Guide provides that the "decision-making process for Section 8(e)-reportability should focus primarily on whether the toxicity or exposure information offers reasonable support for a conclusion of substantial risk under the criteria described above, but should not focus at all on whether the information is conclusive regarding the risk." 1991 Reporting Guide at 2. Further, the 1991 Reporting Guide directs that "[t]he evidence that offers reasonable support for a conclusion of substantial risk need not be complete or definitive but should provide a plausible link between 1) an observed serious effect and one or few chemicals (e.g., in a discrete process/operation), or 2) a specific product/activity and a previously unrecognized exposure to a chemical that is known or reasonably anticipated to cause serious adverse health or environmental effects." 1991 Reporting Guide at 7.

569.    As established above, the 1992 Specific Scenario SRI "reliably ascribe[d] the effect to the chemical," and was therefore reportable substantial risk information. 1978 Policy Statement at 11112, Unit VI. The Report to the Board establishes that the 1992 Specific Scenario SRI comprised underlying medical and industrial hygiene data reported to the III's Board of Directors as indicating an apparent causal relationship between confirmed human cases of MDI respiratory sensitization and either MDI skin contact or inhalation of "extremely low exposures of airborne MDI." *Id.*, Exh. 19 at BASF-040044.

570.    The 1992 Specific Scenario SRI not only "reliably ascribe[d] the effect to the chemical [MDI]," but it also characterized the effect in terms of MDI skin contact or low –level inhalation, neither of which was known by the EPA to cause respiratory sensitization in humans. Thus, the information "provide[d] a plausible link between . . . 2) a specific product/activity [here, MDI (product) and MDI skin contact or low-level inhalation (activity)] and a previously *unrecognized exposure* to a chemical [here, human skin contact or low-level inhalation] that is known or reasonably anticipated to cause serious adverse health or environmental effects." 1991 Reporting Guide at 7 (emphasis added). The 1992 Specific Scenario SRI was therefore reportable substantial risk information under the 1991 Reporting Guide.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

571.    Indeed, each defendant expressly demonstrated its recognition that such information constitutes reportable substantial risk information.  As referenced briefly above, on June 11, 1992, each defendant, through the III, reported to the EPA's TSCA Section 8(e) Coordinator the then-unpublished results of Dr. Ian Kimber's study of the dermal induction of respiratory hypersensitivity in guinea pigs. Exh. 16, Bice/Dow12306.  According to the III's June 11, 1992 TSCA Section 8(e) submission, the animal data "indicate that respiratory hypersensitivity in guinea pigs *may result* from dermal exposure to MDI." *Id.* (emphasis added). Yet these defendants failed to report concurrently-received reports that multiple humans appeared to have sustained MDI respiratory sensitization from skin contact.  Since the defendants correctly recognized the reportability of information that they claimed indicated the *possible* dermal induction of respiratory hypersensitivity in *animals*, they necessarily recognized the reportability of information that indicated the apparent dermal induction of respiratory sensitization in *humans*.

572.    In other words, the defendants knowingly concealed the existence of the 1992 Specific Scenario SRI from the EPA.

573.    The 1978 Policy Statement identifies two factors to weigh in the substantial risk determination:  "the seriousness of the effect" and "the fact or probability of its occurrence." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V.  The 1978 Policy provides that these factors are weighed differently for different effects.  If the effects are among the human health effects identified in unit V(a) of the 1978 Policy Statement, the EPA views the effects as "so serious that relatively little weight is given to exposure; the mere fact that the implicated chemical is in commerce constitutes sufficient evidence of exposure." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V.  Accordingly, if the information concerns a "serious" health effect identified in unit V(a) of the 1978 Policy Statement, the information constitutes substantial risk information.

574.    The "serious" human health effects identified in unit V(a)(1) of the 1978 Policy include "[a]ny instance of . . . serious or prolonged incapacitation, including the loss of or

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   inability to use a normal bodily function with a consequent relatively serious impairment of

2   normal activities, if one (or a few) chemical(s) is strongly implicated." 1978 Policy Statement,

3   43 Fed. Reg. at 11112, Unit V(a)(1).  Respiratory sensitization, which can lead to occupational

4   asthma and permanent lung damage, is such a "serious" human health effect.

5       575.   Accordingly, information about "[a]ny instance" of respiratory sensitization

6   "must be reported" under TSCA Section 8(e) (unless otherwise exempted) "if one (or a few)

7   chemical(s) is strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1).

8   Indeed, the EPA's 1978 Policy Statement elsewhere reiterates that a single instance of such an

9   effect is reportable:  "It is anticipated here that reportable effects will generally occur in a

10  pattern, where a significant common feature is exposure to the chemical.  However, a single

11  instance of . . . serious incapacitation in a human would be reportable if one (or a few)

12  chemical(s) was strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit

13  VI(2).

14      576.   The 1992 Specific Scenario SRI, which concerned the human health effect of

15  respiratory sensitization caused by either by MDI skin contact or low-level inhalation, was

16  therefore reportable substantial risk information.  The 1992 Specific Scenario SRI involved

17  effects that "occur[ed] in a pattern, where a significant common feature [was] exposure to the

18  chemical," here, exposure through skin contact or low-level inhalation.  Indeed, the report calls

19  the pattern the "specific scenario," in which the common pattern is respiratory sensitization

20  arising in a work environment involving a "process that gives rise to extremely low exposures of

21  airborne MDI." 1992 Report to III Board, Exh. 19 at BASF-040044.  And, as the 1992 Specific

22  Scenario SRI indicated a high degree of confidence that these workers had MDI respiratory

23  sensitization—in other words, respiratory sensitization caused by MDI exposure, "one . . .

24  chemical[] is strongly implicated."  The 1992 Specific Scenario SRI was reportable substantial

25  risk information.

26      577.   Moreover, the Report to the Board confirms that the 1992 Specific Scenario SRI

27  added to a larger set of similar data that the III member companies had previously developed or

28

1   obtained.  The III's Scientific Director reported to the III's Board of Directors that the

2   information about the apparent induction of human respiratory sensitization in an environment of

3   "extremely low" airborne MDI concentrations "has *again* raised the question of such responses

4   arising from <u>skin</u> contact."  *Id.*, Exh. 19 at BASF-040044 (italicized emphasis added, underlined

5   emphasis in original).  The fact that such information had "again" suggested the dermal

6   induction route emphasized the need for the defendants to report the information, as "reportable

7   effects will generally occur in a pattern."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unite

8   VI(2).

9          578.    The fact that the 1992 Specific Scenario SRI was consistent with other

10  information that the III member companies had previously developed or obtained also establishes

11  that the 1992 Specific Scenario SRI comprised underlying data that is different from the data

12  comprising the earlier substantial risk information that the defendants had obtained or developed

13  (and failed to report).  For example, the "workers" whose injuries the 1992 Specific Scenario

14  SRI concerned are different from the "human cases of MDI sensitization" in the 1989 Human

15  Cases SRI.  The 1992 Report to the III Board confirms that the defendants obtained or developed

16  numerous discrete and separate items of substantial risk information.

17         579.    The 1992 Report to the Board therefore establishes that the defendants

18  intentionally concealed those numerous discrete and separate items of substantial risk

19  information.  By recalling earlier similar reports, the 1992 Specific Scenario SRI, expressly

20  reminded the defendants of the accumulating evidence that MDI skin contact and/or low level

21  inhalation had caused, or at least was closely associated with, human respiratory sensitization.

22  The defendants' continuing refusal to report this human information, even as they reported the

23  animal data, establishes their conscious decision, either individually or in conspiracy, to conceal

24  the human data.

25         580.    The EPA's 1978 Policy Statement provides that information that is reportable

26  under Section 8(e) may be obtained from sources other than designed, controlled studies,

27  although designed, controlled studies must be reported.  1978 Policy Statement, 43 Fed. Reg. at

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

11112, Unit VI(1).  Indeed, in its 1978 Policy Statement, the EPA identifies the sources of information that "will often 'reasonably support' a conclusion of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI.  These sources include "reports concerning and studies of undesigned, uncontrolled circumstances." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2).  Examples of "[r]eports and studies of undesigned circumstances include: (i) medical and health surveys, (ii) clinical studies, and (iii) *reports concerning and evidence of effects in consumers, workers, or the environment.*" 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2) (emphasis added).

581.    The defendants obtained the 1992 Specific Scenario SRI from "reports concerning. . . undesigned, uncontrolled circumstances," including "reports concerning and evidence of effects in consumers, workers, or the environment." The 1992 Human Cases SRI therefore comprises information that is reportable under TSCA Section 8(e).

### c.    Each defendant separately obtained the 1992 Specific Scenario SRI.

582.    Under TSCA, a "business organization is considered to have obtained any information which any officer or employee capable of appreciating the significance of that information has obtained." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit II.

583.    The III's Scientific Director sent his report to the III Board of Directors in April 1992.  1992 Report to the III Board, Exh. 19 at BASF-0040034.

584.    As of April 2, 1992, each of the four defendants had a representative on the III's Board of Directors.  April 2, 1992 III Organizational Chart, Exh. 20, BASF-038636-038637 at 038637.  As of October 9, 1992, each of the four defendants still had a representative on the III's Board of Directors.  October 9, 1992 III Organization Chart, Exh. 21, BASF-038701-038702 at 038702.

585.    Thus, during the month of April 1992, the month in which the Scientific Director provided his Report to the Board, and in the six-month period following the provision of the report, each defendant had a representative on the III's Board of Directors, to whom this report was distributed.  By appointing these individuals as their representatives on the III Board of

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

*Qui Tam* Complaint

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Directors, each defendant indicated its confidence in their respective employees' capability to appreciate the significance of isocyanate safety information that they would obtain as Board members. Through these representatives, each defendant separately obtained the 1992 Specific Scenario SRI when those representatives received the report.  Although the Report to the Board does not indicate the exact distribution date, it was distributed during April 1992.  Assuming distribution on the last day of April (April 30, 1992), and conservatively allowing two weeks for mailing, each defendant obtained the 1992 Specific Scenario SRI as of May 14, 1992.

      **d.**   **TSCA required that each defendant report the 1992 Specific Scenario SRI by June 4, 1992.**

586.    The EPA's 1978 Policy Statement provides that "a person has 'immediately informed' the Administrator if information is received by EPA not later than the 15th working day after the date the person obtained such information."  1978 Policy Statement, 43 Fed. Reg. at 11111, Unit IV.

587.    As alleged more thoroughly above, each defendant obtained the 1992 Specific Scenario SRI by May 14, 1992, and TSCA required that each defendant report the 1992 Specific Scenario SRI to the EPA by June 4, 1992, the fifteenth working day after the date that each defendant separately obtained the information.

      **e.**   **Each defendant was subject to TSCA's reporting requirement when it separately obtained the 1992 Specific Scenario SRI.**

588.    At the time that it obtained the 1992 Specific Scenario SRI, Bayer was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

589.    At the time that it obtained the 1992 Specific Scenario SRI, BASF was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the

Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

590.    At the time that it obtained the 1992 Specific Scenario SRI, Dow was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

591.    At the time that it obtained the 1992 Specific Scenario SRI, Huntsman was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

**f.    Each defendant failed to report the 1992 Specific Scenario SRI, even though TSCA did not exempt its reporting obligation.**

592.    BASF did not report the 1992 Specific Scenario SRI to the EPA "immediately" after obtaining it.

593.    BASF has never reported the 1992 Specific Scenario SRI to the EPA.

594.    BASF did not have knowledge as of June 4, 1992 that some entity other than BASF had submitted the 1992 Specific Scenario SRI to the EPA.

595.    BASF has not acquired knowledge since June 4, 1992 that some entity other than BASF has submitted the 1992 Specific Scenario SRI to the EPA.

596.    BASF did not have actual knowledge as of June 4, 1992 that the EPA was adequately informed of the 1992 Specific Scenario SRI.

597.    BASF has not acquired actual knowledge since June 4, 1992 that the EPA has become adequately informed of the 1992 Specific Scenario SRI.

598.    Therefore, TSCA did not exempt BASF from its obligation to report the 1992 Specific Scenario SRI.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

599.   Bayer did not report the 1992 Specific Scenario SRI to the EPA "immediately" after obtaining it.

600.   Bayer has never reported the 1992 Specific Scenario SRI to the EPA.

601.   Bayer did not have knowledge as of June 4, 1992 that some entity other than Bayer had submitted the 1992 Specific Scenario SRI to the EPA.

602.   Bayer has not acquired knowledge since June 4, 1992 that some entity other than Bayer has submitted the 1992 Specific Scenario SRI to the EPA.

603.   Bayer did not have actual knowledge as of June 4, 1992 that the EPA was adequately informed of the 1992 Specific Scenario SRI.

604.   Bayer has not acquired actual knowledge since June 4, 1992 that the EPA has become adequately informed of the 1992 Specific Scenario SRI.

605.   Therefore, TSCA did not exempt Bayer from its obligation to report the 1992 Specific Scenario SRI.

606.   Dow did not report the 1992 Specific Scenario SRI to the EPA "immediately" after obtaining it.

607.   Dow has never reported the 1992 Specific Scenario SRI to the EPA.

608.   Dow did not have knowledge as of June 4, 1992 that some entity other than Dow had submitted the 1992 Specific Scenario SRI to the EPA.

609.   Dow has not acquired knowledge since June 4, 1992 that some entity other than Dow has submitted the 1992 Specific Scenario SRI to the EPA.

610.   Dow did not have actual knowledge as of June 4, 1992 that the EPA was adequately informed of the 1992 Specific Scenario SRI.

611.   Dow has not acquired actual knowledge since June 4, 1992 that the EPA has become adequately informed of the 1992 Specific Scenario SRI.

612.   Therefore, TSCA did not exempt Dow from its obligation to report the 1992 Specific Scenario SRI.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

613.   Huntsman did not report the 1992 Specific Scenario SRI to the EPA "immediately" after obtaining it.

614.   Huntsman has never reported the 1992 Specific Scenario SRI to the EPA.

615.   Huntsman did not have knowledge as of June 4, 1992 that some entity other than Huntsman had submitted the 1992 Specific Scenario SRI to the EPA.

616.   Huntsman has not acquired knowledge since June 4, 1992 that some entity other than Huntsman has submitted the 1992 Specific Scenario SRI to the EPA.

617.   Huntsman did not have actual knowledge as of June 4, 1992 that the EPA was adequately informed of the 1992 Specific Scenario SRI.

618.   Huntsman has not acquired actual knowledge since June 4, 1992 that the EPA has become adequately informed of the 1992 Specific Scenario SRI.

619.   Therefore, TSCA did not exempt Huntsman from its obligation to report the 1992 Specific Scenario SRI.

### g.   The EPA's guidance documents did not exempt any defendant's obligation to report the 1992 Specific Scenario SRI.

620.   Although the EPA's guidance documents could be read to broaden TSCA's limited exemption, the EPA's guidance documents cannot alter the scope of the statutory exemption, and each defendant's separate reporting obligation is exempted only if it had "actual knowledge that the Administrator [of the EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

621.   Regardless, however, the EPA's guidance documents did not exempt BASF, Bayer, Dow, or Huntsman from the obligation to report the 1992 Specific Scenario SRI.

622.   The EPA's 1978 Policy Statement provided that substantial risk information was exempted from reporting if the information: "(a) Has been published by EPA in reports; (b) Has been submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA . . .; (c) Has been published in the scientific literature and referenced [by one of several listed abstract services]; (d) Is corroborative of well-

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   established adverse effects already documented in the scientific literature and referenced [by one

2   of the abstract services listed in (c) above]; or (e) [Is contained in an environmental notification

3   of spills]." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VII(a) through (e).

4       623.    In its June 1991 Reporting Guide, EPA added two new exemptions, covering

5   information that (1) is contained in a formal report, publication, or public statement of another

6   Federal agency or (2) constitutes national security information based upon a determination by the

7   President of the United States.  1991 Reporting Guide at 8.

8       624.    As of June 4, 1992, the latest date by which TSCA required BASF, Bayer,  Dow,

9   and Huntsman to report the 1992 Specific Scenario SRI, the EPA's 1991 Reporting Guide

10  provided that substantial risk information was exempted from reporting if the information:

(1)     is contained in an EPA study or report.

(2)     is published in the open scientific literature.

(3)     has been submitted already to EPA under another mandatory
        reporting provision of 1) TSCA, or 2) some other authority that is
        administered by EPA.

(4)     is contained in a formal publication/report or a formal statement
        made available to the general public by another Federal agency.

(5)     is corroborative (in terms of, for example, route of exposure, dose,
        species, time to onset, severity, species, strain, etc.) of a **well-
        established** adverse effect.
        It is important to note, however, that information that newly
        identifies a serious toxic effect **at a lower dose level** for example,
        or **confirms a serious effect that was previously only suspected**,
        is **not** considered by EPA to be corroborative and should be
        reported under Section 8(e) of TSCA.

(6)     [constitutes national security information based upon a
        determination of the President of the United States.]

21  1991 Reporting Guide at 8 (emphasis in original).  The EPA noted in a separate section of the

22  1991 Reporting Guide that information obtained at public scientific conferences or meetings is

23  exempt from reporting if there is a written record of the meeting that adequately describes the

24  information and is released to the public in a reasonable time frame.  The EPA indicated,

25  however, that information obtained at a private conference or meeting is not exempt and should

26  be considered for reporting.  1991 Reporting Guide at 7.

27

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

625.     The EPA's 1991 Reporting Guide expanded the exemption for published information to include "information that is obtained from major U.S. news publications (e.g., newspapers or news magazines with national circulation) or nationally broadcast U.S. radio and/or television news reports." 1991 Reporting Guide at 9.  The EPA clarified, however, that the published-information exemption exempted the reporting requirement only if the regulated company "obtained" the information from the published literature:

> With regard to item (2) on the preceding page [that is, "published in the open scientific literature"], EPA believes that for the purposes of Section 8(e) reporting, a subject person need not report information that is *obtained from* well-established/well-recognized scientific journals, such as those typically abstracted in a) major computerized abstract data bases, or 2) [sic] publications such as <u>Current Contents</u>, published by the Institute for Scientific Information (ISI), Inc. (Philadelphia, Pennsylvania.  Similarly, information that is *obtained from* major U.S. news publications (e.g., newspapers or news magazines with national circulation) or nationally broadcast U.S. radio and/or television news reports typically need not be submitted to EPA under Section 8(e) of TSCA.  However, with regard to information *obtained from* lesser known scientific journals, or from other magazines, newspapers, radio, or television reports, a subject person must have actual knowledge that EPA has been adequately informed about such information [to be exempt from the reporting obligation].

1991 Reporting Guide at 9 (italicized emphases added, other emphases in original).

626.     The EPA's 1991 Reporting Guide did not exempt any defendant from its obligation to report the 1992 Specific Scenario SRI.

627.     As of June 4, 1992, the 1992 Specific Scenario SRI was not "contained in an EPA study or report." 1991 Reporting Guide at 8, Item 1.

628.     As of June 4, 1992, none of the defendants had "obtained" the 1992 Specific Scenario SRI from "well-established/well-recognized scientific journals," or "major U.S. news publications (e.g., newspapers or news magazines with national circulation) or nationally broadcast U.S. radio and/or television news reports." 1991 Reporting Guide at 9, clarifying Item 2 on page 8.

629.     As of June 4, 1992, the 1992 Specific Scenario SRI had not been "submitted already to EPA under another mandatory reporting provision of 1) TSCA, or 2) some other authority that is administered by EPA." 1991 Reporting Guide at 8, Item 3.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

630.     As of June 4, 1992, the 1992 Specific Scenario SRI was not "contained in a formal publication/report or a formal statement made available to the general public by another Federal agency." 1991 Reporting Guide at 8, Item 4.

631.     As of June 4, 1992, the President of the United States had not determined that the 1992 Specific Scenario SRI was national security information. 1991 Reporting Guide at 8, Item 6.

632.     As of June 4, 1992, the 1992 Specific Scenario SRI was not obtained from a *public* scientific conference or meeting, and the 1992 Specific Scenario SRI was not "captured accurately/adequately in a meeting transcript, abstract or other such written record or document *that is to be formally released to the public within a reasonable time frame*." 1991 Reporting Guide at 7 (emphasis added).

633.     The remaining exemption provided in the EPA's 1991 Reporting Guide is for information that "is corroborative (in terms of, for example, route of exposure, dose, species, time to onset, severity, species, strain, etc.) of a **well-established** adverse effect." 1991 Reporting Guide at 8, Item 5 (emphasis in original).  The EPA explained: "It is important to note, however, that information that newly identifies a serious toxic effect at a lower dose level for example, or confirms a serious effect that was previously only suspected, is not considered by EPA to be corroborative and should be reported under Section 8(e) of TSCA." 1991 Reporting Guide at 8.

634.     Thus, consistent with the statutory requirement to report information reasonably supporting a conclusion that the chemical presents a substantial *risk* of injury, the EPA defined "adverse effect" in the context of "risk"—not only whether a chemical causes a particular adverse effect, but how (route of exposure) or under what circumstances (dose levels or time to onset).  As one company commented in response to the EPA's proposals that preceded its 1978 Policy Statement, "[a] determination that information 'reasonably supports the conclusion' of substantial risk cannot be made independently of consideration of use, since the method and manner of using a chemical may influence the occurrence of an effect." 1978 Policy Statement,

43 Fed. Reg. at 11115, Comment 19.  Although the company apparently offered the comment in the context of normal versus abnormal use (*id.*), the EPA agreed that "[t]he method and manner of using a chemical is one of several factors determining its exposure potential," and further observed that "a definition of 'normal' use for a particular chemical will often depend upon a *knowledge of the risks* associated with the chemical." *Id.* at 11115, Response to Comment 19. The EPA's 1991 Reporting Guide confirmed that "the method and manner of use"—route of exposure and dose—was an integral part of the "adverse effect" being considered.

635.   As of June 4, 1992, the 1992 Specific Scenario SRI was not corroborative (in terms of, for example, route of exposure, dose, species, time to onset, severity, species, strain, etc.) of a **well-established** adverse effect." 1991 Reporting Guide at 8, Item 5.  Indeed, one week after June 4, 1992, the latest date by which TSCA required BASF, Bayer,  Dow, and Huntsman to report the 1992 Specific Scenario SRI, those defendants, through the III, reported animal data that they claimed indicated the possibility that MDI dermal exposure could cause respiratory hypersensitivity in guinea pigs.  June 11, 1992 TSCA Section 8(e) Submission, Exh. 16 at Bice/Dow12306.  By reporting the supposedly uncertain animal data, the defendants indicated that the effect they were reporting was *not* "corroborative . . . of a well-established adverse effect."  None of the defendants can contend that the 1992 Specific Scenario SRI corroborated a well-established adverse effect as of June 4, 1992, because they conceded one week later, on June 11, 1992 that that same adverse effect was not well-established, even at the animal level.

636.   Further, each defendant has since publicly contended that the scant publicly-available information that suggests that the possibility for isocyanate skin contact to cause respiratory sensitization is anecdotal, inconclusive, and unreliable.  For example, in a May 2002 III paper entitled "Respiratory sensitization:  the role of dermal contact with MDI and TDI," defendants and other III member companies discussed the animal and human data relevant to the potential link between skin contact with MDI and respiratory sensitization.  Exh. 2, at CHARM

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

012422–012446. Each defendant was a co-author of that 2002 III paper. *Id.* at CHARM 12425, Exh. 2.

637. The defendants neither published nor otherwise discussed in that paper the 1992 Specific Scenario SRI, even though that substantial risk information is directly relevant to the link between human isocyanate skin contact and respiratory sensitization. Moreover, the defendants concluded their May 2002 paper by contending that the link between respiratory sensitization and MDI skin contact was not well-established and that the "available" human data was insufficient to establish the link: "The available data do not provide sufficient evidence for a clear correlation between skin exposure and occupational asthma." *Id.* at CHARM 12442, Exh. 2. That statement contradicts the 1992 Specific Scenario SRI, which defendants knowingly failed to report to the EPA and are continuing to conceal.

638. Furthermore, through the Diisocyanates Panel of the ACC, the defendants have recently disputed the potential for dermal induction of respiratory sensitization directly to the EPA. In April 2011, the EPA expressed its heightened interest in MDI and related chemicals by issuing an "MDI Action Plan." *Methylene Diphenyl Diisocyanate (MDI) and Related Compounds Action Plan [RIN 2070-ZA15]*, U.S. Environmental Protection Agency, April 2011 ("MDI Action Plan"). On February 26, 2013, defendants submitted comments to the EPA's proposed MDI Action Plan through the ACC. Feb. 26, 2013 ACC Comments to MDI Action Plan, Exh. 3. Disputing the EPA's statement in the MDI Action Plan that "[b]oth inhalation and dermal exposures to diisocyanates are thought to contribute to the development of isocyanate asthma" (*id.* at 9, Exh. 3), the defendants contended "the role that dermal contact with diisocyanates plays in the development of occupational asthma remains unresolved for humans." *Id.* at 10, Exh. 3. That statement contradicts the 1992 Specific Scenario SRI, which defendants knowingly failed to report to the EPA and are continuing to conceal.

639. None of the defendants can contend that the 1992 Specific Scenario SRI was "corroborative . . . of **well-established** adverse effects," because they have contended afterward, and directly to the EPA, that the effect is not well-established.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

10.   **In or shortly after March 1993, each defendant obtained the "1993 Especial Work Situation SRI," which is substantial risk information about MDI skin contact and low-level inhalation.**

a.   **Each defendant separately obtained the information in or shortly after March 1993.**

640.   In or shortly after March 1993, BASF, Bayer, Dow, and Huntsman each obtained substantial risk information about respiratory sensitization in humans caused by skin contact with or low-level inhalation of MDI.  In April 1993, the III's Scientific Director, D.S. Gilbert, provided a report to the III's Board of Directors.  Report to Board, 1993, BASF-040074-040132 at 040075, Exh. 22.  In Section 4.1.1 of his report, Dr. Gilbert addressed "Sensitisation" under the general heading 4.1 "Medtox Studies."  *Id.*, Exh. 22 at BASF-040083-040085.  Under the subheading "MDI," Dr. Gilbert stated:

> Several years ago medical information from an especial work situation indicated that some workers had possibly become sensitized as a result of skin contact, because vapour exposure appeared to have been extremely low.  These observations led to an III animal study (Kimber).  The draft report of this study indicates that respiratory sensitization may be provoked by skin or intradermal (into the skin) contact with MDI.  There has been considerable debate on this subject, with significant contribution from Member Companies having research experience in this area.

*Id.*, Exh. 22 at BASF-040084 (emphasis in original).

b.   **The 1993 Especial Work Situation SRI was "substantial risk information."**

641.   This information, the "1993 Especial Work Situation SRI," comprised "medical information" relating to multiple "workers," plural, whose MDI respiratory sensitization arose in an "especial work situation" involving "extremely low" inhalation exposure, indicating that the sensitization "possibly" arose from skin contact.  *Id.*, Exh. 22 at BASF-040084.

642.   The III's Scientific Director expressly stated that the 1993 Especial Work Situation SRI contained "medical information."  Moreover, he stated that this "medical information . . . indicated that some workers had possibly become sensitized as a result of skin contact, because vapour exposure appeared to have been extremely low."  *Id.*, Exh. 22 at BASF-040084.  The syntax indicates that the "medical information" confirmed the sensitization

diagnosis, while industrial hygiene data (measurements or other information indicating that vapour exposures were "extremely low") suggested that the sensitization arose not from inhalation but rather from skin contact.

643.   The express reference to "medical information" indicates a high degree of confidence in the sensitization diagnosis. The statement that the "medical information . . . *indicated* [the diagnosis]" reveals an underlying analysis of the medical data that the III's Scientific Director either performed or reviewed.

644.   The context confirms that these workers' diagnosis was *respiratory* sensitization. The Scientific Director began his report with the observation that, "It is widely accepted that under certain circumstances respiratory sensitisation to MDI can arise from inhalation of MDI." *Id.*, Exh. 22 at BASF-040084. He then described the information that indicated "that some workers had possibly become sensitised," which led the III to undertake an animal study, which concluded that "respiratory sensitisation can be provoked by skin or intradermal (into the skin) contact with MDI." *Id.* Logic compels the conclusion that the animal study investigated the same typed of sensitization (respiratory) involved in the human cases that caused the III to undertake the study.

645.   Further, the Scientific Director indicated knowledge about the "vapour exposure" levels in the "especial work situation." *Id.*, Exh. 22 at BASF-040044. The knowledge of these inhalation exposure levels and the exposure conclusions that the Scientific Director reached as a result of that knowledge, indicates the analysis of underlying industrial hygiene data. Indeed, the Scientific Director stated that the knowledge of airborne concentrations ("extremely low") had suggested the possibility that the sensitization had been cause by skin contact. *Id.*

646.   The 1993 Report to the Board therefore establishes that the 1993 Especial Work Situation SRI comprised underlying medical and industrial hygiene data reported to the III's Board of Directors as indicating a causal relationship between confirmed human cases of MDI respiratory sensitization and either MDI skin contact or inhalation of "extremely low" inhalation exposures. *Id.*, Exh. 22 at BASF-040084. Moreover, the report establishes that the III, through

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

its member companies, found the information to be compelling enough to commence an animal study to investigate it. *Id.*

647.    TSCA defines substantial risk information as "information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." 15 U.S.C. § 2607(e). The 1978 Policy Statement provides that "'reasonably supports the conclusion' of substantial risk is not identical to a conclusive demonstration of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11110, Supplementary Information, ¶ (3). The 1978 Policy Statement further provides that "[a] person is not to delay reporting until he obtains conclusive information that a substantial risk exists, but is to immediately report any evidence which 'reasonably supports' that conclusion. Such evidence will generally not be conclusive as to the substantiality of the risk; it should, however, reliably ascribe the effect to the chemical." 1978 Policy Statement at 11112, Unit VI.

648.    In its June 1991 Reporting Guide, the EPA reaffirmed the 1978 policy, providing that "such information need not and most typically does not establish conclusively that a substantial risk exists." 1991 Reporting Guide at 2. The 1991 Reporting Guide provides that the "decision-making process for Section 8(e)-reportability should focus primarily on whether the toxicity or exposure information offers reasonable support for a conclusion of substantial risk under the criteria described above, but should not focus at all on whether the information is conclusive regarding the risk." 1991 Reporting Guide at 2. Further, the 1991 Reporting Guide directs that "[t]he evidence that offers reasonable support for a conclusion of substantial risk need not be complete or definitive but should provide a plausible link between 1) an observed serious effect and one or few chemicals (e.g., in a discrete process/operation), or 2) a specific product/activity and a previously unrecognized exposure to a chemical that is known or reasonably anticipated to cause serious adverse health or environmental effects." 1991 Reporting Guide at 7.

649.    As established above, the 1993 Especial Work Situation SRI "reliably ascribe[d] the effect to the chemical," and was therefore reportable substantial risk information. 1978

130

Policy Statement at 11112, Unit VI. The 1993 Report to the Board establishes that the 1993 Especial Work Situation SRI comprised underlying medical and industrial hygiene data reported to the III's Board of Directors as indicating a causal relationship between confirmed human cases of MDI respiratory sensitization and either MDI skin contact or inhalation of "extremely low" airborne levels of MDI. *Id.*, Exh. 22 at BASF-040084.

650.    The 1993 Especial Work Situation SRI not only "reliably ascribe[d] the effect to the chemical [MDI]," but it also characterized the effect in terms of MDI skin contact or low – level inhalation, neither of which was known by the EPA to cause respiratory sensitization in humans. Thus, the information "provide[d] a plausible link between . . . 2) a specific product/activity [here, MDI (product) and MDI skin contact or low-level inhalation (activity)] and a previously *unrecognized exposure* to a chemical [here, human skin contact or low-level inhalation] that is known or reasonably anticipated to cause serious adverse health or environmental effects." 1991 Reporting Guide at 7 (emphasis added). The 1993 Especial Work Situation SRI was therefore reportable substantial risk information under the 1991 Reporting Guide.

651.    Indeed, each defendant had recently demonstrated its recognition that such information constitutes reportable substantial risk information. On June 11, 1992, each defendant, through the III, reported to the EPA's TSCA Section 8(e) Coordinator the then-unpublished results of Dr. Ian Kimber's study of the dermal induction of respiratory hypersensitivity in guinea pigs. Exh. 16, Bice/Dow12306. According to the III's June 11, 1992 TSCA Section 8(e) submission, the animal data "indicate that respiratory hypersensitivity in guinea pigs *may result* from dermal exposure to MDI." *Id.* (emphasis added). Yet these defendants then failed to report the 1993 Especial Work Situation SRI, which comprised  reports that multiple humans appeared to have sustained MDI respiratory sensitization from skin contact. Since the defendants correctly recognized the reportability of information that they claimed indicated the *possible* dermal induction of respiratory hypersensitivity in *animals*, they

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   necessarily recognized the reportability of information that indicated the apparent dermal

2   induction of respiratory sensitization in *humans*.

3      652.   In other words, the defendants knowingly concealed the existence of the 1993

4   Especial Work Situation SRI from the EPA.

5      653.   The 1978 Policy Statement identifies two factors to weigh in the substantial risk

6   determination: "the seriousness of the effect" and "the fact or probability of its occurrence."

7   1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V.   The 1978 Policy provides that these

8   factors are weighed differently for different effects.   If the effects are among the human health

9   effects identified in unit V(a) of the 1978 Policy Statement, the EPA views the effects as "so

10  serious that relatively little weight is given to exposure; the mere fact that the implicated

11  chemical is in commerce constitutes sufficient evidence of exposure." 1978 Policy Statement,

12  43 Fed. Reg. at 11111, Unit V.   Accordingly, if the information concerns a "serious" health

13  effect identified in unit V(a) of the 1978 Policy Statement, the information constitutes substantial

14  risk information.

15     654.   The "serious" human health effects identified in unit V(a)(1) of the 1978 Policy

16  include "[a]ny instance of . . . serious or prolonged incapacitation, including the loss of or

17  inability to use a normal bodily function with a consequent relatively serious impairment of

18  normal activities, if one (or a few) chemical(s) is strongly implicated." 1978 Policy Statement,

19  43 Fed. Reg. at 11112, Unit V(a)(1).   Respiratory sensitization, which can lead to occupational

20  asthma and permanent lung damage, is such a "serious" human health effect.

21     655.   Accordingly, information about "[a]ny instance" of respiratory sensitization

22  "must be reported" under TSCA Section 8(e) (unless otherwise exempted) "if one (or a few)

23  chemical(s) is strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1).

24  Indeed, the EPA's 1978 Policy Statement elsewhere reiterates that a single instance of such an

25  effect is reportable: "It is anticipated here that reportable effects will generally occur in a

26  pattern, where a significant common feature is exposure to the chemical.   However, a single

27  instance of . . . serious incapacitation in a human would be reportable if one (or a few)

28

chemical(s) was strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2).

656.    The 1993 Especial Work Situation  SRI, which concerned the human health effect of respiratory sensitization caused by either by MDI skin contact or low-level inhalation, was therefore reportable substantial risk information. The 1993 Especial Work Situation SRI involved effects that "occur[ed] in a pattern, where a significant common feature [was] exposure to the chemical," here, exposure through skin contact or low-level inhalation. Indeed, the report calls the pattern an "especial work situation," in which the common pattern is respiratory sensitization in a work environment where "vapour exposure appeared to have been extremely low." 1993 Report to III Board, Exh. 22 at BASF-040084. And, as the 1993 Especial Work Situation SRI indicated a high degree of confidence that these workers had MDI respiratory sensitization—in other words, respiratory sensitization caused by MDI exposure, "one . . . chemical[] is strongly implicated." The 1992 Specific Scenario SRI was reportable substantial risk information.

657.    The EPA's 1978 Policy Statement provides that information that is reportable under Section 8(e) may be obtained from sources other than designed, controlled studies, although designed, controlled studies must be reported. 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(1). Indeed, in its 1978 Policy Statement, the EPA identifies the sources of information that "will often 'reasonably support' a conclusion of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI. These sources include "reports concerning and studies of undesigned, uncontrolled circumstances." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2). Examples of "[r]eports and studies of undesigned circumstances include: (i) medical and health surveys, (ii) clinical studies, and (iii) *reports concerning and evidence of effects in consumers, workers, or the environment.*" 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2) (emphasis added).

658.    The defendants obtained the 1993 Especial Work Situation SRI from "reports concerning. . . undesigned, uncontrolled circumstances," including "reports concerning and

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

evidence of effects in consumers, workers, or the environment." The 1993 Especial Work Situation SRI therefore comprises information that is reportable under TSCA Section 8(e).

c.    **Each defendant separately obtained the 1993 Especial Work Situation SRI.**

659.    Under TSCA, a "business organization is considered to have obtained any information which any officer or employee capable of appreciating the significance of that information has obtained." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit II.

660.    The III's Scientific Director sent his 1993 report to the III Board of Directors in March 1993. 1993 Report to the III Board, Exh. 22 at BASF-0040075.

661.    As of January 12, 1993, each of the four defendants had a representative on the III's Board of Directors. January 12, 1993 III Organization Chart, Exh. 23, BASF-038739-038740 at 038740. As of July 1993, each of the four defendants still had a representative on the III's Board of Directors. July 1993 III Organization Chart, Exh. 24, BASF-038784-038785 at 038785.

662.    Thus, during the month of March 1993, the month in which the Scientific Director provided his Report to the Board, and in the four-month period following the provision of the report, each defendant had a representative on the III's Board of Directors, to whom this report was distributed. By appointing these individuals as their representatives on the III Board of Directors, each defendant indicated its confidence in its respective employees' capability to appreciate the significance of isocyanate safety information that they would obtain as Board members. Through these representatives, each defendant separately obtained the 1993 Especial Work Situation SRI when those representatives received the report. Although the Report to the Board does not indicate the exact distribution date, it was distributed during March 1993. Assuming distribution on the last day of March (March 31, 1993), and conservatively allowing two weeks for mailing, each defendant obtained the 1993 Especial Work Situation SRI as of April 14, 1993.

*Qui Tam* Complaint

**d.      TSCA required that each defendant report the 1993 Especial Work Situation SRI by May 5, 1993.**

663.    The EPA's 1978 Policy Statement provides that "a person has 'immediately informed' the Administrator if information is received by EPA not later than the 15th working day after the date the person obtained such information." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit IV.

664.    As alleged more thoroughly above, each defendant obtained the 1993 Especial Work Situation SRI by April 14, 1993, and TSCA required that each defendant report the 1993 Especial Work Situation SRI to the EPA by May 5, 1993, the fifteenth working day after the date that each defendant separately obtained the information.

**e.      Each defendant was subject to TSCA's reporting requirement when it separately obtained the 1993 Especial Work Situation SRI.**

665.    At the time that it obtained the 1993 Especial Work Situation SRI, Bayer was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

666.    At the time that it obtained the 1993 Especial Work Situation SRI, BASF was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

667.    At the time that it obtained the 1993 Especial Work Situation SRI, Dow was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

135

*Qui Tam* Complaint

668.   At the time that it obtained the 1993 Especial Work Situation SRI, Huntsman was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

   f.   **Each defendant failed to report the 1993 Especial Work Situation SRI, even though TSCA did not exempt its reporting obligation.**

669.   BASF did not report the 1993 Especial Work Situation SRI to the EPA "immediately" after obtaining it.

670.   BASF has never reported the 1993 Especial Work Situation SRI to the EPA.

671.   BASF did not have knowledge as of May 5, 1993 that some entity other than BASF had submitted the 1993 Especial Work Situation SRI to the EPA.

672.   BASF has not acquired knowledge since May 5, 1993 that some entity other than BASF has submitted the 1993 Especial Work Situation SRI to the EPA.

673.   BASF did not have actual knowledge as of May 5, 1993 that the EPA was adequately informed of the 1993 Especial Work Situation SRI.

674.   BASF has not acquired actual knowledge since May 5, 1993 that the EPA has become adequately informed of the 1993 Especial Work Situation SRI.

675.   Therefore, TSCA did not exempt BASF from its obligation to report the 1993 Especial Work Situation SRI.

676.   Bayer did not report the 1993 Especial Work Situation SRI to the EPA "immediately" after obtaining it.

677.   Bayer has never reported the 1993 Especial Work Situation SRI to the EPA.

678.   Bayer did not have knowledge as of May 5, 1993 that some entity other than Bayer had submitted the 1993 Especial Work Situation SRI to the EPA.

679.   Bayer has not acquired knowledge since May 5, 1993 that some entity other than Bayer has submitted the 1993 Especial Work Situation SRI to the EPA.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

680.   Bayer did not have actual knowledge as of May 5, 1993 that the EPA was adequately informed of the 1993 Especial Work Situation SRI.

681.   Bayer has not acquired actual knowledge since May 5, 1993 that the EPA has become adequately informed of the 1993 Especial Work Situation SRI.

682.   Therefore, TSCA did not exempt Bayer from its obligation to report the 1993 Especial Work Situation SRI.

683.   Dow did not report the 1993 Especial Work Situation SRI to the EPA "immediately" after obtaining it.

684.   Dow has never reported the 1993 Especial Work Situation SRI to the EPA.

685.   Dow did not have knowledge as of May 5, 1993 that some entity other than Dow had submitted the 1993 Especial Work Situation SRI to the EPA.

686.   Dow has not acquired knowledge since May 5, 1993 that some entity other than Dow has submitted the 1993 Especial Work Situation SRI to the EPA.

687.   Dow did not have actual knowledge as of May 5, 1993 that the EPA was adequately informed of the 1993 Especial Work Situation SRI.

688.   Dow has not acquired actual knowledge since May 5, 1993 that the EPA has become adequately informed of the 1993 Especial Work Situation SRI.

689.   Therefore, TSCA did not exempt Dow from its obligation to report the 1993 Especial Work Situation SRI.

690.   Huntsman did not report the 1993 Especial Work Situation SRI to the EPA "immediately" after obtaining it.

691.   Huntsman has never reported the 1993 Especial Work Situation SRI to the EPA.

692.   Huntsman did not have knowledge as of May 5, 1993 that some entity other than Huntsman had submitted the 1993 Especial Work Situation SRI to the EPA.

693.   Huntsman has not acquired knowledge since May 5, 1993 that some entity other than Huntsman has submitted the 1993 Especial Work Situation SRI to the EPA.

694.   Huntsman did not have actual knowledge as of May 5, 1993 that the EPA was adequately informed of the 1993 Especial Work Situation SRI.

695.   Huntsman has not acquired actual knowledge since May 5, 1993 that the EPA has become adequately informed of the 1993 Especial Work Situation SRI.

696.   Therefore, TSCA did not exempt Huntsman from its obligation to report the 1993 Especial Work Situation SRI.

### g.   The EPA's guidance documents did not exempt any defendant's obligation to report the 1993 Especial Work Situation SRI.

697.   Although the EPA's guidance documents could be read to broaden TSCA's limited exemption, the EPA's guidance documents cannot alter the scope of the statutory exemption, and each defendant's separate reporting obligation is exempted only if it had "actual knowledge that the Administrator [of the EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

698.   Regardless, however, the EPA's guidance documents did not exempt BASF, Bayer, Dow, or Huntsman from the obligation to report the 1993 Especial Work Situation SRI.

699.   The EPA's 1978 Policy Statement provided that substantial risk information was exempted from reporting if the information: "(a) Has been published by EPA in reports; (b) Has been submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA . . .; (c) Has been published in the scientific literature and referenced [by one of several listed abstract services]; (d) Is corroborative of well-established adverse effects already documented in the scientific literature and referenced [by one of the abstract services listed in (c) above]; or (e) [Is contained in an environmental notification of spills]." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VII(a) through (e).

700.   In its June 1991 Reporting Guide, EPA added two new exemptions, covering information that (1) is contained in a formal report, publication, or public statement of another Federal agency or (2) constitutes national security information based upon a determination by the President of the United States.  1991 Reporting Guide at 8.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

701.     As of May 5, 1993, the latest date by which TSCA required BASF, Bayer, Dow, and Huntsman to report the 1993 Especial Work Situation SRI, the EPA's 1991 Reporting Guide provided that substantial risk information was exempted from reporting if the information:

(1)     is contained in an EPA study or report.
(2)     is published in the open scientific literature.
(3)     has been submitted already to EPA under another mandatory reporting provision of 1) TSCA, or 2) some other authority that is administered by EPA.
(4)     is contained in a formal publication/report or a formal statement made available to the general public by another Federal agency.
(5)     is corroborative (in terms of, for example, route of exposure, dose, species, time to onset, severity, species, strain, etc.) of a **well-established** adverse effect.
        It is important to note, however, that information that newly identifies a serious toxic effect **at a lower dose level** for example, or **confirms a serious effect that was previously only suspected**, is **not** considered by EPA to be corroborative and should be reported under Section 8(e) of TSCA.
(6)     [constitutes national security information based upon a determination of the President of the United States.]

1991 Reporting Guide at 8 (emphasis in original).  The EPA noted in a separate section of the 1991 Reporting Guide that information obtained at public scientific conferences or meetings is exempt from reporting if there is a written record of the meeting that adequately describes the information and is released to the public in a reasonable time frame.  The EPA indicated, however, that information obtained at a private conference or meeting is not exempt and should be considered for reporting.  1991 Reporting Guide at 7.

702.     The EPA's 1991 Reporting Guide expanded the exemption for published information to include "information that is obtained from major U.S. news publications (e.g., newspapers or news magazines with national circulation) or nationally broadcast U.S. radio and/or television news reports."  1991 Reporting Guide at 9.  The EPA clarified, however, that the published-information exemption exempted the reporting requirement only if the regulated company "obtained" the information from the published literature:

With regard to item (2) on the preceding page [that is, "published in the open scientific literature"], EPA believes that for the purposes of Section 8(e) reporting, a subject person need not report information that is *obtained from* well-established/well-recognized scientific journals, such as those typically abstracted

in a) major computerized abstract data bases, or 2) [sic] publications such as <u>Current Contents</u>, published by the Institute for Scientific Information (ISI), Inc. (Philadelphia, Pennsylvania. Similarly, information that is *obtained from* <u>major</u> U.S. news publications (e.g., newspapers or news magazines with national circulation) or nationally broadcast U.S. radio and/or television news reports typically need not be submitted to EPA under Section 8(e) of TSCA. However, with regard to information *obtained from* lesser known scientific journals, or from other magazines, newspapers, radio, or television reports, a subject person must have actual knowledge that EPA has been adequately informed about such information [to be exempt from the reporting obligation].

1991 Reporting Guide at 9 (italicized emphases added, other emphases in original).

703.    The EPA's 1991 Reporting Guide did not exempt any defendant from its obligation to report the 1993 Especial Work Situation SRI.

704.    As of May 5, 1993, the 1993 Especial Work Situation SRI was not "contained in an EPA study or report." 1991 Reporting Guide at 8, Item 1.

705.    As of May 5, 1993, none of the defendants had "obtained" the 1993 Especial Work Situation SRI from "well-established/well-recognized scientific journals," or "<u>major</u> U.S. news publications (e.g., newspapers or news magazines with national circulation) or nationally broadcast U.S. radio and/or television news reports." 1991 Reporting Guide at 9, clarifying Item 2 on page 8.

706.    As of May 5, 1993, the 1993 Especial Work Situation SRI had not been "submitted already to EPA under another mandatory reporting provision of 1) TSCA, or 2) some other authority that is administered by EPA." 1991 Reporting Guide at 8, Item 3.

707.    As of May 5, 1993, the 1993 Especial Work Situation SRI was not "contained in a formal publication/report or a formal statement made available to the general public by another Federal agency." 1991 Reporting Guide at 8, Item 4.

708.    As of May 5, 1993, the President of the United States had not determined that the 1993 Especial Work Situation SRI was national security information. 1991 Reporting Guide at 8, Item 6.

709.    As of May 5, 1993, the 1993 Especial Work Situation SRI was not obtained from a *public* scientific conference or meeting, and the 1993 Especial Work Situation SRI was not

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  "captured accurately/adequately in a meeting transcript, abstract or other such written record or

2  document *that is to be formally released to the public within a reasonable time frame.*" 1991

3  Reporting Guide at 7 (emphasis added).

4       710.   The remaining exemption provided in the EPA's 1991 Reporting Guide is for

5  information that "is corroborative (in terms of, for example, route of exposure, dose, species,

6  time to onset, severity, species, strain, etc.) of a **well-established** adverse effect." 1991

7  Reporting Guide at 8, Item 5 (emphasis in original).  The EPA explained: "It is important to

8  note, however, that information that newly identifies a serious toxic effect at a lower dose level

9  for example, or confirms a serious effect that was previously only suspected, is not considered by

10  EPA to be corroborative and should be reported under Section 8(e) of TSCA." 1991 Reporting

11  Guide at 8.

12       711.   Thus, consistent with the statutory requirement to report information reasonably

13  supporting a conclusion that the chemical presents a substantial *risk* of injury, the EPA defined

14  "adverse effect" in the context of "risk"—not only whether a chemical causes a particular

15  adverse effect, but how (route of exposure) or under what circumstances (dose levels or time to

16  onset).  As one company commented in response to the EPA's proposals that preceded its 1978

17  Policy Statement, "[a] determination that information 'reasonably supports the conclusion' of

18  substantial risk cannot be made independently of consideration of use, since the method and

19  manner of using a chemical may influence the occurrence of an effect." 1978 Policy Statement,

20  43 Fed. Reg. at 11115, Comment 19.  Although the company apparently offered the comment in

21  the context of normal versus abnormal use (*id.*), the EPA agreed that "[t]he method and manner

22  of using a chemical is one of several factors determining its exposure potential," and further

23  observed that "a definition of 'normal' use for a particular chemical will often depend upon a

24  *knowledge of the risks* associated with the chemical." *Id.* at 11115, Response to Comment 19.

25  The EPA's 1991 Reporting Guide confirmed that "the method and manner of use"—route of

26  exposure and dose—was an integral part of the "adverse effect" being considered.

27

28

712.    As of May 5, 1993, the 1993 Especial Work Situation SRI was not corroborative (in terms of, for example, route of exposure, dose, species, time to onset, severity, species, strain, etc.) of a **well-established** adverse effect." 1991 Reporting Guide at 8, Item 5 (emphasis in original).  Indeed, eleven months prior to May 5, 1993, the latest date by which TSCA required BASF, Bayer, Dow, and Huntsman to report the 1993 Especial Work Situation SRI, those defendants, through the III, had reported animal data that they claimed indicated the possibility that MDI dermal exposure could cause respiratory hypersensitivity in guinea pigs.  June 11, 1992 TSCA Section 8(e) Submission, Exh. 16 at Bice/Dow12306.  By reporting the supposedly uncertain animal data, the defendants indicated that the effect they were reporting was *not* "corroborative . . . of a well-established adverse effect."  None of the defendants can contend that the 1993 Especial Work Situation SRI corroborated a well-established adverse effect as of May 5, 1993, because they conceded eleven months earlier, on June 11, 1992 that that same adverse effect was not well-established, even at the animal level.

713.    Further, each defendant has since publicly contended that the scant publicly-available information that suggests that the possibility for isocyanate skin contact to cause respiratory sensitization is anecdotal, inconclusive, and unreliable.  For example, in a May 2002 III paper entitled "Respiratory sensitization:  the role of dermal contact with MDI and TDI," defendants and other III member companies discussed the animal and human data relevant to the potential link between skin contact with MDI and respiratory sensitization.  Exh. 2, at CHARM 012422–012446.  Each defendant was a co-author of that 2002 III paper.  *Id.* at CHARM 12425, Exh. 2.

714.    The defendants neither published nor otherwise discussed in that paper the 1993 Especial Work Situation SRI, even though that substantial risk information is directly relevant to the link between human isocyanate skin contact and respiratory sensitization.  Moreover, the defendants concluded their May 2002 paper by contending that the link between respiratory sensitization and MDI skin contact was not well-established and that the "available" human data was insufficient to establish the link:  "The available data do not provide sufficient evidence for a

*Qui Tam* Complaint

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

clear correlation between skin exposure and occupational asthma." *Id.* at CHARM 12442, Exh. 2. That statement contradicts the 1993 Especial Work Situation SRI, which defendants knowingly failed to report to the EPA and are continuing to conceal.

715.    Furthermore, through the Diisocyanates Panel of the ACC, the defendants have recently disputed the potential for dermal induction of respiratory sensitization directly to the EPA. In April 2011, the EPA expressed its heightened interest in MDI and related chemicals by issuing an "MDI Action Plan." *Methylene Diphenyl Diisocyanate (MDI) and Related Compounds Action Plan [RIN 2070-ZA15]*, U.S. Environmental Protection Agency, April 2011 ("MDI Action Plan"). On February 26, 2013, defendants submitted comments to the EPA's proposed MDI Action Plan through the ACC.  Feb. 26, 2013 ACC Comments to MDI Action Plan, Exh. 2. Disputing the EPA's statement in the MDI Action Plan that "[b]oth inhalation and dermal exposures to diisocyanates are thought to contribute to the development of isocyanate asthma" (*id.* at 9, Exh. 3), the defendants contended "the role that dermal contact with diisocyanates plays in the development of occupational asthma remains unresolved for humans." *Id.* at 10, Exh. 3.   That statement contradicts the 1993 Especial Work Situation SRI, which defendants knowingly failed to report to the EPA and are continuing to conceal.

716.    None of the defendants can contend that the 1993 Especial Work Situation SRI was "corroborative . . . of **well-established** adverse effects," because they have contended afterward, and directly to the EPA, that the effect is not well-established.

11.   **By January 29, 2003, each defendant separately obtained the "2003 Isocyanate Asthma SRI," which comprised substantial risk information about MDI and/or TDI skin contact.**

a.   **Each defendant separately obtained the information by January 29, 2003.**

717.    By January 29, 2003, BASF, Bayer, Dow, and Huntsman each obtained substantial risk information about respiratory sensitization in humans caused by skin contact with MDI and/or TDI. The minutes of the January 28-29, 2003 meeting of the III's Americas Analytical Sub-Committee establish that the attendees discussed cases of isocyanate asthma:

We continue to see cases of isocyanate asthma when there is no evidence of airborne exposure. Latex glove usage is a concern. Some companies are recommending to their customers to not use latex gloves.

The size of these files are [sic] extensive and are available on the Intranet for reference.

Minutes of the January 28-29, 2003 Meeting of the III Americas Analytical Sub-Committee, Exh. 25, III(Bice)019837-019848 at 019839-019840.

b.      **The 2003 Isocyanate Asthma SRI was "substantial risk information."**

718.    This information, the "2003 Isocyanate Asthma SRI," comprised "extensive files" that concerned "cases of isocyanate asthma when there is no evidence of airborne exposure." *Id.*, Exh. 25 at III(Bice)019839.

719.    The minutes do not itemize the content of the "extensive" files, but the context indicates that the files contained both medical and industrial hygiene information.

720.    The minutes reflect conclusive confidence in the diagnosis of "isocyanate asthma." That confidence indicates that the "extensive" files included medical data that prompted the isocyanate asthma diagnosis.

721.    Additionally, the minutes reflect conclusive confidence in the exposure scenario. The statement that these isocyanate asthma cases arose in situations where "there is *no evidence of airborne exposure*" indicates the existence of sophisticated industrial hygiene data that excluded inhalation as a possible exposure route.

722.    The minutes also establish that the attendees suspected that skin contact had caused the cases of isocyanate asthma. The minutes indicate that the discussion of these cases occurred in the context of discussing the "Biomonitoring workshop-Dermal Exposure." *Id.*, Exh. 25 at III(Bice)019839. And immediately after noting the continuing occurrence of isocyanate asthma in environments with no evidence of airborne exposure, the attendees discussed the use or non-use of latex gloves as protection. Logic indicates that the attendees suspected dermal exposure, in the absence of appropriate protective clothing, as the causal exposure that produced the isocyanate asthma cases they continued to see.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

723.    The continuing occurrence of these cases might also account for the "extensive" size of the files. The attendees discussed that "[w]e *continue* to see cases of isocyanate asthma," indicating that the recent cases of dermally-induced isocyanate asthma were consistent with prior such cases. *Id.*, Exh. 25 at III(Bice)019839 (emphasis added). Indeed, the minutes suggest that the III had accumulated these "extensive" files over a period of time during which it "continue[d] to see" these cases of dermally-induced isocyanate asthma. The "extensive" files may well have comprised all or a significant part of the earlier-obtained substantial risk information, including the 1982 Japanese Skin Contact SRI, the 1988 Mineworkers SRI, the 1989 Human Cases SRI, the 1989 German Mine SRI, the 1989 Nakata Papers SRI, the 1992 Human Cases SRI, the 1992 Specific Scenario SRI, and the 1993 Especial Work Situation SRI.

724.    The minutes do not specify the particular isocyanate or isocyanates to which the isocyanate asthma sufferers' had been exposed. However, the III is and has been an association of MDI and/or TDI manufacturers, with a proclaimed mission to promote the safe handling of MDI and TDI. See www.diisocyanates.org (last visited May 2, 2015). Logic indicates that the isocyanate exposures about which the III compiled these extensive files were exposures to the two isocyanates that were the subject of the III's mission.

725.    The meeting minutes therefore establish that the 2003 Isocyanate Asthma SRI comprised underlying medical and industrial hygiene data, stored by the III and available to its member companies on its intranet, that excluded the inhalation exposure route as the cause of confirmed cases of isocyanate asthma, and therefore implicated the dermal exposure route.

726.    TSCA defines substantial risk information as "information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." 15 U.S.C. § 2607(e). The 1978 Policy Statement provides that "'reasonably supports the conclusion' of substantial risk is not identical to a conclusive demonstration of substantial risk." 1978 Policy Statement, 43 Fed. Reg. at 11110, Supplementary Information, ¶ (3). The 1978 Policy Statement further provides that "[a] person is not to delay reporting until he obtains conclusive information that a substantial risk exists, but

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   is to immediately report any evidence which 'reasonably supports' that conclusion. Such

2   evidence will generally not be conclusive as to the substantiality of the risk; it should, however,

3   reliably ascribe the effect to the chemical." 1978 Policy Statement at 11112, Unit VI.

4       727.   In its June 1991 Reporting Guide, the EPA reaffirmed the 1978 policy, providing

5   that "such information need not and most typically does not establish conclusively that a

6   substantial risk exists." 1991 Reporting Guide at 2. The 1991 Reporting Guide provides that the

7   "decision-making process for Section 8(e)-reportability should focus primarily on whether the

8   toxicity or exposure information offers reasonable support for a conclusion of substantial risk

9   under the criteria described above, but should not focus at all on whether the information is

10   conclusive regarding the risk." 1991 Reporting Guide at 2. Further, the 1991 Reporting Guide

11   directs that "[t]he evidence that offers reasonable support for a conclusion of substantial risk

12   need not be complete or definitive but should provide a plausible link between 1) an observed

13   serious effect and one or few chemicals (e.g., in a discrete process/operation), or 2) a specific

14   product/activity and a previously unrecognized exposure to a chemical that is known or

15   reasonably anticipated to cause serious adverse health or environmental effects." 1991

16   Reporting Guide at 7.

17       728.   As established above, the 2003 Isocyanate Asthma SRI "reliably ascribe[d] the

18   effect to the chemical," and was therefore reportable substantial risk information. 1978 Policy

19   Statement at 11112, Unit VI. The meeting minutes establish that the 2003 Isocyanate Asthma

20   SRI comprised underlying medical and industrial hygiene data, stored by the III and available to

21   its member companies on its intranet, that excluded the inhalation exposure route as the cause of

22   confirmed cases of isocyanate asthma, and therefore implicated the dermal exposure route.

23       729.   The 2003 Isocyanate Asthma SRI not only "reliably ascribe[d] the effect to the

24   chemical [MDI]," but it also characterized the effect in terms of MDI skin contact, which was

25   not known by the EPA to cause respiratory sensitization in humans. Thus, the information

26   "provide[d] a plausible link between . . . 2) a specific product/activity [here, MDI (product) and

27   MDI skin contact (activity)] and a previously *unrecognized exposure* to a chemical [here, human

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

skin contact] that is known or reasonably anticipated to cause serious adverse health or environmental effects." 1991 Reporting Guide at 7 (emphasis added). The 2003 Isocyanate Asthma SRI was therefore reportable substantial risk information under the 1991 Reporting Guide.

730.     The 1978 Policy Statement identifies two factors to weigh in the substantial risk determination: "the seriousness of the effect" and "the fact or probability of its occurrence." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V. The 1978 Policy provides that these factors are weighed differently for different effects. If the effects are among the human health effects identified in unit V(a) of the 1978 Policy Statement, the EPA views the effects as "so serious that relatively little weight is given to exposure; the mere fact that the implicated chemical is in commerce constitutes sufficient evidence of exposure." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit V. Accordingly, if the information concerns a "serious" health effect identified in unit V(a) of the 1978 Policy Statement, the information constitutes substantial risk information.

731.     The "serious" human health effects identified in unit V(a)(1) of the 1978 Policy include "[a]ny instance of . . . serious or prolonged incapacitation, including the loss of or inability to use a normal bodily function with a consequent relatively serious impairment of normal activities, if one (or a few) chemical(s) is strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1). Isocyanate asthma is such a "serious" human health effect.

732.     Accordingly, information about "[a]ny instance" of isocyanate asthma "must be reported" under TSCA Section 8(e) (unless otherwise exempted) "if one (or a few) chemical(s) is strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit V(a)(1). Indeed, the EPA's 1978 Policy Statement elsewhere reiterates that a single instance of such an effect is reportable: "It is anticipated here that reportable effects will generally occur in a pattern, where a significant common feature is exposure to the chemical. However, a single instance of . . . serious incapacitation in a human would be reportable if one (or a few) chemical(s) was strongly implicated." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2).

733.    The 2003 Isocyanate Asthma  SRI, which concerned the human health effect of isocyanate asthma caused by MDI skin contact, was therefore reportable substantial risk information.  The 2003 Isocyanate Asthma SRI involved effects that "occur[ed] in a pattern, where a significant common feature [was] exposure to the chemical," here, exposure through skin contact.  Indeed, the report groups the cases according to the pattern, which is cases of isocyanate asthma arising in a work environment where "there is no evidence of airborne exposure."  Minutes of January 28-29, 2003 III Americas Analytical Sub-Committee Meeting, Exh. 25 at III(Bice)019839.  And, as the 2003 Isocyanate Asthma SRI indicated a high degree of confidence that these workers had isocyanate asthma—in other words, asthma caused by exposure to either MDI or TDI, "one . . . chemical[] is strongly implicated."  The 2003 Isocyanate Asthma SRI was reportable substantial risk information.

734.    The EPA's 1978 Policy Statement provides that information that is reportable under Section 8(e) may be obtained from sources other than designed, controlled studies, although designed, controlled studies must be reported.  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(1).  Indeed, in its 1978 Policy Statement, the EPA identifies the sources of information that "will often 'reasonably support' a conclusion of substantial risk."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI.  These sources include "reports concerning and studies of undesigned, uncontrolled circumstances."  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2).  Examples of "[r]eports and studies of undesigned circumstances include: (i) medical and health surveys, (ii) clinical studies, and (iii) *reports concerning and evidence of effects in consumers, workers, or the environment.*"  1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VI(2) (emphasis added).

735.    The defendants obtained the 2003 Isocyanate Asthma SRI from "reports concerning. . . undesigned, uncontrolled circumstances," including "reports concerning and evidence of effects in consumers, workers, or the environment."  The 2003 Isocyanate Asthma SRI therefore comprises information that is reportable under TSCA Section 8(e).

1

**c.     Each defendant separately obtained the 2003 Isocyanate Asthma SRI.**

736.    Under TSCA, a "business organization is considered to have obtained any information which any officer or employee capable of appreciating the significance of that information has obtained." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit II.

737.    Each defendant had representatives present at this January 28-29, 2003 meeting of the III Americas Analytical Sub-Committee meeting. Exh. 25, at III(Bice)019837 (attendance list)..

738.    By appointing these individuals as their representatives on the III Americas Analytical Sub-Committee, each defendant indicated its confidence in its respective employees' capability to appreciate the significance of isocyanate safety information that they would obtain as members of the sub-committee. Through these representatives, each defendant separately obtained the 2003 Isocyanate Asthma SRI when those representatives attended the meeting. Thus, each defendant obtained the 2003 Isocyanate Asthma SRI as of January 29, 2003, the last day of the meeting.

**d.     TSCA required that each defendant report the 2003 Isocyanate Asthma SRI by February 28, 2003.**

739.    The EPA's 1978 Policy Statement provides that "a person has 'immediately informed' the Administrator if information is received by EPA not later than the 15th working day after the date the person obtained such information." 1978 Policy Statement, 43 Fed. Reg. at 11111, Unit IV.

740.    On July 13, 1993, the EPA announced its intention "to change the current 15-working day reporting deadline for the submission of written reports containing substantial risk information to 30 calendar days." 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37736. In its 2003 TSCA Guidance Revisions, the EPA formally revised the reporting period to "the 30th calendar day after the date the subject person obtained such information." 2003 TSCA Guidance Revisions at 33138, Section VIII, Unit IV.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

741.    As alleged more thoroughly above, each defendant obtained the 2003 Isocyanate Asthma SRI by January 29, 2003, and TSCA required that each defendant report the 2003 Isocyanate Asthma SRI to the EPA by February 28, 2003, the thirtieth calendar day after the date that each defendant separately obtained the information.

  e.  **Each defendant was subject to TSCA's reporting requirement when it separately obtained the 2003 Isocyanate Asthma SRI.**

742.    At the time that it obtained the 2003 Isocyanate Asthma SRI, Bayer was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

743.    At the time that it obtained the 2003 Isocyanate Asthma SRI, BASF was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

744.    At the time that it obtained the 2003 Isocyanate Asthma SRI, Dow was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

745.    At the time that it obtained the 2003 Isocyanate Asthma SRI, Huntsman was a "person who manufactures, processes, or distributes in commerce [the] chemical substance[s] or mixture[s]" MDI, PMDI, and TDI, and thus was obligated to "immediately inform the Administrator [of the EPA]" of the substantial risk information, which directly concerned MDI and PMDI, and which concerned TDI either directly or as a closely related chemical.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

**f.   Each defendant failed to report the 2003 Isocyanate Asthma SRI, even though TSCA did not exempt its reporting obligation.**

746.   BASF did not report the 2003 Isocyanate Asthma SRI to the EPA "immediately" after obtaining it.

747.   BASF has never reported the 2003 Isocyanate Asthma SRI to the EPA.

748.   BASF did not have knowledge as of February 28, 2003 that some entity other than BASF had submitted the 2003 Isocyanate Asthma SRI to the EPA.

749.   BASF has not acquired knowledge since February 28, 2003 that some entity other than BASF has submitted the 2003 Isocyanate Asthma SRI to the EPA.

750.   BASF did not have actual knowledge as of February 28, 2003 that the EPA was adequately informed of the 2003 Isocyanate Asthma SRI.

751.   BASF has not acquired actual knowledge since February 28, 2003 that the EPA has become adequately informed of the 2003 Isocyanate Asthma SRI.

752.   Therefore, TSCA did not exempt BASF from its obligation to report the 2003 Isocyanate Asthma SRI.

753.   Bayer did not report the 2003 Isocyanate Asthma SRI to the EPA "immediately" after obtaining it.

754.   Bayer has never reported the 2003 Isocyanate Asthma SRI to the EPA.

755.   Bayer did not have knowledge as of February 28, 2003 that some entity other than Bayer had submitted the 2003 Isocyanate Asthma SRI to the EPA.

756.   Bayer has not acquired knowledge since February 28, 2003 that some entity other than Bayer has submitted the 2003 Isocyanate Asthma SRI to the EPA.

757.   Bayer did not have actual knowledge as of February 28, 2003 that the EPA was adequately informed of the 2003 Isocyanate Asthma SRI.

758.   Bayer has not acquired actual knowledge since February 28, 2003 that the EPA has become adequately informed of the 2003 Isocyanate Asthma SRI.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

759.   Therefore, TSCA did not exempt Bayer from its obligation to report the 2003 Isocyanate Asthma SRI.

760.   Dow did not report the 2003 Isocyanate Asthma SRI to the EPA "immediately" after obtaining it.

761.   Dow has never reported the 2003 Isocyanate Asthma SRI to the EPA.

762.   Dow did not have knowledge as of February 28, 2003 that some entity other than Dow had submitted the 2003 Isocyanate Asthma SRI to the EPA.

763.   Dow has not acquired knowledge since February 28, 2003 that some entity other than Dow has submitted the 2003 Isocyanate Asthma SRI to the EPA.

764.   Dow did not have actual knowledge as of February 28, 2003 that the EPA was adequately informed of the 2003 Isocyanate Asthma SRI.

765.   Dow has not acquired actual knowledge since February 28, 2003 that the EPA has become adequately informed of the 2003 Isocyanate Asthma SRI.

766.   Therefore, TSCA did not exempt Dow from its obligation to report the 2003 Isocyanate Asthma SRI.

767.   Huntsman did not report the 2003 Isocyanate Asthma SRI to the EPA "immediately" after obtaining it.

768.   Huntsman has never reported the 2003 Isocyanate Asthma SRI to the EPA.

769.   Huntsman did not have knowledge as of February 28, 2003 that some entity other than Huntsman had submitted the 2003 Isocyanate Asthma SRI to the EPA.

770.   Huntsman has not acquired knowledge since February 28, 2003 that some entity other than Huntsman has submitted the 2003 Isocyanate Asthma SRI to the EPA.

771.   Huntsman did not have actual knowledge as of February 28, 2003 that the EPA was adequately informed of the 2003 Isocyanate Asthma SRI.

772.   Huntsman has not acquired actual knowledge since February 28, 2003 that the EPA has become adequately informed of the 2003 Isocyanate Asthma SRI.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

773.    Therefore, TSCA did not exempt Huntsman from its obligation to report the 2003 Isocyanate Asthma SRI.

**g.    The EPA's guidance documents did not exempt any defendant's obligation to report the 2003 Isocyanate Asthma SRI.**

774.    Although the EPA's guidance documents could be read to broaden TSCA's limited exemption, the EPA's guidance documents cannot alter the scope of the statutory exemption, and each defendant's separate reporting obligation is exempted only if it had "actual knowledge that the Administrator [of the EPA] has been adequately informed of such information." 15 U.S.C. § 2607(e).

775.    Regardless, however, the EPA's guidance documents did not exempt BASF, Bayer, Dow, or Huntsman from the obligation to report the 2003 Isocyanate Asthma SRI.

776.    The EPA's 1978 Policy Statement provided that substantial risk information was exempted from reporting if the information: "(a) Has been published by EPA in reports; (b) Has been submitted in writing to EPA pursuant to mandatory reporting requirements under TSCA or any other authority administered by EPA . . .; (c) Has been published in the scientific literature and referenced [by one of several listed abstract services]; (d) Is corroborative of well-established adverse effects already documented in the scientific literature and referenced [by one of the abstract services listed in (c) above]; or (e) [Is contained in an environmental notification of spills]." 1978 Policy Statement, 43 Fed. Reg. at 11112, Unit VII(a) through (e).

777.    In its June 1991 Reporting Guide, EPA added two new exemptions, covering information that (1) is contained in a formal report, publication, or public statement of another Federal agency or (2) constitutes national security information based upon a determination by the President of the United States. 1991 Reporting Guide at 8.

778.    The EPA's 1991 Reporting Guide provided that substantial risk information was exempted from reporting if the information:

(1)    is contained in an EPA study or report.
(2)    is published in the open scientific literature.
(3)    has been submitted already to EPA under another mandatory reporting provision of 1) TSCA, or 2) some other authority that is administered by EPA.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

(4)    is contained in a formal publication/report or a formal statement made available to the general public by another Federal agency.

(5)    is corroborative (in terms of, for example, route of exposure, dose, species, time to onset, severity, species, strain, etc.) of a **well-established** adverse effect.

It is important to note, however, that information that newly identifies a serious toxic effect **at a lower dose level** for example, or **confirms a serious effect that was previously only suspected**, is **not** considered by EPA to be corroborative and should be reported under Section 8(e) of TSCA.

(6)    [constitutes national security information based upon a determination of the President of the United States.]

1991 Reporting Guide at 8 (emphasis in original).  The EPA noted in a separate section of the 1991 Reporting Guide that information obtained at public scientific conferences or meetings is exempt from reporting if there is a written record of the meeting that adequately describes the information and is released to the public in a reasonable time frame.  The EPA indicated, however, that information obtained at a private conference or meeting is not exempt and should be considered for reporting.  1991 Reporting Guide at 7.

779.    The EPA's 1991 Reporting Guide expanded the exemption for published information to include "information that is obtained from major U.S. news publications (e.g., newspapers or news magazines with national circulation) or nationally broadcast U.S. radio and/or television news reports."  1991 Reporting Guide at 9.  The EPA clarified, however, that the published-information exemption exempted the reporting requirement only if the regulated company "obtained" the information from the published literature:

> With regard to item (2) on the preceding page [that is, "published in the open scientific literature"], EPA believes that for the purposes of Section 8(e) reporting, a subject person need not report information that is *obtained from* well-established/well-recognized scientific journals, such as those typically abstracted in a) major computerized abstract data bases, or 2) [sic] publications such as Current Contents, published by the Institute for Scientific Information (ISI), Inc. (Philadelphia, Pennsylvania.  Similarly, information that is *obtained from* major U.S. news publications (e.g., newspapers or news magazines with national circulation) or nationally broadcast U.S. radio and/or television news reports typically need not be submitted to EPA under Section 8(e) of TSCA.  However, with regard to information *obtained from* lesser known scientific journals, or from other magazines, newspapers, radio, or television reports, a subject person must have actual knowledge that EPA has been adequately informed about such information [to be exempt from the reporting obligation].

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1991 Reporting Guide at 9 (italicized emphases added, other emphases in original).

780.    In its 1993 Proposed Policy Clarification, the EPA confirmed that the prior-publication exemption applied to information that the regulated company "obtained solely from" one of several sources.  1993 Proposed Policy Clarification, 58 Fed. Reg. at 37739.  Those sources include official federal reports, certain scientific publications, certain databases to which EPA has access, major written news publications, nationally-broadcast radio and television reports, or certain national public scientific conferences.  1993 Proposed Policy Clarification, 58 Fed. Reg. at 37739 and 37741, Unit VII(a)(1)-(6).

781.    As of February 28, 1993, the last day by which TSCA required BASF, Bayer, Dow, and Huntsman to report the 2003 Isocyanate Asthma SRI, the EPA's 1993 Proposed Policy Clarification provided the following reporting exemptions:

"Substantial risk" information need not be reported if it:
    (a)      Is obtained from one of the following sources:
    1.      An official publication or official report published or made available to the general public by EPA or another Federal agency.
    2.      A scientific publication to which an EPA Headquarters library subscribes or that is referenced in a data base, including one which is computerized, to which an EPA Headquarters library subscribes.
    3.      A data base, including one which is computerized, to which an EPA Headquarters library subscribes.
Note:  Specifically regarding paragraphs (2) and (3) above, general information concerning the data bases and publications to which the EPA Headquarters libraries subscribe is available from the Environmental Assistance Division (TS-799), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 401 M. St., SW., Washington, DC 20460, (202) 554-1404, TDD: (202) 554-0551.
    4.      A major written news publication (i.e., newspaper, news magazine, trade press) with national circulation in the U.S.
    5.      A radio or television news report broadcast nationally in the U.S.
Note:  Specifically regarding paragraphs (4) and (5) above, EPA anticipates that information will be obtained from news publications with less than national circulation, or radio or television news reports broadcast only on a local, State, or regional level. In such cases, the information must be reported under section 8(e) of TSCA unless the subject person has actual knowledge that EPA has been adequately informed of such information through that or another source.
    6.      A national public scientific conference or meeting held within the U.S., provided that the information is captured accurately by way of a meeting transcript, abstract, or other such record, and has been cited in a bibliographic/abstract computerized data base, publication, or report of the type

cited in paragraphs (1), (2), (3), (4), or (5) above within 30 days of obtaining such information.

      (b)    Corroborates (i.e., substantially duplicates or confirms) in terms of, for example, route of exposure, dose, species, strain, sex, time to onset, and severity, a well-recognized/well-established serious adverse effect for the subject chemical(s), unless such information concerns effects observed in association with emergency incidents of environmental contamination as described in Part V(c).

      (c)    Is information that is reported to EPA within 30 calendar days for non-emergency information, or immediately (i.e., as soon as the subject person has knowledge of the incident) for emergency information, pursuant to a mandatory reporting requirement of any statutory authority that is administered by EPA [listing examples],

      (d)    [certain information reported to a State], or

      (e)    [certain information reported to a State].

1993 Proposed Policy Clarification, 58 Fed. Reg. at 37741, Unit VII.

    782.    The EPA's 1991 Reporting Guide did not exempt any defendant from its obligation to report the 2003 Isocyanate Asthma SRI.

    783.    As of February 28, 2003, none of the defendants had "obtained" the 2003 Isocyanate Asthma SRI "from . . . [a]n official publication or official report published or made available to the general public by EPA or another Federal agency." 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37741, Unit VII(a)(1).

    784.    As of February 28, 2003, none of the defendants had "obtained" the 2003 Isocyanate Asthma SRI "from . . . [a] scientific publication to which an EPA Headquarters library subscribes or that is referenced in a data base, including one which is computerized, to which an EPA Headquarters library subscribes." 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37741, Unit VII(a)(2).

    785.    As of February 28, 2003, none of the defendants had "obtained" the 2003 Isocyanate Asthma SRI "from . . . [a] data base, including one which is computerized, to which an EPA Headquarters library subscribes." 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37741, Unit VII(a)(3).

    786.    As of February 28, 2003, none of the defendants had "obtained" the 2003 Isocyanate Asthma SRI "from . . . [a] major written news publication (i.e., newspaper, news

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

*Qui Tam* Complaint

magazine, trade press) with national circulation in the U.S." 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37741, Unit VII(a)(4).

787.    As of February 28, 2003, none of the defendants had "obtained" the 2003 Isocyanate Asthma SRI "from . . . [a] radio or television news report broadcast nationally in the U.S." 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37741, Unit VII(a)(5).

788.    As of February 28, 2003, none of the defendants had "obtained" the 2003 Isocyanate Asthma SRI "from . . . [a] national public scientific conference or meeting held within the U.S., provided that the information is captured accurately by way of a meeting transcript, abstract, or other such record, and has been cited in a bibliographic/abstract computerized data base, publication, or report of the type cited in paragraphs (1), (2), (3), (4), or (5) above within 30 days of obtaining such information." 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37741, Unit VII(a)(6).

789.    As of February 28, 2003, the 2003 Isocyanate Asthma SRI was not information that had been reported to the EPA within thirty calendar days under some other mandatory reporting requirement. 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37741, Unit VII(c).

790.    As of February 28, 2003, the 2003 Isocyanate Asthma SRI was not information that had been reported to a State within 30 calendar days under the circumstances specified in exemptions VII(d) and (e). 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37741, Unit VII(d) and (e).

791.    The remaining exemption provided in the EPA's 1993 Proposed Policy Clarification is for information that "[c]orroborates (i.e., substantially duplicates or confirms) in terms of, for example, route of exposure, dose, species, strain, sex, time to onset, and severity, a well-recognized/well-established serious adverse effect for the subject chemical(s)," with environmental contamination exceptions not relevant here. 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37741, Unit VII(b).

792.    In its 1991 Reporting Guide, the EPA had explained this exemption: "It is important to note, however, that information that newly identifies a serious toxic effect at a lower

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   dose level for example, or confirms a serious effect that was previously only suspected, is <u>not</u>

2   considered by EPA to be corroborative and should be reported under Section 8(e) of TSCA."

3   1991 Reporting Guide at 8 (emphasis in original).

4       793.   Thus, consistent with the statutory requirement to report information reasonably

5   supporting a conclusion that the chemical presents a substantial *risk* of injury, the EPA had

6   defined "adverse effect" in the context of "risk"—not only whether a chemical causes a

7   particular adverse effect, but how (route of exposure) or under what circumstances (dose levels

8   or time to onset).  As one company commented in response to the EPA's proposals that preceded

9   its 1978 Policy Statement, "[a] determination that information 'reasonably supports the

10  conclusion' of substantial risk cannot be made independently of consideration of use, since the

11  method and manner of using a chemical may influence the occurrence of an effect."  1978 Policy

12  Statement, 43 Fed. Reg. at 11115, Comment 19.  Although the company apparently offered the

13  comment in the context of normal versus abnormal use (*id.*), the EPA agreed that "[t]he method

14  and manner of using a chemical is one of several factors determining its exposure potential," and

15  further observed that "a definition of 'normal' use for a particular chemical will often depend

16  upon a *knowledge of the risks* associated with the chemical." *Id.* at 11115, Response to

17  Comment 19.  The EPA's 1991 Reporting Guide confirmed that "the method and manner of

18  use"—route of exposure and dose—was an integral part of the "adverse effect" being considered.

19      794.   EPA further confirmed this policy in its 1993 Proposed Policy Clarification:

20  EPA maintains its position under Part VII(c) of the 1978 Policy Statement that
    information need not be reported under section 8(e) of TSCA if the information

21  corroborates well established, serious adverse effects that are already
    documented. The term "corroborates," in the context of this particular reporting

22  exclusion, means that the information *essentially duplicates and/or confirms an
    existing and well-documented understanding of a serious adverse effect* of a

23  particular chemical substance or mixture. EPA has correctly received, and expects
    to continue to receive, substantial risk reports that show adverse effects of a more

24  serious degree or of a different kind than are already established. In other words,
    the Agency expects subject persons to immediately consider reporting

25  information on serious toxic effects (including but not limited to cancer,
    developmental, reproductive toxicity, or neurotoxicity) if, for example: such

26  effects are substantially more serious in terms of the severity of the effects or the
    number of animals affected; occur within a significantly shorter time frame

27  following exposure; *occur via a different route of exposure*; *occur at a*

28

*significantly lower dose or concentration*; or occur in a different species, strain, or sex.

1993 Proposed Policy Clarification, 58 Fed. Reg. at 37739 (emphasis added).

795.    As of February 28, 2003, the 2003 Isocyanate Asthma SRI did not "[c]orroborate[] (i.e., substantially duplicate[] or confirm[]) in terms of, for example, route of exposure, dose, species, strain, sex, time to onset, and severity, a well-recognized/well-established serious adverse effect for the subject chemical(s)." 1993 Proposed Policy Clarification, 58 Fed. Reg. at 37741, Unit VII(b).

796.    Indeed, nine months prior to February 28, 2003, the latest date by which TSCA required BASF, Bayer, Dow, and Huntsman to report the 2003 Isocyanate Asthma SRI, those defendants, through the III, had publicly contended that the scant publicly-available information that suggests that the possibility for isocyanate skin contact to cause respiratory sensitization is anecdotal, inconclusive, and unreliable. In a May 2002 III paper entitled "Respiratory sensitization: the role of dermal contact with MDI and TDI," defendants and other III member companies discussed the animal and human data relevant to the potential link between skin contact with MDI and respiratory sensitization. Exh. 2, at CHARM 012422–012446. Each defendant was a co-author of that 2002 III paper. *Id.* at CHARM 12425, Exh. 2.

797.    The defendants neither published nor otherwise discussed in that paper the 2003 Isocyanate Asthma SRI, even though that substantial risk information is directly relevant to the link between human isocyanate skin contact and respiratory sensitization. Moreover, the defendants concluded their May 2002 paper by contending that the link between respiratory sensitization and MDI skin contact was <u>not</u> well-established and that the "available" human data was insufficient to establish the link: "The available data do not provide sufficient evidence for a clear correlation between skin exposure and occupational asthma." *Id.* at CHARM 12442, Exh. 2. That statement directly contradicts the 2003 Isocyanate Asthma SRI, which defendants knowingly failed to report to the EPA and are continuing to conceal.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

798.   Furthermore, through the Diisocyanates Panel of the ACC, the defendants have recently disputed the potential for dermal induction of respiratory sensitization directly to the EPA.  In April 2011, the EPA expressed its heightened interest in MDI and related chemicals by issuing an "MDI Action Plan."  *Methylene Diphenyl Diisocyanate (MDI) and Related Compounds Action Plan [RIN 2070-ZA15]*, U.S. Environmental Protection Agency, April 2011 ("MDI Action Plan").  On February 26, 2013, defendants submitted comments to the EPA's proposed MDI Action Plan through the ACC.  Feb. 26, 2013 ACC Comments to MDI Action Plan, Exh. 3.  Disputing the EPA's statement in the MDI Action Plan that "[b]oth inhalation and dermal exposures to diisocyanates are thought to contribute to the development of isocyanate asthma" (*id.* at 9, Exh. 3), the defendants contended "the role that dermal contact with diisocyanates plays in the development of occupational asthma remains unresolved for humans." *Id.* at 10, Exh. 3.   That statement directly contradicts the 2003 Isocyanate Asthma SRI, which defendants knowingly failed to report to the EPA and are continuing to conceal.

799.   None of the defendants can contend that the 2003 Isocyanate Asthma SRI was "corroborative . . . of **well-established** adverse effects," because they contended contemporaneously with their receipt of the substantial risk information that the effect was not well-established.  And they continue to make the same contention, as recently as February 2013 directly to the EPA.

### 12.   Summary of SRI Obtained or Developed by Defendants.

800.   The following chart identifies the SRI each defendant obtained, the date by which the defendant obtained the SRI, and the date by which TSCA required the defendant to report the SRI.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

| SRI Obtained by Each Defendant | | | | |
|---|---|---|---|---|
| SRI | Defendant | Date Obtained | Report Deadline | Information |
| Bayer's 1979 Skin Contact SRI | Bayer | 12/31/79 | 1/22/80 | Information that skin contact with MDI could cause respiratory sensitization and reduced lung function, communicated in internal training by Bayer's industrial hygienists. Exh. 6 -- April 21, 2005 Deposition of David Hussey at 56-62, 66. |
| 1982 Japanese Skin Contact SRI | Bayer | 4/20/82 | 5/11/82 | Analysis relevant to whether TDI or MDI skin absorption can cause pulmonary sensitization. Exh. 7 -- Minutes of the meeting of the III Safety Committee, April 19-20, 1982, at III(Bice) 003127. |
| | Dow | 4/20/82 | 5/11/82 | |
| 1988 Mineworkers SRI | BASF | 11/7/88 | 11/30/88 | Cases of human respiratory sensitization conclusively caused either by MDI skin contact or low-level inhalation. Exh. 8 -- Minutes of the September 6-8, 1988 meeting of the III Safety Committee, at III(Bice)007178, Item 10.6. |
| | Bayer | 11/7/88 | 11/30/88 | |
| | Dow | 9/8/88 | 9/29/88 | |
| | Huntsman | 9/8/88 | 9/8/88 | |
| 1989 Human Cases SRI | BASF | 3/9/89 | 3/30/89 | "Evidence" relating to multiple "cases," plural, of MDI respiratory sensitization in humans, caused by MDI exposure in what appeared to be a low-level ("negligible") inhalation exposure environment. Exh. 12 -- Minutes of the III Scientific Committee's March 6-9, 1989 meeting, at III(Bice)007425, Item 7.0(A). |
| | Bayer | 5/8/89 | 5/30/89 | |
| | Dow | 3/9/89 | 3/30/89 | |
| | Huntsman | 3/9/89 | 3/30/89 | |
| 1989 German Mine SRI | BASF | 3/9/89 | 3/30/89 | Information relating to multiple "situations," plural, of "MDI respiratory sensitization" in humans, caused either by MDI skin contact or by low-level ("inordinately low") MDI inhalation exposure. Exh. 12 -- Minutes of the III Scientific Committee's March 6-9, 1989 meeting, at III(Bice)007436. |
| | Bayer | 5/8/89 | 5/30/89 | |
| | Dow | 3/9/89 | 3/30/89 | |
| | Huntsman | 3/9/89 | 3/30/89 | |
| 1989 Nakata Papers SRI | BASF | 3/9/89 | 3/30/89 | Several papers that analyzed medical and industrial hygiene data and determined, based on that analysis, an apparent causal relationship between documented MDI skin contact and confirmed human cases of MDI respiratory sensitization. Exh. 12 -- Minutes of the III Scientific Committee's March 6-9, 1989 meeting, at III(Bice)007436. |
| | Bayer | 5/8/89 | 5/30/89 | |
| | Dow | 3/9/89 | 3/30/89 | |
| | Huntsman | 3/9/89 | 3/30/89 | |

*Qui Tam* Complaint

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

| SRI Obtained by Each Defendant | | | | |
|---|---|---|---|---|
| SRI | Defendant | Date Obtained | Report Deadline | Information |
| 1992 Human Cases SRI | All | 3/16/92 | 4/6/92 | Underlying medical and industrial hygiene data from which various III member companies had concluded a "likely" causal relationship between documented MDI skin contact and confirmed human cases of MDI respiratory sensitization. Exh. 15 -- Minutes of the III European Med-Tox (EU-MTX) Sub-Committee's January 16, 1992 meeting, at III(Bice)009472, Item 5.1. |
| 1992 Specific Scenario SRI | All | 5/14/92 | 6/4/92 | Underlying medical and industrial hygiene data reported to the III's Board of Directors as indicating an apparent causal relationship between confirmed human cases of MDI respiratory sensitization and either MDI skin contact or inhalation of "extremely low exposures of airborne MDI." Exh. 19 – 1992 Report to III Board, at BASF-040044. |
| 1993 Especial Work Situation SRI | All | 4/14/93 | 5/5/93 | Underlying medical and industrial hygiene data reported to the III's Board of Directors as indicating a causal relationship between confirmed human cases of MDI respiratory sensitization and either MDI skin contact or inhalation of "extremely low" inhalation exposures. Exh. 22 – 1993 Report to III Board, at BASF-040084. |
| 2003 Isocyanate Asthma SRI | All | 1/29/03 | 2/28/03 | Underlying medical and industrial hygiene data, stored by the III and available to its member companies on its intranet, that excluded the inhalation exposure route as the cause of confirmed cases of isocyanate asthma, and therefore implicated the dermal exposure route. Exh. 25 -- Minutes of the January 28-29, 2003 Meeting of the III Americas Analytical Sub-Committee, at III(Bice)019839-019840. |

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

**D.** **Each defendant's civil penalty obligations for TSCA reporting violations**

801. TSCA originally imposed a "civil penalty" of up to $25,000 for each TSCA violation (since adjusted upward, as detailed below), and specified that "[e]ach day such a violation continues shall . . . constitute a separate violation." 15 U.S.C.§ 2615(a)(1).

802. In accordance with Congressional instruction, the EPA has adjusted TSCA's civil penalty from time to time for inflation, as reflected in the following chart:

| Adjustments to TSCA Civil Penalty | | | |
|---|---|---|---|
| **01/01/77 - 1/30/97** | **01/31/97 – 3/15/04** | **03/16/04 – 1/12/09** | **01/13/09 - Present** |
| $25,000 per violation | $27,500 per violation | $32,500 per violation | $37,500 per violation |

Civil Monetary Penalty Inflation Adjustment Rule, 73 Fed. Reg. 75340, 75345 (Dec. 11, 2008).

1. **Determination of each defendant's "Gravity Based Penalty."**

803. The EPA declared its current policy for assessing penalties for violations of TSCA's Section 8(e) reporting obligations in The Enforcement Response Policy for Reporting and Recordkeeping Rules and Requirements for TSCA Sections 8, 12, and 13, United States Environmental Protection Agency, (1999) ("TSCA Enforcement Response Policy"). The EPA's policy designates Section 8(e) reporting violations as some of the most serious TSCA violations, and therefore assesses such violations at the high end of the penalty assessment scale. *Id.* at 8-14.

804. The EPA determines penalties in two stages. It first determines a "gravity based penalty" (GBP) and then adjusts the GBP based on various factors. *Id.* at 5.

805. The EPA calculates the GBP based on four statutory factors: Nature, Circumstances, Extent, and Gravity. *Id.*

806. The "Nature" of the Section 8, 12, and 13 record-keeping and reporting violations addressed by the TSCA Enforcement Response Policy is "hazard assessment." *Id.*

807. The EPA assesses the "Gravity" of the violation as a "dependent variable;" its evaluation of the Nature, Circumstances, and Extent will determine the gravity. *Id.*

808. Thus, "[s]ince the statutory factor of 'nature' is a constant throughout this policy, and the statutory factor of 'gravity' is a 'dependent variable,' the gravity based penalty is determined by applying a matrix with 'circumstances' on the vertical axis and 'extent' along the horizontal axis." *Id.*

809. The TSCA Enforcement Response Policy provides that "[n]on reporting violations under TSCA § 8 occur when information, studies, or reports are not submitted to EPA." *Id.* at 9. Each defendant's failure to report the substantial risk information it obtained or developed constitutes a "non reporting violation" under EPA's TSCA Enforcement Response Policy.

810. The EPA assesses "Non reporting for TSCA § 8(e)" as "Level 1," the highest "Circumstance Level," and assesses the violation on a "per day" basis. *Id.* at 9.

811. As for the "Extent Level," the EPA assesses Section 8(e) reporting violations as either "Major" (the highest level) or "Significant." The EPA assesses Section 8(e) violations "involving human data" as "Major" violations. The EPA also assesses as "Major" violations those Section 8(e) violations "which directly interfere with the Agency's ability to address situations involving potential imminent hazard, unreasonable risks, or substantial endangerment to health or the environment." *Id.* at 11. However, the TSCA Enforcement Response Policy provides that the EPA's assessment of a Section 8(e) reporting violation as "Major" must have the written concurrence from EPA's Office of Prevention, Pesticides, and Toxic Substances (OPPTS). *Id.*

812. Each defendant's Section 8(e) reporting violations involved human data, and are thus "Major" violations.

813. Each defendant's Section 8(e) reporting violations "directly interfere[d] with the Agency's ability to address situations involving . . . unreasonable risks[] or substantial endangerment to health," (*id.* at 11) and are thus "Major" violations.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

814.   The EPA indicates that "incomplete and inaccurate information will have far-reaching effects on the Agency's risk assessment, regulatory priority setting, and regulation development process." *Id.* at 18.

815.   For more than twenty-five years (thirty-five for Bayer), each defendant has willfully concealed from the EPA substantial risk information about an unusual and unexpected hazard—the potential for skin contact to cause respiratory sensitization and/or permanent pulmonary injury.  As alleged thoroughly below in connection with each defendant's concealment of their statutory and contractual obligations, each defendant concealed and failed to report the substantial risk information to avoid and deflect the increased regulatory activity that the anticipated such reporting would prompt.

816.   On February 1, 1991, the EPA announced the Compliance Audit Program (CAP). The program essentially operated as an amnesty for prior TSCA Section 8(e) reporting violations.  Registration and Agreement for TSCA Section 8(e) Compliance Audit Program, 56 Fed. Reg. 4128 (February 1, 1991) ("CAP Agreement"), Exh. 26.

817.   The EPA instituted CAP based on its observation that regulated companies had been failing to report information that the EPA viewed as reportable under Section 8(e).  CAP Agreement, Exh. 26, 56 Fed. Reg. at 4128, Unit I, Background.

818.   In announcing the program, the EPA stated:

> Up-to-date information on hazard and exposure *is vital in supporting EPA efforts to protect human health and the environment from risks from toxic chemicals. EPA has the responsibility under TSCA to perform needed risk assessments on chemicals.*  Section 8(e) is a very important part of TSCA's section 8 information reporting and recordkeeping provisions that enable EPA to obtain and disseminate information needed to set priorities and perform risk assessments that may be national in scope.  *Companies that do not report vital information are undermining the effectiveness of the early warning system intended under section 8(e).*

*Id.*, CAP Agreement, Exh. 26, 56 Fed Reg. at 4128, Unit I, Background (emphasis added).

819.   Thus, "to achieve the Agency's goal of obtaining any outstanding section 8(e) data, EPA has developed this one-time voluntary compliance program designed to strongly

1   encourage companies to voluntarily audit their files for studies reportable under section 8(e)."

2   *Id.* at 4129.

3   820.   As alleged thoroughly below in connection with BASF, Bayer, and Dow's

4   contractual obligations, BASF, Bayer, and Dow each contractually agreed to provide their

5   previously-unreported substantial risk information to the EPA as information that was "vital in

6   supporting EPA efforts to protect human health and the environment from risks from toxic

7   chemicals." *Id.* (emphasis added).

8   821.   Although Huntsman apparently did not enter a CAP Agreement with EPA, it

9   nonetheless knew or should have known, as an EPA-regulated company, that the EPA needed

10   Huntsman's previously-unreported substantial risk information as information that was "vital in

11   supporting EPA efforts to protect human health and the environment from risks from toxic

12   chemicals." *Id.* (emphasis added).

13   822.   By failing to report its substantial risk information, each defendant thus thwarted,

14   rather than supported, the EPA's "efforts to protect human health and the environment from risks

15   from toxic chemicals," and "undermin[ed] the effectiveness of the early warning system intended

16   under section 8(e). *Id.*

17   823.   For example, in April 1992, the EPA created a Hazard Summary for MDI, and

18   revised the Hazard Summary in January 2000.  EPA Hazard Summary for MDI,

19   http://www.epa.gov/ttnatw01/hlthef/methyl-d.html (last visited May 6, 2015).  As of and prior to

20   April 1992, when EPA created the Hazard Summary, BASF, Bayer, Dow, and Huntsman each

21   had obtained or developed substantial risk information that reasonably supported the conclusion

22   that skin contact with or low-level inhalation of MDI or PMDI could cause respiratory

23   sensitization or other pulmonary injury.  Yet each defendant failed to report that substantial risk

24   information, and thus "directly interfere[d] with the Agency's ability to address situations

25   involving . . . unreasonable risks[] or substantial endangerment to health," by depriving the EPA

26   of that information in connection with its creation of the MDI Hazard Summary.  TSCA

27   Enforcement Response Policy at 11.

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

824.    Similarly, as of and prior to January 2000, when EPA revised the Hazard Summary, BASF, Bayer, Dow, and Huntsman each had obtained or developed additional substantial risk information that reasonably supported the conclusion that skin contact with or low-level inhalation of MDI or PMDI could cause respiratory sensitization or other pulmonary injury. Yet each defendant failed to report that substantial risk information, and thus "directly interfere[d] with the Agency's ability to address situations involving . . . unreasonable risks[] or substantial endangerment to health," by depriving the EPA of that information in connection with its creation of the MDI Hazard Summary. TSCA Enforcement Response Policy at 11.

825.    Indeed, the EPA's Hazard Summary for MDI does not indicate the possibility that skin contact with or low-level inhalation of MDI or PMDI could cause respiratory sensitization or other pulmonary injury.

826.    BASF, Bayer, Dow, and Huntsman similarly interfered with the EPA's hazard identification and risk assessment activities when the EPA prepared its "Toxicological Review of MDI" in 1998. In and prior to 1998, each defendant had obtained or developed substantial risk information that reasonably supported the conclusion that skin contact with or low-level inhalation of MDI or PMDI could cause respiratory sensitization or other pulmonary injury. Yet each defendant failed to report that substantial risk information, and thus "directly interfere[d] with the Agency's ability to address situations involving . . . unreasonable risks[] or substantial endangerment to health," by depriving the EPA of that information in connection with its creation of the Toxicological Review of MDI in 1998. TSCA Enforcement Response Policy at 11.

827.    Indeed, the EPA's 1998 Toxicological Review of MDI does not indicate the possibility that skin contact with or low-level inhalation of MDI or PMDI could cause respiratory sensitization or other pulmonary injury.

828.    In April 2011, the EPA expressed its heightened interest in MDI and related chemicals by issuing an "MDI Action Plan," in which it proposed increased scrutiny of MDI to

KASUWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

address its concerns about the chemical, and in particular "the potential health effects that may result from exposures to the consumer or self-employed worker." MDI Action Plan at 1.

829.     Although the EPA expressed concern about potential isocyanate health effects, it characterized the potential for respiratory injury from skin exposure as uncertain.  While acknowledging several published reports in which respiratory injury had occurred where the airborne exposure was either below established exposure levels, undetected with the measuring systems used, or unmeasured (studies that these defendants have long criticized) (MDI Action Plan at 6), the EPA cited to recent scientific articles in which "[b]oth inhalation and dermal exposures to isocyanates *are thought to contribute* to the development of isocyanate asthma" (*id.* at 5 (emphasis added)).  In contrast to this uncertain human data, the EPA noted that MDI "*is a* respiratory sensitizer via both the dermal and inhalation routes of exposure in animals." *Id.* (emphasis added).

830.     To address its concerns, the EPA stated its intention to take several actions.  First, it stated that it would "[i]ssue a data call-in" under various TSCA regulations to obtain "allegations of significant adverse effects" and "one-time reporting of relevant unpublished health and safety studies for uncured MDI." *Id.* at 10.  The EPA also stated that it would consider requiring the industry to conduct exposure monitoring studies in both the consumer and commercial settings. *Id.*

831.     Based on the EPA's April 2011 issuance of the MDI Action Plan, BASF, Bayer, Dow, and Huntsman knew or should have known at or around that time of the EPA's stated interest in the health effects of MDI, including its interest in human data related to the potential dermal induction of respiratory sensitization.

832.     Each defendant's failure to report previously-obtained substantial risk information in these circumstances thus "directly interfere[d] with the Agency's ability to address situations involving . . . unreasonable risks[] or substantial endangerment to health," by depriving the EPA of that information to inform its regulatory decisions.  TSCA Enforcement Response Policy at 11.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

833.   Instead of reporting previously-obtained substantial risk information, on February 26, 2013, each defendant submitted comments to the EPA's proposed MDI Action Plan through the ACC.   Feb. 26, 2013 ACC Comments to MDI Action Plan, Exh. 3.  Disputing the EPA's statement in the MDI Action Plan that "[b]oth inhalation and dermal exposures to diisocyanates are thought to contribute to the development of isocyanate asthma" (*id.* at 9, Exh. 3), each defendant falsely represented that "the role that dermal contact with diisocyanates plays in the development of occupational asthma remains unresolved for humans." *Id.* at 10, Exh. 3.

834.   This statement directly contradicted the substantial risk information that each defendant has failed to report and continues to conceal.  By making this statement, each defendant falsely implied that no other human data existed and falsely denied the existence of the substantial risk information it was concealing.

835.   By making this statement, each defendant "directly interfere[d] with the Agency's ability to address situations involving . . . unreasonable risks[] or substantial endangerment to health." TSCA Enforcement Response Policy at 11.

836.   Based on the EPA's April 2011 issuance of the MDI Action Plan, BASF, Bayer, Dow, and Huntsman knew or should have known at or around that time of the EPA's stated interest in the health effects of MDI, "the potential health effects that may result from exposures to the consumer or self-employed worker." MDI Action Plan at 1.  Those types of exposures necessarily included inhalation exposures at concentrations below the regulatory or recommended limits.

837.   But each defendant concealed their substantial risk information about the low-level-inhalation-induction health effect, and instead falsely represented to the EPA that low-level exposures were safe.  In their comments to the EPA's MDI Action Plan, each defendant disputed the EPA's statement in the MDI Action Plan that "[b]oth inhalation and dermal exposures to diisocyanates are thought to contribute to the development of isocyanate asthma" (Feb. 26, 2013 ACC Comments to MDI Action Plan at 9, Exh. 3).  In commenting on that statement, each defendant represented to the EPA: "The ability of diisocyanates to induce respiratory

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

sensitization in some individuals, and asthma in some cases, is a known potential adverse health effect in humans *after exposure to concentrations above workplace exposure limits.*" *Id.* at 10 (emphasis added), Exh. 3.

838.   As alleged thoroughly above, in February 2013 each defendant possessed substantial risk information about the low-level-inhalation health effect.  By omitting this information from their 2013 comments to the EPA's MDI Action Plan, BASF, Bayer, Dow, and Huntsman each represented to the EPA that they neither possessed nor were aware of substantial risk information about the low-level-inhalation health effect.  By making such a false representation to the EPA, each defendant "directly interfere[d] with the Agency's ability to address situations involving . . . unreasonable risks[] or substantial endangerment to health." TSCA Enforcement Response Policy at 11

839.   The defendants' statement also misleadingly implies that exposures below the "workplace exposure limits" did not have the ability to "induce respiratory sensitization," in direct contradiction to the substantial risk information that each defendant has failed to report and continues to conceal.

840.   By making this misleading representation and continuing to conceal the substantial risk information about the low-level-inhalation-induction health effect, each defendant "directly interfere[d] with the Agency's ability to address situations involving . . . unreasonable risks[] or substantial endangerment to health."  TSCA Enforcement Response Policy at 11.

841.   The penalty matrix provides that for violations occurring on or before January 30, 1997, a Level 1, Major violation results in the assessment of the maximum daily penalty of $25,000.  For violations after January 30, 1997 (and prior to subsequent penalty inflation adjustments), a Level 1, Major violation results in the assessment of the maximum daily penalty of $27,500.

842.   In other words, a Level 1, Major violation results in a "base penalty" in the amount of the maximum daily penalty allowed under the penalty amounts set by the penalty inflation adjustments for the date or dates during which the violation continues.

843.   Each defendant's reporting violations are Level 1, Major violations. The EPA's TSCA Enforcement Response Policy therefore determines the "base penalty" to be assessed for each violation as the maximum daily penalty allowed under the penalty amounts set by the penalty inflation adjustments for the date or dates during which the violation continues.

844.   The EPA has set "[n]o cap" on the number of days for a penalty to be assessed for a TSCA Section 8(e) violation. *Id.* at 13 and 26. The EPA explains:  The harm continues as long as the violation continues." *Id.* at 26.

845.   Moreover, because the defendant's violations have "directly interfere[d] with the Agency's ability to address situations involving . . . unreasonable risks[] or substantial endangerment to health" (*id.* at 11), the penalty equals the base penalty times the number of days in violation. *Id.* at 12.

846.   Additionally, the EPA's policy provides that "[m]ultiple penalties are to be used if there is more than one violation of the same rule or violations of different rules." *Id.* at 13. For TSCA Section 8(e) violations, this policy means that violations will be determined "Per Type of Reportable Effect or Event Per Chemical." *Id.* at 14. The EPA explains that "[o]mission of one significant adverse effect even if other effects are reported impedes the Agency's risk assessment." *Id.* at 27.

847.   Most of the defendants' reporting failures involved two significant adverse effects:  (1) the dermal-induction of respiratory sensitization or pulmonary injury and (2) the low-level-inhalation-induction of respiratory sensitization or pulmonary injury.

848.   In such cases, a defendant's failure to report the information constitutes two separate violations under the EPA's TSCA Enforcement Response Policy, for each day of the defendant's continuing failure to report.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

849.   Further, the defendants' reporting failures involved two and sometimes three chemicals:  (1) MDI; (2) PMDI; and (3) TDI.

850.   Each defendant that obtained or developed substantial risk information about MDI should have reported that information to the EPA for both MDI and PMDI.  As each defendant has acknowledged, PMDI is "a mixture of MDI and higher molecular weight oligomers of MDI," with MDI representing "[a]pproximately 50%" of that mixture. *Initial Submission:  Letter from International Isocyanate Institute to U.S. EPA submitting information on Monomeric and Polymeric MDI*, Submitted March 14, 1984, EPA Document ID: FYI-OTS-0794-1027, EPA00609-00626 at 00615, Exh. 1.  Thus, because it is the primary component of PMDI, substantial risk information about MDI (a "substance") is necessarily substantial risk information about PMDI (a "mixture" comprised primarily of MDI).

851.   Each defendant has acknowledged that substantial risk information reportable for MDI is also reportable for PMDI.  On March 14, 1984, the III responded to a request for information about MDI from the TSCA Interagency Testing Committee (ITC).  Although the ITC had requested information about MDI (CAS numbers 101-68-8 and 26447-40-5), the III also believed it necessary to make a PMDI submission of its MDI information:  "However, since MDI is mostly manufactured and sold in its polymeric form, we are also submitting information on this third chemical group [identifying PMDI]." *Id.*, Exh.1 at EPA00613.

852.   Further, because PMDI consists primarily of MDI, substantial risk information about PMDI (a "mixture") is necessarily substantial risk information about MDI, the "substance" that is the primary constituent of PMDI.

853.   Thus, the majority of each defendant's reporting failures constitute four violations (two significant adverse effects for two chemicals—MDI and PMDI), and some constitute six violations (two significant adverse effects for three chemicals—MDI, PMDI, and TDI), for each day of the defendant's continuing failure to report.

854. TSCA's civil penalty provision affirms that TSCA reporting violations are continuing violations ("[e]ach day such a violation continues"), and provides that the penalty imposed for the continuing violation will increase each day the violation continues.

### a. BASF's Gravity Based Penalty

855. TSCA imposed an obligation on BASF to report each adverse effect, with respect to each chemical, for each of the following separate items of substantial risk information that it obtained or developed:

a. <u>1988 Mineworkers SRI</u> (two adverse effects, two chemicals);

b. <u>1989 Human Cases SRI</u> (two adverse effects, two chemicals);

c. <u>1989 German Mine SRI</u> (two adverse effects, two chemicals);

d. <u>1989 Nakata Papers SRI</u> (one adverse effect, two chemicals);

e. <u>1992 Human Cases SRI</u> (one adverse effect, two chemicals);

f. <u>1992 Specific Scenario SRI</u> (two adverse effects, two chemicals);

g. <u>1993 Especial Work Situation SRI</u> (two adverse effects, two chemicals); and

h. <u>2003 Isocyanate Asthma SRI</u> (one adverse effect, two chemicals).

856. BASF failed to fulfill each of these separate reporting obligations, and each such failure is a separate, continuing reporting violation that continues until BASF fulfills that reporting obligation. The penalty for each separate violation increases each day that the violation continues.

857. Because BASF has not fulfilled any of these reporting obligations, the penalties for each of its violations have continued to increase through the date of this complaint. The chart below summarizes the calculation of BASF's $6,897,125,000 in civil penalties through the date of this complaint. In the "Effect/Chemical" column, "Dermal" means "dermal-induction health effect," and "LLI" means "low-level-inhalation-induction health effect."

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

| TSCA Civil Penalties -- BASF | | | | | | | |
|---|---|---|---|---|---|---|---|
| SRI | Effect/ Chemical | Report Due | Through 1/30/97 $25k/day | 1/31/97 – 3/15/04 $27.5k/day | 3/16/04 – 1/12/09 $32.5k/day | 1/12/09 – 5/20/15 $37.5k/day | TOTAL |
| 1988 Mine-workers SRI | | | 2,983 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| | Dermal – PMDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| | LLI – MDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| | LLI – PMDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| 1989 Human Cases SRI | | | 2,863 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| 1989 German Mine SRI | | | | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal - MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI - PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| 1989 Nakata Papers SRI | | | | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| 1992 Human Cases SRI | | | 1,760 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 4/6/92 | 44,000,000 | 71,527,500 | 57,297,500 | 86,962,500 | 259,787,500 |
| | Dermal – PMDI | 4/6/92 | 44,000,000 | 71,527,500 | 57,297,500 | 86,962,500 | 259,787,500 |

| SRI | Effect/ Chemical | Report Due | Through 1/30/97 $25k/day | 1/31/97 – 3/15/04 $27.5k/day | 3/16/04 – 1/12/09 $32.5k/day | 1/12/09 – 5/20/15 $37.5k/day | TOTAL |
|---|---|---|---|---|---|---|---|
| | | | | | | | TSCA Civil Penalties -- BASF |
| 1992 Specific Scenario SRI | | | 1,701 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | Dermal – PMDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | LLI – MDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | LLI – PMDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| 1993 Especial Work Situation SRI | | | 1,366 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | Dermal – PMDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | LLI – MDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | LLI - PMDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| 2003 Isocyanate Asthma SRI | | | 0 days | 381 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 2/28/03 | 0 | 10,477,500 | 57,297,500 | 86,962,500 | 154,737,500 |
| | Dermal - PMDI | 2/28/03 | 0 | 10,477,500 | 57,297,500 | 86,962,500 | 154,737,500 |
| TOTAL | | | | | | | 6,897,125,000 |

### b. Bayer's Gravity Based Penalty

858.   TSCA imposed an obligation on Bayer report each adverse effect, with respect to each chemical, for each of the following separate items of substantial risk information that it obtained or developed:

a.   Bayer's 1979 Skin Contact SRI (one adverse effect, two chemicals);

b.   1982 Japanese Skin Contact SRI (one adverse effect, three chemicals);

c.   1988 Mineworkers SRI (two adverse effects, two chemicals);

d.   1989 Human Cases SRI (two adverse effects, two chemicals);

1      e.     1989 German Mine SRI (two adverse effects, two chemicals);

2      f.     1989 Nakata Papers SRI (one adverse effect, two chemicals);

3      g.     1992 Human Cases SRI (one adverse effect, two chemicals);

4      h.     1992 Specific Scenario SRI (two adverse effects, two chemicals);

5      i.     1993 Especial Work Situation SRI (two adverse effects, two chemicals);

6      and

7      j.     2003 Isocyanate Asthma SRI (one adverse effect, two chemicals).

8     859.    Bayer failed to fulfill each of these separate reporting obligations, and each such

9  failure is a separate, continuing reporting violation that continues until Bayer fulfills that

10  reporting obligation. The penalty for each separate violation increases each day that the

11  violation continues.

12     860.    Because Bayer has not fulfilled any of these reporting obligations, the penalties

13  for each of its violations have continued to increase through the date of this complaint. The chart

14  below summarizes the calculation of Bayer's $8,675,062,500 in civil penalties through the date

15  of this complaint. In the "Effect/Chemical" column, "Dermal" means "dermal-induction health

16  effect," and "LLI" means "low-level-inhalation-induction health effect."

| TSCA Civil Penalties -- Bayer | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SRI | Effect/ Chemical | Report Due | Through 1/30/97 $25k/day | 1/31/97 – 3/15/04 $27.5k/day | 3/16/04 – 1/12/09 $32.5k/day | 1/12/09 – 5/20/15 $37.5k/day | TOTAL | |
| Bayer's 1979 Skin Contact SRI | | | 6,218 days | 2,601 days | 1,763 days | 2,319 days | | 0 |
| | Dermal – MDI | 1/22/80 | 155,450,000 | 71,527,500 | 57,297,500 | 86,962,500 | 371,237,500 | |
| | Dermal - PMDI | 1/22/80 | 155,450,000 | 71,527,500 | 57,297,500 | 86,962,500 | 371,237,500 | |
| 1982 Japanese Skin Contact SRI | | | 5,378 days | 2,601 days | 1,763 days | 2,319 days | | 0 |
| | Dermal – MDI | 5/11/82 | 134,450,000 | 71,527,500 | 57,297,500 | 86,962,500 | 350,237,500 | |
| | Dermal – PMDI | 5/11/82 | 134,450,000 | 71,527,500 | 57,297,500 | 86,962,500 | 350,237,500 | |
| | Dermal - TDI | 5/11/82 | 134,450,000 | 71,527,500 | 57,297,500 | 86,962,500 | 350,237,500 | |

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

| TSCA Civil Penalties -- Bayer | | | | | | | |
|---|---|---|---|---|---|---|---|
| SRI | Effect/ Chemical | Report Due | Through 1/30/97 $25k/day | 1/31/97 – 3/15/04 $27.5k/day | 3/16/04 – 1/12/09 $32.5k/day | 1/12/09 – 5/20/15 $37.5k/day | TOTAL |
| 1988 Mine-workers SRI | | | 2,983 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| | Dermal – PMDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| | LLI – MDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| | LLI – PMDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| 1989 Human Cases SRI | | | 2,802 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 5/30/89 | 70,050,000 | 71,527,500 | 57,297,500 | 86,962,500 | 285,837,500 |
| | Dermal – PMDI | 5/30/89 | 70,050,000 | 71,527,500 | 57,297,500 | 86,962,500 | 285,837,500 |
| | LLI – MDI | 5/30/89 | 70,050,000 | 71,527,500 | 57,297,500 | 86,962,500 | 285,837,500 |
| | LLI – PMDI | 5/30/89 | 70,050,000 | 71,527,500 | 57,297,500 | 86,962,500 | 285,837,500 |
| 1989 German Mine SRI | | | 2,802 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal - MDI | 5/30/89 | 70,050,000 | 71,527,500 | 57,297,500 | 86,962,500 | 285,837,500 |
| | Dermal – PMDI | 5/30/89 | 70,050,000 | 71,527,500 | 57,297,500 | 86,962,500 | 285,837,500 |
| | LLI – MDI | 5/30/89 | 70,050,000 | 71,527,500 | 57,297,500 | 86,962,500 | 285,837,500 |
| | LLI - PMDI | 5/30/89 | 70,050,000 | 71,527,500 | 57,297,500 | 86,962,500 | 285,837,500 |
| 1989 Nakata Papers SRI | | | 2,802 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 5/30/89 | 70,050,000 | 71,527,500 | 57,297,500 | 86,962,500 | 285,837,500 |
| | Dermal – PMDI | 5/30/89 | 70,050,000 | 71,527,500 | 57,297,500 | 86,962,500 | 285,837,500 |
| 1992 Human Cases SRI | | | 1,760 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 4/6/92 | 44,000,000 | 71,527,500 | 57,297,500 | 86,962,500 | 259,787,500 |
| | Dermal – PMDI | 4/6/92 | 44,000,000 | 71,527,500 | 57,297,500 | 86,962,500 | 259,787,500 |

*Qui Tam* Complaint

| TSCA Civil Penalties -- Bayer | | | | | | | |
|---|---|---|---|---|---|---|---|
| SRI | Effect/Chemical | Report Due | Through 1/30/97 $25k/day | 1/31/97 – 3/15/04 $27.5k/day | 3/16/04 – 1/12/09 $32.5k/day | 1/12/09 – 5/20/15 $37.5k/day | TOTAL |
| **1992 Specific Scenario SRI** | | | 1,701 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | Dermal – PMDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | LLI – MDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | LLI – PMDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| **1993 Special Work Situation SRI** | | | 1,366 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | Dermal – PMDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | LLI – MDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | LLI - PMDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| **2003 Isocyanate Asthma SRI** | | | 0 days | 381 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 2/28/03 | 0 | 10,477,500 | 57,297,500 | 86,962,500 | 154,737,500 |
| | Dermal - PMDI | 2/28/03 | 0 | 10,477,500 | 57,297,500 | 86,962,500 | 154,737,500 |
| **TOTAL** | | | | | | | **8,675,062,500** |

### c.   Dow's Gravity Based Penalty

861.   TSCA imposed an obligation on Dow to report each adverse effect, with respect to each chemical, for each of the following separate items of substantial risk information that it obtained or developed:

    a.   <u>1982 Japanese Skin Contact SRI</u> (one adverse effect, one chemical – Dow was not manufacturing, distributing, or processing MDI or PMDI in 1982);

    b.   <u>1988 Mineworkers SRI</u> (two adverse effects, two chemicals);

*Qui Tam* Complaint

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

c.   1989 Human Cases SRI (two adverse effects, two chemicals);

d.   1989 German Mine SRI (two adverse effects, two chemicals);

e.   1989 Nakata Papers SRI (one adverse effect, two chemicals);

f.   1992 Human Cases SRI (one adverse effect, two chemicals);

g.   1992 Specific Scenario SRI (two adverse effects, two chemicals);

h.   1993 Especial Work Situation SRI (two adverse effects, two chemicals); and

i.   2003 Isocyanate Asthma SRI (one adverse effect, two chemicals).

862.   Dow failed to fulfill each of these separate reporting obligations, and each such failure is a separate, continuing reporting violation that continues until Dow fulfills that reporting obligation. The penalty for each separate violation increases each day that the violation continues.

863.   Because Dow has not fulfilled any of these reporting obligations, the penalties for each of its violations have continued to increase through the date of this complaint. The chart below summarizes the calculation of Dow's $7,253,562,500 in civil penalties through the date of this complaint. In the "Effect/Chemical" column, "Dermal" means "dermal-induction health effect," and "LLI" means "low-level-inhalation-induction health effect."

| TSCA Civil Penalties -- Dow | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SRI | Effect/ Chemical | Report Due | Through 1/30/97 $25k/day | 1/31/97 – 3/15/04 $27.5k/day | 3/16/04 – 1/12/09 $32.5k/day | 1/12/09 – 5/20/15 $37.5k/day | TOTAL | |
| 1982 Japanese Skin Contact SRI | | | 5,378 days | 2,601 days | 1,763 days | 2,319 days | | 0 |
| | Dermal - TDI | 5/11/82 | 134,450,000 | 71,527,500 | 57,297,500 | 86,962,500 | 350,237,500 | |

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

| TSCA Civil Penalties -- Dow | | | | | | | |
|---|---|---|---|---|---|---|---|
| SRI | Effect/ Chemical | Report Due | Through 1/30/97 $25k/day | 1/31/97 – 3/15/04 $27.5k/day | 3/16/04 – 1/12/09 $32.5k/day | 1/12/09 – 5/20/15 $37.5k/day | TOTAL |
| 1988 Mine-workers SRI | | | 3,045 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 9/29/88 | 76,125,000 | 71,527,500 | 57,297,500 | 86,962,500 | 291,912,500 |
| | Dermal – PMDI | 9/29/88 | 76,125,000 | 71,527,500 | 57,297,500 | 86,962,500 | 291,912,500 |
| | LLI – MDI | 9/29/88 | 76,125,000 | 71,527,500 | 57,297,500 | 86,962,500 | 291,912,500 |
| | LLI – PMDI | 9/29/88 | 76,125,000 | 71,527,500 | 57,297,500 | 86,962,500 | 291,912,500 |
| 1989 Human Cases SRI | | | 2,863 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| 1989 German Mine SRI | | | | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal - MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| 1989 Nakata Papers SRI | | | | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| 1992 Human Cases SRI | | | 1,760 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 4/6/92 | 44,000,000 | 71,527,500 | 57,297,500 | 86,962,500 | 259,787,500 |
| | Dermal – PMDI | 4/6/92 | 44,000,000 | 71,527,500 | 57,297,500 | 86,962,500 | 259,787,500 |

1
2
3
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Qui Tam* Complaint

| TSCA Civil Penalties -- Dow | | | | | | | |
|---|---|---|---|---|---|---|---|
| SRI | Effect/ Chemical | Report Due | Through 1/30/97 $25k/day | 1/31/97 – 3/15/04 $27.5k/day | 3/16/04 – 1/12/09 $32.5k/day | 1/12/09 – 5/20/15 $37.5k/day | TOTAL |
| 1992 Specific Scenario SRI | | | 1,701 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | Dermal – PMDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | LLI – MDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | LLI – PMDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| 1993 Especial Work Situation SRI | | | 1,366 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | Dermal – PMDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | LLI – MDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | LLI - PMDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| 2003 Isocyanate Asthma SRI | | | 0 days | 381 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 2/28/03 | 0 | 10,477,500 | 57,297,500 | 86,962,500 | 154,737,500 |
| | Dermal - PMDI | 2/28/03 | 0 | 10,477,500 | 57,297,500 | 86,962,500 | 154,737,500 |
| TOTAL | | | | | | | 7,253,562,500 |

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
...RNIA STREET, SUITE 2300
...ISCO, CALIFORNIA 941

d.   **Huntsman's Gravity Based Penalty**

864.   TSCA imposed an obligation on Huntsman to report each adverse effect, with respect to each chemical, for each of the following separate items of substantial risk information that it obtained or developed:

    a.   <u>1988 Mineworkers SRI</u> (two adverse effects, two chemicals);

    b.   <u>1989 Human Cases SRI</u> (two adverse effects, two chemicals);

    c.   <u>1989 German Mine SRI</u> (two adverse effects, two chemicals);

    d.   <u>1989 Nakata Papers SRI</u> (one adverse effect, two chemicals);

e.  <u>1992 Human Cases SRI</u> (one adverse effect, two chemicals);

f.  <u>1992 Specific Scenario SRI</u> (two adverse effects, two chemicals);

g.  <u>1993 Especial Work Situation SRI</u> (two adverse effects, two chemicals);
and

h.  <u>2003 Isocyanate Asthma SRI</u> (one adverse effect, two chemicals).

865.   Huntsman failed to fulfill each of these separate reporting obligations, and each such failure is a separate, continuing reporting violation that continues until Huntsman fulfills that reporting obligation.  The penalty for each separate violation increases each day that the violation continues.

866.   Because Huntsman has not fulfilled any of these reporting obligations, the penalties for each of its violations have continued to increase through the date of this complaint. The chart below summarizes the calculation of Huntsman's $6,903,325,000 in civil penalties through the date of this complaint.  In the "Effect/Chemical" column, "Dermal" means "dermal-induction health effect," and "LLI" means "low-level-inhalation-induction health effect."

| TSCA Civil Penalties -- Huntsman | | | | | | | |
|---|---|---|---|---|---|---|---|
| Effect/ Chemical | Report Due | Through 1/30/97 $25k/day | 1/31/97 – 3/15/04 $27.5k/day | 3/16/04 – 1/12/09 $32.5k/day | 1/12/09 – 5/20/15 $37.5k/day | TOTAL | |
| | | 3,045 days | 2,601 days | 1,763 days | 2,319 days | | 0 |
| Dermal – MDI | 9/29/88 | 76,125,000 | 71,527,500 | 57,297,500 | 86,962,500 | 291,912,500 | |
| Dermal – PMDI | 9/29/88 | 76,125,000 | 71,527,500 | 57,297,500 | 86,962,500 | 291,912,500 | |
| LLI – MDI | 9/29/88 | 76,125,000 | 71,527,500 | 57,297,500 | 86,962,500 | 291,912,500 | |
| LLI – PMDI | 9/29/88 | 76,125,000 | 71,527,500 | 57,297,500 | 86,962,500 | 291,912,500 | |

1988 Mine-workers SRI

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **TSCA Civil Penalties -- Huntsman** | | | | | | | |
| **SRI** | **Effect/ Chemical** | **Report Due** | **Through 1/30/97** $25k/day | **1/31/97 – 3/15/04** $27.5k/day | **3/16/04 – 1/12/09** $32.5k/day | **1/12/09 – 5/20/15** $37.5k/day | **TOTAL** |
| 1989 Human Cases SRI | | | 2,863 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| 1989 German Mine SRI | | | | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal - MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI - PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| 1989 Nakata Papers SRI | | | | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| 1992 Human Cases SRI | | | 1,760 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 4/6/92 | 44,000,000 | 71,527,500 | 57,297,500 | 86,962,500 | 259,787,500 |
| | Dermal – PMDI | 4/6/92 | 44,000,000 | 71,527,500 | 57,297,500 | 86,962,500 | 259,787,500 |
| 1992 Specific Scenario SRI | | | 1,701 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | Dermal – PMDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | LLI – MDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |
| | LLI – PMDI | 6/4/92 | 42,525,000 | 71,527,500 | 57,297,500 | 86,962,500 | 258,312,500 |

*Qui Tam* Complaint

| | TSCA Civil Penalties -- Huntsman | | | | | | | |
| SRI | | Effect/ Chemical | Report Due | Through 1/30/97<br><br>$25k/day | 1/31/97 – 3/15/04<br><br>$27.5k/day | 3/16/04 – 1/12/09<br><br>$32.5k/day | 1/12/09 – 5/20/15<br><br>$37.5k/day | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 1993 Especial Work Situation SRI | | | | 1,366 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | | Dermal – MDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | | Dermal – PMDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | | LLI – MDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| | | LLI - PMDI | 5/5/93 | 34,150,000 | 71,527,500 | 57,297,500 | 86,962,500 | 249,937,500 |
| 2003 Isocyanate Asthma SRI | | | | 0 days | 381 days | 1,763 days | 2,319 days | 0 |
| | | Dermal – MDI | 2/28/03 | 0 | 10,477,500 | 57,297,500 | 86,962,500 | 154,737,500 |
| | | Dermal - PMDI | 2/28/03 | 0 | 10,477,500 | 57,297,500 | 86,962,500 | 154,737,500 |
| TOTAL | | | | | | | | 6,903,325,000 |

**2.   The adjustment factors justify an upward adjustment to each defendant's Gravity Based Penalty**

867.    After determining the Gravity Based Penalty, the EPA assesses several additional factors to determine whether the GBP should be adjusted upward or downward. Those factors are (1) the violator's degree of culpability; (2) the violator's history of prior violations; (3) the violator's ability to pay; (4) the violator's ability to continue in business; and (5) such other matters as justice may require. TSCA Enforcement Response Policy at 6.

868.    Here, each defendant has a high degree of culpability. As alleged thoroughly below, each defendant willfully refused to report multiple items of substantial risk information obtained or developed over a lengthy time period, willfully concealed its violations and the substantial risk information from the EPA, and has publicly disputed (including directly to the EPA) the very adverse health effects indicated by the substantial risk information it continues to conceal.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

869.   KBT&F is not aware of each defendant's history of prior violations.  However, each defendant here committed multiple violations over a lengthy period of time, and has actively concealed those violations from the EPA.

870.   Each defendant is a large, very profitable chemical company, capable of paying the maximum penalty and continuing in business.

871.   Among the "other factors as justice may require," the EPA considers whether the violator voluntarily disclosed the violation, the violator's exposure reduction efforts, the violator's attitude, and the economic benefit the violator gained from non-compliance.  *Id.* at 15-17.

872.   The defendants have not voluntarily disclosed their violations.  Instead, each defendant has actively concealed its multiple violations over a lengthy period of time, and implicitly represented to the EPA that the data that comprises the concealed substantial risk information does not exist.

873.   Each defendant's attitude justifies an upward adjustment to the GBP.  The EPA looks to "whether the violator is making good faith efforts to comply with the appropriate regulations" as one factor in assessing the violator's attitude.  *Id.* at 16.  As alleged thoroughly below, each defendant violated its reporting obligations in bad faith.  Each defendant reported *animal* data that reasonably supported the conclusion of an adverse health effect, but concealed and failed to report *human* data that reasonably supported (sometimes more conclusively) that very same adverse health effect.  And each defendant thereafter told the EPA that the human evidence for that adverse health effect was "inconclusive," even as that defendant continued to conceal such human evidence from the EPA.  None of the defendants made good faith efforts to comply with TSCA's reporting obligations.

874.   The EPA indicates that an "upward adjustment of a maximum of 15% may be justified where company officials . . . do not act in good faith, hinder EPA's progress, cause increased government expenditures, or are otherwise uncooperative."  *Id.* at 16.  Each

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

185

*Qui Tam* Complaint

1    defendant's actions here justify such an upward adjustment.  Each defendant has acted in bad

2    faith, has hindered EPA's ability to conduct its regulatory activities, and has been uncooperative.

3        875.    The EPA also assesses the economic benefit that the violator gained from its non-

4    compliance:

> In no case should the final penalty imposed be less than the economic benefit.  In
> those cases where the initial gravity based penalty is less than the economic
> benefit derived from non-compliance, EPA reserves the right to impose penalties
> up to the maximum of $25,000 per day [or the maximum penalty as adjusted for
> inflation for the date or dates during which the violation continues] to assure that
> the penalty is not less than the economic benefit.

9    *Id.* at 16.

10       876.    The EPA discussed the calculation of the economic benefit component in <u>A</u>

11   <u>Framework for Statute-Specific Approaches to Penalty Assessments: Implementing EPA's</u>

12   <u>Policy on Civil Penalties</u>, EPA General Enforcement Policy #GM-22, at 2, February 16, 1984

13   ("Framework for Penalty Assessments").   The EPA indicated that some violations allow the

14   violator to sell products that "are more attractive to the consumer," and lists as an example

15   "[s]elling products without required labelling or warnings."  Framework for Penalty Assessments

16   at 10.  In those cases, the economic benefit includes "the net profits made from the improper

17   transactions." *Id.*

18       877.    As alleged thoroughly below, as each defendant failed to report the substantial

19   risk information to the EPA, it also omitted from its product labels and warnings the health-effect

20   conclusions reasonably supported by the substantial risk information.  Each defendant concealed

21   this information to avoid or deflect anticipated regulatory scrutiny and to maintain its substantial

22   isocyanate profits by avoiding customer "de-selection" of its products.

23       878.    Each defendant knew from the substantial risk information it was concealing that

24   its MDI, PMDI, and TDI products posed serious and unusual hazards that customers could avoid

25   only by using specific, expensive, and cumbersome protective equipment.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

879.    Each defendant knew that skin contact with those products could cause respiratory sensitization and permanent pulmonary injury.  To avoid that hazard the worker should:

     a.    cover all exposed skin with protective clothing made of specific, chemical-resistant material;

     b.    replace that protective clothing before the "breakthrough time" expires and the isocyanate "breaks through" the clothing to the skin; and

     c.    follow specific and cumbersome procedures, possibly involving a suitably-attired assistant, to remove the protective clothing.

880.    Each defendant also knew that low-level inhalation of those products could cause respiratory sensitization and permanent pulmonary injury.  To avoid that hazard the worker should use a supplied-air respirator or, at a minimum, an air-purifying respirator with an approved cartridge that is replaced before its useful service-life expires.

881.    Each defendant feared that its disclosure of the dermal-induction or the low-level-inhalation hazard could prompt its customers to "de-select" its products, and therefore concealed those hazards to protect its products.

882.    Thus, each defendant's non-compliance provided it with a significant economic benefit comprising all or some of its net profits from the sale of MDI, PMDI, and TDI products during the period of its non-compliance.

883.    Bayer's non-compliance period began on or before January 22, 1980, the date by which it was required to report Bayer's 1979 Skin Contact SRI, and continues through the present.  KBT&F does not possess sufficient information at this time to calculate Bayer's net profits from MDI, PMDI, and TDI sales during that period.

884.    Dow's non-compliance period began on or before May 11, 1982, the date by which it was required to report the 1982 Japanese Skin Contact SRI, and continues through the present.  KBT&F does not possess sufficient information at this time to calculate Dow's net profits from MDI, PMDI, and TDI sales during that period.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

885.    Huntsman's non-compliance period began on or before September 29, 1988, the date by which it was required to report the 1988 Mineworkers SRI, and continues through the present.  KBT&F does not possess sufficient information at this time to calculate BASF's net profits from MDI, PMDI, and TDI sales during that period.

886.    BASF's non-compliance period began on or before November 30, 1988, the date by which it was required to report the 1988 Mineworkers SRI, and continues through the present. KBT&F does not possess sufficient information at this time to calculate BASF's net profits from MDI, PMDI, and TDI sales during that period.

887.    Each defendant also feared that its disclosure of the dermal-induction or the low-level-inhalation hazard could prompt the EPA or other regulatory authorities to restrict or ban the sale or use of its products, and therefore concealed those hazards to avoid or deflect such regulation.

888.    Thus, each defendant's violations directly interfered with the EPA's hazard identification and risk assessment activities, and each defendant concealed the substantial risk information to prevent or thwart those activities.

889.    None of the EPA's adjustment factors justify a downward adjustment in BASF, Bayer, Dow, or Huntsman's Gravity Based Penalty.

890.    The Attitude factor justifies an upward adjustment of 15% in BASF, Bayer, Dow, and Huntsman's Gravity Based Penalty.

891.    The Economic Benefit factor requires that the final penalty imposed on each defendant at least equal the value of the economic benefit that the defendant obtained from its non-compliance.

892.    BASF's TSCA reporting violations obligate it to pay $6,897,125,000 to the United States government as of May 20, 2015, as shown in chart set out in the Gravity Based Penalty subsection above.

893. Bayer's TSCA reporting violations obligate it to pay $8,675,062,500 to the United States government as of May 20, 2015, as shown in chart set out in the Gravity Based Penalty subsection above.

894. Dow's TSCA reporting violations obligate it to pay $7,253,562,500 to the United States government as of May 20, 2015, as shown in chart set out in the Gravity Based Penalty subsection above.

895. Huntsman's TSCA reporting violations obligate it to pay $6,903,325,000 to the United States government as of May 20, 2015, as shown in chart set out in the Gravity Based Penalty subsection above.

E. **BASF, Bayer, and Dow's contractual obligations.**

896. On February 1, 1991, the EPA announced the Compliance Audit Program (CAP). The program essentially operated as an amnesty for prior TSCA Section 8(e) reporting violations. Registration and Agreement for TSCA Section 8(e) Compliance Audit Program, 56 Fed. Reg. 4128 (February 1, 1991) ("CAP Agreement"), Exh. 26.

897. In response to industry complaints that it had changed its interpretation of the reporting requirements and that its high monetary penalties created a disincentive for companies to audit their hazard information for compliance, the EPA developed CAP to "encourage companies to audit their files for studies reportable under [TSCA] Section 8(e)." *Id.*, Exh. 26 at 4128-4129, Section I.3.

898. The EPA required each participating company to sign the CAP contract, the text of which is published in the Federal Register. *Id.*, Exh. 26 at 4129-4131, Section II. (The EPA twice slightly revised the text of the contract: Registration and Agreement for TSCA Section 8(e) Compliance Audit Program Modification, 56 Fed. Reg. 19514 (April 26, 1991) ("CAP Modification 1"), Exh. 27, and Registration and Agreement for TSCA Section 8(e) Compliance Audit Program Modification, 56 Fed. Reg. 28458 (June 20, 1991) ("CAP Modification 2"), Exh. 28.)

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

899.   Each participating company agreed to audit its substantial risk reporting compliance and to submit all previously unsubmitted substantial risk information, in return for which the EPA agreed to reduce significantly the reporting penalties for each submitted report, and to cap the total reporting penalties for all previously unsubmitted information at $1 million. CAP Agreement, 56 Fed. Reg. at 4129-4130, Section II.B.1 – II.B.3. The contract further required each participating company to certify its completion of the audit program at the program's conclusion. *Id.* at 4130, Section II.B.4.

900.   In a Freedom of Information Act (FOIA) request, KBT&F requested that the EPA produce the CAP contracts and associated documents executed by any of the defendants, as well as documents that identified the companies that participated in CAP.  The EPA responded that its document retention schedule for the CAP documents had expired and it could not locate the contracts and associated documents. However, the EPA provided KBT&F with a "Final Summary Chart" for the TSCA Section 8(e) Compliance Audit Program.  EPA's March 4, 2015 FOIA Response, Exh. 29.

901.   The Final Summary Chart for CAP establishes that defendants BASF, Bayer (through its predecessor-in-interest Miles), and Dow each participated in CAP.

902.   By virtue of its participation in CAP, BASF entered a contract with the EPA in the form and substance set out in the CAP Agreement, attached as Exh. 26, as modified by CAP Modification 1 (Exh. 27) and CAP Modification 2 (Exh. 28).

903.   By virtue of its participation in CAP, Bayer entered a contract with the EPA in the form and substance set out in the CAP Agreement, attached as Exh. 26, as modified by CAP Modification 1 (Exh. 27) and CAP Modification 2 (Exh. 28).

904.   By virtue of its participation in CAP, Dow entered a contract with the EPA in the form and substance set out in the CAP Agreement, attached as Exh. 26, as modified by CAP Modification 1 (Exh. 27) and CAP Modification 2 (Exh. 28).

905.   In their respective contracts with the EPA, BASF, Bayer, and Dow each agreed and was contractually required to audit its substantial risk reporting compliance and to submit all

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    previously unsubmitted substantial risk information, in return for which the EPA agreed to

2    reduce significantly the reporting penalties for each submitted report, and to cap the total

3    reporting penalties for all previously unsubmitted information at $1 million.  CAP Agreement,

4    Exh. 26, 56 Fed. Reg. at 4129-4130, Section II.B.1 – II.B.3.

5        906.    In their respective contracts with the EPA, BASF, Bayer, and Dow each agreed

6    and was contractually required to certify its completion of the audit program at the program's

7    conclusion.  CAP Agreement, Exh. 26, 56 Fed. Reg. at 4130, Section II.B.4.

8        907.    In their respective contracts with the EPA, BASF, Bayer, and Dow each agreed

9    that its failure to comply with its contractual obligations would authorize the EPA to impose full

10   penalties for any substantial risk information it had submitted under CAP and received a reduced

11   or "capped" amnesty penalty.   CAP Agreement, Exh. 26, 56 Fed. Reg. at 4130, Section II.D.4.

12       908.    In their respective contracts with the EPA, BASF, Bayer, and Dow each agreed

13   that its failure to comply with its contractual obligations would authorize the EPA to pursue full

14   penalties for the company's failure to submit substantial risk information that it should have

15   submitted under the CAP Agreement.  CAP Agreement, Exh. 26, 56 Fed. Reg. at 4129, Section

16   II.A.5.

17       909.    Shortly after it instituted CAP, the EPA amended the contract to extend through

18   February 28, 1992 the deadline for participating companies to submit substantial risk

19   information, and also inserted a provision that allowed for additional extensions to be assessed

20   on a case-by-case basis.  CAP Modification 1, Exh. 26, 56 Fed. Reg. at 19514.

21       910.    In response to questions about EPA's guidance about the reportability of

22   information concerning environmental distribution and contamination, the EPA announced on

23   June 20, 1991 that it would provide more specific guidance about the reportability of such

24   information.  CAP Modification 2, Exh. 28, 56 Fed Reg. at 28459, Unit 3.D.  The EPA issued

25   that guidance on July 13, 1993.  1993 Proposed Policy Clarification, 58 Fed. Reg. 37735.  The

26   CAP reporting deadline appears to have been extended as the EPA issued this guidance and

27   analyzed the comments received about the revised guidance.  2003 TSCA Guidance Revisions,

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

68 Fed. Reg. 33129, June 3, 2003.  After terminating CAP on May 15, 1996, the EPA "reached final settlements with CAP participants, announced those settlements on October 15, 1996, and collected payment for stipulated penalties." *Id.*, 68 Fed. Reg. at 33131, Unit II.D.

911.    Thus, the CAP Agreement required BASF, Bayer, and Dow to audit their files for unreported substantial risk information and to submit such information to the EPA by May 15, 1996.

912.    BASF, Bayer, and Dow each breached both of these obligations.

**F.    BASF, Bayer, and Dow's obligation to pay damages for breach of the CAP Agreement.**

913.    The CAP Agreement authorized the EPA to obtain at least two categories of damages for a participating company's failure to submit previously unreported substantial risk information.

914.    First, the EPA is authorized to impose full TSCA Section 8(e) civil penalties for any substantial risk information for which the participating company received a reduced or capped "amnesty" penalty.  CAP Agreement, Exh. 26, 56 Fed. Reg. at 4130, Unit II.D.4.

915.    The EPA was unable to locate the Consent Agreement or Consent Order that summarized the results of the program with respect to BASF, Bayer, or Dow.  Although the EPA's TSCA Section 8(e) Final Summary Chart establishes that BASF, Bayer, and Dow each submitted substantial risk information under CAP for which they each received reduced or "amnesty" penalties (Exh. 29), KBT&F is not currently able to calculate the differential between the full penalties that would have been due for those submissions absent the amnesty reduction.

916.    Second, the CAP Agreement authorizes the EPA to pursue full penalties for a participating company's failure to submit substantial risk information that it should have submitted under the CAP Agreement:

> EPA reserves its rights under TSCA Section 16 to take appropriate enforcement action if EPA determines later that Regulatee was required to submit under TSCA section 8(e) a study or report determined by the Regulatee to be not reportable and therefore not submitted under the TSCA Section 8(e) Compliance Audit Program. In such event, the terms of the EPA TSCA Sections 8, 12, and 13 Enforcement Response Policy will apply to such proceeding.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

CAP Agreement, Exh. 26, 56 Fed. Reg. at 4129, Unit II.A.5.

917.   Under this contractual damages provision, the civil penalties for the substantial risk information "not submitted under the TSCA Section 8(e) Compliance Audit Program" are calculated under the TSCA Enforcement Response Policy as of the date the "appropriate enforcement action" that EPA initiates after it has "determine[d] later" that the participating company breached the agreement.

918.   As alleged thoroughly above, the terms of the EPA's enforcement policy require each defendant to pay the maximum daily penalty for each reporting violation.

919.   Thus, the EPA is and has been entitled to damages separately against BASF, Bayer, and Dow for the accumulated civil penalties for each company's multiple reporting violations as to each separate piece of substantial risk information that the defendant should have provided, but failed to provide, under the CAP Agreement.

1.   **Damages for BASF's breach of the CAP Agreement.**

920.   BASF violated its contractual duty to submit the following unreported substantial risk information:

    a.   <u>1988 Mineworkers SRI</u> (two adverse effects, two chemicals);

    b.   <u>1989 Human Cases SRI</u> (two adverse effects, two chemicals);

    c.   <u>1989 German Mine SRI</u> (two adverse effects, two chemicals);

    d.   <u>1989 Nakata Papers SRI</u> (one adverse effect, two chemicals);

    e.   <u>1992 Human Cases SRI</u> (one adverse effect, two chemicals);

    f.   <u>1992 Specific Scenario SRI</u> (two adverse effects, two chemicals); and

    g.   <u>1993 Especial Work Situation SRI</u> (two adverse effects, two chemicals).

921.   Because BASF failed to submit these separate items of substantial risk information, it is liable in contract damages to the United States Government in the amount of $6,587,650,000, the TSCA civil penalties, accumulated through the date of this complaint, for its multiple failures to report these separate items of substantial risk information.  The chart below

1  summarizes the calculation of BASF's breach of contract damages through the date of this

2  complaint.  In the "Effect/Chemical" column, "Dermal" means "dermal-induction health effect,"

3  and "LLI" means "low-level-inhalation-induction health effect."

4

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

| CAP Breach of Contract Damages -- BASF | | | | | | | |
|---|---|---|---|---|---|---|---|
| SRI | Effect/ Chemical | Report Due | Through 1/30/97 $25k/day | 1/31/97 – 3/15/04 $27.5k/day | 3/16/04 – 1/12/09 $32.5k/day | 1/12/09 – 5/20/15 $37.5k/day | TOTAL |
| 1988 Mine-workers SRI | | | 2,983 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| | Dermal – PMDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| | LLI – MDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| | LLI – PMDI | 11/30/88 | 74,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 290,362,500 |
| 1989 Human Cases SRI | | | 2,863 days | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| 1989 German Mine SRI | | | | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal - MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | LLI - PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| 1989 Nakata Papers SRI | | | | 2,601 days | 1,763 days | 2,319 days | 0 |
| | Dermal – MDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |
| | Dermal – PMDI | 3/30/89 | 71,575,000 | 71,527,500 | 57,297,500 | 86,962,500 | 287,362,500 |

*Qui Tam* Complaint