# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KASOWITZ, BENSON, TORRES & FRIEDMAN LLP, <br><br> *Plaintiff*, <br><br> v. <br><br> BASF CORPORATION; BAYER MATERIAL SCIENCE, LLC f/k/a/ MILES, INC. f/k/a MOBAY CHEMICAL COMPANY; THE DOW CHEMICAL COMPANY; and HUNTSMAN INTERNATIONAL LLC, f/k/a IMPERIAL CHEMICAL INDUSTRIES PLC and f/k/a ICI AMERICAS, INC., <br><br> *Defendants*. | Case No. 1:16-CV-02269-RMC |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

Christopher Landau, P.C. (DC Bar No. 425319)
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Michael Foradas, P.C. (admitted *pro hac vice*)
Nader Boulos (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Jeremy M. Feigenbaum (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10010
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Alice S. Fisher (DC Bar No. 437492)
Anne W. Robinson (DC Bar No. 503232)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201

Steven M. Bauer (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

*Attorneys for Defendant*
*The Dow Chemical Company*

Seth A. Rosenthal (DC Bar No. 482586)
VENABLE LLP
575 7th Street, NW
Washington, DC 20004
Telephone: (202) 344-4741
Facsimile: (202) 344-8300

*Attorney for Defendant BASF Corporation*

Kyle C. Hankey (DC Bar No. 1010827)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
Telephone: (202) 393-7150
Facsimile: (202) 347-1684

Fred M. Haston III (admitted *pro hac vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: (205) 521-8303
Facsimile: (205) 488-6303

William F. Goodman III (admitted *pro hac vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
Roundabout Plaza, 1600 Division Street, Suite 700
Nashville, TN 37203
Telephone: (615) 252-2381
Facsimile: (615) 252-6381

*Attorneys for Defendant Covestro LLC*

Lawrence S. Sher (DC Bar No. 430469)
REED SMITH LLP
1301 K Street, NW
Suite 1000-East Tower
Washington, DC 20005
Telephone: (202) 414-9200
Facsimile: (202) 414-9299

Scott D. Baker (admitted *pro hac vice*)
Raymond Cardozo (admitted *pro hac vice*)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
Telephone: (415) 543-8700
Facsimile: (415) 391-8269

James L. Sanders (admitted *pro hac vice*)
Francisca M. Mok (admitted *pro hac vice*)
REED SMITH LLP
1901 Avenue of the Stars, Suite 700
Los Angeles, CA 90067
Telephone: (310) 734-5200
Facsimile: (310) 734-5299

*Attorneys for Defendant*
*Huntsman International LLC*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND................................................ 3

    A.    Statutory Background ........................................................................3

           1.    The False Claims Act...............................................................4

           2.    The Toxic Substances Control Act and Compliance Audit Program .........5

    B.    Background Allegations.....................................................................6

    C.    Procedural History ...........................................................................9

LEGAL STANDARDS ....................................................................................... 11

ARGUMENT ..................................................................................................... 12

I.    This Court Should Dismiss Counts I And IV Because The False Claims Act Does Not Permit Liability Based On Unassessed Penalties Under TSCA Or The CAP. ................. 13

    A.    The Reverse False Claims Act Does Not Permit Liability Based On Unassessed Statutory Penalties. ..............................................................14

           1.    The Reverse False Claims Act's Plain Text Prohibits Liability Based On Unassessed Statutory Penalties. ..........................................14

           2.    The Drafting History Establishes That Congress Did Not Intend For Liability Based On Unassessed Statutory Penalties...................................17

           3.    Case Law Confirms That There Is No Liability Based On Unassessed Statutory Penalties. ..................................................19

           4.    The Federal Government Agrees That There Is No Liability Based On Unassessed Statutory Penalties. ..............................................21

           5.    Authorizing Liability Based On Unassessed Statutory Penalties Would Have Profound And Harmful Consequences. ...........................................22

    B.    The Kasowitz Firm's Allegations Of TSCA Noncompliance Impermissibly Base Liability On Contingent And Unassessed Statutory Penalties.....................25

    C.    The Kasowitz Firm's Allegations of CAP Noncompliance Impermissibly Base Liability on Contingent and Unassessed Statutory Penalties...............................30

II.      This Court Should Dismiss Counts II And IV Because The Reverse False Claims Act's "Property" Clause Does Not Render All Failures To Report Information Actionable. ................................................................................................... 32

III.     This Court Should Dismiss Count III Because The False Claims Act's "Conversion" Provision Similarly Bars Liability Based On Unassessed Statutory Penalties And Unreported "Substantial Risk Information." ................................................. 36

IV.      This Court Should Dismiss Count V Because The Kasowitz Firm Fails To Plead The Required Elements Of A False Claims Act Conspiracy. .................................................. 39

V.       This Court Should Dismiss The Amended Complaint Because The Kasowitz Firm Fails To Sufficiently Allege That Defendants Acted Knowingly. .................................... 41

VI.      This Court Should Dismiss The Amended Complaint Under The Public Disclosure Bar Because The Allegations Were Previously Disclosed And The Kasowitz Firm Is Not An Original Source. ................................................................................................. 44

         A.      The Allegations In The Amended Complaint Are Substantially The Same As Information Previously Disclosed In News Sources, EPA FOIA Reports, And State And Federal Court Litigation. ..................................................................... 46

                 1.      Public Disclosures Of Direct "Allegations" Of Fraud In News Media Bar All Claims. ....................................................................................... 48

                 2.      Public Disclosures Of Certain "Transactions" In A Combination Of News Media And EPA FOIA Reports Also Bar All Claims. .................... 50

                 3.      Public Disclosures Of Direct "Allegations" Of Fraud In Court Filings Additionally Bar All Claims Based On Alleged Conduct Occurring Before March 23, 2010. ........................................................................... 51

                 4.      Public Disclosures Of Certain "Transactions" In A Combination Of Court Filings And EPA FOIA Reports Additionally Bar All Claims Based On Alleged Conduct Occurring Before March 23, 2010. .............. 53

         B.      The Kasowitz Firm Is Not An "Original Source." ............................................... 54

                 1.      The Kasowitz Firm Is Not An Original Source Under The Pre-Amendment Bar. ..................................................................................... 55

                 2.      The Kasowitz Firm Is Not An Original Source Under The Amended Bar. .......................................................................................................... 57

CONCLUSION ............................................................................................................................. 60

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*3M Co. v. Browner*,
  17 F.3d 1453 (D.C. Cir. 1994) ............................................................................ 28

*Am. Textile Mfrs. Inst., Inc. v. Limited, Inc.*,
  190 F.3d 729 (6th Cir. 1999) ............................................................................. 17

*Ark. Pub. Emps. Ret. Sys. v.*
  *Harman Int'l Indus. Inc. (In re Harman Int'l Indus. Inc. Sec. Litig.)*,
  791 F.3d 90 (D.C. Cir. 2015),
  *cert. denied*, 136 S. Ct. 1167 (2016) ............................................................... 7, 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................... 11, 42

*Bd. of Governors of the Fed. Reserve Sys. v. First Lincolnwood Corp.*,
  439 U.S. 234 (1978) ............................................................................................ 27

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 11

*Chevron U.S.A. Inc. v. NRDC, Inc.*,
  467 U.S. 837 (1984) ............................................................................................ 22

*Commodity Futures Trading Comm'n v. Schor*,
  478 U.S. 833 (1986) ............................................................................................ 27

*Cudjoe ex rel. Cudjoe v. Dep't of Veterans Affairs*,
  426 F.3d 241 (3d Cir. 2005) .............................................................................. 23

*Elemary v. Holzmann*,
  533 F. Supp. 2d 116 (D.D.C. 2008) .................................................................. 11

*FC Inv. Grp. LC v. IFX Mkts., Ltd.*,
  529 F.3d 1087 (D.C. Cir. 2008) ........................................................................ 40

*Fed. Maritime Comm'n v. S.C. State Ports Auth.*,
  535 U.S. 743 (2002) ............................................................................................ 22

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) ............................................................................................ 22

*Gobeille v. Liberty Mut. Ins. Co.*,
　136 S. Ct. 936 (2016)..................................................................................................... 36

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
　559 U.S. 280 (2010).......................................................................................... 4, 5, 44, 45

*Heckler v. Chaney*,
　470 U.S. 821 (1985)..................................................................................................... 28

\* *Hoyte v. Am. Nat'l Red Cross*,
　518 F.3d 61 (D.C. Cir. 2008) .......................................................................... 4, 17, 31, 32, 33

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
　520 U.S. 939 (1997)..................................................................................................... 22

*In re Aiken Cnty.*,
　725 F.3d 255 (D.C. Cir. 2013)..................................................................................... 28

*Kaiser Aetna v. United States*,
　444 U.S. 164 (1979)..................................................................................................... 34

*Kowal v. MCI Commc'ns Corp.*,
　16 F.3d 1271 (D.C. Cir. 1994)..................................................................................... 11

*N'Jai v. EPA*,
　No. 13-1212, 2014 WL 2508289 (W.D. Pa. June 4, 2014) ...................................... 27

*Pencheng Si v. Laogai Research Found.*,
　71 F. Supp. 3d 73 (D.D.C. 2014)................................................................................. 39

*Puerto Rico v. Shell Oil Co. (In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.)*,
　117 F. Supp. 3d 276 (S.D.N.Y. 2015) ........................................................................ 23

*Richards v. Duke Univ.*,
　480 F. Supp. 2d 222 (D.D.C. 2007)............................................................................. 11

*Rockwell Int'l Corp. v. United States*,
　549 U.S. 457 (2007)..................................................................................................... 55

*Ruckelshaus v. Monsanto Co.*,
　467 U.S. 986 (1984)..................................................................................................... 34

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
　563 U.S. 401 (2011),.................................................................................................... 51

*Secretary of Labor v. Twentymile Coal Co.*,
　456 F.3d 151 (D.C. Cir. 2006)..................................................................................... 28

iv

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
 231 F.3d 20 (D.C. Cir. 2000) ................................................................................ 12

*United States ex rel. Aakhus v. Dyncorp. Inc.*,
 136 F.3d 676 (10th Cir. 1998) ........................................................................ 38, 39

*United States ex rel. Ahumada v. Nat'l Ctr. for Emp't of the Disabled*,
 No. 1:06-cv-713, 2013 WL 2322836 (E.D. Va. May 22, 2013),
 *aff'd sub nom. United States ex rel. Ahumada v. NISH*, 756 F.3d 268 (4th Cir. 2014)........... 57

*United States ex rel. Bahrani v. Conagra, Inc.*,
 465 F.3d 1189 (10th Cir. 2006) ............................................................................ 18

*United States ex rel. Bain v. Ga. Gulf Corp.*,
 386 F.3d 648 (5th Cir. 2004) ................................................................................ 17

*United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*,
 251 F. Supp. 2d 28 (D.D.C. 2003) ................................................................... 38, 39

*United States ex rel. Colquitt v. Abbott Labs.*,
 864 F. Supp. 2d 499 (N.D. Tex. 2012) .................................................................. 49

*United States ex rel. Comeaux v. W&T Offshore, Inc.*,
 No. 10-494, 2013 WL 4012644 (E.D. La. Aug. 6, 2013) ....................................... 20

*United States ex rel. Conteh v. IKON Office Sols., Inc.*,
 103 F. Supp. 3d 59 (D.D.C. 2015) .................................................................. 39, 40

*United States ex rel. Davis v. Dist. of Columbia*,
 413 F. App'x 308 (D.C. Cir. 2011) ........................................................................ 57

*\* United States ex rel. Davis v. Dist. of Columbia*,
 679 F.3d 832 (D.C. Cir. 2012) ........................................................... 48, 54, 55, 58

*United States ex rel. Davis v. Dist. of Columbia*,
 773 F. Supp. 2d 21 (D.D.C. 2011) ................................................................. 12, 49

*United States ex rel. Ervin & Assocs. v. Hamilton Sec. Grp., Inc.*,
 332 F. Supp. 2d 1 (D.D.C. 2003) .......................................................................... 48

*United States ex rel. Findley v. FPC-Boron Employees' Club*,
 105 F.3d 675 (D.C. Cir. 1997) ........................................................... 46, 49, 55, 59

*United States ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*,
 843 F. Supp. 2d 20 (D.D.C. 2012) ........................................................................ 49

*United States ex rel. Grubbs v. Kanneganti*,
 565 F.3d 180 (5th Cir. 2009) ................................................................................ 40

*United States ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*,
  No. CIV.A. 13-6000, 2014 WL 7274913 (E.D. La. Dec. 18, 2014),
  *aff'd*, 626 F. App'x 528 (5th Cir. 2015) ................................................................... 20

*United States ex rel. Holbrook v. Brink's Co.*,
  No. 2:13-cv-873, 2015 WL 196424 (S.D. Ohio Jan. 15, 2015) ................................ 38

*United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.*,
  370 F. Supp. 2d 993 (N.D. Cal. 2005) ..................................................................... 41

*United States ex rel. J. Cooper & Assocs. v. Bernard Hodes Grp., Inc.*,
  422 F. Supp. 2d 225 (D.D.C. 2006) .......................................................................... 47

*United States ex rel. John v. Hastert*,
  82 F. Supp. 3d 750 (N.D. Ill. 2015) .......................................................................... 47

*United States ex rel. King v. Hillcrest Health Ctr., Inc.*,
  264 F.3d 1271 (10th Cir. 2001) ................................................................................ 57

*United States ex rel. Kraxberger v. Kan. City Power & Light Co.*,
  756 F.3d 1075 (8th Cir. 2014) .................................................................................. 59

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
  985 F.2d 1148 (2d Cir. 1993) ................................................................................... 56

* *United States ex rel. Landis v. Tailwind Sports Corp.*,
  155 F. Supp. 3d 12 (D.D.C. 2016) ................................................................. 15, 31, 44

*United States ex rel. Marcy v. Rowan Cos.*,
  520 F.3d 384 (5th Cir. 2008) .................................................................................... 17

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
  608 F.3d 871 (D.C. Cir. 2010) .............................................................................. 39, 40

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
  812 F.3d 294 (3d Cir. 2016) ..................................................................................... 51

* *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
  No. 12-1562-SLR, __ F. Supp. 3d __, 2016 WL 4051266 (D. Del. July 26, 2016)15, 19, 20, 30

*United States ex rel. Nissman v. Southland Gaming of the Virgin Islands, Inc.*,
  No. 2011-0010, __ F. Supp. 3d __, 2016 WL 1317495 (D.V.I. Mar. 31, 2016) ..................... 20

*United States ex rel. Oliver v. Philip Morris USA, Inc.*,
  101 F. Supp. 3d 111 (D.D.C. 2015),
  *aff'd on other grounds*, 826 F.3d 466 (D.C. Cir. 2016) ............................................ 49

\* *United States ex rel. Oliver v. Philip Morris USA, Inc.*,
  826 F.3d 466 (D.C. Cir. 2016)............................................................... 46, 47, 51, 54, 55

*United States ex rel. Osheroff v. Humana, Inc.*,
  776 F.3d 805 (11th Cir. 2015) .......................................................................... 47, 59

*United States ex rel. Repko v. Guthrie Clinic, P.C.*,
  No. 3:04-cv-1556, WL 3875987 (M.D. Pa. Sept. 1, 2011),
  *aff'd*, 490 F. App'x 502 (3d Cir. 2012).................................................................... 49

*United States ex rel. Schaengold v. Mem'l Health, Inc.*,
  No. 4:11-cv-58, 2014 WL 6908856 (S.D. Ga. Dec. 8, 2014)..................................... 20

*United States ex rel. Settlemire v. Dist. of Columbia*,
  198 F.3d 913 (D.C. Cir. 1999)...................................................................... 47, 54

*United States ex rel. Shea v. Verizon Commc'ns, Inc.*,
  160 F. Supp. 3d 16 (D.D.C. 2015) ....................................................................... 45

*United States ex rel. Siller v. Becton Dickinson & Co.*,
  21 F.3d 1339 (4th Cir. 1994) ........................................................................... 51

*United States ex rel. Simoneaux v. E.I. du Pont de Nemours & Co.*,
  No. 12-219-SDD-EWD, 2016 WL 236239 (M.D. La. Jan. 20, 2016).............................. 20, 21

*United States ex rel. Springfield Terminal R. Co. v. Quinn*,
  14 F.3d 645 (D.C. Cir. 1994) ......................................................................... 5, 47

*United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v.*
  *Prudential Ins. Co.*,
  944 F.2d 1149 (3d Cir. 1991) ......................................................................... 56

*United States ex rel. Stinson, Lyons, Gerlin & Bustamente, P.A. v.*
  *Pan Am. Life Ins. Co.*,
  Civ. A. No. 90-411, 1992 WL 125329 (E.D. La. May 22, 1992)................................. 56

*United States ex rel. Szymoniak v. Am. Home Mortg. Servicing, Inc.*,
  No. 0:10-cv-01465-JFA, 2014 WL 1910845 (D.S.C. May 12, 2014) ......................... 59

*United States ex rel. Totten v. Bombardier Corp.*,
  286 F.3d 542 (D.C. Cir. 2002)......................................................................... 11

*United States ex rel. Webb v. Miller Family Enter.*,
  No. 1:13-cv-169-DBH, 2014 WL 6611012 (D. Me. July 2, 2014) ........................... 38

\* *United States ex rel. Winkelman v. CVS Caremark Corp.*,
  827 F.3d 201 (1st Cir. 2016)................................................................. 46, 47, 54, 59

*United States v. Bank of Farmington*,
  166 F.3d 853 (7th Cir. 1999),
  *overruled in part on other grounds, Glaser v. Wound Care Consultants, Inc.*,
  570 F.3d 907 (7th Cir. 2009) ........................................................................................ 57

*United States v. Bouchey*,
  860 F. Supp. 890 (D.D.C. 1994)..................................................................................... 41

*United States v. Pemco Aeroplex, Inc.*,
  195 F.3d 1234 (11th Cir. 1999) *(en banc)* ...................................................................... 33

*United States v. Q Int'l Courier, Inc.*,
  131 F.3d 770 (8th Cir. 1997) .......................................................................................... 17

* *United States v. Sci. Applications Int'l Corp. (SAIC)*,
  626 F.3d 1257 (D.C. Cir. 2010) ............................................................................... 42, 43

*United States v. Universal Fruits & Vegetables Corp.*,
  370 F.3d 829 (9th Cir. 2004) .......................................................................................... 24

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  136 S. Ct. 1989 (2016)..................................................................................................... 42

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)......................................................................................................... 23

*Whitney Nat'l Bank v. Bank of New Orleans & Tr. Co.*,
  379 U.S. 411 (1965)......................................................................................................... 23

## Rules and Statutes

15 U.S.C. § 2601 *et seq.*............................................................................................................ 1, 5

15 U.S.C. § 2601(c) ................................................................................................................... 27

15 U.S.C. § 2607(e) ......................................................................... 5, 6, 9, 13, 25, 26, 27, 30, 42, 50

15 U.S.C. § 2614(1) ......................................................................................................... 5, 13, 28

15 U.S.C. § 2615 ....................................................................................................................... 26

15 U.S.C. § 2615(a) ................................................................................................................... 28

15 U.S.C. § 2615(a)(1).............................................................................................................. 26

15 U.S.C. § 2615(a)(2)...................................................................................................... 6, 14, 24, 26

15 U.S.C. § 2615(a)(2)(B) ................................................................................................ 5, 13, 26, 28

15 U.S.C. § 2615(a)(2)(C) .................................................................... 5, 13, 26

15 U.S.C. § 2615(a)(3) ......................................................................... 6, 14, 24

15 U.S.C. § 2619(a)(1) ............................................................................. 8, 23

15 U.S.C. § 2619(a)(2) ............................................................................. 8, 23

16 U.S.C. § 2437(a) .................................................................................... 29

19 U.S.C. § 1584(a)(1) ................................................................................ 29

19 U.S.C. § 283 ........................................................................................... 29

28 U.S.C. § 1292(b) .................................................................................... 20

29 U.S.C. § 1021(b) .................................................................................... 36

29 U.S.C. § 1023(b)(1) ................................................................................ 36

29 U.S.C. § 1023(b)(3)(A) ........................................................................... 36

29 U.S.C. § 1023(b)(3)(B) ........................................................................... 36

29 U.S.C. § 1024(a) .................................................................................... 36

29 U.S.C. § 1026(a) .................................................................................... 36

30 U.S.C. § 1719(a) .................................................................................... 29

31 U.S.C. § 3729 *et seq.* ............................................................................. 1

31 U.S.C. § 3729(a)(1)(A) ............................................................................. 4

* 31 U.S.C. § 3729(a)(1)(D) .............................................. 4, 36, 37, 38, 39, 41

* 31 U.S.C. § 3729(a)(1)(G) ............................................. 4, 13, 14, 24, 32, 41

31 U.S.C. § 3729(a)(3) ................................................................................ 41

31 U.S.C. § 3729(a)(4) ................................................................................ 38

31 U.S.C. § 3729(b)(1)(A) ........................................................................... 24

31 U.S.C. § 3729(b)(3) ........................................................................... 15, 16

31 U.S.C. § 3730(b) ...................................................................................... 4

31 U.S.C. § 3730(b)(4) .................................................................................. 9

31 U.S.C. § 3730(d)(1) ........................................................................................................ 4

* 31 U.S.C. § 3730(e)(4) ........................................................................................ 5, 44, 45, 46

31 U.S.C. § 3730(e)(4)(A) .............................................................................................. 46, 51

31 U.S.C. § 3730(e)(4)(B) .............................................................................................. 55, 57

33 U.S.C. § 1233 ............................................................................................................... 29

33 U.S.C. § 1236 ............................................................................................................... 29

33 U.S.C. § 1236(b) ........................................................................................................... 29

33 U.S.C. § 1415(a) ........................................................................................................... 29

33 U.S.C. § 1608(a) ........................................................................................................... 29

33 U.S.C. § 1908 ............................................................................................................... 30

33 U.S.C. § 2104(e) ........................................................................................................... 29

33 U.S.C. § 533(b) ............................................................................................................. 29

39 U.S.C. § 3017(h)(1)(A) ................................................................................................. 29

42 U.S.C. § 9152(c)(1) ....................................................................................................... 29

49 U.S.C. § 521(b)(2)(A) ................................................................................................... 29

Fed. R. Civ. P. 12(b)(1) ............................................................................................. 1, 11, 45

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 1, 11, 41, 45

Fed. R. Civ. P. 9(b) ...................................................................................... 1, 11, 39, 40, 57

Pub. L. No. 111-148, 124 Stat. 119 (2010) .......................................................................... 45

Pub. L. No. 94-469, 90 Stat. 2003 (1976) ............................................................................. 5

Pub. L. No. 99-562, 100 Stat. 3153 (1986) .......................................................................... 17

Registration & Agreement for TSCA Section 8(e) Compliance Audit Program,
   56 Fed. Reg. 4128 (Feb. 1, 1991) ........................................................................... 6, 30, 32

**Other Authorities**

* Amicus Curiae Brief of the United States in Support of Appellant,
  *Simoneaux v. E.I. DuPont De Nemours & Co.*,
  Case No. 16-30141, 2016 WL 3090877 (5th Cir. May 26, 2016) ..................................... 21, 27

* *Black's Law Dictionary* (10th ed. 2014) ...................................................................... 15, 16, 37

Boese, John T.,
  *Civil False Claims & Qui Tam Actions* (2016) ................................................................ 20, 37

* Proceedings and Debates of the 111th Congress, First Session,
  155 Cong. Rec. S4531 (daily ed. Apr. 22, 2009) ............................................................. 18, 19

S. Rep. No. 111-10, 2009 WL 787872 (2009) ...................................................................... 18, 19

*Webster's New Collegiate Dictionary* (1974) ............................................................................ 15

* Authorities chiefly relied upon are marked with an asterisk.

Defendants BASF Corporation, Covestro LLC (f/k/a Bayer MaterialScience LLC), The Dow Chemical Company, and Huntsman International LLC (collectively, Defendants) respectfully submit this Memorandum in support of their Motion to Dismiss Relator's Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 9(b).

## INTRODUCTION

Plaintiff-Relator, the law firm Kasowitz, Benson, Torres & Friedman LLP, comes to this Court demanding *billions* of dollars in damages under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, based on an interpretation of the statute that other courts have repeatedly rejected and that the Federal Government itself has urged them to reject.  Although the FCA establishes a mechanism for individuals to recover money or property that is owed to the Federal Government, the Kasowitz firm seeks to transform the statute into something much more.  It believes that the FCA allows a citizen to seek penalties for the violation of any federal law that authorizes the Federal Government to impose civil fines or penalties—even before the Executive Branch alleges such a violation (if it ever does), decides in its discretion to seek such fines or penalties, determines how much to seek, succeeds in obtaining fines or penalties in an enforcement action, and then prevails on judicial review.  And so, in this case, the Kasowitz firm contends that it is entitled to pursue penalties for Defendants' alleged violations of provisions of the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 *et seq.*, that require chemical manufacturers to report "substantial risk information" about their products to the U.S. Environmental Protection Agency (EPA)—*even though EPA has never found the alleged TSCA violations, let alone assessed any penalties for noncompliance*.

The problem for the Kasowitz firm is that, as the FCA's text and history and settled case law make clear, Defendants have no duty to pay penalties—and so there is no FCA liability— unless and until the Federal Government, subject to administrative and judicial review, says so.

To read the FCA as the Kasowitz firm does would strip the Federal Government of enforcement discretion, and let bounty-hunter relators decide when a statutory violation warrants a penalty. Nothing in the FCA remotely permits this radical shift in administrative law.  No wonder the Government—which is the real party in interest and stands to recover from any successful FCA suit—has specifically rejected the Kasowitz firm's theory of liability in a case currently pending before the Fifth Circuit.  Because the FCA, properly interpreted, recognizes no duty to pay a penalty that the Government has never sought or assessed, the Kasowitz firm's core theory of liability, advanced in Count I of the Amended Complaint, fails as a matter of law.

The Kasowitz firm's ancillary theories of liability are equally unavailing as a matter of pure statutory interpretation.  Although the Kasowitz firm contends in Count II that the FCA imposes liability on those who fail to turn over "property" that they owe the Federal Government, the information at issue here does not qualify as property within the meaning of that statute.  No case has ever held that a statutory reporting obligation automatically converts the reportable information into "property" under the FCA—and indeed the information at issue here does not qualify as property as a matter of law, because Defendants do not exclusively possess it.  To characterize such information as "property" under the FCA would transform federal law, creating an FCA claim for every violation of a reporting statute.  The Kasowitz firm's other counts—alleging that Defendants knowingly delivered to the Government less than all of the money or property the Government would use (Count III), made a false record in connection with an obligation to transmit money or property to the Government (Count IV), and conspired to commit these substantive violations (Count V)—once again erroneously assume that the FCA recognizes a duty to pay unassessed penalties and/or that substantial risk information is property, so they fail for the same reasons.  Because none of the firm's theories is

cognizable under the FCA, this Court should dismiss the entire Amended Complaint for failure to state a claim.

And there is more: even though the Kasowitz firm's erroneous interpretation of the FCA alone requires dismissal, the Amended Complaint suffers other fatal flaws.  For one, the Amended Complaint fails to satisfy the FCA's scienter requirement.  Even though Congress never intended for the FCA to punish honest mistakes or mere negligence, the Kasowitz firm fails to allege that each Defendant—much less any single individual employee, as required—*knew* that it was violating a reporting obligation and *knew* that EPA would have successfully pursued penalties as a consequence.  For another, the Kasowitz firm's allegations run headlong into the FCA's well-established public disclosure bar.  While preserving the ability of whistleblower insiders to file suits containing non-derivative, inside information, the public disclosure bar forbids relators from reprising information that is already in the public domain. But that is precisely what the Kasowitz firm has done, making allegations that were previously published in news reports, government reports, and documents in prior lawsuits.

For all these reasons, this Court should dismiss the entire Amended Complaint as a matter of law.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.      Statutory Background

This lawsuit asserts that two of the FCA's provisions permit a private citizen to recover penalties for violations of federal statutes—even where, as here, the Federal Government has never alleged a violation, much less assessed penalties for one.  In particular, the Kasowitz firm alleges that Defendants owe these unassessed penalties for violating certain reporting obligations under TSCA and EPA's Compliance Audit Program (CAP).  Accordingly, Defendants first provide a brief overview of the relevant FCA, TSCA, and CAP provisions.

### 1.    The False Claims Act

For more than a century, the False Claims Act—as its name suggests—has imposed liability on anyone who submits "a false or fraudulent claim for payment or approval" to the Federal Government.  31 U.S.C. § 3729(a)(1)(A).  The Act has been amended over the years, and two of its provisions now apply not when an individual wrongfully *takes* money or property from the Government, but instead when that individual wrongfully *withholds* money or property that it owes to the Government.  *First*, in 1986 Congress amended the statute to include a "reverse" theory of liability, imposing liability on anyone who (under the FCA's current language) "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G); *see Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 63 n.1 (D.C. Cir. 2008) (under this provision, "the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated" (citation omitted)).  *Second*, a defendant is liable under the FCA's "conversion" provision if it "has possession, custody, or control of property or money used, or to be used, by the Government" and "knowingly delivers, or causes to be delivered, less than all of that money or property."  31 U.S.C. § 3729(a)(1)(D).

In order to provide "adequate incentives for whistle-blowing insiders with genuinely valuable information" to come forward, Congress enabled certain individuals—"relators"—to file civil actions under the FCA on behalf of the Federal Government, and to keep up to thirty percent of any damages awarded in such a suit.  *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294 (2010); 31 U.S.C. §§ 3730(b), (d)(2).  But Congress had no desire to reward "opportunistic plaintiffs who have no significant information to contribute of their own," so it carefully circumscribed who could bring such actions (known in

FCA parlance as "*qui tam*" actions). *Graham Cnty.*, 559 U.S. at 294 (quoting *United States ex rel. Springfield Terminal R. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994)).  As a result, the FCA includes a public disclosure bar that prevents parties from pursuing *qui tam* actions where the underlying alleged fraud is already known.  *See* 31 U.S.C. § 3730(e)(4).  That bar requires courts to dismiss any action where the alleged fraud was previously publicly disclosed and the relator is not an "original source" of the allegations.

### 2.    The Toxic Substances Control Act and Compliance Audit Program

Forty years ago, Congress enacted TSCA to ensure that adequate data and authority exist to regulate chemicals that present an unreasonable risk of injury to health or the environment. *See* Pub. L. No. 94-469, 90 Stat. 2003 (1976) (codified at 15 U.S.C. § 2601 *et seq*.).  To that end, Section 8(e) of TSCA requires chemical manufacturers to report to EPA information that reasonably supports the conclusion that a chemical substance or mixture presents a "substantial risk of injury" to health or the environment.  *See* 15 U.S.C. § 2607(e) (any person who manufactures a chemical substance or mixture and "obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform the Administrator of such information unless such person has actual knowledge that the Administrator has been adequately informed of such information").  The information to be disclosed is known as "substantial risk information," which the Amended Complaint abbreviates as SRI.  Congress delegated to EPA the authority to monitor compliance with these reporting requirements; determine whether violations occurred; exercise discretion to decide whether to impose penalties if it finds a violation; and exercise discretion to establish the amount of any penalties owed.  *Id.* §§ 2607(e), 2614(1), 2615(a)(2)(B)-(C).  EPA can assess penalties only after providing opportunity for a hearing before an Administrative Law Judge (ALJ), and the alleged violator can challenge the assessment of any

penalties in an administrative appeal to EPA's Environmental Appeals Board and obtain judicial review in a federal court of appeals. *Id.* § 2615(a)(2), (3).

On February 1, 1991, EPA announced the "Compliance Audit Program" as a "one-time voluntary compliance program designed to strongly encourage companies to voluntarily audit their files for studies reportable under [TSCA] section 8(e)." Registration & Agreement for TSCA Section 8(e) Compliance Audit Program, 56 Fed. Reg. 4128 at 4128-29 (Feb. 1, 1991) (Am. Compl., Ex. 26 (ECF No. 22-4)). Each participating company agreed to audit its substantial risk reporting compliance and to submit health effects studies that it determined were "[r]eportable under TSCA Section 8(e)." *Id.* at 4129-30, Ex. 26, Section II.B.1. These companies also agreed that each submission pursuant to their CAP agreements would "constitute a violation of TSCA section[] 8(e)." *Id.* at 4129, Ex. 26, Section II.A.4. In return, EPA agreed to limit the penalties it would pursue for information submitted under the CAP, both per study and in the aggregate. *Id.* at 4130, Ex. 26, Section II.B.2. If a company failed to submit a study that EPA later concluded was in fact "reportable under TSCA Section 8(e)," EPA "reserve[d] its rights under TSCA section 16 to take appropriate enforcement action." *Id.* at 4129, Ex. 26, Section II.A.5; *see also id.* at 4130, Section II.D.4 ("Failure to comply with the terms of this CAP Agreement permits EPA to proceed under TSCA section 16 to impose the civil penalties allowable under the existing EPA TSCA Sections 8, 12, and 13 Enforcement Response Policy….").

### B.     Background Allegations

Defendants BASF Corporation, Covestro LLC (erroneously sued as "Bayer MaterialScience LLC, f/k/a Miles, Inc., f/k/a Mobay Chemical Company"), The Dow Chemical Company, and Huntsman International LLC (erroneously sued as "Huntsman International LLC f/k/a ICI America, Inc.") manufacture isocyanate chemicals, which can be used to produce a

variety of polyurethane-based materials such as paint, adhesives, insulation, foam for mattresses and cushions, and parts for automotive interiors. *See* Am. Compl. ¶ 7 (ECF No. 21). The relator, the Kasowitz firm, previously represented a group of plaintiffs bringing personal injury claims against BASF, Bayer (now Covestro), Dow, and others (but not Huntsman), and alleging that they had been injured by exposure to certain isocyanate chemicals that the defendants manufactured. *Id.* ¶ 18, 932, 1120. In that case, a long-running civil action in Alabama captioned *Bice v. Micon*, the plaintiffs also alleged that the defendants concealed the health risks of those chemicals, including the health risks posed by skin contact with and low-level inhalation exposure to them. *Id.* ¶¶ 18, 1120.

Here, the Kasowitz firm similarly alleges that the same companies, as well as Huntsman, violated TSCA and the CAP by failing to inform EPA of substantial risk information regarding the purported health risks of isocyanate chemicals, owed penalties for their alleged reporting failures (even though EPA has never found a violation, much less assessed any penalties), and violated the FCA by failing to pay such hypothetical, unassessed penalties. *See id.* ¶¶ 21, 25, 30, 35.[1] The thrust of the Kasowitz firm's allegations is that each Defendant possessed information that certain isocyanate chemicals posed substantial health risks not known to EPA but failed to inform EPA of this information in violation of the reporting requirements of TSCA and the CAP. *Id.* ¶¶ 898-908.[2] But the Amended Complaint brings no claims under TSCA. That is no

---

[1] Because Defendants are seeking dismissal on the pleadings under Rule 12, they are constrained, for present purposes, to accept the truth of the well-pleaded allegations in the Amended Complaint. *See, e.g.*, *Ark. Pub. Emps. Ret. Sys. v. Harman Int'l Indus. Inc. (In re Harman Int'l Indus. Inc. Sec. Litig.)*, 791 F.3d 90, 99 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1167 (2016). Defendants do not, however, concede the factual accuracy of those allegations.

[2] Although the Kasowitz firm alleges that all Defendants participated in the CAP, "EPA was unable to locate the Consent Agreement or Consent Order that summarized the results of the program with respect to BASF, Bayer, Dow" or "ICI America, Inc.," an alleged predecessor to Huntsman that allegedly participated in the Program. Am. Compl. ¶¶ 898-908.

accident: although TSCA contains a citizen suit provision that allows a private right of action to stop a violation or to compel EPA to perform a non-discretionary act or duty, TSCA does not create a private right of action for damages.  *See* 15 U.S.C. § 2619(a)(1), (2).  So the Kasowitz firm turns instead to the FCA in the hope of a payday.

As the Amended Complaint acknowledges, EPA and other federal agencies have "long known" that inhaling certain isocyanates in sufficient concentrations can cause respiratory injury. Am. Compl. ¶ 12.  Indeed, the Occupational Safety and Health Administration, the National Institute for Occupational Safety and Health, and the American Conference of Governmental Industrial Hygienists have promulgated standards setting out the maximum permissible or recommended levels of exposure to various isocyanate chemicals.  *Id.* ¶¶ 174-75.  But the Kasowitz firm alleges that, starting in the late 1970s, Defendants obtained information bearing on whether inhaling isocyanates in low concentrations or having skin contact with them can cause respiratory sensitization.  *See, e.g.*, *id.* ¶¶ 141-42, 173.  Much of the information allegedly was obtained via written or oral reports at technical meetings of the International Isocyanate Institute (III).  *See, e.g.*, *id.* ¶¶ 180-82, 184-86.  For example, the Kasowitz firm alleges that in 1982, Bayer and Dow employees attended a meeting at which "attendees acknowledged" a "concern" about "whether skin absorption can lead to pulmonary [sensitization]" based on "[s]ome relevant Japanese work."  *Id.* ¶¶ 206-07.  As indicated in the chart summarizing all the allegations, the Kasowitz firm claims that one or more Defendants obtained substantial risk information about isocyanates on ten occasions, between 1979 and 2003.  *See id.* ¶ 800.

The Kasowitz firm acknowledges that it is not a whistleblowing insider, but rather filed this suit based on information obtained during discovery in *Bice*.  Am. Compl. ¶¶ 18, 932, 1120, 1122-25.  The firm alleges that, between 2005 and 2009, BASF, Bayer, and Dow produced in

*Bice* the very documents that the Amended Complaint now identifies in Paragraph 800, among others, as the alleged SRI that had to be reported under TSCA. *Id*. ¶ 1122. (Around the same time, various news media outlets and filings in other state and federal litigation also stated that Defendants had concealed from government officials purported SRI concerning the respiratory hazards of dermal and low-level inhalation exposure to isocyanates. *See* Ex. 1 (Appx.) & Exs. 2-31 (collecting news media, agency reports, and state and federal litigation filings).) The Kasowitz firm then filed Freedom of Information Act (FOIA) requests with EPA requesting all the information about certain isocyanate chemicals that had been submitted under TSCA in an effort to find out whether Defendants had provided EPA this information. Am. Compl. ¶¶ 18-19; MTD Ex. 17. EPA responded with "Standard Report[s]" listing information about isocyanates that regulated entities had submitted. Ex. 17. On behalf of the *Bice* plaintiffs, the Kasowitz firm then offered the testimony of proffered expert Joel Charm, who opined that the information contained in the documents produced in discovery was substantial risk information under TSCA and that, based on the EPA FOIA reports, BASF, Bayer, and Dow had not reported it to EPA, in violation of Section 8(e). Am. Compl. ¶¶ 1122-25; MTD Ex. 18. Charm's assertions in *Bice* are the basis of the Kasowitz firm's allegations in the Amended Complaint.

### C.    Procedural History

In May 2015, the Kasowitz firm filed its original complaint in this action "on behalf of itself and the United States." Compl. (ECF No. 1) ¶ 4. As required by the FCA, the Kasowitz firm filed the complaint under seal to give the Federal Government an opportunity to review the allegations and decide whether it wanted to take over the action. *See* 31 U.S.C. § 3730(b)(4); Compl. ¶ 6. The United States declined to intervene. The Kasowitz firm filed its Amended Complaint in September 2015, which was unsealed and served on Defendants in August 2016. (ECF No. 27). The case was transferred to this Court on November 14, 2016. (ECF No. 83).

The Amended Complaint asserts five counts under the FCA based on the alleged failures to report the alleged substantial risk information and pay unassessed penalties to EPA.  Count I alleges that, as of May 20, 2009, Defendants knowingly concealed or avoided an obligation to pay money to the Government in violation of the reverse FCA.  Am. Compl. ¶¶ 1750-51.  The Kasowitz firm contends that because each Defendant failed to inform EPA of certain reportable SRI, and because EPA might have in its discretion commenced enforcement proceedings and might have sought penalties for their failure to do so, and because those penalties might have been upheld on review, each Defendant knowingly failed to pay money it owes the Federal Government.  Count II alleges that, as of May 20, 2009, Defendants knowingly concealed or avoided their obligation to transmit property—namely, the substantial risk information itself—to the Government, again in violation of the reverse FCA.  *Id.* ¶¶ 1759-60.  Count III alleges that, as of May 20, 2009, Defendants possessed money and property belonging to the Government (the same civil penalties and underlying substantial risk information, respectively) and knowingly delivered less than all of that money and property to the Government, this time in violation of the FCA's "conversion" provision.  *Id.* ¶¶ 1768-75.  Count IV alleges that, on February 26, 2013, Defendants knowingly made false statements material to Defendants' purported obligations to pay penalties or transmit property.  *Id.* ¶¶ 1787-89.  And Count V alleges that Defendants conspired together to commit these substantive violations.  *Id.* ¶¶ 1795-96.

The Kasowitz firm alleges that Defendants owe billions of dollars in civil penalties under TSCA and in contract damages under the CAP—all trebled under the FCA—plus additional civil penalties under the FCA, attorneys' fees, costs, expenses, and prejudgment interest.  *See* Am. Compl. at 393 (prayer for relief); *id.* ¶¶ 892-95 (TSCA damages); *id.* ¶¶ 924-30 (CAP damages).

### LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint that fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), and "to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555 (citation omitted). Although the court accepts well-pleaded facts as true, "the court need not accept the plaintiff's legal conclusions." *Harman,* 791 F.3d at 99. Nor must the court "accept asserted inferences or conclusory allegations that are unsupported by facts set forth in [the] complaint." *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 235 (D.D.C. 2007).

Moreover, "because the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b)" of the Federal Rules of Civil Procedure. *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002). Under Rule 9(b)'s heightened pleading standard, "the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (citation omitted). Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), plaintiffs still have a "duty to plead *some* facts from which the court may reasonably infer knowledge or another mental state," *Elemary v. Holzmann*, 533 F. Supp. 2d 116, 132 (D.D.C. 2008).

Finally, under Rule 12(b)(1), which applies in part to the public disclosure bar analysis, the party seeking to invoke the jurisdiction of a federal court—here, the Kasowitz firm—bears the burden of establishing that the court has jurisdiction to hear its claims. *United States ex rel.*

*Davis v. Dist. of Columbia*, 773 F. Supp. 2d 21, 26-27 (D.D.C. 2011) (citing *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000)).

## ARGUMENT

The Kasowitz firm cobbles together five counts based on the FCA's reverse false claims and conversion provisions, but all five fail as a matter of straightforward statutory interpretation. Count I asserts liability under the reverse FCA based on Defendants' failure to pay penalties that EPA has never assessed (for violations it has never found), but the FCA does not impose liability for failing to pay such *unassessed* penalties.  *See infra* Section I.  Count II asserts liability under the same provision based on Defendants' failure to transmit property to EPA, but the alleged substantial risk information does not qualify as "property" under the FCA as a matter of law.  *See infra* Section II.  In Count III, the Kasowitz firm tries to fit the same two theories—based on failures to pay unassessed penalties and to transmit SRI—into the FCA's conversion provision, but again there is no statutory basis to do so.  *See infra* Section III.  Count IV is a wholly derivative claim, alleging that Defendants violated the reverse FCA by making false records in connection with the same alleged obligations to pay unassessed penalties and transmit SRI, and so it fails for the same reasons as Counts I and II.  *See infra* Sections I, II.  Finally, Count V's assertion of a conspiracy fails too; where there are no underlying substantive violations, there is no conspiracy.  (This last count also fails for other, independent reasons.)  *See infra* Section IV.  So the firm has invented two new legal theories and tried to fit them into two FCA provisions, but the counts all seek to create liability where none can exist under the statute.  This Court should therefore dismiss the entire Amended Complaint for failure to state a claim.

There are two other independent grounds for dismissing the entire Amended Complaint. First, the Kasowitz firm fails to satisfy the FCA's scienter requirements, because the Amended Complaint fails to allege that any of the Defendants' individual employees had the requisite

knowledge of these alleged violations.  *See infra* Section V.  Second, the firm's allegations run afoul of the FCA's public disclosure bar because they are substantially similar to information previously published by news media, in government reports, and in prior litigation, and the firm is not an "original source" of that information.  *See infra* Section VI.  Accordingly, this Court should grant Defendants' motion to dismiss the entire Amended Complaint.

I. **This Court Should Dismiss Counts I And IV Because The False Claims Act Does Not Permit Liability Based On Unassessed Penalties Under TSCA Or The CAP.**

The reverse FCA imposes liability on anyone who "[1] knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or [2] knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  The Kasowitz firm's principal theory of liability (alleged in Count I and repeated in Count IV) is that Defendants violated Section 8(e) of TSCA and EPA's Compliance Audit Program by failing to tell the Federal Government about alleged substantial risk information relating to isocyanate chemicals and, as a result, violated the reverse FCA by "withholding" hypothetical, unassessed penalties EPA purportedly would have imposed for the alleged reporting violations.[3]  That theory is meritless.

As explained above, Congress delegated authority and discretion to EPA to enforce TSCA.  15 U.S.C. §§ 2607(e), 2614(1), 2615(a)(2)(B)-(C).  EPA can only assess penalties after an on-the-record hearing before an EPA Administrative Law Judge (if one is requested), and any

---

[3] Specifically, Count I relies on the second part of the reverse FCA and asserts that the failure to pay hypothetical, unassessed penalties qualifies as "conceal[ing] or … improperly avoid[ing] or decreas[ing] an obligation to pay."  Count IV, which relies on the first part of the reverse FCA, alleges that Defendants lied about possessing that alleged SRI (and so lied about owing these hypothetical, unassessed penalties), and therefore "ma[de] … a false record or statement material to an obligation to pay."  Both counts are thus based on the assertion that "an obligation to pay" includes Defendants' alleged obligation to pay unassessed penalties.

penalties are then subject to judicial review in a federal court of appeals.  *Id.* § 2615(a)(2), (3).  The reverse FCA, contrary to Kasowitz's theory, does not deputize *qui tam* relators to sidestep this entire regulatory scheme and arrogate to themselves the power to determine whether, and in what amount, to seek civil penalties.  Yet that is what Kasowitz is doing here.  Invoking the FCA's treble damages provision, it claims entitlement to thirty percent of *billions* in trebled hypothetical penalties that EPA has never sought, much less imposed.

The Kasowitz firm's gambit has no basis in law.  The plain language of the FCA, its legislative history, and settled case law foreclose a reverse FCA claim premised on the failure to pay unassessed penalties—a conclusion the Federal Government itself recently embraced in an almost-identical case.  Moreover, permitting reverse FCA liability based on unassessed penalties would revolutionize the administrative state.  The Kasowitz firm's theory would transform every penalty-triggering violation of a statute or regulation, and every breach of a government contract, into a treble damages claim for FCA fraud, and would thus authorize private bounty hunters to usurp the Executive Branch's traditional constitutional authority to decide whether and when enforcement is warranted.  Nothing in the FCA's text or history remotely suggests that Congress intended this radical result; to the contrary, the statute's text and history squarely foreclose it.

**A.      The Reverse False Claims Act Does Not Permit Liability Based On Unassessed Statutory Penalties.**

**1.      The Reverse False Claims Act's Plain Text Prohibits Liability Based On Unassessed Statutory Penalties.**

The reverse FCA, as noted, imposes liability on anyone who "[1] knowingly makes, uses, or causes to be made or used, a false record or statement material to an *obligation* to pay or transmit money or property to the Government, or [2] knowingly conceals or knowingly and improperly avoids or decreases an *obligation* to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G) (emphasis added).  In the absence of an "obligation"

to pay or transmit money or property to the Government, in other words, there can be no "reverse" FCA claim.   And there is no need to speculate about the meaning of the word "obligation" in this context: the statute defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."   *Id.* § 3729(b)(3).   Therefore, the reverse FCA imposes liability only where there is an "established duty" to "pay or transmit money or property to the Government."   That simple point dooms the Kasowitz firm's theory of reverse FCA liability.

As a matter of law, the failure to pay an unassessed penalty is not the breach of an "*established* duty" to "pay or transmit money or property to the Government."   To "establish" means "[t]o make or form; to bring about or into existence."   *Black's Law Dictionary* 664 (10th ed. 2014); *Webster's New Collegiate Dictionary* 391 (1974) (same).   As a result, an "established duty" to "pay or transmit money" within the meaning of the FCA must refer to an obligation to pay money that already has been made, formed, or brought into existence.   An unassessed civil penalty is the opposite—it is a potential obligation to pay that has *not* been made, formed, or brought into existence.   Such an unassessed penalty is "contingent," *i.e.,* "[d]ependent on something that might or might not happen in the future" or "conditional."   *Black's Law Dictionary* 387; *see also United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, No. 12-1562-SLR, __ F. Supp. 3d __, 2016 WL 4051266, at *8 (D. Del. July 26, 2016) (distinguishing between established and contingent fines); *United States ex rel. Landis v. Tailwind Sports Corp.*, 155 F. Supp. 3d 12, 30-31 (D.D.C. 2016) (same).   Put differently, there is no "established" obligation to pay a penalty to the Government unless and until the Government actually assesses that penalty.

15

The distinction between a general duty to obey the law and an established duty to pay a penalty assessed for an alleged violation is hardly a technicality.  In our system of separated powers, where the Legislative Branch makes the laws and the Executive Branch enforces them, the Executive Branch generally decides whether an alleged violation of law should give rise to an obligation to pay money; that is what enforcement discretion is all about.  Where the most that can be said is that the Executive Branch *might* one day decide to make, form, or bring into existence an obligation to pay a fine or penalty as a result of noncompliance with a civil statute, the obligation to pay such a fine or penalty is "established" only once the agency establishes it. Under the FCA, an unassessed, contingent fine is insufficient to state a reverse false claim.

To be sure, the FCA permits the imposition of liability "whether or not" the "established" obligation "to pay money" has been "fixed," 31 U.S.C. § 3729(b)(3), but that language does not extend liability to the failure to pay unassessed penalties.  To "fix" a duty to pay commonly means to set forth the *precise amount* to be paid.  *See, e.g., Black's Law Dictionary* 754 ("[t]o announce (an exchange price, interest rate, etc.) <interest was fixed at 6%>").  And so it must here.  After all, the term "fixed" cannot logically be interpreted to mean that the *existence* of the duty (as contrasted with its amount) need not yet be certain because such an interpretation would be incoherent—a duty cannot be both "established" and "not fixed" at the same time.  But it makes perfect sense, in light of the plain text, to read the provision as permitting liability where there is an established duty to pay even when the precise amount has not yet been set.  Under that proper reading, liability cannot reach the case of unassessed fines or penalties—where the Executive Branch has not even found a violation, let alone decided in its discretion that a penalty is warranted.

### 2.    The Drafting History Establishes That Congress Did Not Intend For Liability Based On Unassessed Statutory Penalties.

The drafting history confirms what the text makes plain—the reverse FCA does not extend liability to potential obligations to pay unassessed statutory fines or penalties.  Although Congress amended the reverse FCA provision in 2009 to cover obligations to pay money where the *amount* remains undetermined, the drafters explicitly refused to extend liability to situations where the *existence* of an obligation to pay money remains contingent.

Prior to the 2009 amendments, the reverse FCA imposed liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government," but did not define "obligation."  False Claims Amendments Act of 1986, Pub. L. No. 99-562, § 2, 100 Stat. 3153, 3153.  Courts interpreting the pre-2009 FCA—including the D.C. Circuit— consistently rejected claims, like the one here, premised on potential or contingent obligations to pay the government fines or penalties that had not been levied or assessed.  *See, e.g.*, *Hoyte*, 518 F.3d at 67; *United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 391 (5th Cir. 2008); *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004); *Am. Textile Mfrs. Inst., Inc. v. Limited, Inc.*, 190 F.3d 729, 736 (6th Cir. 1999); *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 774 (8th Cir. 1997).

The courts did not agree, however, on whether the reverse FCA provision applied where the defendant had an established duty to pay but the *amount* had not yet been fixed.  In *Q International Courier,* the Eighth Circuit concluded that "an obligation ... must be for a fixed sum that is immediately due."  131 F.3d at 774.  In *United States ex rel. Bahrani v. Conagra, Inc.*, by contrast, the Tenth Circuit concluded that an "obligation[]" may exist "by virtue of the relationship between the government and the person who owes the government money or

property" and that such an obligation was actionable even where the "precise amount" had not yet been fixed.  465 F.3d 1189, 1201, 1202 (10th Cir. 2006) (citation omitted).

The legislative history is clear that Congress was only seeking to resolve this circuit conflict by clarifying that the precise amount need not be set in stone; the drafters did not intend to upend the broader judicial consensus denying liability based on unassessed penalties. Although an earlier version of the 2009 FCA amendments had defined "obligation" to mean "a fixed duty, *or a contingent duty* arising from an express or implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, statutory, fee-based, or similar relationship and the retention of overpayment," S. Rep. No. 111-10, 2009 WL 787872, at *23 (2009), Senator Jon Kyl proposed an amendment on the floor striking this definition of "obligation" and replacing it with the definition ultimately enacted into law.  That definition required that the "obligation" already have been "established."   Senator Kyl's explanation for this amendment addresses the very situation presented here:

> The original language spoke of "contingent" obligations.  Such contingent or potential duties could include duties to pay penalties or fines, which could arise— and at least become "contingent" obligations—as soon as the conduct that is the basis for the fines has occurred.
>
> Obviously, we don't want the Government or anyone else suing under the False Claims Act to treble and enforce a fine before the duty to pay that fine has been formally established.  It is unlikely that Justice would ever have brought suit to enforce a claim of this nature, but the FCA can also be enforced by private relators who often may be motivated by personal gain and not always exercise the same good judgment that the Government does.
>
> To preclude such a reading of the act, my amendment strikes contingent obligations from the FCA's new definition of "obligation."

Proceedings and Debates of the 111th Congress, First Session, 155 Cong. Rec. S4531, S4539 (daily ed. Apr. 22, 2009).  Senator Kyl reiterated that the amendment precluded liability for a fine or penalty before that fine is established or assessed:

> It modifies the bill's definition of the term "obligation" as used in the reverse False Claims Act to exclude contingent obligations, *thus precluding the possibility that conduct that makes a defendant liable for a penalty or fine could become actionable under this law before that fine is actually established or assessed*.

*Id.* at S4543.  The Senate approved the amendment by a vote of 94 to 1.  *See id.*

It is hard to imagine drafting history any clearer.  Senator Kyl twice explained that his amendment would preclude "the possibility that conduct that makes a defendant liable for a penalty or fine could become actionable under [the FCA] before that fine is actually established or assessed," and the Senate approved it by a nearly unanimous vote.  *Id.*  And there is even more support for this understanding in the relevant Committee Report, which states that Congress intended to extend liability only "where there is a relationship between the Government and a person that 'results in a duty to pay the Government money, whether or not *the amount owed* is yet fixed.'"  S. Rep. No. 111-10, 2009 WL 787872, at *14 (citation omitted) (emphasis added). In other words, while the 2009 amendments resolved the split regarding whether the amount of payment had to be fixed, Congress consciously and deliberately codified the consensus view precluding FCA suits based on contingent obligations to pay unassessed fines or penalties.

### 3. Case Law Confirms That There Is No Liability Based On Unassessed Statutory Penalties.

In light of this text and history, courts have repeatedly dismissed FCA lawsuits like this one on the ground that the FCA does not permit liability based on unassessed penalties.  In the recent case *Majestic Blue Fisheries,* for example, the district court dismissed a law firm relator's complaint alleging that two fishing companies violated the reverse FCA by failing to report required information under the Vessel Documentation Act.  *See* 2016 WL 4051266, at *7-8. There, as here, the law firm relator argued that liability attached where the companies owed the Government unassessed civil penalties; the court responded by noting that "multiple district

courts" and "[m]ultiple circuit courts" had "held that reverse false claims are not meant to cover unassessed statutory fines." *Id.* at *8. The court ultimately reached the same conclusion: "potential obligations to pay unassessed fines are not within the scope of the FCA." *Id.*

Other courts overwhelmingly agree. *See, e.g., United States ex rel. Nissman v. Southland Gaming of the Virgin Islands, Inc.*, No. 2011-0010, __ F. Supp. 3d __, 2016 WL 1317495, at *14 (D.V.I. Mar. 31, 2016) ("[T]he reverse false claims provision was not meant to cover the type of contingent obligations Plaintiff contemplates—*i.e.*, unadjudicated and unassessed statutory fines."); *Boise*, 2015 WL 4461793, at *1 n.1; *United States ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*, No. CIV.A. 13-6000, 2014 WL 7274913, at *7 (E.D. La. Dec. 18, 2014), *aff'd*, 626 F. App'x 528 (5th Cir. 2015); *United States ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-cv-58, 2014 WL 6908856, at *17 (S.D. Ga. Dec. 8, 2014); *United States ex rel. Comeaux v. W&T Offshore, Inc.*, No. 10-494, 2013 WL 4012644, at *3 & n.6 (E.D. La. Aug. 6, 2013). As far as Defendants are aware, only *one* court has deviated from this otherwise unanimous view to adopt the Kasowitz firm's position, *see United States ex rel. Simoneaux v. E.I. du Pont de Nemours & Co.*, No. 12-219-SDD-EWD, 2016 WL 236239, at *5 (M.D. La. Jan. 20, 2016), and that decision is pending on interlocutory appeal to the Fifth Circuit under 28 U.S.C. § 1292(b) and was argued on November 2, 2016. Further, that decision has been heavily criticized. *See* 1 John T. Boese, *Civil False Claims & Qui Tam Actions* § 2.01[L] (2016) (opining that *Simoneaux* "misread the 2009 amendments" and that the court had no warrant to "completely disregard[] clearly expressed congressional intent, particularly when doing so dramatically expands a punitive statute like the FCA to a place where it has never gone before"). This Court should join every other court to address the issue by recognizing that the FCA bars suits premised on unassessed statutory penalties.

4.    **The Federal Government Agrees That There Is No Liability Based On Unassessed Statutory Penalties.**

The United States agrees with the overwhelming consensus that the reverse FCA does not permit liability based on unassessed penalties.  In *Simoneaux*, discussed above, the Government took the unusual step of filing a statement of interest before the district court in support of the FCA defendant, explaining that unassessed penalties are not actionable under the statute.  After the district court disagreed but certified an interlocutory appeal to the Fifth Circuit, *see Simoneaux*, 2016 WL 236239, at *6, the Government again weighed in by filing an *amicus* brief that squarely rejected the district court's approach and urged the Fifth Circuit to interpret the reverse FCA as all other courts and Defendants interpret it.  Amicus Curiae Brief of the United States in Support of Appellant 10-15, *Simoneaux v. E.I. DuPont De Nemours & Co.*, Case No. 16-30141, 2016 WL 3090877 (5th Cir. May 26, 2016).  Even though the United States stands to recover money if the relator in that case were to prevail, the Government recognized that the relator's theory simply could not be squared with the statute's plain text and history.

With respect to the text, the Federal Government noted that—as Defendants argue—the FCA only makes liable parties that breach an established duty to pay money.  Problematically for the Kasowitz firm, the Government explained, "[s]tatutes enforceable through unassessed penalties ... create obligations to obey the law, *not* obligations to pay money." *Id.* at 6 (emphasis added).  As a result, the Government went on, "unassessed penalties are not a basis for 'reverse' False Claims Act liability."  *Id.* at 13.  Moreover, the Government explained, the drafting history points to the same result: "While Congress in the 2009 amendments clarified that certain 'unfixed' obligations may indeed be a basis for False Claims Act liability, it did not overturn the settled rule that unassessed statutory penalties may not be." *Id.* at 12.  And relying on the same statements from Senator Kyl quoted above, the Government concluded (just as Defendants do)

that "[t]he legislative history confirms that Congress did not disturb the rule that unassessed penalties are not a basis for 'reverse' False Claims Act liability." *Id.* at 13. The Government recognized this was the only tenable interpretation of the reverse FCA.

**5.** **Authorizing Liability Based On Unassessed Statutory Penalties Would Have Profound And Harmful Consequences.**

There are good reasons for Congress's decision to bar liability based on unassessed penalties. For one, permitting such liability would undermine established principles of agency discretion. For another, permitting such liability would prove unworkable in practice.

Permitting a *qui tam* relator to assert FCA claims based on unassessed civil penalties would create countless new private rights of action based on perceived regulatory violations and would upend settled principles of administrative discretion. The administrative state is vast; "its reams of regulations would leave [the Framers] rubbing their eyes." *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 755 (2002) (citation omitted). The administrative state rests on the bedrock principle that Congress delegates power to expert agencies to administer and carry out the law. *See, e.g.*, *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 843-44 (1984). These agencies are politically accountable because their heads are subject to oversight and removal by the President. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 495-98 (2010). And these agencies decide whether and when enforcement is actually appropriate. Private relators, by contrast, lack agency expertise and accountability and "are motivated primarily by prospects of monetary reward rather than the public good." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997). Congress would not, through the addition of one definition in the FCA, have revolutionized the administrative state by permitting unaccountable, non-expert bounty-hunters to exercise the full authority of the Executive Branch to assess billions of dollars in discretionary penalties for every failure to obey

the law.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").  That is especially unlikely where the FCA's text and history disprove any intent to effect such a seismic shift.

Permitting FCA liability based on unassessed penalties would particularly undermine the various federal statutes that grant an agency primary jurisdiction to seek statutory penalties in administrative enforcement proceedings, with limited judicial review, and bar private citizens from doing the same.  "[W]here Congress has provided statutory review procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive."  *Whitney Nat'l Bank v. Bank of New Orleans & Tr. Co.*, 379 U.S. 411, 420 (1965).  Under the Kasowitz firm's theory of liability, however, those procedures would not be exclusive: even where (as here) a private citizen is barred from suing for damages for failure to comply with the relevant statute, that same citizen could bring a substantively identical claim for relief, style it as a claim for unassessed penalties under the reverse FCA, and seek *treble* damages.  Absent any indication from Congress that it intended to work such a radical shift in statutes that provide agencies primary enforcement authority, this Court must reject that result.

In fact, TSCA is a perfect example.  Under TSCA, only EPA—not private parties—may seek civil penalties.  The statute limits private citizen suits to injunctive relief: citizens may sue an alleged violator to "restrain" the violation, or "to compel the Administrator to perform any act or duty under this chapter which is not discretionary."  15 U.S.C. § 2619(a)(1), (2).  But private citizens may not sue to recover civil penalties (nor can they sue to require the agency to levy penalties).  *See, e.g.*, *Cudjoe ex rel. Cudjoe v. Dep't of Veterans Affairs*, 426 F.3d 241, 248 n.5 (3d Cir. 2005); *Puerto Rico v. Shell Oil Co. (In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.)*, 117 F. Supp. 3d 276, 295 (S.D.N.Y. 2015).  Further, TSCA mandates a particular

administrative process before allowing EPA to collect penalties—including, when requested, an "on the record" hearing by an ALJ and review by EPA's Environmental Appeals Board and ultimately a federal court of appeals. *See* 15 U.S.C. § 2615(a)(2), (3). Nothing in the FCA suggests that Congress intended to eviscerate TSCA's comprehensive scheme by permitting private plaintiffs to recast unassessed TSCA penalties as FCA damages, and so drag alleged violators into district court to assert liability under TSCA and adjudicate the proper amount of penalties owed. *Cf. United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829, 836 (9th Cir. 2004) ("[I]f the government could bring an FCA claim in district court whenever a party fraudulently withholds customs duties, then the exclusive jurisdiction over actions to recover customs duties [in the Court of International Trade] in all such instances would become a virtual nullity…."). Absent any evidence of Congressional intent, this Court should not undermine TSCA's circumscribed limits on private citizen suits and its explicit administrative and judicial review process by allowing those suits to proceed indirectly under the FCA—and for treble damages no less.

Further, permitting liability based on unassessed penalties would be unworkable as a practical matter for two reasons. *First*, under the reverse FCA, a relator must prove a defendant "knowingly" made a statement material to an obligation or concealed or "knowingly" avoided an obligation. 31 U.S.C. § 3729(a)(1)(G); *see id.* § 3729(b)(1)(A) (defining "knowingly"). Under the Kasowitz firm's theory of liability, a relator would need to show a defendant actually knew about, deliberately ignored, or recklessly disregarded an established duty to pay civil penalties, even though the relevant agency had never sought, much less assessed, any such penalties. In other words, to prevail under that theory, the relator would need to prove a "case within an case"—*i.e.,* that the agency would have found a violation and decided in its discretion to seek

penalties—*and then prove* that Defendants knew about or recklessly disregarded the outcome of that hypothetical case so as to conceal or avoid liability.  *Second*, to make matters worse, the parties and the Court would then have to determine damages (assuming a relator could establish liability)—no doubt by imagining what penalties an agency *would have* sought in its discretion for each alleged statutory violation and what penalties the ALJ and a reviewing court *would have* upheld.  The sheer unworkability of this speculative sequence of events further confirms that Congress had no intention to extend reverse FCA liability this far.

Ultimately, the text, legislative history, case law, views of the United States, and practical considerations all point to one conclusion: the FCA prohibits suits based on unassessed penalties.

### B.    The Kasowitz Firm's Allegations Of TSCA Noncompliance Impermissibly Base Liability On Contingent And Unassessed Statutory Penalties.

The Kasowitz firm's TSCA allegations are unquestionably based on the type of unassessed penalties that, for the reasons given above, cannot support a reverse FCA claim.  The Kasowitz firm alleges only that Defendants violated TSCA's reporting obligations.  Am. Compl. ¶ 2.  It fails to allege that EPA has taken any enforcement action or assessed any penalties.  The Kasowitz firm does *not* allege, for example, that EPA has ever found that Defendants violated TSCA, or that EPA provided Defendants written notice of any such violation, or that a hearing was held, or that EPA imposed penalties after such a hearing.  The Kasowitz firm thus alleges the classic kind of "contingent" duty to pay a fine or penalty that cannot support FCA liability.

Perhaps recognizing that this simple fact dooms its claims, the Kasowitz firm suggests that TSCA penalties are automatic and accrue independent of EPA's decision to seek them.  According to the firm, Defendants violated "the continuing duty that TSCA imposes on each defendant to pay civil penalties for its failure to report substantial risk information as required by Section 8(e)."  Am. Compl. ¶ 1182; *see also id.* ¶¶ 1183, 1999 (describing Defendants' supposed

obligation to pay fines as "an established duty," arising out of their "statutory or regulatory 'relationship'" with the Government through TSCA).

That is wrong as a matter of law.  To be sure, TSCA states that "[a]ny person who violates" Section 8(e)'s reporting requirement "shall be liable to the United States for a civil penalty," 15 U.S.C. § 2615(a)(1), and that such a penalty "shall be assessed by the Administrator by an order made on the record after opportunity ... for a hearing," *id.* § 2615(a)(2).  But that does not mean TSCA imposes a self-executing obligation to pay money to the United States as soon as a non-reporting violation occurs and before EPA decides whether to seek a penalty. Nothing in the text, including the word "shall," compels EPA to bring an enforcement action anytime it determines that a TSCA violation occurs.  Rather, subsection (a)(2) prescribes the *procedure* by which EPA assesses penalties when it exercises its discretion to pursue them—by an order made on the record after a hearing.  EPA "shall" follow those procedures, but whether it *commences* an enforcement action in the first place remains a matter of prosecutorial discretion.

Other provisions of section 2615 underscore that this is the only plausible interpretation. For one, in determining the proper penalty, TSCA requires EPA to take into account the "nature, circumstances, extent, and gravity of the violation or violations and, with respect to the violator, ability to pay, effect on ability to continue to do business, any history of prior such violations, the degree of culpability, and such other matters as justice may require." *Id.* § 2615(a)(2)(B).  This reservoir of discretion alone underscores that any penalty remains contingent on how EPA weighs these factors.  For another, the statute specifies that EPA "may compromise, modify, or remit, with or without conditions, any civil penalty which may be imposed under this subsection." *Id.* § 2615(a)(2)(C).  Congress would not have mandated EPA to impose penalties in all cases with the one hand while granting EPA discretion to forgo penalties with the other.

Still other textual evidence establishes that the only sensible reading of TSCA is that EPA maintains discretion.  As another court recently pointed out, TSCA's penalty provision and its attendant "shall" language "appl[ies] only after an administrative complaint has been filed by the [EPA] and a violation has been found to exist by an [ALJ]." *N'Jai v. EPA*, No. 13-1212, 2014 WL 2508289, at *17 (W.D. Pa. June 4, 2014).  As important, that court continued, Congress provided in TSCA that EPA "shall carry out this chapter in a reasonable and prudent manner" and must consider, *inter alia*, the "economic" impact of all of its actions.  *Id.* (quoting 15 U.S.C. § 2601(c)).  Ultimately, "[d]espite the statute's use of the word 'shall,' [TSCA's] provisions do not demonstrate a Congressional intent to circumscribe the EPA Administrator's enforcement discretion."  *Id.*  That is the only reasonable interpretation of the text as a whole.

The Federal Government also recognizes that statutory penalties under TSCA remain contingent on discretionary EPA decisions.  In its brief to the Fifth Circuit in *Simoneaux*, the Government agreed that Section 8(e)'s reporting provision "creates no obligation to pay money to the government before EPA actually assesses a penalty under it."  U.S. Amicus Curiae Br. at 15, *Simoneaux*, 2016 WL 3090877.  EPA has long understood TSCA the same way.  As the Kasowitz firm admits, EPA granted "amnesty" to those who participated in its Compliance Audit Program by submitting studies and reports—a clear exercise of discretion incompatible with an unqualified obligation to assess penalties.  Am. Compl. ¶ 917.  EPA's "long-standing construction of its statutory mandate is entitled to great respect."  *Bd. of Governors of the Fed. Reserve Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 248 (1978).  Such respect is even more appropriate here because Congress has since amended TSCA with actual or constructive knowledge of EPA's longstanding view, but has not overridden EPA's construction.  *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) ("It is well established

that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" (citations omitted)).

Established administrative law principles confirm Defendants' and the Government's reading of TSCA as preserving EPA discretion.  Importantly, TSCA's penalty provisions are punitive, not compensatory.  TSCA provides that failure or refusal to comply is "unlawful," 15 U.S.C. § 2614(1), that EPA may impose a "civil penalty" based on such "unlawful" violations, *id.* § 2615(a), and that such fines must be based on the "gravity" of the violation and the violator's "degree of culpability" (among other factors), *id.* § 2615(a)(2)(B).  In our system of justice, that makes all the difference—punishment for breaking the law is not self-executing and automatic, but instead is contingent on the exercise of sound prosecutorial discretion by government actors.  *See 3M Co. v. Browner*, 17 F.3d 1453, 1456 (D.C. Cir. 1994) ("[A]gency attorneys who bring administrative complaints, including complaints for civil penalties, are performing 'prosecuting functions.'" (citation omitted)).   Like criminal prosecutors, administrative agencies enjoy broad discretion *not* to bring enforcement actions and *not* to seek monetary penalties, and their decisions to refrain from doing so are presumptively unreviewable. *See Heckler v. Chaney*, 470 U.S. 821, 834 (1985); *see also In re Aiken Cnty.*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (Kavanaugh, J., joining) ("It is likely that the Executive['s]" decision not "to seek *civil* penalties or sanctions" is subject to the same absolute discretion as a declination to bring criminal prosecution).  And the D.C. Circuit has explained that a statute's use of the word "shall" is not enough to displace this presumption.  *See Secretary of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 155 n.5, 156 (D.C. Cir. 2006) (adhering to *Chaney*'s rule even when the civil

28

penalties provision at issue provided that penalties "shall be assessed").   Ultimately, nothing about TSCA suggests a desire to upend the venerable rule establishing the plenary discretion of the Executive Branch to seek civil penalties.

Finally, treating TSCA civil penalties as "mandatory" would undermine more than just TSCA's scheme; it would open the floodgates to a tsunami of reverse FCA suits under any statute that contains the word "shall" in relation to a potential penalty.   That cannot be right: a multitude of statutes provide that violators "shall be liable" for a prescribed penalty.   Congress could not have contemplated, for example, that an "[un]licensed officer," 33 U.S.C. § 1236, would be subject to suit under the FCA for, *inter alia*, violating regulations governing "regattas or marine parades," *id.* § 1233.   But that is precisely what the Kasowitz firm's theory would allow.[4]   No doubt that is why, for as long as these types of laws have existed, courts have

---

[4] *See also* 16 U.S.C. § 2437(a) ("Any person who commits an act that" violates the Antarctic Marine Living Resources Convention "shall be liable to the United States for a civil penalty…."); 19 U.S.C. § 283 ("[S]aloon keeper[s] ... shall be liable to a penalty of not less than $100 and not more than $500" for failure to report or pay duties on imported articles.); *id.* § 1584(a)(1) ("Any master of any vessel and any person in charge ... who does not produce the manifest to the officer (whether of the Customs Service or the Coast Guard) demanding the same shall be liable to a penalty of $1,000…."); 30 U.S.C. § 1719(a) ("Any person who" fails to comply with mineral leasing laws "shall be liable for a penalty of up to $500 per violation …."); 33 U.S.C. § 533(b) ("Whoever violates" the laws governing construction of bridges "shall be liable to a civil penalty of not more than ... $25,000 for a violation occurring in 2008 and any year thereafter."); *id.* § 1236(b) ("Any person in charge of the navigation of a vessel other than a licensed officer shall be liable to a penalty of $5,000."); *id.* § 1415(a) ("Any person who violates" ocean dumping regulations "shall be liable to a civil penalty of not more than $50,000…."); *id.* § 1608(a) ("Whoever operates a vessel ... in violation of this chapter ... shall be liable to a civil penalty of not more than $5,000…."); *id.* § 2104(e) ("Any person who" violates laws regarding construction and management of artificial reefs "shall be liable to the United States for a civil penalty, not to exceed $10,000 for each violation."); 39 U.S.C. § 3017(h)(1)(A) ("Any promoter … who recklessly mails nonmailable matter ... shall be liable to the United States in an amount of $10,000…."); 42 U.S.C. § 9152(c)(1) ("Any person who" violates ocean thermal energy conversion regulations "shall be liable to the United States for a civil penalty, not to exceed $25,000 for each violation."); 49 U.S.C. § 521(b)(2)(A) ("[A]ny person who is determined" to have violated motor vehicle safety regulations "shall be liable to the United States for a civil penalty in an amount not to exceed $10,000 for each offense.").

recognized that the agency or prosecutor still maintains discretion over whether to pursue a monetary penalty. Indeed, one of the reporting statutes at issue in *Majestic Blue Fisheries*—again, another reverse FCA lawsuit involving unassessed penalties—stated that a violator "*shall be liable to the United States for a civil penalty*" and that "the civil penalty *shall* be assessed by the Secretary." 2016 WL 4051266, at *7-8 (emphasis added) (quoting 33 U.S.C. § 1908). But the court still found that FCA "liability under these acts" was "contingent on the government's discretion to impose fines on defendants." *Id.* at *8. That conclusion applies equally to TSCA.

### C.    The Kasowitz Firm's Allegations of CAP Noncompliance Impermissibly Base Liability on Contingent and Unassessed Statutory Penalties.

The Kasowitz Firm's CAP allegations are also based on the type of unassessed penalties that, as explained above, cannot support a reverse FCA claim. As noted above, the CAP was a "voluntary compliance program" that EPA implemented in the 1990s "to strongly encourage companies to voluntarily audit their files for studies reportable under [TSCA] section 8(e)." 56 Fed. Reg. 4128 at 4129. The Kasowitz firm claims that Defendants are liable under the reverse FCA because they allegedly participated in this program and then failed to turn over health effects studies. *See, e.g.*, Am Compl. ¶¶ 923-29. This argument fails for two reasons.

*First*, the CAP agreements do not provide an independent basis for EPA—let alone a *qui tam* relator—to pursue penalties for such alleged failures. Although the CAP stipulated certain reduced penalties for submitting studies identified by a company in an 8(e) compliance audit, it did not impose any penalties for *failing* to report information. Instead, information not reported under the CAP simply remained subject to TSCA: in the event that EPA determined an unsubmitted study was in fact "reportable under TSCA Section 8(e)," EPA "reserve[d] its rights under TSCA section 16 to take appropriate enforcement action," *i.e.*, to seek TSCA penalties. 56 Fed. Reg. at 4129, Section II.A.5 (Am. Compl., Ex. 26); *see also id.* at 4130, Section II.D.4

30

("Failure to comply with the terms of this CAP Agreement permits EPA to proceed under TSCA section 16 to impose the civil penalties allowable under the existing EPA TSCA Sections 8, 12, and 13 Enforcement Response Policy….").  Given that independent CAP penalties do not exist, Defendants cannot be liable for failing to pay them.  And although the CAP made clear that TSCA penalties were still in play, for all the reasons above, any potential TSCA penalties for studies not submitted under the CAP are contingent and unassessed.

*Second*, even if the CAP did establish an independent basis for seeking penalties, those penalties, like TSCA's, would be too contingent to constitute "obligations" under the reverse FCA.  To determine whether an alleged breach of contract gives rise to an "obligation," the starting point is the contract, *i.e.*, "what the relevant legal instrument ... requires a party to do." *Landis*, 160 F. Supp. 3d at 272.  Thus, contractual penalties remain contingent when they are "condition[ed] ... on the exercise of governmental discretion" (*i.e.,* the Government must take additional discretionary steps to impose penalties or to seek damages for breach).  *Id.* at 268-69. In *Hoyte*, for example, the relator alleged that the American Red Cross had an "obligation" to pay stipulated penalties under a consent decree that imposed handling and reporting requirements for blood donations.  518 F.3d at 62-63.  But the D.C. Circuit disagreed and denied liability because the decree stated only that FDA "*may* assess" financial penalties.  *Id.* at 63 (emphasis added).  The D.C. Circuit held that this provision "imposed no obligation on [the Red Cross] to tender money or property to the Government."  *Id.* at 67.

Putative CAP penalties clearly fall on the contingent side of the line.  Once again, the Kasowitz firm does not allege that Defendants breached an express contractual duty to pay money.  Instead, the Kasowitz firm alleges that Defendants breached a CAP requirement to report information.  Am. Compl. ¶¶ 904-22.  But, as in *Hoyte*, the CAP states only that that EPA

"reserve[d] its rights under TSCA section 16 to take appropriate enforcement action" regarding unreported information, 56 Fed. Reg. at 4129, Section II.A.5 (Am. Compl., Ex. 26), and that the CAP "*permits* EPA to proceed under TSCA section 16," *id.* at 4130, Section II.D.4 (emphasis added). This trail, too, leads back to the Government's discretion. As in *Hoyte*, because EPA (like the FDA) simply has the *option* to initiate an administrative enforcement proceeding, the CAP's obligations are contingent and unassessed. Unless and until EPA decides to commence such proceedings, and unless and until those proceedings result in penalties, there is a no basis for a reverse FCA claim.

## II.    This Court Should Dismiss Counts II And IV Because The Reverse False Claims Act's "Property" Clause Does Not Render All Failures To Report Information Actionable.

Given the tenuousness of the Kasowitz firm's argument that unassessed civil penalties can support a claim under the reverse FCA, the firm throws a Hail Mary pass. In Count II, the firm alleges that Defendants violated the same FCA provision, 31 U.S.C. § 3729(a)(1)(G), by knowingly concealing an obligation to transmit "property"—specifically, the substantial risk information itself—to the Government. Am. Compl. ¶ 1760. (And again, Count IV is a derivative claim, alleging that Defendants made a "false record" in connection with that same obligation.) This contention also fails as a matter of law.

By extending liability only to failures "to pay or transmit money or property," Congress surely did not intend the FCA to be a tool for enforcing all statutory reporting requirements. Defendants have not found a single case holding that information subject to a statutory reporting requirement is actionable under the reverse FCA's "property" clause—and some cases, including from this circuit, indicate just the opposite.[5] In *Hoyte*, for example, a relator brought an FCA

_____

[5] The few cases endorsing FCA liability based on a defendant's failure to transmit property typically involve government property that a party failed to return. In those cases, the United

charge alleging that the Red Cross had failed to report to the FDA its mishandling of blood supplies as required by a judicial consent decree.  518 F.3d at 67.  That is analogous to this case: the defendant allegedly had information (about mishandled blood supplies or the alleged risks of a particular chemical) that it allegedly was required by law (by a decree or TSCA) to submit to an agency (the FDA or EPA).  So if the Kasowitz firm's theory had merit, one would have expected the D.C. Circuit to accept Hoyte's claim under the reverse FCA.  It did not.  To be sure, the panel and parties focused on whether the failure to pay the unassessed penalties flowing from a reporting violation supported an FCA suit, *see supra* Section I, and the panel held that it could not.  But in the process, the court also understood that this reportable information was not "property" within the meaning of the FCA: while the Consent Decree required the Red Cross "to follow the prescribed ... reporting requirements," the court concluded that the decree "imposed no obligation on [the Red Cross] to tender money *or property* to the Government."  *Id.* (emphasis added).  Indeed, if the reportable information had been "property," there would have been no need to consider the unassessed penalties, as FCA liability already would have been clear.  And that is true, of course, for all the unassessed penalty cases premised on failures to report information, discussed in Section I, *supra*.  The mere fact that a defendant allegedly has some information it must report under a federal statute or rule does not mean the defendant has any "property" within the meaning of the FCA.

There is also no indication in the FCA's text or history that Congress intended to turn the FCA into an all-purpose tool for enforcing statutory or regulatory reporting requirements through

---

States (or a relator) can state a claim because the defendant "had *government property* in its possession and a contractual obligation to account for the full value of any excess government property by returning that property or otherwise disposing of it in accordance with the government's instructions."  *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999) (*en banc*) (emphasis added) (defendant, an Air Force contractor, allegedly possessed five model C-130 wings that it needed to return to the Federal Government).

a simple reference to "property" in the reverse false claims provision.  The word "property" is hardly the language Congress would have employed had it also intended to capture information reportable under a statute or regulation—had Congress intended the latter, it would have used language that fit, such as "reportable information."  As a general matter, after all, "information" is not "property" *per se*.  To the contrary, at common law, intangible information can constitute "property" only under certain narrow and specific circumstances, generally characterized by, as most relevant here, the right to exclude.  *See, e.g.*, *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979) ("the 'right to exclude'" is "*universally* held to be a fundamental element of the property right" (citation omitted)); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) (when information is disclosed to others, any preexisting "property right [in the information] is extinguished").  Since "information" qualifies as "property" only under narrow and specific circumstances, Congress would not have used that term had it intended to include all reportable information.

The Kasowitz firm identifies *nothing* about any of the reportable information at issue here that would qualify as "property" within the meaning of the FCA.  In particular, the Kasowitz firm does not, and cannot, allege that any Defendant had the right to exclude others from any of the alleged "substantial risk information."  Indeed, much of that information consists of no more than a few words in minutes of industry meetings—which hardly makes the information anyone's "property."[6]  Other information on which the Kasowitz firm relies is

---

[6] *See, e.g.*, Am. Compl. ¶ 206 ("1982 Japanese Skin Contact SRI" refers to "discussion of the topic 'Dermal toxicity of TDI and MDI,'" at III meeting during which concern over "whether skin absorption can lead to pulmonary sensitization" was mentioned); *id.* ¶ 295 ("1989 Human Cases SRI" refers to discussion at III meeting of "need to investigate respiratory effects resulting from percutaneous administration of MDI in animals").

nothing more than research or data generated by non-parties,[7] which the Amended Complaint alleges was disclosed at these meetings[8] and beyond to other industry members.[9]

The Kasowitz firm's theory that reportable information *per se* qualifies as "property" in the FCA context would also produce shocking results. That theory, of course, cannot be cabined to TSCA—*every single* reporting statute and regulation could suddenly serve as the basis for a reverse false claim. Take the Employee Retirement Income Security Act, which imposes extensive reporting requirements on welfare benefit plans—*e.g.*, to file an annual report with the Secretary of Labor detailing assets, liabilities, receipts, and disbursements, report data that the

---

[7] *See, e.g.*, Am. Compl. ¶ 206 ("1982 Japanese Skin Contact SRI" refers to discussion at III meeting of "'[s]ome relevant Japanese work'" regarding "whether skin absorption can lead to pulmonary sensitization"); *id.* ¶ 241 ("1988 Mineworkers SRI" refers to discussion at III meeting of "Respiratory Studies"); *id.* ¶ 295 ("1989 Human Cases SRI" refers to discussion at III meeting of "need to investigate respiratory effects resulting from percutaneous administration of MDI in animals"); *id.* ¶¶ 354-55 ("1989 German Mine SRI" refers to discussion at III meeting of "air-monitoring data from 'a well-monitored W. German mine'".).

[8] *See, e.g.*, Am. Compl. ¶ 206, Ex. 7 ("1982 Japanese Skin Contact SRI" was disseminated at 1982 III Safety Committee Meeting); *id.* ¶ 241, Ex. 8 ("1988 Mineworkers SRI" was disseminated at 1988 III Safety Committee Meeting); *id.* ¶ 295, Ex. 12 ("1989 Human Cases SRI," was disseminated at 1989 III Scientific Committee Meeting); *id.* ¶ 354, Ex. 12 ("1989 German Mine SRI" was disseminated at 1989 III Scientific Committee Meeting); *id.* ¶ 416, Ex. 12 ("1989 Nakata Papers SRI" was disseminated at 1989 III Scientific Committee Meeting); *id.* ¶ 480, Ex. 15 ("1992 Human Cases SRI" was disseminated at 1992 III EU-MTX Subcommittee Meeting); *id.* ¶ 480, Exs. 19, 20 ("1992 Specific Scenario SRI" was disseminated at 1992 III Board Meeting); *id.* ¶ 640, Exs. 22, 23 ("1993 Especial Work Situation SRI" was disseminated at 1993 III Board Meeting); *id.* ¶ 717, Ex. 25 ("2003 Isocyanate Asthma SRI" was disseminated at 2003 III Americas Analytic Sub-Committee Meeting).

[9] *See, e.g.*, Am. Compl. ¶ 241, Ex. 8 ("1988 Mineworkers SRI" was circulated to members of the III Executive committee, to legal counsel, and to chairmen of other sub-committees); *id.* ¶ 295, Ex. 12 ("1989 Human Cases SRI," was circulated to the same); *id.* ¶ 354, Ex. 12 ("1989 German Mine SRI" was circulated to the same); *id.* ¶ 416, Ex. 12 ("1989 Nakata Papers SRI" was circulated to the same); *id.* ¶ 480, Ex. 15 ("1992 Human Cases SRI" was circulated to members of the EU-MTX Sub-Committee, Scientific Sub-Committee, and AM-MTX Sub-Committee, as well as the "FE Companies" and "Sodaso"); *id.* ¶ 717, Ex. 25 ("2003 Isocyanate Asthma SRI" was circulated to members of the Scientific Committee, AP Companies, AM-ANA, EU-ANA, and AP Office).

Secretary requires for statistical and research purposes, and report any other information that the Secretary believes necessary to carry out the Act's purposes. *See Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 944-45 (2016) (citing 29 U.S.C. §§ 1021(b), 1023(b)(1), 1023(b)(3)(A)-(B), 1024(a), 1026(a)). Normally, if any plan knowingly fails to satisfy one of the reporting rules, the Secretary can exercise discretion to decide whether and when enforcement action is appropriate. But under the Kasowitz firm's theory, these plans all would have "property"—data about assets, liabilities, receipts, disbursements, and anything else the Secretary wants—that they failed to report. So rather than wait for the Secretary to exercise sound discretion, a relator could haul that plan into court and demand treble damages under the FCA. And this problem would repeat itself for the literally thousands of statutory and regulatory reporting requirements on the books. Where administrative agencies now have the power to determine which reporting infractions merit enforcement action, the Kasowitz firm's theory would shift that authority to bounty-hunter relators instead. This Court should not endorse such a radical theory; there is no suggestion that Congress intended the FCA to restructure our entire system of government.

## III.   This Court Should Dismiss Count III Because The False Claims Act's "Conversion" Provision Similarly Bars Liability Based On Unassessed Statutory Penalties And Unreported "Substantial Risk Information."

Nor can the Kasowitz firm shoehorn its theories of FCA liability for unassessed civil penalties and unreported substantial risk information into the FCA's little-used "conversion" provision. That provision makes it unlawful for any person who "has possession, custody, or control of property or money used, or to be used, by the Government" to "knowingly deliver[], or cause[] to be delivered, less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D). The Kasowitz firm's arguments under this subsection fail for the simple reason that the Amended Complaint does not plausibly allege that Defendants possessed "property or money used, or to be used, by the Government" or "knowingly delivered" less than all of such property or money.

36

There is no "property ... used, or to be used, by the Government" because, for all the reasons already given, the alleged substantial risk information the Kasowitz firm says must be reported to EPA does not qualify as "property." *See supra* Section II.  Nor is there "money ... used, or to be used, by the Government" involved here either—because the same unassessed TSCA penalties that cannot constitute "established" obligations also cannot qualify as money to be used by the Government.  Dictionaries define "use" as "[t]o employ for the accomplishment of a purpose." *Black's Law Dictionary* 1776.  Where the Government has not even found a violation, let alone decided in its discretion to pursue and assess penalties, it is incoherent to think of such contingent penalties as money that the Government is or will be employing.  At most, it is money the Government might one day use *if* it exercised discretion to commence enforcement proceedings, *if* an ALJ assessed the fines, and *if* the fines were upheld in an administrative appeal and on judicial review.  Indeed, if unassessed penalties cannot demonstrate that Defendants have an "established" duty to pay, they cannot prove the *subsequent* step—that such unassessed penalties, here and now, are money the Government will employ.  That is no doubt why, as the leading FCA treatise recognizes, the analysis under Section 3729(a)(1)(D) of whether money is "used, or to be used, by the Government" is similar to the analysis under the reverse FCA regarding whether "obligations to pay or transmit money" exist in the first place. *See* Boese § 1.09[A][4] ("[P]roving liability under th[e] little-used" Section 3729(a)(1)(D) "is similar to the proof required for reverse false claims liability….").

To hold otherwise would contravene the 2009 FCA amendments.  As explained above, Congress deliberately defined the "obligation" that may trigger reverse false claims liability to encompass only an "established duty" to ensure that relators cannot sue immediately upon the occurrence of conduct that potentially could give rise to a fine or penalty before the relevant

agency has formally established that fine or penalty.  To construe the little-used FCA conversion provision to permit that very result would contravene Congress's intent that the FCA not be used as a vehicle to pursue unassessed fines or penalties.  So for all the reasons that unassessed penalties are not "established" duties to pay, the Kasowitz firm errs by alleging that Defendants had "money used, or to be used, by the Government."

Even beyond that threshold deficiency, the Kasowitz firm has not alleged, and cannot allege, a plausible Section 3729(a)(1)(D) claim because that provision also requires the "knowing[] deliver[y]" of less than all of the Government's property or money.  31 U.S.C. § 3729(a)(1)(D); *see also United States ex rel. Holbrook v. Brink's Co.*, No. 2:13-cv-873, 2015 WL 196424, at *7 (S.D. Ohio Jan. 15, 2015); *United States ex rel. Aakhus v. Dyncorp. Inc.*, 136 F.3d 676, 681 (10th Cir. 1998).  In other words, the mere *possession* of government property or money is not sufficient.  The defendant must also have *delivered* or *caused to be delivered* less than all of that property or money.  *See, e.g.*, *United States ex rel. Webb v. Miller Family Enter.*, No. 1:13-cv-169-DBH, 2014 WL 6611012, at *6 (D. Me. July 2, 2014) (liability under § 3729(a)(1)(D) "arise[s] for delivering to the Government less than what it is entitled to").  Thus, in *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 36 (D.D.C. 2003), this Court dismissed an FCA suit premised on the defendants' alleged failure to refund Medicare overpayments (under the predecessor to Section 3729(a)(1)(D)) because "none of the allegations implicate[d] delivering property to the United States."[10]  Here, as in

---

[10] That delivery is a distinct element of a Section 3729(a)(1)(D) claim is confirmed by the statutory text prior to the 2009 amendments.  At that time, Section 3729(a)(1)(D) (then numbered Section 3729(a)(4)) applied to persons who "'deliver[ed], or cause[d] to be delivered, less property than the amount for which the person receives a certificate or receipt.'"  *See Aakhus*, 136 F.3d at 681 (citing 31 U.S.C. § 3729(a)(4)).  The requirement that a party receive a "certificate or receipt" would make no sense unless delivery was an independent requirement.  The 2009 amendments removed the "certificate or receipt" requirement to address a line of cases

*Barrett*, there are no allegations that implicate delivering money or property to the Government. To the contrary, the Kasowitz firm's theory is that Defendants made *no* payment of the unassessed TSCA penalties and made *no* report of the alleged undisclosed substantial risk information whatsoever.  Such conduct is not actionable under Section 3729(a)(1)(D).

## IV.     This Court Should Dismiss Count V Because The Kasowitz Firm Fails To Plead The Required Elements Of A False Claims Act Conspiracy.

To state a conspiracy claim under the FCA, a relator must allege: "(1) that 'an agreement existed to have false or fraudulent claims allowed or paid' to the government, (2) that each alleged member of the conspiracy 'joined that agreement,' and (3) that 'one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy.'" *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014) (quoting *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010)).  The Kasowitz firm fails to do so for three independent reasons.

*First*, as a threshold matter, because the Kasowitz firm has failed to properly allege any substantive violation of the FCA, *see supra* Sections I-III, the conspiracy claim necessarily fails as well.  *See Pencheng Si*, 71 F. Supp. 3d at 98 ("[T]here can be no conspiracy to commit fraud in violation of the FCA if an underlying false claim has not been adequately alleged.").

*Second*, the Kasowitz firm fails to allege specifics related to the purported conspiracy beyond mere conclusory statements, even though a claim of conspiracy under the FCA is subject to the heightened pleading standard of Rule 9(b).  *See, e.g.*, *United States ex rel. Conteh v. IKON Office Sols., Inc.*, 103 F. Supp. 3d 59, 68-69 (D.D.C. 2015) (applying heightened 9(b) pleading

---

that had permitted defendants who had fraudulently delivered less than all of the Government's money or property to avoid liability based only upon the Government's failure to issue a receipt upon delivery.  *See, e.g.*, *id.* at 681.  However, although a receipt is no longer required, the provision still requires a delivery.  31 U.S.C. § 3729(a)(1)(D) (2016).

standard to FCA conspiracy claims and holding that vague and conclusory allegations regarding an alleged conspiracy do not meet this standard).  The Amended Complaint includes conclusory statements alleging that each Defendant's actions were taken "individually and in conspiracy" with other Defendants (*e.g.*, Am. Compl. ¶¶ 164, 169, 579, 931, 932, 1068, 1107, 1149, 1150, 1170, 1171, 1205, 1223, 1226, 1241, 1244, 1259).  But, fatally for the Kasowitz firm, the Amended Complaint nowhere specifies when the alleged conspiracy to defraud arose, who agreed with whom, the object of the conspiracy, what was done to effect the conspiracy, or other required particulars.  For example, contentions that Defendants "individually and in conspiracy" omitted risk information from their product labels, *see* Am. Compl. ¶¶ 1039-1107, do not allege any agreement whatsoever, much less an agreement to *defraud* the Government with the particularity required by Rule 9(b).  Nor is there an allegation specifying any "overt act" performed by any Defendant in furtherance of a conspiracy, even in the particular section of the Amended Complaint purportedly describing the conspiracy count.  *See id.* ¶¶ 1794-800; *see generally Miller*, 608 F.3d at 899 (holding an "overt act" a required element of FCA conspiracy); *Conteh*, 103 F. Supp. 3d at 68 ("A claim fails under Rule 9(b) when there are no specific allegations of an agreement or the commission of an overt act."); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) (requiring relators alleging conspiracy under the FCA to plead with particularity "the conspiracy as well as the overt acts ... taken in furtherance of the conspiracy" (alteration in original) (quoting *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1098 (D.C. Cir. 2008))).

*Third*, the conspiracy claims are not actionable under the version of the FCA at issue here.  The Amended Complaint alleges that Defendants acted "in conspiracy" *only* "prior to May 20, 2009."  *See* Am. Compl. ¶¶ 1205, 1208, 1223, 1226, 1241, 1244, 1259, 1262, 1296, 1299,

1317, 1320, 1341, 1359, 1362, 1400, 1403, 1421, 1424, 1442, 1445, 1463, 1466, 1495, 1498, 1517, 1520, 1539, 1542, 1561, 1564, 1590, 1606, 1622, 1638, 1656, 1674, 1692, 1710. Although the Kasowitz firm alleges that Defendants *individually* continued to conceal substantial risk information from EPA after May 20, 2009, it never alleges that they continued to do so as part of any conspiracy.  But under the pre-2009 version of the FCA, conspiracy liability applies only where a defendant has submitted and been paid for a false claim; it does not apply to reverse false claims.  *See* 31 U.S.C. § 3729(a)(3) (2009) (imposing liability on persons who "conspire to defraud the Government by getting a false or fraudulent claim *allowed or paid*" (emphasis added)); *see also, e.g.*, *United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.*, 370 F. Supp. 2d 993, 1001-02 (N.D. Cal. 2005) (holding that FCA conspiracy liability requires a claim to have been submitted and paid and that such liability does not apply to allegations of reverse false claims); *United States v. Bouchey*, 860 F. Supp. 890, 893-94 (D.D.C. 1994) (requiring for FCA conspiracy liability that defendants conspired to "have a fraudulent claim paid by the United States").  The Kasowitz firm has not alleged that Defendants conspired to get a false or fraudulent claim allowed or paid.  For all these reasons, this Court should dismiss the conspiracy claim.

**V.    This Court Should Dismiss The Amended Complaint Because The Kasowitz Firm Fails To Sufficiently Allege That Defendants Acted Knowingly.**

The Amended Complaint also fails to state a claim under Rule 12(b)(6) because it does not adequately allege that Defendants violated the FCA with the requisite scienter.  The FCA imposes liability on a person who "*knowingly* conceals" or "*knowingly* and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G) (emphases added); *see also* 31 U.S.C. § 3729(a)(1)(D) ("*knowingly* delivers, or causes to be delivered, less than all of that money or property" (emphasis added)).  With this

knowledge requirement, the FCA is not a "vehicle for either 'punish[ing] honest mistakes or incorrect claims submitted through mere negligence' or imposing 'a burdensome obligation' on government contractors." *United States v. Sci. Applications Int'l Corp. (SAIC)*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) (alteration in original) (citation omitted). Both the Supreme Court and the D.C. Circuit have underscored the need for strict enforcement of this requirement. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016) (describing the scienter requirement as "rigorous" and urging its "strict enforcement"); *SAIC,* 626 F.3d at 1271 ("Strict enforcement of the FCA's scienter requirement" is needed to "ensure that ordinary breaches of contract are not converted into FCA liability.").

Accordingly, the Kasowitz firm must plead factual allegations to support a "plausible" case that each Defendant *knowingly* concealed or *knowingly* and improperly avoided paying money or property owed to the Government. *Iqbal*, 556 U.S. at 679 (allegations that "are no more than conclusions, are not entitled to the assumption of truth" and cannot avoid dismissal at the pleading stage). To do so, under either of the Kasowitz firm's theories (addressing penalties or property), it must sufficiently allege that each Defendant (1) knew it possessed substantial risk information reportable under TSCA Section 8(e); and (2) knew EPA was not otherwise adequately informed of the unreported information through, for instance, the public scientific literature and debate addressing the same subjects. Moreover, with respect to the claims that rely on the alleged failure to pay unassessed penalties, the Kasowitz firm must also show that each Defendant (3) knew that EPA would have exercised its discretion to allege reporting violations and seek penalties, knew that an ALJ would have imposed such penalties, and knew that the Environmental Appeals Board and a U.S. Court of Appeals would have upheld them; and (4) knew it was concealing or improperly avoiding paying those unassessed penalties. Also,

under D.C. Circuit precedent, the Kasowitz firm cannot rely on the "collective knowledge" of a corporation, but rather must identify specific individual employees who have all of the requisite knowledge. *SAIC,* 626 F.3d at 1274 ("[U]nder the FCA, 'collective knowledge' provides an inappropriate basis for proof of scienter because it effectively imposes liability, complete with treble damages and substantial civil penalties, for a type of loose constructive knowledge that is inconsistent with the Act's language, structure, and purpose.").

The allegations in the Amended Complaint fall well short of establishing that there was a single individual for each Defendant who possessed all of the relevant knowledge. Despite its length, the Amended Complaint relies on unsupported legal conclusions that the cited information constitutes "substantial risk information,"[11] and asserts in a conclusory fashion that "Defendants knew that this information reasonably supported the conclusion that [certain isocyanate chemicals] presented a substantial risk of injury to health, that the EPA was not adequately informed of that information." Am. Compl. ¶¶ 9, 11. There are no allegations that each Defendant—*much less a single individual employed by each Defendant*—knew or acted in reckless disregard of the fact (1) that this was reportable substantial risk information; (2) that EPA was not otherwise adequately informed of this information; (3) that EPA would have commenced enforcement proceedings to pursue civil penalties for the failure to report the information; (4) that an ALJ would have assessed such penalties after a hearing; (5) that those penalties would be affirmed on review; *and then* (6) that each Defendant knowingly concealed or improperly avoided paying those penalties. Instead, the Amended Complaint merely recites the

---

[11] For example, the Amended Complaint concludes that Defendants possessed "1982 Japanese Skin Contact SRI" solely on the basis of minutes from a III Safety Committee Meeting that had included the phrase "[s]ome relevant Japanese work available" under the topic "Dermal toxicity of [certain isocyanate chemicals]." Am. Compl. ¶ 206. No facts are pled to support this conclusion—in fact, the Amended Complaint and the referenced minutes give no indication what the "relevant Japanese work" contained.

same rote conclusory allegation for each Defendant: its concealment of information referred to in the Amended Complaint *ipso facto* means it knowingly concealed an obligation to transmit money or property to the Government. *See, e.g.*, Am. Compl. ¶¶ 1205-06 (BASF); Am. Compl. ¶¶ 1223-24 (Bayer); ¶¶ 1241-42 (Dow); ¶¶ 1259-60 (Huntsman).

Such conclusory allegations and legal conclusions are insufficient to allege scienter. *See, e.g.*, *United States ex rel. Harper v. Muskingum Watershed Conservancy District*, No. 15-4406, slip op. at 6 (6th Cir. Nov. 21, 2016) (affirming dismissal of reverse FCA and conversion claims for failing to plead scienter where the relator alleged that the defendant had entered into leases violating the terms of a government deed but "failed to state facts from which [the defendant's] awareness of the alleged FCA violations may be inferred"); *Landis*, 51 F. Supp. 3d at 52 (dismissing complaint where the relator failed to plead specific facts that an individual knew of fraud because "[t]he FCA's scienter requirement should be strictly enforced," particularly "[g]iven that our Court of Appeals has rejected the theory that the 'collective knowledge' of a corporation's officers can support" finding FCA liability). This Court should dismiss all of the counts in the Amended Complaint for failure to allege scienter as required under the FCA.

**VI.    This Court Should Dismiss The Amended Complaint Under The Public Disclosure Bar Because The Allegations Were Previously Disclosed And The Kasowitz Firm Is Not An Original Source.**

Because this Court should dismiss the Amended Complaint in its entirety for failure to state a claim, the Court need not consider any other grounds for dismissal. There is, however, a separate and independent ground for dismissing the entire Amended Complaint: the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4). "[S]trik[ing] a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits," *Graham Cnty.*, 559 U.S. at 295, the public disclosure bar requires courts to dismiss a *qui tam* complaint where the allegations are

substantially the same as information previously disclosed in certain specified sources, unless the relator can prove that it is a so-called "original source" of the information.

Congress amended the public disclosure bar effective March 23, 2010. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010). Because the amended version of the bar (Amended Bar) is not retroactive, *see Graham Cnty.*, 559 U.S. at 283 n.1, the earlier version (Pre-Amendment Bar) applies to all claims based on alleged conduct occurring prior to March 23, 2010, while the Amended Bar applies to all claims based on alleged conduct occurring after that date. *See United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 160 F. Supp. 3d 16, 24 (D.D.C. 2015) (holding, in another case alleging misconduct spanning the amendment, that it is "the date of Defendants' allegedly fraudulent conduct—not the date when litigation is filed—that governs which law the Court must apply"). In this case, that means the Pre-Amendment Bar applies to what Kasowitz alleges to be each daily failure to report substantial risk information and pay penalties to EPA in the 31-year period from 1979 (when Kasowitz alleges that one Defendant first possessed SRI) to March 23, 2010 (the date of the amendment), while the Amended Bar applies to each alleged daily failure in the five-year period from March 23, 2010 (the date of the amendment) through May 2015 (when Kasowitz filed its original complaint). Defendants discuss below the differences between the two versions as needed.

The Pre-Amendment and Amended Bars, taken together, require dismissal of the entire Amended Complaint.[12] Under the two-part test used for each Bar: (1) the Amended Complaint's core allegations are substantially the same as numerous prior public disclosures asserting that Defendants purportedly concealed information suggesting that dermal and low-level inhalation

---

[12] The Pre-Amendment Bar was jurisdictional, while the Amended Bar is not. *Compare* 31 U.S.C. § 3730(e)(4)(A) (2009), *with* 31 U.S.C. § 3730(e)(4) (2016). Thus, as a technical matter, the Pre-Amendment Bar requires dismissal for lack of jurisdiction under Rule 12(b)(1), while the Amended Bar requires dismissal for failure to state a claim under Rule 12(b)(6).

exposure to certain isocyanates causes respiratory sensitization; and (2) the Kasowitz firm, like other law firms that have filed FCA suits in their own names without any insider information, is not an "original source."

**A.**     **The Allegations In The Amended Complaint Are Substantially The Same As Information Previously Disclosed In News Sources, EPA FOIA Reports, And State And Federal Court Litigation.**

Under both the Pre-Amendment and Amended Bars, a *qui tam* complaint must be dismissed if its allegations are "substantially the same" as "allegations or transactions" previously published in, *inter alia*, the "news media" or government agency "reports."  31 U.S.C. § 3730(e)(4)(A) (2009); *United States ex rel. Oliver v. Philip Morris USA, Inc.*, 826 F.3d 466, 472, 474 (D.C. Cir. 2016) ("*Oliver II*") (Pre-Amendment Bar); 31 U.S.C. § 3730(e)(4)(A) (2016); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 n.4 (1st Cir. 2016) (Amended Bar).[13]  Under the Pre-Amendment Bar, a complaint also must be dismissed if its allegations are substantially the same as "allegations or transactions" previously disclosed in state or federal court litigation, *i.e.*, "civil … hearings."[14]  31 U.S.C. § 3730(e)(4)(A) (2009).

Under both versions of the Bar, "allegations" refers to direct allegations of fraud and "transactions" refers to "two or more elements that, when considered together, give rise to an

---

[13] Technically, the Pre-Amendment Bar precludes claims "based upon" allegations or transactions revealed in prior public disclosures.  31 U.S.C. § 3730(e)(4) (2009).  Like nearly every other circuit, however, the D.C. Circuit interpreted "based upon" to mean "substantially similar to."  *Oliver II*, 826 at 472 (citation omitted); *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 690 (D.C. Cir. 1997).  By precluding claims that are "substantially the same as" allegations or transactions in prior public disclosures, the Amended Bar merely codified the interpretation of "based upon" that the D.C. Circuit and most other circuits had adopted for the Pre-Amendment Bar.  *See Winkelman*, 827 F.3d at 208 n.4 ("The revised statutory language—'substantially the same'—merely confirms our earlier understanding [of 'based upon'].").

[14] Disclosures in "civil … hearings" also qualify under the Amended Bar, but only if the hearing was in federal court and included the Government as a party.  31 U.S.C. § 3730(e)(4)(A) (2016).

inference that fraud has taken place." *Oliver II*, 826 F.3d at 471.  The D.C. Circuit has offered a formula to explain "transactions": "[I]f X+Y=Z, Z represents the *allegation* of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.,* the conclusion that fraud has been committed." *Id.* (quoting *Springfield Terminal*, 14 F.3d at 654). Said another way, the term "transaction" means a combination of a misrepresented state of facts (*X*) and a true state of facts (*Y*) from which fraud (*Z*) can be inferred.  *Springfield Terminal*, 14 F.3d at 654.  The Pre-Amendment and Amended Bars thus preclude *qui tam* FCA claims that are substantially the same as *either* publicly disclosed allegations of fraud *or* publicly disclosed transactions from which fraud reasonably can be inferred.  *Oliver II*, 826 F.3d at 472.

Importantly, both versions preclude claims based even partly on such allegations or transactions.  *United States ex rel. J. Cooper & Assocs. v. Bernard Hodes Grp., Inc.*, 422 F. Supp. 2d 225, 235 n.10 (D.D.C. 2006) (Pre-Amendment Bar); *United States ex rel. John v. Hastert*, 82 F. Supp. 3d 750, 765 (N.D. Ill. 2015) (Amended Bar).  Thus, a relator may not "negate substantial similarity" by "providing 'more specific details'" or "reveal[ing] specific instances of fraud where the general practice has already been publicly disclosed." *Oliver II*, 826 F.3d at 472 (quoting *United States ex rel. Settlemire v. Dist. of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999)) (Pre-Amendment Bar); *see also United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 814 (11th Cir. 2015) (Amended Bar); *Winkelman*, 827 F.3d at 210 (Amended Bar).  The "substantial similarity" standard is intended to prevent suits by those other than an original source "when the government already has enough information to 'investigate the case and to make a decision about whether to prosecute' or where the information 'could at least have

alerted law-enforcement authorities to the likelihood of wrongdoing.'"  *United States ex rel. Davis v. Dist. of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012) (citation omitted).

Applying these standards here, the allegations in the Amended Complaint were publicly disclosed in qualifying sources long before the Kasowitz firm filed this action in 2015.  The core allegation of fraud is that Defendants possessed but failed to inform EPA about substantial risk information showing that dermal and low-level inhalation exposure to certain isocyanates causes respiratory sensitization.  *See, e.g.*, Am. Compl. ¶ 8.[15]  As a result, this Court should dismiss the Amended Complaint *either* if the prior disclosures directly allege the same concealment of SRI (direct "allegations" of fraud) *or* if the prior disclosures, taken together, reveal the purported "true" fact that Defendants allegedly possessed alleged SRI and the purported "misrepresented" fact that Defendants allegedly failed to inform EPA of that SRI ("transactions" implying fraud). That test is satisfied: these "allegations" and "transactions" were previously disclosed in news media, agency reports, and (as relevant to the claims based on pre-2010 failures to report) state and federal litigation.  These disclosures are detailed in the attached Appendix (Ex. 1), included as exhibits (Exs. 2-31), and summarized below.

### 1.    Public Disclosures Of Direct "Allegations" Of Fraud In News Media Bar All Claims.

The Amended Complaint's allegations are substantially the same as the direct allegations of fraud previously disclosed in an online newspaper, a website press release, a trade journal, and a legal news service.[16]  For one, in September 2010, the *Tuscaloosa News* reported on the *Bice*

---

[15] The Kasowitz firm returns to its core allegation throughout the Amended Complaint.  *See* Am. Compl. ¶¶ 1, 12, 14, 137, 177, 492, 559-60, 572, 579, 637-38, 652, 714-15, 797-98, 815, 834, 837, 839-40, 868, 873, 877-78, 881, 887-88, 931-32, 934-35, 939-40, 942-43, 945, 950, 950, 954, 960-62, 966, 969, 972, 976, 979, 982, 985, 993, 998, 1000-01, 1003-07.

[16] Each of these qualifies as "news media" under both versions of the Bar.  *See, e.g., United States ex rel. Ervin & Assocs. v. Hamilton Sec. Grp., Inc.*, 332 F. Supp. 2d 1, 5-6 (D.D.C. 2003)

litigation—again, the Alabama state litigation in which the Kasowitz firm represented a group of plaintiffs alleging personal injury claims against BASF, Bayer, and Dow.  Exs. 2-3.  The *Tuscaloosa News* explained in two different articles that *Bice* involved claims that coal miners "suffered from occupational asthma caused by isocyanate exposure" and that "exposure to [isocyanate products] can make people more prone to severe asthma attacks."  *Id.*  Fatally for the Kasowitz firm's ability to pursue this action, the articles disclosed precisely the same allegations that the Amended Complaint lodges here: that the defendants in *Bice*, including BASF, Covestro (then Bayer), and Dow, purportedly "*violated*," the "federal *Toxic Substances Control Act*," "*committed fraud by willfully misrepresenting, concealing or suppressing the truth about the dangers of the product*," and "engaged in a *civil conspiracy*."  *Id.* (emphases added).

A press release the Kasowitz firm issued about *Bice* in May 2009 also precludes its current action.  Like the Amended Complaint here, the press release states that BASF, Covestro (then Bayer), and Dow, among others, were "engag[ing] in an industry-wide conspiracy extending over several decades to conceal and misrepresent [the] hazards [of exposure to isocyanate-based products used in mines] to ... government regulators."  Ex. 4.[17]

---

(newspaper articles); *United States ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*, 843 F. Supp. 2d 20, 32-33 (D.D.C. 2012) (accessible website); *United States ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 111, 125 (D.D.C. 2015) (searchable websites available to public), *aff'd on other grounds*, 826 F.3d 466, 475-76 nn.7-8 (D.C. Cir. 2016); *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 518 (N.D. Tex. 2012) ("trade journals" and "scholarly periodicals"); *United States ex rel. Repko v. Guthrie Clinic, P.C.*, No. 3:04-cv-1556, WL 3875987, at *8 (M.D. Pa. Sept. 1, 2011) (website collecting and publicizing information about nonprofits for a subscription fee), *aff'd*, 490 F. App'x 502 (3d Cir. 2012).

[17] The fact that the Kasowitz firm itself published these allegations is irrelevant to the public disclosure inquiry.  Congress enacted the public disclosure bar based on its "recognition that '[o]nce the information is in the public domain, there is less need for a financial incentive to spur individuals into exposing frauds,'" so the bar is implicated regardless of whether it was the relator who made the prior public disclosure.  *Davis*, 773 F. Supp. 2d at 28, 30 (alteration in original) (quoting *Findley*, 105 F.3d at 685).

Further, from 2005-2010, the trade journal *Mealey's* and the legal news service Law360, reporting extensively on the litigation in *Rex Tanner v. Int'l Isocyanate Inst., Inc.*, No. cv-05-HGD-2341-E (N.D. Ala.), published numerous articles containing the core allegations made here. Exs. 5-16. Like the Amended Complaint, the *Mealey's* articles stated that the defendants in *Tanner*, including BASF, Covestro (then Bayer), Dow, and the International Isocyanate Institute, supposedly "conspired for more than 20 years to hide the health risks of occupational exposure to isocyanates in Appalachian coal mine shafts." Exs. 5-14. Similarly, the Law360 articles noted that the plaintiffs in *Tanner* alleged, as the Kasowitz firm does here, that "the manufacturers of isocyanates such as methylene diphenyl diisocyanate—commonly referred to as MDI—have conspired to use trade organizations including ... [t]he Isocyanate Institute Inc. to conceal the true health effects of exposure to the chemical." Exs. 15-16.

### 2. Public Disclosures Of Certain "Transactions" In A Combination Of News Media And EPA FOIA Reports Also Bar All Claims.

The Amended Complaint's allegations are also substantially the same as "transactions" previously disclosed in a combination of qualifying news media and government agency reports. By reporting that Defendants allegedly concealed information about the hazards of isocyanates, including respiratory injuries, Exs. 2-16, the news sources identified above necessarily disclosed the supposedly "true" fact, the "*Y*," that Defendants possessed alleged SRI about the dangers of their products. At the same time, EPA's responses to the Kasowitz firm's FOIA requests—again, submitted on behalf of the *Bice* plaintiffs—disclosed the supposed "misrepresented" fact, the "*X*," that Defendants did not report this SRI to EPA. In those requests, Kasowitz asked EPA for "copies of any and all information submitted to the EPA pursuant to Section[] … 8(e) of [TSCA] that refers or in any way relates to [isocyanates MDI, TDI, and PMDI]." Ex. 17. In response, EPA provided "Standard Report[s]" listing information about MDI, TDI, and PMDI

that had been submitted. Those reports—which qualify as "administrative … report[s]" under the Pre-Amendment Bar, 31 U.S.C. § 3730(e)(4)(A) (2009); *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 411 (2011), and "Federal report[s]" under the Amended Bar, 31 U.S.C. § 3730(e)(4)(A) (2016); *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 302 (3d Cir. 2016)—did not include the alleged SRI identified in the Amended Complaint in this case. Ex. 17. Together with the news reports, the FOIA reports thus disclosed that Defendants supposedly failed to tell EPA about the alleged SRI they allegedly possessed. That is precisely the concealment scheme, the "Z," that the Kasowitz firm alleges in this case; the Kasowitz firm even acknowledges the FOIA reports were the basis of this suit. *See* Am. Compl. ¶¶ 18-19.

### 3.     Public Disclosures Of Direct "Allegations" Of Fraud In Court Filings Additionally Bar All Claims Based On Alleged Conduct Occurring Before March 23, 2010.

The Pre-Amendment Bar included filings in state and federal court litigation as qualifying public disclosures. *See, e.g.*, *Oliver II*, 826 F.3d at 474 (court filings that are not subject to a protective order constitute public disclosures); *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1350 (4th Cir. 1994) (filings in state court litigation constitute public disclosures). Here, numerous filings in the following state and federal court lawsuits involving Defendants contain information that is substantially the same as the direct "allegations" of SRI concealment in the Amended Complaint: *Bice v. Micon, Inc.*, No. cv-01-1194 (Ala. Cir. Ct.); *Abernathy v. Micon, Inc. et al.*, No. cv-01-1341 (Ala. Cir. Ct.); *Acklin v. Micon, Inc. et al.*, No. cv-02-1518 (Ala. Cir. Ct.); *Richard D. Abbott v. Earth Support Servs., et al.*, No. 08-c-138 (W. Va. Cir. Ct.); *Rex Tanner v. Int'l Isocyanate Inst., Inc.*, No. cv-05-HGD-2341-E (N.D. Ala.). For this additional reason, all claims based on alleged conduct occurring before March 23, 2010 should be dismissed.

In 2010, the *Bice* plaintiffs filed an affidavit from a proffered expert witness, Joel Charm, who attached most of the very documents that the Amended Complaint in this case claims to be the substantial risk information Defendants were obligated to report under TSCA. *Compare* Ex. 18 ¶¶ 54, 63, 72, 81, 90 & Exs. N-R, *with* Am. Compl. ¶ 241 ("1988 Mineworkers SRI"), ¶ 295 ("1989 Human Cases SRI"), ¶ 354 ("1989 German Mine SRI"), ¶ 480 ("1992 Human Cases SRI"), ¶ 640 ("1993 Especial Work Situation SRI"), and ¶ 717 ("1989 German Mine SRI"). Charm averred that this information qualified as SRI under TSCA. Ex. 18 ¶¶ 54, 63, 72, 91, 90. After comparing this information with EPA's responses to the Kasowitz firm's FOIA requests, Charm then asserted that "neither Bayer [Covestro], Dow, BASF, nor any other entity (such as the III or another III member company) reported to the EPA any of the substantial risk information that Bayer [Covestro], Dow and/or BASF obtained." Ex. 18 ¶¶ 27-31; *see also id.* ¶¶ 62, 71, 80, 89, 98. This direct allegation of SRI non-reporting is precisely the same as the core allegation of fraud here. Indeed, as the Kasowitz firm acknowledges, Charm's publicly disclosed assertions in *Bice* are the *foundation* of the allegations in this case. *See* Am. Compl. ¶¶ 1123-25.

A proposed amended complaint in *Tanner*, filed in October 2007, also mirrors the claims here. It alleged that BASF, Covestro (then Bayer), Dow, and III, among others, conspired to conceal from "government officials," "governmental regulatory agencies," "the medical and scientific community," and "the general public" purported SRI concerning the respiratory hazards of dermal and low-level inhalation exposure to isocyanates. Ex. 25 ¶¶ 9, 73e, 90-103; *see also* Ex. 24 (original *Tanner* complaint). The allegedly concealed information included what the Amended Complaint in this case identifies as the "1993 Especial Work Situation SRI." *Compare* Ex. 25 ¶ 98, *with* Am. Compl. ¶ 640.

Filings in the other cases similarly disclosed the allegations of SRI concealment made here.  For example, the various complaints filed in Alabama state court in *Abernathy* and *Acklin*, as well as the complaints filed in West Virginia state court in *Abbott*, alleged that BASF, Covestro (then Bayer), Dow, and Huntsman failed to disclose and concealed the dangers of isocyanate products to coal miners and "mining regulators."  Exs. 26-31 & Ex. 1 (excerpting Exs. 26-31).  The complaints and other court filings in *Bice*, as well as the lengthy hearings in summary judgment proceedings in *Bice*, expanded on these allegations in even greater detail.  Exs. 19-23 & Ex. 1 (excerpting Exs. 19-23).

4.      **Public Disclosures Of Certain "Transactions" In A Combination Of Court Filings And EPA FOIA Reports Additionally Bar All Claims Based On Alleged Conduct Occurring Before March 23, 2010.**

A combination of the above-identified court filings and the EPA FOIA reports disclosed the "transactions," the "*X*" and the "*Y*," that make up the SRI concealment scheme alleged here.  The *Bice* discovery (filed with the court in the proffered expert's affidavit in 2010) and the proposed amended complaint filed in *Tanner* in October 2007 disclosed the allegedly "true" fact that Defendants possessed much of the purported SRI identified in the complaint here:  the 1988 Mineworkers SRI, 1989 Human Cases SRI, 1989 German Mine SRI, 1992 Human Cases SRI, 1993 Especial Work Situation SRI, and 2003 Isocyanate Asthma SRI.  At the same time, the EPA FOIA reports disclosed the allegedly "misrepresented" fact that Defendants did not report this purported SRI to EPA.  Taken together, the public disclosures in the court filings and the EPA FOIA reports reveal the exact same "transactions" from which one may infer the fraud alleged in this case, *i.e.*, the "*Z*."

In fact, the Amended Complaint expressly acknowledges that it is based on the *Bice* discovery and EPA FOIA reports, as it alleges that the Kasowitz firm received information "showing defendants' TSCA reporting violations, as well as evidence showing their ongoing

individual and conspiratorial fraud to conceal from the EPA and others the existence of the reportable information."  Am. Compl. ¶ 18; *see also id.* ¶ 1122 ("Between 2005 and 2009, *Bice* defendants BASF, Bayer [Covestro], and Dow produced documents that revealed their receipt and development of substantial risk information.").  The allegations here are thus not only substantially similar to, but actually *derived from*, publicly disclosed "transactions" from which the alleged fraud can be inferred.  For this additional reason, all claims based on alleged conduct occurring before March 23, 2010 should be dismissed.

*   *   *

Over the past decade, news sources, EPA reports, and court filings, both independently and in combination, repeatedly revealed the Kasowitz firm's core allegation that Defendants conspired to conceal information suggesting that dermal and low-level inhalation exposure to certain isocyanates causes respiratory sensitization.  The Kasowitz firm simply repackages and recycles those publicly disclosed allegations, and attempts to provide a few additional "specific instances of [alleged] fraud."  *Oliver II*, 826 F.3d at 472 (citation omitted).  But the additions do not "negate [the] substantial similarity" of the prior disclosures and the allegations in the Amended Complaint; at most, they just add details to prior disclosures that were already sufficient to alert the Government to the purported "'likelihood of wrongdoing.'"  *Id.* (quoting *Davis*, 679 F.3d at 836); *Settlemire*, 198 F.3d at 919; *Winkelman*, 827 F.3d at 209.  Such details are wholly inadequate to take the Kasowitz firm's allegations outside the strictures of the public disclosure bar.

## B.   The Kasowitz Firm Is Not An "Original Source."

Because the allegations in the Amended Complaint mimic previously disclosed information, the Kasowitz firm can avoid dismissal only if it qualifies as an original source of the information.  It cannot do so under either version of the Bar.  Therefore, the Kasowitz firm is

54

unable to rescue either its claims based on alleged conduct occurring prior to March 23, 2010, or its claims based on subsequent alleged conduct.

### 1. The Kasowitz Firm Is Not An Original Source Under The Pre-Amendment Bar.

To qualify as an "original source" under the Pre-Amendment Bar, a relator must establish that it (1) has "*direct and independent knowledge* of the information on which the allegations are ... based," *and* (2) "voluntarily provided the information to the Government *before filing an action* under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B) (2009) (emphases added). A relator's knowledge is "direct" if it is "firsthand" and unmediated by "an intervening agency"; it is "independent" if it is "not itself dependent on public disclosure." *Oliver II*, 826 F.3d at 476 (citations omitted); *see also United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 688 (D.C. Cir. 1997) ("[A] person who learns of fraud from a public disclosure can never be an 'original source.'"), *abrogated on other grounds by Davis*, 679 F.3d 832.

The Kasowitz firm cannot satisfy either original source requirement. *First,* its knowledge of the fraud alleged here is neither direct nor independent. By its own admission, the Kasowitz firm obtained its knowledge from public disclosures—namely, discovery about Defendants' possession of alleged SRI obtained and filed in court in *Bice*, combined with FOIA reports revealing Defendants' failure to disclose that alleged SRI to EPA. *See* Am. Compl. ¶¶ 18, 1122. This is not a case where a relator is relying on its own inside information. Defendants' current or former employees, for instance, did not hire the Kasowitz firm to sue based on *the employees'* first-hand knowledge of Defendants' purported failure to inform EPA about the alleged SRI. *See, e.g., Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 475 (2007) (relator did not have the required direct knowledge where the alleged wrongdoing occurred after he left his employment); *Oliver II*, 826 F.3d at 477-79 (relator

did not have the required firsthand knowledge because he did not allege that he worked for, sold cigarettes on behalf of, or purchased cigarettes from Philip Morris; he only learned about its sales practices from a third party, whose knowledge prompted him to investigate).  Rather, the Kasowitz firm seeks to pursue an FCA action in its own name based on information it obtained for its clients in litigation.  But the law is clear that law firms who do so must fail, because their information is neither firsthand nor independent.  *See, e.g.*, *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1159 (2d Cir. 1993) (dismissing case because counsel who conducted the litigation that resulted in prior public disclosure was not an original source of that information, and holding that "conduct[ing] some collateral research and investigations" and having "background knowledge [that] enabled it to understand the significance of the information acquired in the … action" did not constitute independent knowledge); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160, 1161 n.10 (3d Cir. 1991) (holding that lawyer who obtained information through discovery was not original source and that such a construction "avoids the conflict of interest issue that could arise by a lawyer arrogating to himself or herself a *qui tam* action based on information learned in the service of a client"); *United States ex rel. Stinson, Lyons, Gerlin & Bustamente, P.A. v. Pan Am. Life Ins. Co.*, Civ. A. No. 90-411, 1992 WL 125329, at *6 (E.D. La. May 22, 1992) (dismissing case where relator "obtained all of its knowledge of the defendant's conduct via … discovery" such that his knowledge was "not obtained independently of the public disclosure").

*Second*, the Kasowitz firm does not qualify as an original source under the Pre-Amendment Bar because it did not voluntarily provide information to the Government *before* filing the complaint.  The Kasowitz firm itself concedes that it only disclosed its allegations to the Government "*[c]oncurrently* with filing this complaint."  Am. Compl. ¶ 6 (emphasis added).

"Concurrently" is not "before."  *See, e.g.*, *United States ex rel. Davis v. Dist. of Columbia,* 413 F. App'x 308, 311 (D.C. Cir. 2011) (finding "contemporaneous disclosure to the federal government ... insufficient to meet § 3730(e)(4)(B)'s standard that the information is provided to the federal government 'before filing an action.'"); *United States v. Bank of Farmington*, 166 F.3d 853, 866 (7th Cir. 1999) ("[I]t is clear that the requirement is not satisfied by informing the government at the time of filing the action…."), *overruled in part on other grounds*, *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009); *United States ex rel. King v. Hillcrest Health Ctr., Inc.*, 264 F.3d 1271, 1280-81 (10th Cir. 2001) (providing notice "at the time of filing does not satisfy the pre-filing disclosure requirement").[18]

### 2. The Kasowitz Firm Is Not An Original Source Under The Amended Bar.

The Kasowitz firm fares no better under the Amended Bar.  Under the Amended Bar, there are two alternative tests for qualifying as an original source.  Either (1) the relator must have voluntarily disclosed the information on which the publicly disclosed allegations are based to the Government "*prior to* a public disclosure" or (2) the relator must "ha[ve] knowledge that is *independent of and materially adds to* the publicly disclosed allegations or transactions" *and* "has voluntarily provided the information to the Government *before filing an action*."  31 U.S.C. § 3730(e)(4)(B) (2016) (emphases added).  The Kasowitz firm cannot satisfy either test.

---

[18] A relator must plead its status as an original source with the particularity required by Rule 9(b)—that is, it must demonstrate that, pre-suit, it informed the Government about the specific allegations it is making in the complaint against each individual defendant.  *See, e.g.*, *United States ex rel. Ahumada v. Nat'l Ctr. for Emp't of the Disabled*, No. 1:06-cv-713, 2013 WL 2322836, *3, 6 (E.D. Va. May 22, 2013), *aff'd sub nom. United States ex rel. Ahumada v. NISH*, 756 F.3d 268 (4th Cir. 2014).  The Kasowitz firm's failure to allege that it informed the Government about its specific allegations against each Defendant before filing suit is yet *another* reason why it does not qualify as an original source.

The Kasowitz firm cannot satisfy the first test by its own admission.  According to the Amended Complaint, the Kasowitz firm's disclosure to the Government occurred "concurrently" with the filing of the original complaint on May 20, 2015.  Am. Compl. ¶ 6.  Yet the news media disclosures occurred years earlier, from 2005-2010, as did EPA's FOIA reports, which responded to requests made in June 2006.  Thus, the Kasowitz firm did not disclose the allegations in the Amended Complaint "prior to" the qualifying public disclosures.

The Kasowitz firm also fails the second test.  As explained, the Kasowitz firm did not provide the Government with the facts alleged in the complaint *before* filing this action, because it did so "concurrently" with filing the complaint.  Although that fact alone proves fatal, the Kasowitz firm also lacks any knowledge that is "independent of and materially adds" to the news reports and EPA FOIA disclosures.  The Kasowitz firm's knowledge is not independent because, as the Kasowitz firm concedes, it is derived at least in part from information furnished in the FOIA reports.  *See* Am. Compl. ¶¶ 18-19.  The Amended Complaint also does not "materially add" to the information in the news reports and EPA FOIA reports because the news media had already disclosed that Defendants were accused of failing to inform the Government about the dangers of isocyanates, and the FOIA reports disclosed that Defendants did not inform the EPA about the ten specific pieces of alleged SRI identified in the complaint.  Exs. 2-17.  None of the additional factual allegations in the Amended Complaint—including, for example, the alleged breaching of CAP agreements that simply reinforced longstanding TSCA reporting requirements or the calculation of penalties Defendants allegedly owe—"add[] value" sufficient to overcome the Amended Bar's prohibition on parasitic litigation.  *Davis*, 679 F.3d at 839 n.4.

To the contrary, these extra allegations merely furnish additional detail about the already-disclosed, essential elements of the alleged SRI concealment scheme.  Such additional detail is

insufficient to establish original source status, as is any legal expertise the Kasowitz firm might claim it supplied in deducing and alleging the purported fraud.  *See, e.g., Winkelman*, 827 F.3d at 210-13 (dismissing case where public disclosures in the media and in a prior lawsuit had already revealed the basic "anatomy" of the fraud and relator's added detail about the precise manner of fraud and specific examples of the fraud did not "materially add" information); *Findley*, 105 F.3d at 688 (D.C. Cir. 1997) ("If a relator merely uses his or her unique expertise or training to conclude that the material elements already in the public domain constitute a false claim, then a *qui tam* action cannot proceed."); *Osheroff*, 776 F.3d at 814-15 (relators "were not original sources because they merely possessed background information about the defendants' environmental violations that allowed them to understand, based on public disclosures, that the defendants were committing fraud."); *United States ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1080 (8th Cir. 2014) (plaintiff's information did not materially add to public disclosures that revealed "the essential elements comprising that fraudulent transaction ... so as to raise a reasonable inference of fraud." (citation omitted)); *United States ex rel. Szymoniak v. Am. Home Mortg. Servicing, Inc.*, No. 0:10-cv-01465-JFA, 2014 WL 1910845, at *5 (D.S.C. May 12, 2014) (relators who just "connect[] the dots" are not original sources).  Even a complaint of nearly 400 pages cannot mask the fact that the Kasowitz firm merely reprises— and does not "materially add to"—"allegations and transactions" that were previously publicly disclosed.

*   *   *

To summarize, the Pre-Amendment and Amended Bars preclude all of the Kasowitz firm's claims because the allegations in the Amended Complaint are substantially the same as "allegations or transactions" previously disclosed in the *Tuscaloosa News*, the Kasowitz firm's

press release, the *Mealey's* trade journal articles, the Law360 articles, and the EPA FOIA reports. The Pre-Amendment Bar *further* precludes all claims based on alleged conduct occurring prior to March 23, 2010, because the allegations in the Amended Complaint are substantially the same as "allegations or transactions" disclosed in court filings in *Bice*, *Tanner*, *Abbott*, *Abernathy* and *Acklin* and in the EPA FOIA reports.  The Kasowitz firm is unable to escape the preclusive effect of these prior disclosures for any of its claims because it cannot prove that it is an original source under either Bar.   Accordingly, the Pre-Amendment and Amended Bars, together, require dismissal of the Amended Complaint in its entirety.

## CONCLUSION

Because the Kasowitz firm alleges no actionable conduct under the False Claims Act, and because its allegations run afoul of the FCA's public disclosure bar, the Court should dismiss all counts in the Amended Complaint with prejudice.

December 9, 2016

Respectfully submitted,

KIRKLAND & ELLIS LLP
/s/ *Christopher Landau*
Christopher Landau, P.C. (DC Bar No. 425319)
clandau@kirkland.com
655 15th Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Michael Foradas, P.C. (admitted *pro hac vice*)
mforadas@kirkland.com
Nader Boulos (admitted *pro hac vice*)
nboulos@kirkland.com
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Jeremy M. Feigenbaum (admitted *pro hac vice*)
jeremy.feigenbaum@kirkland.com
601 Lexington Avenue
New York, NY 10010
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

LATHAM & WATKINS LLP
/s/ *Alice S. Fisher*
Alice S. Fisher (DC Bar No. 437492)
alice.fisher@lw.com
Anne W. Robinson (DC Bar No. 503232)
anne.robinson@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201

Steven M. Bauer (admitted *pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

*Attorneys for The Dow Chemical Company*

VENABLE LLP
/s/ *Seth A. Rosenthal*
Seth A. Rosenthal (DC Bar No. 482586)
sarosenthal@venable.com
575 7th Street, NW
Washington, DC 20004
Telephone: (202) 344-4741
Facsimile: (202) 344-8300

*Attorney for BASF Corporation*


BRADLEY ARANT BOULT CUMMINGS, LLP
/s/ *Kyle C. Hankey*
Kyle C. Hankey (DC Bar No. 1010827)
khankey@bradley.com
1615 L Street NW, Suite 1350
Washington, DC 20036
Telephone: (202) 393-7150
Facsimile: (202) 347-1684

Fred M. Haston III (admitted *pro hac vice*)
thaston@bradley.com
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: (205) 521-8303
Facsimile: (205) 488-6303

William F. Goodman III (admitted *pro hac vice*)
wgoodman@bradley.com
Roundabout Plaza, 1600 Division Street, Suite 700
Nashville, TN 37203
Telephone: (615) 252-2381
Facsimile: (615) 252-6381

*Attorneys for Covestro LLC*

REED SMITH LLP
/s/ *Lawrence Sher*
Lawrence S. Sher (DC Bar No. 430469)
lsher@reedsmith.com
1301 K Street, NW
Suite 1000-East Tower
Washington, DC 20005
Telephone: (202) 414-9200
Facsimile: (202) 414-9299

Scott D. Baker (admitted *pro hac vice*)
sbaker@reedsmith.com
Raymond Cardozo (admitted *pro hac vice*)
rcardozo@reedsmith.com
101 Second Street, Suite 1800
San Francisco, CA 94105
Telephone: (415) 543-8700
Facsimile: (415) 391-8269

James L. Sanders (admitted *pro hac vice*)
jsanders@reedsmith.com
Francisca M. Mok (admitted *pro hac vice*)
fmok@reedsmith.com
1901 Avenue of the Stars, Suite 700
Los Angeles, CA 90067
Telephone: (310) 734-5200
Facsimile: (310) 734-5299

*Attorneys for Huntsman International LLC*