# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KASOWITZ, BENSON, TORRES & FRIEDMAN LLP,<br><br>Plaintiff,<br><br>v.<br><br>BASF CORPORATION; BAYER MATERIAL SCIENCE, LLC f/k/a/ MILES, INC. f/k/a MOBAY CHEMICAL COMPANY; THE DOW CHEMICAL COMPANY; and HUNTSMAN INTERNATIONAL LLC, f/k/a IMPERIAL CHEMICAL INDUSTRIES PLC and f/k/a ICI AMERICAS, INC.,<br><br>Defendants. | Case No. 1:16-CV-02269-RCM |

**PLAINTIFF AND RELATOR KASOWITZ, BENSON, TORRES & FRIEDMAN LLP'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................iv

INTRODUCTION ..............................................................................................1

FACTUAL BACKGROUND ...............................................................................5

    A.    FCA Claims. ...........................................................................5

    B.    The TSCA Statute....................................................................7

    C.    The CAP Agreement. ..............................................................8

    D.    Defendants' Fraudulent Conspiracy. .........................................9

ARGUMENT ..................................................................................................13

I.    EACH DEFENDANT CONCEALED OR IMPROPERLY AVOIDED
    STATUTORY MONEY-PAYMENT OBLIGATIONS ...............................13

    A.    The FCA's plain language unambiguously defines FCA "obligations"
        to include TSCA's reporting and penalty-payment duties. ..................15

        1.    The FCA defines "obligation" to include some contingent duties. ..........15

        2.    TSCA "establishes" a duty both to transmit property and to pay
            money. ............................................................................18

            a.    TSCA creates an established duty to transmit property,
                and that duty is fixed in all particulars. .........................18

            b.    TSCA creates an established duty to pay money, and that
                duty is fixed as to the violator's liability but unfixed in
                other particulars. ........................................................19

        3.    The property-transmission and penalty-payment obligations are
            FCA obligations "arising from an . . . implied contractual . . .
            relationship." ....................................................................22

    B.    The legislative history confirms that Congress intended FCA
        "obligations" to include the type of property-transmit and money-
        payment duties imposed by TSCA's Section 8(e)..............................24

        1.    Congress has consistently declared its intent for courts broadly to
            apply the FCA to reach all fraud against the Government. .................24

2.      Congress again amended the FCA in 2009 to ensure broad FCA
application. ...........................................................................................25

3.      The legislative history confirms that Congress intended to bring
back within the FCA's reach those "contingent" obligations *ATMI*
had rejected – obligations contingent on government discretion. .............26

4.      The legislative history confirms Congress intended the term "not
fixed" to mean those duties contingent on government discretion,
while "fixed" duties include even those duties unfixed in amount. ..........28

5.      The plain meaning of the statute's language and the legislative
history confirm that FCA obligations include contingent
obligations such as TSCA's payment obligation, even though a
revision to the definition of obligation substituted the phrase
"whether or not fixed" for the  word "contingent."...................................29

C.      Case Law Does Not Support Defendants' Motion. ................................................31

D.      Because their fraud prevented the EPA from assessing TSCA penalties,
defendants are estopped from raising the absence of assessment as a
defense. ..............................................................................................................37

II.      DEFENDANTS CONCEALED OR IMPROPERLY AVOIDED  STATUTORY
PROPERTY-TRANSFER OBLIGATIONS ....................................................................38

A.      The Concealed SRI is FCA "Property" .............................................................38

III.      DEFENDANTS KNOWINGLY CONCEALED OR IMPROPERLY AVOIDED
CONTRACTUAL MONEY-PAYMENT AND PROPERTY-TRANSFER
OBLIGATIONS. ...........................................................................................................43

A.      The CAP contract established money-payment obligations for breach. ...............43

1.      CAP established an obligation for each defendant to forfeit its
amnesty reduction and pay the full penalties for the SRI for which
it  had received a reduced amnesty penalty. .............................................44

2.      CAP established an obligation for each defendant to pay the full
penalties for the Concealed SRI it failed to submit under CAP. ...............45

3.      Defendants' pre-FERA cases not applicable.............................................46

B.      The CAP Agreement established property-transmission obligations...................47

IV.      DEFENDANTS HAVE POSSESSION, CUSTODY, OR CONTROL OF
MONEY OR PROPERTY TO BE USED BY THE GOVERNMENT AND
KNOWINGLY DELIVERED LESS THAN ALL OF IT .................................................48

A.      Each defendant possessed property to be used by the Government. ..................... 48

B.      Each defendant possessed money to be used by the Government. ....................... 49

C.      Partial delivery is not a required element, but KBT&F's allegations
        satisfy whatever partial delivery element may exist. ............................................ 50

V.      KBT&F SUFFICIENTLY PLEADED ITS CONSPIRACY CLAIM ............................ 52

VI.     KBT&F SUFFICIENTLY ALLEGED THAT DEFENDANTS ACTED
        KNOWINGLY ........................................................................................................... 53

VII.    THE PUBLIC DISCLOSURE BAR DOES NOT BAR KBT&F'S CLAIMS ................ 61

A.      The Standard for Evaluating Whether The Amended Bar Applies. ..................... 63

B.      The Tort Litigation Articles Are Not "Substantially the Same" As The
        Amended Complaint's Allegations and Fail to Reference Let Alone
        Identify Defendants' Fraud. .................................................................................. 64

C.      The Defendants' Tort Litigation Articles and FOIA Exhibit Do Not
        Provide Notice of A Transaction and Defendants Miscalculate the
        X+Y=Z Formula. ................................................................................................... 69

CONCLUSION .................................................................................................................... 70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

\* *3M Co. v. Browner*,
17 F.3d 1453 (D.C. Cir. 1994)................................................2, 14, 19, 32, 34, 37

*Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*,
190 F.3d 729 (6th Cir. 1999)......................1, 6, 7, 14, 23, 24, 26, 27, 31, 32, 34, 46

*Beauchamp v. Academi Training Ctr.*,
816 F.3d 37 (4th Cir. 2016)...............................................................63

*Carpenter v. U.S.*,
484 U.S. 19 (1987) .......................................................................40

*Cooper v. Blue Cross & Blue Shield of Fla., Inc.*,
19 F.3d 562 (11th Cir. 1994)...............................................................68

*English v. District of Columbia*,
717 F.3d 968 (D.C. Cir. 2013)..............................................................62

\* *Envtl. Integrity Project v. U.S. Envtl. Protection Agency*,
177 F. Supp.3d 36 (2016) ...............................................................40, 41

\* *Hicks v. District of Columbia*,
CA No. 15-1828 (CKK), D.D.C. (Apr. 28, 2016), 2016 U.S. Dist. LEXIS
56372 ................................................................................17, 26, 33, 46

*Hoyte v. American Nat'l Red Cross*,
518 F.3d 61 (D.C. Cir. 2008)..................................7, 17, 26, 33, 42, 46, 47

*Leveski v. ITT Educ. Servs., Inc.*,
719 F.3d 818 (7th Cir. 2013) ..............................................................63

*In re McGuirl*,
162 B.R. 630 (D.D.C. 1993)...............................................................37

\* *Pierce v. S.E.C.*,
786 F.3d 1027 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1713 (2016) .................37

\* *Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ...................................................................40, 41

*U.S. ex rel. Baltazar v. Warden*
866, 867-68 (7th Cir. 2011) ...............................................................68

*U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*,
   251 F. Supp. 2d 28 (D.D.C. 2003)...................................................................50

*U.S. ex rel. Boise v. Cephalon, Inc.*,
   CIV. A. 08-287, 2015 WL 1724572 (E.D. Pa. Apr. 15, 2015)...............................33

*U.S. ex rel. Colquitt v. Abbott Labs.*,
   864 F. Supp. 2d 499 (N.D. Tx. 2012)..........................................................68, 69

*U.S. ex rel. Comeaux v. W&T Offshore, Inc.*,
   No. 10-494, 2013 WL 4012644 (E.D. La. Aug. 6, 2013).....................................33

* *U.S. ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*,
   839 F.3d 242 (3d Cir. 2016) ...............................4, 34, 35, 36, 41, 42

*U.S. ex rel. Davis v. Dist. of Columbia*,
   679 F.3d 832 (D.C. Cir. 2012).....................................................................22

*U.S. ex rel. Fine v. Sandia Corp.*,
   70 F.3d 568 (10th Cir. 1995) ..........................................................30, 31, 68

*U.S. ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*,
   843 F. Supp. 2d 20 (D.D.C. 2012)................................................................37

*U.S. ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*,
   CA 13-6000, 2014 WL 7274913 (E.D. La. Dec. 18, 2014), *aff'd*, 626 F. App'x
   528 (5th Cir. 2015) ...............................................................................33

*U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
   842 F.3d 430 (6th Cir. 2016).................................................................61, 63

*U.S. ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prod., Inc.*,
   370 F. Supp. 2d 993 (N.D. Cal. 2005)...........................................................36

*U.S. ex rel. Joseph v. Cannon*,
   642 F. 2d 1373 (D.C. Cir. 1981).................................................................69

*U.S. ex rel. Kester v. Novartis*,
   43 F. Supp. 3d 332 (S.D.N.Y. 2014) .......................................................64, 68, 69

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
   160 F. Supp. 3d 253 (D.D.C. 2016)..........................................................46, 47

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
   167 F. Supp. 3d 80 (D.D.C. 2016)................................................................46

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
   51 F. Supp. 3d 9 (D.D.C. 2014)..................................................................60

*U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
   No. 12-1562-SLR, 2016 WL 4051266 (D. Del. July 26, 2016) .......................................32, 42

*U.S. ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*,
   812 F.3d 294 (3d Cir. 2015) ................................................................................................69

*U.S. ex rel. Nissman v. Southland Gaming of the Virgin Islands, Inc.*,
   No. 2011 0010 2016 WL 1317495 (D.V.I. March 31, 2016) ................................................32

*U.S. ex rel. Oliver v. Philip Morris USA Inc.*,
   763 F.3d 36 (D.C. Cir. 2014) ..............................................................................................61

*U.S. ex rel. Oliver v. Philip Morris USA, Inc.*,
   826 F.3d 466 (D.C. Cir. 2016) .............................................................................................69

*U.S. ex rel. Schaengold v. Memorial Health, Inc.*,
   2014 WL 6908856 (S.D. Ga. 2014) ....................................................................................32

\* *U.S. ex rel. Shea v. Verizon Comm., Inc.*,
   160 F. Supp. 3d 16 (D.D.C. 2015) .................................................................................61, 62

\* *U.S. ex rel. Shemesh v. CA, Inc.*,
   89 F. Supp.3d 36 (D.D.C. 2015) .....................................................................................57, 58

\* *U.S. ex rel. Shemesh v. CA, Inc.*,
   89 F. Supp.3d 67 (D.D.C. 2015) .....................................................................................57, 58

*U.S. ex rel. Simoneaux v. DuPont*,
   No. 16-30141, 2016 U.S. App. LEXIS 22117
   (5th Cir. Dec. 13, 2016) ................................................2, 13, 14, 18, 20, 21, 27, 29, 31, 33, 34

\* *U.S. ex rel. Springfield Terminal Ry. v. Quinn*,
   14 F.3d 645 (D.C. Cir. 1994) ..................................................................................64, 67, 69, 70

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*,
   389 F.3d 1251 (D.C. Cir. 2004) ..........................................................................................59

\* *U.S. v. Neifert-White Co.*,
   390 U.S. 228 (1968) .......................................................................................................24, 35

*U.S. v. Poirier*,
   321 F.3d 1024 (11th Cir. 2003) ..........................................................................................39

*U.S. v. Science Applications Intern. Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) .....................................................................................57, 60

\* *U.S. v. Sullivan*,
   No. 2:13-cr-00039, 2013 U.S. Dist. LEXIS 91660 (E.D. Pa. July 1, 2013) ...........................38

*U.S. v. Universal Fruits & Vegetables Corp.*,
    370 F.3d 829 (9th Cir. 2004) ............................................................... 36

**Statutes**

15 U.S.C. § 2601(a)(2) ............................................................................... 7

15 U.S.C. § 2607(e) ........................................................................ 8, 18, 64

15 U.S.C. §2615(a) ...................................................................2, 7, 8, 18, 19

15 U.S.C. § 2615(a)(2) ............................................................................... 9

15 U.S.C. § 2615(a)(2)(C) ......................................................................... 20

15 U.S.C. § 2615(a)(3) ............................................................................... 9

31 U.S.C. § 2615 ..................................................................................... 45

31 U.S.C. § 3729(a)(1)(D) .......................................................6, 48, 49, 50, 51

31 U.S.C. § 3729(a)(1)(G) ........................................................1, 6, 13, 15, 67

31 U.S.C. § 3729(a)(4) (2008) ................................................................... 50

31 U.S.C. § 3729(b)(1)(B) ......................................................................... 55

31 U.S.C. § 3729(b)(3) .............................................................1, 7, 15, 22, 28

31 U.S.C. § 3730(e)(3) ............................................................................. 36

31 U.S.C. § 3730(e)(4)(A) (2016) ..............................................61, 62, 63, 64

TSCA section 16 ..................................................................................... 45

TSCA section 16(a)(2) ........................................................................... 9, 44

TSCA section 8(e) and 15(3)(b) ................................................................. 44

Patient Protection and Affordable Care Act, Pub. L. No. 11-148, 124 Stat 119
    (2010) ............................................................................................... 61

**Other Authorities**

155 CONG. REC. E1296 (daily ed. June 3, 2009) (Statement of Rep. Berman)..........25, 26, 27, 31,

155 CONG. REC. S45439 (daily ed. April 22, 2009) (Statement of Sen. Kyl) .............................29

43 Fed. Reg. 11109 ........................................................................................................58

56 Fed. Reg. 4128 .......................................................................................................8, 39

*Black's Law Dictionary* ....................................................................16, 19, 38

H.R. REP. NO. 99-660, 99th Cong., 2d Sess. (June 26, 1986) ....................................25

Fed. R. Civ. P. 9(b)........................................................................................................57

Fed. R. Civ. P. 12(b)(6) .................................................................................................62

SEN. REP. NO. 99-345, 99th Cong., 2d Sess. (July 28, 1986) ....................................24

SEN. REP. No. 111-10, 111th Cong., 1st Sess. (2009) ...........................2, 7, 25, 26, 27, 28, 29, 30

SEN. REP. NO. 110-507, 110th Cong., 2d Sess. (Sept. 25, 2008)...................................25

*A Framework for Statute-Specific Approaches to Penalty Assessments:
  Implementing EPA's Policy on Civil Penalties*, EPA General Enforcement
  Policy #GM-22, February 16, 1984. ..................................................................21

*The Enforcement Response Policy for Reporting and Recordkeeping Rules and
  Requirements for TSCA Sections 8, 12 and 13*, U.S. Environmental Protection
  Agency (1999) ..........................................................................................21, 45

*Toxic Substances Control Act, Statement of Interpretation and Enforcement
  Policy; Notification of Substantial Risk*, 43 Fed. Reg. 11110 ................................40

**INTRODUCTION**

Defendant chemical companies have for decades developed and obtained extensive medical and scientific information that confirmed certain dangerous and unexpected hazards of their isocyanate chemicals. Although obligated both by the Toxic Substances Control Act ("TSCA") and by contracts with the United States Government to transmit that substantial risk information ("SRI") to the Environmental Protection Agency ("EPA"), defendants concealed and conspired to conceal that SRI from the United States. Because they breached these obligations, defendants owe the United States billions of dollars in automatic penalties and contract damages.

The Amended Complaint's ("AC") allegations and incorporated attachments detail the numerous fraudulent acts defendants committed in concealing the SRI. Those allegations, which on this motion must be taken as true and viewed in the light most favorable to KBT&F, demonstrate that defendants concealed and avoided their statutory and contractual obligations to transmit to the EPA property (the SRI), as well as their statutory and contractual obligations to pay to the EPA the TSCA penalties and contract damages for which they automatically became liable when they deprived the EPA of this property. Defendants thereby violated the FCA, which prohibits "knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

In 2009 Congress amended the FCA to legislatively overrule courts that had declined to impose FCA liability for "contingent obligations" – obligations that, according to those courts, "attach only after the exercise of administrative or prosecutorial discretion, and often after a selection from a range of penalties." *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 736-737 (6th Cir. 1999) ("*ATMI*"). Congress negated that restriction, enacting a new definition of "obligation" as "an established duty, *whether or not fixed*," that arises from various sources, including contract, statute, or regulation. 31 U.S.C. § 3729(b)(3) (emphasis added). Thus, "the

new definition of 'obligation' expressly includes *contingent, non-fixed* obligations." SEN. REP. No. 111-10, 111th Cong., 1st Sess. at 14 and n.10 (2009) ("SEN. REP. NO. 111-10") (emphasis added). Accordingly, an FCA obligation can be simultaneously "established" (existing) and "not fixed" (contingent on government discretion).

TSCA penalties fit squarely within this definition. TSCA not only imposes an "established duty" to transmit SRI to the EPA, it imposes an automatic penalty obligation – also an "established duty" – by providing that a violator "shall be liable" for the penalty. 15 U.S.C. §2615(a). This Circuit's binding precedent holds that this language means exactly what it says: "liability for the penalty attaches at the moment of the violation." *3M Co. v. Browner*, 17 F.3d 1453, 1461 (D.C. Cir. 1994). Any subsequent discretion the EPA might have in assessing the penalty therefore necessarily relates only to the penalty's "not fixed" aspects.  The recent Fifth Circuit decision in *U.S. ex rel. Simoneaux v. DuPont*, No. 16-30141, 2016 U.S. App. LEXIS 22117 (5th Cir. Dec. 13, 2016) is in no way to the contrary.

Defendants' contractual payment obligations also unquestionably are within the statutory definition, even under the erroneous interpretation advanced by defendants and the *Simoneaux* court – that the new definition requires all contingencies other than the obligation's payment amount to be "fixed." *Id.* at *8-9; Def. Br. at 16. As shown below, each defendant entered into a contract with the EPA obligating it to audit and correct its past TSCA SRI transmission compliance, in exchange for which the EPA granted a significant "amnesty" reduction in TSCA penalties. Under each contract, however, if defendant failed to transmit all previously un-transmitted SRI as promised, it forfeited the amnesty and became liable for full TSCA penalties assessed by the EPA under its guidelines. And because each defendant waived its right to challenge or appeal the EPA's penalty assessment, the contract imposes mandatory and

automatic liability for the penalties – the contract damages – that EPA has unilateral authority to set. These contract damages, then, are essentially self-executing stipulated damages – "established dut[ies]" whose amount will be "fixed" by the EPA.

Defendants' statutory and contractual obligations to transmit the SRI to the EPA are also FCA obligations. The SRI defendants failed to transmit to the EPA is "property" and by concealing and avoiding their transmission obligations defendants violated the FCA. The EPA has allowed regulated companies to protect their property interest in SRI by designating portions of their SRI as "Confidential Business Information" (CBI). Moreover, here, by continuing to conceal their SRI, defendants have exercised several hallmark rights associated with property – the rights to possess, use, and exclude others from possession and use – and have obtained substantial economic benefits from their exclusive possession and use. Moreover, defendants and the EPA treated the SRI as property when they contracted for defendants to transmit the SRI (another hallmark property right) in exchange for valuable consideration. Operating as the valuable property the EPA contracted to acquire and the currency defendants used to acquire the contract's amnesty benefits, the SRI is property.

Defendants' arguments are therefore negated by this Circuit's binding precedent in *3M*, as well as the unambiguous language of the FCA, TSCA, and their contracts with the EPA. But defendants also improperly seek to benefit from their own fraud. Defendants shamelessly contend that the comprehensive success of their fraud immunizes them from FCA liability. Defendants argue, for example, that TSCA penalties are not FCA obligations because the EPA never initiated enforcement proceedings or assessed any penalties. Defendants' Brief in Support of Motion to Dismiss, D.E. 110-1 (Def. Br.) at 1-2, 14-32. But defendants' concealment was aimed precisely at preventing the EPA from doing so. The FCA does not allow defendants to use

the absence of Government enforcement activity as a defense to a relator's fraud claims when the very fraud for which the relator seeks redress on the Government's behalf prevented – indeed, was *designed* to prevent – that very enforcement activity. To the contrary, the FCA expressly forbids this fraud by imposing liability for knowingly and improperly "*avoiding*" an obligation to pay, and long-established equitable estoppel principles prohibit defendants from benefiting from their fraud.

Defendants' contention that imposing FCA liability on them "would strip the Federal Government of [TSCA] enforcement discretion" (Def. Br. at 2) is equally disingenuous and unavailing. Defendants' fraud – not FCA liability – stripped the Government of such discretion. While defendants' fraud deprived the Government of the information necessary to exercise its discretion, and misled the Government into believing there was nothing to enforce, FCA liability rectifies that situation by compensating the Government for its loss and providing it the tools to detect and combat such fraud. As the Third Circuit explained: "[I]f the [defendant] believes the value of [concealment] exceeds the risk that the deception will be discovered … [it] may decline to [transmit the information], since the chance that [the concealment] will be discovered … [and a penalty] will be owed would still result in a net gain to the company. *Reverse false claims liability changes that value proposition because a finding of deception carries the possibility of treble damages.*" *U.S. ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 255-56 (3d Cir. 2016) (emphasis added).

Defendants' strawman arguments ignore their fraudulent concealment and its effect. Whether the FCA addresses "the violation of any federal law that authorizes the Federal Government to impose civil fines or penalties" (Def. Br. at 1) is irrelevant here, because its provisions unquestionably establish that Congress intended it to be used in situations like this,

where defendants employ extensive and continuing fraud to "conceal" and thereby "avoid" their penalty obligations. Defendants argue as if they had merely – and even honestly – failed to transmit SRI, and they completely excise their extensive and continuing fraud from the record.

Accordingly, this Court need not decide whether defendants' mere statutory violations or contract breaches, absent any fraud, also constitute FCA violations for, as demonstrated below, KBT&F has alleged and bases it claims on much more. The AC details how defendants not only violated their statutory and contractual obligations to transmit the SRI, but also conspired to conceal that SRI and to falsely assure the EPA that there was no evidence of the dangerous hazards the SRI confirmed. Defendants directly misled the EPA about both the SRI and their prior transmission compliance, thereby concealing and avoiding their multiple money-payment and property-transmission obligations. The FCA forbids and imposes liability for such fraud. Defendants' motion to dismiss must be denied.

## FACTUAL BACKGROUND

**A.      FCA Claims.**

For decades defendants have reaped billions of dollars from sales of their isocyanate chemicals, even as (and at least in part because) they concealed from the EPA and the public extensive, non-public information about those chemicals' dangerous health hazards. The defendants' concealment has obstructed the EPA's hazard identification and risk assessment activities. Moreover, by concealing this information from the EPA, each defendant failed to transmit property to the EPA in violation of its statutory reporting duty under TSCA (AC at ¶¶ 184-800, 1378-1482) and its contractual reporting duty under its Compliance Audit Program contract with the EPA (AC at ¶¶ 896-915, 1483-1580), and thereby became liable for statutory penalties (AC at 801-895) and breach of contract damages (AC at 916-930).

In its AC, KBT&F alleges seventeen distinct causes of action against each defendant. Four arise under 31 U.S.C. § 3729(a)(1)(D), which prohibits knowingly delivering to the Government less than all of the money or property to be used by the Government. Those causes of action comprise Count III and are alleged at paragraphs 1581-1720 of the AC.

Twelve causes of action arise under the FCA's reverse false claim provision, which prohibits (1) making or using false statements material to, (2) knowingly concealing, or (3) knowingly and improperly avoiding an "obligation" to (a) pay money or (b) transmit property to the United States. 31 U.S.C. § 3729(a)(1)(G). KBT&F alleges that each defendant violated the FCA by taking each of these three prohibited actions with respect to two different obligations – money-payment and property-transmission obligations to the United States – each of which arose separately from both statute and contract. AC at ¶¶ 1177-1580, 1721-1748, Counts I, II, and IV. More specifically, each defendant owes the government (a) money-payment and (b) property-transmission obligations that arose from statute or regulation, and each defendant similarly owes the government (c) money-payment and (d) property-transmission obligations that arose from contract. Each defendant conducted all three prohibited actions with respect to each of these four obligations, resulting in twelve separate reverse false claims causes of action. The final cause of action is for defendants' conspiracy to commit the sixteen other FCA violations. AC at ¶ 931-1129, Count IV.

In 2009 Congress amended several of the FCA's provisions in the Fraud Enforcement and Recovery Act of 2009 (FERA). Even before those amendments, most courts agreed that contractual duties like those alleged here qualified as FCA "obligations." *ATMI,* 190 F.3d at 736-737. Some courts also acknowledged that a limited class of statutory or regulatory duties (like the fixed, statutory property-transmission obligation alleged here) could constitute FCA

obligations (*id*. at 737-738), but many excluded "contingent" obligations such as the statutory money-payment obligation alleged here, because it was subject to government enforcement or assessment discretion. *Id.* at 738. The D.C. Circuit adopted this view shortly before the FERA amendments. *Hoyte v. American Nat'l Red Cross*, 518 F.3d 61 (D.C. Cir. 2008). To correct the unduly narrow construction of FCA obligations adopted in *ATMI* and *Hoyte*, Congress amended the FCA in 2009 to make clear that contingent obligations are FCA obligations.

In those amendments, Congress defined "obligation" as "an established duty, whether or not fixed, arising from . . . statute or regulation." 31 U.S.C. § 3729(b)(3). As shown below, the legislative history confirms what the amendment's plain language declares: Congress intended to overrule the narrow interpretation of "obligation" exemplified in *ATMI* and to enforce "contingent, non-fixed obligations" as FCA obligations. SEN. REP. No. 111-10 at 14 and n.10.

## B.     The TSCA Statute.

To address concerns that some chemicals "may present an unreasonable risk of injury to health or the environment" (15 U.S.C. § 2601(a)(2)), Congress enacted TSCA and granted the EPA broad regulatory authority, including authority to prohibit or restrict the production or sale of such chemicals (*id.* at § 2605(a)). Congress also required that companies "immediately" submit to the EPA any information, called "substantial risk information" (SRI), "which reasonably supports the conclusion" that a chemical the company makes or sells "presents a substantial risk of injury to health or the environment" unless the company "has actual knowledge that the [EPA] has been adequately informed of such information." *Id.* at § 2607(e). TSCA provides that a company "shall be liable" to pay a significant monetary penalty for "each" failure to submit the SRI, and additionally "shall" be liable to pay that same penalty amount for "each day" the failure continues. 15 U.S.C. § 2615(a).

Thus, TSCA establishes a fixed property-transmission duty – the reporting duty is mandatory ("shall") and must be satisfied in a fixed timeframe ("immediately"): "[the company] shall immediately inform [the EPA] of such information." 15 U.S.C. § 2607(e). Further, TSCA establishes a partially contingent or "not fixed" money-payment duty – the violator incurs automatic liability immediately upon committing the violation even though the penalty's exact amount and assessment remains subject to government discretion: "Any person who violates a provision . . . shall be liable . . . for a civil penalty." 15 U.S.C. § 2615(a).

**C.     The CAP Agreement.**

On February 1, 1991, the EPA announced the Compliance Audit Program ("CAP"), designed as an amnesty to "encourage companies to voluntarily audit their files for studies reportable under [TSCA] Section 8(e)." Registration and Agreement for TSCA Section 8(e) Compliance Audit Program, 56 Fed. Reg. 4128, 4128-4129, Unit I.3. (February 1, 1991) ("CAP Agreement"), AC at ¶ 896, Ex. 26. Each participating company agreed to sign and return the CAP Agreement; to audit its SRI reporting compliance and to submit all previously unsubmitted SRI, in return for which the EPA agreed to reduce significantly the reporting penalties for each submitted report; and to cap the total reporting penalties for all previously unsubmitted SRI at $1 million. AC ¶ 898-899; 56 Fed Reg. at 4129-4130, Unit II.B.1 – II.B.3.

Additionally, each defendant agreed that breach of its contractual obligations would subject it to two separate money-payment obligations. First, it would forfeit the amnesty reductions it had received for any SRI it had submitted under CAP and be required to pay full penalties as assessed by EPA for that SRI. AC at ¶ 910. Second, it would be required to pay full penalties as assessed by EPA for any SRI the company failed to submit under CAP. AC at ¶ 911. Importantly, as to each of these obligations, each company "waive[d] its right to request a judicial or administrative hearing on any issue of law or fact that has arisen or may arise"

8

whether during the CAP itself or "in any subsequent proceeding . . . including but not limited to the Regulatee's right under TSCA section 16(a)(2) [15 U.S.C. § 2615(a)(2)] to request a hearing." AC Ex. 26 at 4129, Unit II.A.5. Since the TSCA Section 16(a)(2) hearing is the defendant's only opportunity to challenge the EPA's determination of the penalty's amount, the CAP Agreement imposes automatic liability for damages unilaterally set by EPA. Moreover, because each defendant's right to seek appellate review of a penalty is conditioned on a prior request for a Section 16(a)(2) hearing (15 U.S.C. § 2615(a)(3)), each defendant also waived its right to appeal the EPA's determination.

**D.     Defendants' Fraudulent Conspiracy.**

Between at least 1979 and 2003, defendants developed and obtained at least ten distinct items of SRI, comprising medical and scientific information that their isocyanate chemicals can cause and had caused permanent respiratory injury to humans through two publicly unknown routes – skin contact (dermal induction) and inhalation below regulatory exposure limits (low-level inhalation). AC at ¶¶ 9, 11. KBT&F identified and describes these ten items of SRI – the "Concealed SRI" – in paragraphs 174-799 of its AC. Each defendant knew the EPA was not adequately informed of this information and that the information constituted SRI that they were required to submit to EPA. AC at ¶¶ 9, 11.

During the time defendants were obtaining the Concealed SRI, they were also meeting to discuss and implement an agreement to conceal that information from regulators and the public. Shortly after Bayer had obtained the first item of Concealed SRI in 1979 (AC at ¶ 184), it held three separate meetings with BASF and Dow (between 1980 and 1982) in which they agreed to conceal certain hazard information from regulators and the public by harmonizing the hazard disclosures in their federally-required Material Safety Data Sheets (MSDS) (AC at ¶¶ 1039-1050). In August 1982, BASF, Bayer, and Dow "agreed to exchange their MSDSs 'to assure' the

harmony of the content." AC at ¶ 1050. Huntsman joined the concealment conspiracy by February 1987 and agreed at a February 3, 1987 meeting to exchange isocyanate MSDSs with its co-defendants. AC at ¶¶ 1051-1052. After attending or receiving minutes of two other meetings at which harmonization efforts were discussed, all four defendants met again in January 1990 to discuss efforts to "standardize 'language' and format" of MSDSs and labels. AC at ¶ 1062.

A few years earlier, as they were obtaining the bulk of the Concealed SRI, defendants, through their industry trade group the International Isocyanate Institute (III), had been "striv[ing]" to reach an "agreed position" about toxicity data. AC at ¶ 1054-1055. Their ensuing actions, including their collective failure to report this SRI to the EPA and their actions to "harmonize" their hazard disclosures, "strongly suggest[] that the III's 'agreed position' was to conceal that information." AC at ¶ 1055. Indeed, KBT&F specified the precise conspiratorial agreements the defendants made about the harmonized content of their respective "wholesale-level" and "retail-level" health-effect disclosures (AC at ¶ 1070) and then detailed how the defendants executed the conspiracy by harmonizing their MSDSs and labels to implicitly or explicitly deny the existence of the SRI they had agreed to conceal (AC at ¶¶ 1066-1107).

Defendants also conspired to conceal the SRI from federal regulators. In June 1998 defendants discussed regulatory interest the potential for dermal induction risk, the human evidence of which defendants were concealing. AC at ¶ 1103. Shortly after that meeting, and as the defendants re-energized their harmonization efforts (AC at ¶¶ 1098-1102, 1106), BASF and Dow downgraded their MSDS skin contact disclosures to harmonize with those of Bayer and Huntsman. AC at ¶ 1105. Thus, defendants conspired to use their "MSDSs and product labels to publicly conceal the existence of [the Concealed SRI]" both to "avoid or deflect anticipated regulatory scrutiny and to maintain their substantial isocyanate profits." AC at ¶ 1107.

KBT&F also alleged in detail how each defendant's TSCA concealment fraud mirrored that of its co-conspirators, evidencing coordinated, conspiratorial action. Defendants obtained Concealed SRI items collectively while meeting together (AC at ¶¶ 214, 247, 305, 366, 434, and 737) and then all declined to report it, both individually and collectively. Further, the defendants collectively received communications that should have prompted reminders of their Concealed SRI (AC at ¶ 933-1007), but they all refused to report and continued to conceal it. For example, by June 2001, the defendants obtained information that a single drop of isocyanate on the skin would create systemic exposure exceeding the inhalation exposure thresholds. AC at ¶ 983. This information "should have provided each defendant with a heightened awareness of the significance of the dermal-induction health effect [SRI] each had previously obtained or developed." AC at ¶ 984. Yet though they communicated about this "one-drop" information (AC at ¶ 983 and Ex. 69), all declined to report the Concealed SRI.

Further, each defendant entered into a contract with the EPA obligating it to audit and correct its past reporting compliance in exchange for a significant reduction in penalty liability for any corrected reporting. AC at ¶ 956. From the background information the EPA provided when it announced the Compliance Audit Program (CAP), each defendant knew or should have known that the EPA instituted CAP to obtain SRI that it suspected some regulated companies had failed to report. AC at ¶ 952. Despite certifying their compliance with the audit and submission obligations, each defendant failed to submit the SRI (AC at ¶¶ 957, 1489, 1493, 1515, 1537, and 1559), not only breaching their contractual obligations but also falsely concealing their money-payment and property-transmission obligations. In these circumstances, each defendant's breach was "willful and calculated to conceal the [SRI] from the EPA."  AC at ¶¶ 954, 960-963.

All of the defendants failed to report the Concealed SRI, which comprised evidence of likely *human* injury, even though they collectively submitted to the EPA the results of *animal* studies that they claimed were equivocal on the causal link. In June 1992, the defendants collectively submitted, through the III, an animal study concluding that respiratory effects in guinea pigs "*may* result from dermal exposure to MDI." AC at ¶ 1031 (emphasis added). Yet during the six months preceding that submission, the defendants had obtained SRI that "dermal contact was *the likely source* of human sensitisation to MDI." AC at ¶ 1033 (emphasis added). Thus, defendants collectively submitted SRI about *possible* dermal induction in *animals*, but collectively concealed information about "*likely*" dermal induction in *humans*.

Defendants also coordinated to publicly dispute the very health hazards their Concealed SRI confirmed by continuing their coordinated campaign to dispute these health hazards in their MSDSs and labels, and through misrepresentations directly to the EPA in 1984, 1993, and 2013 (discussed below at 12-13, 53-54) and in a paper published in 2002. AC at ¶¶ 1108-1119.

Defendants continued their concealment actions even after learning in May 2010 of expert testimony confirming that the hazard information they were concealing was in fact SRI required to be submitted to the EPA. AC at ¶¶ 932, 1120-1129. KBT&F worked closely with this expert in prosecuting product liability claims against these defendants. AC at ¶¶ 1120-1123. He possessed extensive TSCA compliance experience and had chaired the industry task group that worked with EPA to develop TSCA Section 8(e) compliance guidance. AC at ¶ 1124. KBT&F does not have access to these defendants' communications about this testimony, but alleged on information and belief that they discussed the testimony's implications. AC at ¶¶ 932 and 1127. All defendants subsequently continued to conceal the SRI despite learning of this expert

testimony that confirmed their reporting obligation, strongly suggesting that those discussions led to an agreement to continue their concealment conspiracy. AC at ¶¶ 932 and 1128-1129.

Defendants also actively concealed the SRI by falsely assuring the EPA that no such information existed. In their most recent misrepresentation to the EPA, defendants collectively commented on the EPA's proposed MDI Action Plan, through the Diisocyanates Panel of the American Chemistry Council. AC at ¶ 1116 and Ex. 3. In that February 26, 2013 letter, defendants collectively made a statement to the EPA that directly contradicts the dermal induction SRI they are concealing (AC at ¶ 1116) and represented that they were not aware of SRI about the low-level inhalation health effect (AC at ¶ 1119). Thus, defendants coordinated to further their conspiracy to conceal from the EPA their prior statutory and contractual reporting violations as well as their liability for statutory penalties and contractual damages. *See also* AC at ¶¶ 1723-1748. Moreover, by preparing and sending this letter, defendants committed a separate violation of the FCA (AC at ¶¶ 1721-1748 and Count IV) by "knowingly mak[ing], us[ing,] or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

## ARGUMENT

I.   **EACH DEFENDANT CONCEALED OR IMPROPERLY AVOIDED STATUTORY MONEY-PAYMENT OBLIGATIONS**

Defendants primarily challenge KBT&F's claims on the erroneous contention that TSCA penalties are not FCA obligations, despite the text and purpose of the 2009 FERA amendments. Defendants rely heavily on the Fifth Circuit's recent decision in *Simoneaux*, which defendants claim "precisely tracks the analysis in Defendants' motion to dismiss." Notice of Supplemental Authority, D.E. 111 at 2. But the *Simoneaux* court's central holding (and defendants' central argument) – that "the duty to pay [TSCA] penalties is not 'established' until the penalties are

assessed" (2016 U.S. App. LEXIS 22117 at *14) – is directly contrary to this Circuit's binding precedent, which holds that "liability for the penalty attaches at the moment of the violation." *3M*, 17 F.3d at 1461. Further, the FCA defines a payment obligation as an "established duty, *whether or not fixed*," but the *Simoneaux* court essentially read "whether or not fixed" out of the statute when it decided that the EPA's discretion to remit the penalty prevented the duty to pay from being an "established" duty. *Simoneaux,* 2016 U.S. App. LEXIS 22117 at *15. In any event, the *Simoneaux* court did not consider EPA regulations that make that remission discretion inapplicable, at least as to the penalties here. As shown below (21-22), the EPA's own regulations make clear that it must impose a penalty on each defendant that is not less than the economic benefit the defendant gained from its non-compliance, and each defendant here gained a substantial economic benefit. AC at ¶¶ 882-886.

The unambiguous language of the FCA, as amended by FERA, defines as FCA obligations those statutory penalties for which a defendant's liability is "established" even though aspects of that liability, such as its amount or enforcement, remain "not fixed," that is, contingent on further action. The legislative history of FERA confirms FERA's plain language – that Congress legislatively overruled restrictive court decisions and supplanted them with a statutory definition requiring the enforcement of "contingent" obligations, which those overruled decisions had defined as obligations "that will arise only after the exercise of discretion of government actors." *ATMI*, 190 F.3d at 738. The FCA therefore covers obligations like TSCA's penalties, for which defendants' liability is established, even if subject to the exercise of some governmental discretion.

**A.     The FCA's plain language unambiguously defines FCA "obligations"
to include TSCA's reporting and penalty-payment duties.**

**1.     The FCA defines "obligation" to include some contingent duties.**

The FCA's reverse false claims provision prohibits the knowing concealment or the

knowing and improper avoidance of an "obligation" to pay money or transmit property to the

Government. 31 U.S.C. § 3729(a)(1)(G). The 2009 FCA amendments define "obligation" as "an

established duty, whether or not fixed, arising from" one of four situational categories. 31 U.S.C.

§ 3729(b)(3). "Whether or not fixed" and "established" both modify "duty," and must therefore

complement, rather than contradict, each other. Thus, an "established duty" necessarily includes

at least some duties that are "not fixed." Further, a duty cannot be excluded as an "established

duty" solely because it is "not fixed." Any other reading would improperly allow the modifier

"established" to nullify its complementary modifier "whether or not fixed."

As defendants recognize, an "established" duty is one "already made, formed, or brought

into existence." Def. Br. at 15, citing *Black's Law Dictionary* 664 (10th ed. 2014). Since

"established" concerns the duty's creation or existence, "whether or not fixed" must necessarily

concern something post-dating its creation. The adjective "fixed" means "not subject to change

or fluctuation." http://www.merriam-webster.com/dictionary/fixed (last visited 1/15/2017).

Merriam-Webster defines to "fix" as "to give a permanent or final form to."

https://www.merriam-webster.com/dictionary/fix (last visited 1/15/2017). Thus, "whether or not

fixed" concerns the duty's post-creation transformation into final, permanent form. Congress,

then, explicitly defined an FCA "obligation" to encompass an existing ("established") duty

whose permanent, final form is subject to change (is "not fixed").

The phrase "whether or not fixed" is absolute and contains no internal limitation on the

scope of "fixing" or contingency allowed. That scope is circumscribed instead by the

requirement that the duty also be "established." So long as the duty exists or is "established," the degree of "fixing" employed to transform the duty into permanent and final form will not exclude it from constituting an FCA obligation. And that "fixing" or transformation is necessarily contingent on the discretion of those who will determine that duty's permanent and final form. Thus, the phrase "whether or not fixed" necessarily indicates that a duty can be "established" even though it remains contingent on the discretion of government actors.

Arguing that "whether or not fixed" relates only to the payment duty's amount, defendants focus exclusively on a single sense of the definition of "fix": "[t]o announce (an exchange price, interest rate, etc.) <interest was fixed at 6%>." Def. Br. at 16, citing *Black's Law Dictionary* at 754. Even that narrow sense of the word embodies contingency, the process of individuals making more precise an arrangement that pre-existed the "fixing." A payment duty fixed in all particulars except its amount, for example, remains contingent on the discretion involved in "fixing" that amount. But the statute's text nowhere limits the scope of allowable contingency to a determination of the precise payment amount, as defendants erroneously suggest (Def. Br. at 16). Instead, as discussed above, the statute expressly includes all "not fixed" duties, so long as they are also "established" duties.

The word "fix" is typically understood to have much broader meaning than simply setting an amount, for its conventional definition is "to give a permanent or final form to." (See above at 15). Black's Law Dictionary reflects that broader meaning in its second definition of to "fix" as "[t]o establish (a person's liability or responsibility) <you cannot fix liability on the defendant without evidence>." *Black's Law Dictionary* at 754. Since the definition's example pictures "fixing" as presenting evidence to demonstrate a defendant's responsibility, "establish" appears here to mean "prove" rather than "create." This sense of the word "fix," which defendants

neither reference nor discuss, expressly encompasses enforcement and fact-finding activity, indicating that an "unfixed" duty can be a duty that remains contingent on, among other things, government enforcement discretion and proof of responsibility to a fact-finder.

The FCA's text demonstrates that Congress intended this broader meaning of "fixed" here. Indeed, defendants' proposed interpretation requires this Court to add words to the statute. The statute reads "an established *duty*, whether or not fixed" rather than, as defendants prefer, "an established duty, whether or not *its amount is* fixed." Defendants' reading requires "not fixed" to modify the words they seek to add to the statute ("its amount") rather than the word that is in the statute ("duty"). But the statute permits *the duty itself* to be "not fixed." The *duty itself* is the legal obligation or imperative, while the duty's *amount* is merely one of the duty's many attributes. A "not fixed" attribute might be the duty's payment amount or timing, but a "not fixed" *duty* – the legal obligation itself – must necessarily be an underlying obligation not yet permanent or final, awaiting and contingent on the exercise of discretion for that transformation.

In an FCA opinion one year prior to the 2009 FCA amendments, the D.C. Circuit understood "fixed" in this exact sense, for it contrasted "fixed" FCA obligations with obligations based on "some future or contingent liability." *Hoyte,* 518 F.3d at 69, n.6. Additionally, this Court recently observed that, by amending the FCA to define the term obligation to include "fixed and contingent duties owed to the Government," Congress appears to have intended "to explicitly overrule the set of decisions" – including *Hoyte* – that had excluded FCA liability for fraud as to "future or contingent dut[ies]." *Hicks v. District of Columbia*, CA No. 15-1828 (CKK), D.D.C. (Apr. 28, 2016), 2016 U.S. Dist. LEXIS 56372 at * 18. And as shown below (28-29), the legislative history confirms that Congress understood and used the phrase "not fixed" to reference the duty's contingent nature.

In sum, while the phrase "established duty" fails to exclude all contingent obligations subject to government discretion, the phrase "whether or not fixed" expressly includes them. An "established duty" therefore necessarily includes some contingent or "not fixed" duties whose enforcement or assessment remain contingent or dependent on government discretion. The unambiguous language of the statutory text itself directly refutes the defendants' argument (Def. Br. at 16), as well as the *Simoneaux* court's holding (*Simoneaux*, 2016 U.S. App. Lexis 22117 at * 7-8) that the phrase "whether or not fixed" means merely to set the amount to be paid.

    **2.**       **TSCA "establishes" a duty both to transmit property and to pay money.**

           **a.**       **TSCA creates an established duty to transmit property,
and that duty is fixed in all particulars.**

In TSCA's "Section 8(e)" (15 U.S.C. § 2607(e)), Congress established a mandatory, fixed, and continuing duty for chemical manufacturers, processors, and distributors to report to the EPA each item of non-exempt SRI they receive. Congress used language that emphasized both the mandatory and fixed nature of the duty:  "[the company] shall immediately inform [the EPA] of such information."  15 U.S.C. § 2607(e). "Shall" establishes that the reporting duty is mandatory, while "immediately" establishes a fixed time frame for the duty's discharge.

TSCA provides that a company failing to discharge its mandatory reporting duty "shall be liable" to pay a significant monetary penalty for "each" reporting failure, and additionally "shall" be liable to pay that same penalty amount for "each day" the reporting failure continues. 15 U.S.C. § 2615(a). By imposing an automatic penalty, in a significant amount that increases each day the violation continues, the provision emphasizes that the reporting duty is mandatory and continuing, and that it must be discharged within a short, fixed time frame.

### b.   TSCA creates an established duty to pay money, and that duty is fixed as to the violator's liability but unfixed in other particulars.

TSCA's penalty provision not only emphasizes the fixed nature of the *reporting* duty, it also establishes fixed liability for the *money-payment* duty. Specifically, Congress established automatic civil-penalty liability for any company that fails timely or entirely to discharge its TSCA reporting duty. Congress declared that such a company "shall be liable" to pay a significant monetary penalty for "each" reporting failure, and additionally "shall" be liable to pay that same penalty amount for "each day" the reporting failure continues. 15 U.S.C. § 2615(a).

By declaring that a violator "shall be *liable*" to pay a penalty, Congress imposed an "established duty" or an "obligation" to pay, because "liable" means "[r]esponsible or answerable in law; legally *obligated*." *Black's Law Dictionary* at 1055 (emphasis added). "Shall" establishes the automatic nature of a violator's obligation to pay the penalty ("*shall* be liable"). And the violator incurs that automatic obligation immediately upon committing the violation: "Any person who *violates* a provision . . . shall be liable . . . for a civil penalty." 15 U.S.C. § 2615(a) (emphasis added). Moreover, automatic liability for an increased penalty amount attaches on the next day – a similarly fixed date – and consecutively every day thereafter until the violation ceases, because each day the violation continues "*shall*, for purposes of this subsection, constitute a separate violation." 15 U.S.C. § 2615(a) (emphasis added).

Since "liable" means "legally obligated," the statute's phrase "shall be liable" means "is legally obligated." And the provision unambiguously states that the violator is "liable" or obligated "for a civil penalty." The D.C. Circuit agrees with this conclusion, having held that the statute's language means that automatic liability attaches on a fixed date and at a fixed time: "*liability for the penalty* attaches at the moment of the violation." *3M*, 17 F.3d at 1461 (emphasis added). Under TSCA, the violator's civil-penalty *liability* – its payment *obligation* – is

established automatically on a fixed date, and remains constantly established from that date, even though the civil penalty's exact *amount*, which is increasing daily, remains to be fixed. TSCA, then, imposes an "established duty" to pay the civil penalty.

The scope of the EPA's penalty-enforcement discretion reinforces the payment-duty's "established" nature. Congress authorized the EPA to "compromise, modify, or remit, with or without conditions, any civil penalty which may be imposed under this subsection." 15 U.S.C. § 2615(a)(2)(C). The power to "compromise, modify, or remit" necessarily presumes a pre-existing obligation. Since the EPA can "compromise, modify, or remit" a penalty only if the violator's payment duty already exists, the payment duty necessarily pre-exists the EPA's exercise of discretion. Thus, TSCA grants EPA no power to create or "establish" the duty, but rather grants discretion to "fix" the duty already established by the TSCA statute itself.

The *Simoneaux* court erroneously reasoned that the EPA's remission power refuted any contention that the violator had been liable for a penalty in the period between the violation and the remission. *Simoneaux*, 2016 U.S. App. LEXIS 22117 at *14-15 and n. 22. Rhetorically asking "But liable for what?" the court rejected relator's explanation, which it characterized as "some amorphous duty to pay a penalty somewhere between $0 and $37,500 per day, notwithstanding the fact that the EPA ultimately adjudicated the value at zero." *Id.* at *15, n. 22. But the same rhetorical question could be asked about any penalty whose amount is not yet set, and an "amorphous" answer by this reasoning means its rejection as an FCA obligation. Yet the *Simoneaux* court ruled inconsistently with that reasoning, conceding, as do defendants (Def. Br. at 16), that an FCA obligation need not be for a set sum. 2016 U.S. App. LEXIS 22117 at *9. Regardless, by requiring the particulars of the payment liability to be known before the payment duty is established, the *Simoneaux* court reads "whether or not fixed" completely out of

the statute. The possibility that EPA might at some point remit the penalty does not prevent the violator's legal obligation for the penalty from arising at the time of violation. Such a reading fails to appreciate the statute's unambiguous text as well as its legislative history (discussed below at 24-31).

Importantly, however, the *Simoneaux* court's reasoning does not apply here because the EPA has made clear that in exercising its discretion it must impose a penalty at least equal to the economic benefit gained: "[i]n *no case* should the final penalty imposed be less than the economic benefit . . . [the violator] derived from non-compliance." AC at ¶ 875; The Enforcement Response Policy for Reporting and Recordkeeping Rules and Requirements for TSCA Sections 8, 12 and 13, U.S. Environmental Protection Agency, at 16 (1999) ("TSCA Enforcement Response Policy") (emphasis added). When, as here, the violator's non-compliance allows it to sell products that "are more attractive to the consumer" by, among other things, "[s]elling products without required labelling or warnings," the economic benefit includes "the net profits made from the improper transactions." AC at ¶ 876; A Framework for Statute-Specific Approaches to Penalty Assessments: Implementing EPA's Policy on Civil Penalties, EPA General Enforcement Policy #GM-22, at 10, February 16, 1984.

As summarized above (9-10), defendants harmonized their products' hazard warnings by excluding any disclosure of the Concealed SRI. Defendants intended their harmonization not only to conceal the SRI from the EPA, but also to "prevent EH&S [Environmental, Health, and Safety] issues from causing de-selection of [their products] in the next 5-10 years." AC at ¶ 1106; AC Ex. 63 at BASF-028658. They concluded that, "if [the] III [harmonization] effort continues," the industry would be "successful" in preventing the "asthma/sensitization" evidence from causing end-user product de-selection. AC at ¶ 1106, AC Ex. 63.

Thus, each defendant's TSCA violation provided it with a significant economic benefit comprising some or all of its net profits during its non-compliance period, which continues through today. AC at ¶¶ 882-886. Because the EPA has made clear that it must impose a penalty that is "not less than the economic benefit," it cannot completely remit defendants' penalties.

Of course, the EPA has not remitted any of these penalties and these defendants therefore remain liable – "legally *obligated*" – for those penalties. And even assuming against the evidence the EPA had authority to completely reduce these penalties to zero, defendants would still remain liable under the FCA. During the period addressed in the AC and continuing through a hypothetical penalty remission, these payment duties were and are established but yet unfixed duties – FCA obligations. Thus, defendants have been concealing and avoiding FCA obligations and thus violating the FCA, and a hypothetical remission would not excuse defendants' prior fraudulent violations. And even though the hypothetical remission might reduce the defendants' *TSCA* penalties to zero, defendants would all still remain liable for the *FCA* penalties, because an FCA violation occurs regardless of whether the Government suffers damages. *U.S. ex rel. Davis v. Dist. of Columbia*, 679 F.3d 832, 839 (D.C. Cir. 2012). Thus, KBT&F's FCA claims must survive defendants' motion even accepting *Simoneaux's* erroneous view about remission.

### 3. The property-transmission and penalty-payment obligations are FCA obligations "arising from an . . . implied contractual . . . relationship."

The amended FCA defines the term "obligation" as "an established duty, whether or not fixed, arising from" one of four situational categories, including "an express or implied contractual . . . relationship." 31 U.S.C. § 3729(b)(3). Here, defendants' TSCA reporting and penalty-payment duties arise from an implied contractual relationship.

As alleged in detail in the AC, TSCA establishes an implied contractual relationship between each defendant and the Government with respect to Section 8(e) reporting. AC at ¶¶

1194-1199. The Government provides to each defendant a privilege or benefit (the legal ability to continue selling or distributing isocyanates) that is dependent, in part, on the defendant's compliance with its TSCA obligations. *Id*. at ¶ 1199. Congress provided EPA with broad authority to prohibit, limit, or restrict the manufacture and sale of chemicals to prevent unreasonable risks, and required chemical manufacturers to inform the EPA about the risks of their chemicals. AC at ¶¶ 1195, 1196. Thus, each defendant's ability to manufacture or sell a chemical is a privilege or benefit that the EPA can withdraw, limit, or restrict. *Id.* at ¶ 1196.

Each defendant therefore has an implied contractual relationship with the Government, under which the Government provides each defendant with the privilege to manufacture and sell chemicals that do not present an unreasonable risk of harm, in exchange for which each defendant must discharge an immediate, ongoing duty to inform the EPA of information that reasonably supports the conclusion that its chemical presents a substantial risk of injury to health or the environment. Defendants' SRI reporting plays a central and vital role in this relationship.

Furthermore, certain statutory relationships create FCA obligations: "The "reverse false claims" provision encompasses within its scope those obligations owed to the government (under statute, regulation, contract, or quasi-contract) arising from the provision of some privilege, right or benefit in return for which the recipient owes money or property." *ATMI*, 190 F.3d at 740 (quoting the Government's amicus brief). The *ATMI* court recognized that "the government's position has some force," but decided to "leave for a more appropriate case the status of those obligations arising from the provision of 'rights, privileges, or benefits,' and those obligations created by statute or regulation that are 'essentially contractual in nature.'" *Id.* at 741.

Such a relationship exists here, and it provides an independent FCA basis for KBT&F's reverse false claims. The legislative history of the 2009 amendments, and especially Congress's

expressed intention to correct *ATMI* and to authorize reverse false claims for the improper

avoidance of statutory obligations indicate that FCA "obligations" now include, at a minimum,

those statutory or regulatory obligations that arise from the government's provision of a right,

privilege, or benefit, as the Government argued in *ATMI*.

**B.      The legislative history confirms that Congress intended FCA "obligations" to include the type of property-transmit and money-payment duties imposed by TSCA's Section 8(e).**

   **1.      Congress has consistently declared its intent for courts broadly to apply the FCA to reach all fraud against the Government.**

The United States Supreme Court has observed that "[d]ebates at the time [Congress

enacted the FCA in 1863] suggest that the Act was intended to reach all types of fraud, without

qualification, that might result in financial loss to the Government." *U.S. v. Neifert-White Co.*,

390 U.S. 228, 232 (1968). Accordingly, "[i]n the various contexts in which questions of the

proper construction of the Act have been presented, the Court has consistently refused to accept a

rigid, restrictive reading." *Id.*

Yet since that 1968 Supreme Court pronouncement, Congress has twice amended the

FCA to correct certain decisions' restrictive application of reverse false claims liability. In 1986,

Congress added the reverse false claims provision to correct decisions that had refused to apply

FCA liability to a person who falsely "attempts to defeat or reduce the amount of a claim *or*

*potential claim* by the United States against him."  SEN. REP. NO. 99-345, 99th Cong., 2d Sess. at

18 (July 28, 1986) ("SEN. REP. NO. 99-345") (emphasis added).

Both the House and Senate Judiciary Committee reports on the 1986 amendments

establish that Congress intended the reverse false claims provision to have broad application. The

Senate Committee "strongly endors[ed]" the Supreme Court's statement that the FCA "was

intended to reach all types of fraud, without qualification, that might result in financial loss to the

Government." SEN. REP. NO. 99-345, quoting *Neifert-White*, 390 U.S. at 232. The House

Judiciary Committee stated that "[t]he Government should have the ability to collect all losses

suffered through fraud."  H.R. REP. NO. 99-660, 99th Cong., 2d Sess. at 20 (June 26, 1986).

### 2.    Congress again amended the FCA in 2009 to ensure broad FCA application.

Congress in 2009 again amended the statute to correct certain decisions' narrow

enforcement. Presenting the proposed amendments to the House, Rep. Berman stated:

> In sum, Congress intended the False Claims Act to protect *all* Government funds
> and property, *without qualification or limitation*. However, over the years, some
> courts have incorrectly grafted limitations to the reach of the Act, leaving billions
> of dollars vulnerable to fraud. . . . The primary impetus for the current corrective
> legislation is to reverse these unacceptable limitations and restore the False
> Claims Act to its original status as the protector of *all* Government funds or
> property.

155 CONG. REC. E1296 (daily ed. June 3, 2009) (Statement of Rep. Berman) (emphasis added).

Representative Berman reported that the amendments would "clarify the true intent of the False

Claims Act and [] send a clear message that *all* government funds should be protected from

fraud." *Id.* at E1295 (emphasis added).

The Senate similarly articulated its intention to apply the FCA broadly to protect all

government funds from fraud. Because FERA's 2009 FCA amendments were drawn in

significant part from, and were therefore similar to those favorably reported by the Senate

Judiciary Committee in the False Claims Act Corrections Act of 2008, the Committee indicated

that its report on that 2008 bill "should be read as a complement to" its report on the 2009

amendments. SEN. REP. No. 111-10 at 10, n.2. In that 2008 report, the Committee declared that

"this legislation makes clear that the FCA protects *all* Federal funds." SEN. REP. NO. 110-507,

110th Cong., 2d Sess. at 9 (Sept. 25, 2008) (emphasis added).

**3.     The legislative history confirms that Congress intended to bring back within the FCA's reach those "contingent" obligations *ATMI* had rejected – obligations contingent on government discretion.**

Thus, in its 2009 FCA amendments Congress legislatively overruled several restrictive decisions that failed to protect *all* federal funds and property, including decisions in which courts had refused to impose FCA liability for the concealment of "potential" or "contingent" obligations. The Sixth Circuit approvingly summarized this line of restrictive decisions: "The obligation [to the government] cannot be merely a potential liability . . . . [but rather] must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed." *ATMI,* 190 F.3d at 735. Both the Senate and the House expressly criticized the *ATMI* decision and identified it as the impetus for Congress's decision to supplant the restrictive, court-generated definition of FCA "obligation," which excluded contingent obligations, with a broad statutory definition that included contingent obligations.

After noting that "this legislation addresses current confusion among courts that have developed conflicting definitions of the term "obligation" in Section 3729(a)(7)," the Senate Judiciary Committee declared that Congress was enacting a statutory definition "in response to" the *ATMI* court's decision "to apply reverse false claims to only fixed obligations." SEN. REP. No. 111-10 at 14 and n.10 (Senate); *See also* 155 CONG. REC. E1299 (daily ed. June 3, 2009) (Statement of Rep. Berman) (House). And this Court recently observed that the FERA amendments appear to "explicitly overrule" *Hoyte*. *Hicks,* 2016 U.S. Dist. LEXIS 56372 at * 18. Accordingly, the nature of the "contingent obligations" that the *ATMI* court erroneously excluded from the FCA's reach necessarily indicates the minimum scope of the contingent obligations Congress legislatively brought back within the FCA's reach in the 2009 amendments.

The *ATMI* court rejected a reverse false claim that defendants had fraudulently concealed or avoided their obligation to pay statutory penalties, duties, and liquidated damages arising from

their fraudulent violation of customs laws. *ATMI*, 190 F.3d at 732, 741-742. The court rejected those claims, ruling: "Contingent obligations—those that will arise only after the exercise of discretion of government actors—are not contemplated by the [FCA]." *Id.* at 738. The court explained that "as opposed to quasi-contractual obligations created by statute or regulation (such as the imposition of a standard mailing rate), contingent obligations (such as the imposition of a civil penalty for an antitrust violation) attach only after the exercise of administrative or prosecutorial discretion, and often after a selection from a range of penalties." *Id*.

Congress must be presumed to have understood how *ATMI* defined "contingent obligations" when it specifically overruled that decision and explicitly stated that "contingent obligations" were FCA obligations under its new definition. Indeed, the Senate twice used the term "contingent" in describing the scope of the new definition: FCA obligations "include[] fixed and contingent duties owed to the Government" (SEN. REP. No. 111-10 at 14) and "the new definition of 'obligation' expressly includes contingent, non-fixed obligations" (*id*.). And the House used the term even *after* the Senate's adoption of Senator Kyl's revision (155 CONG. REC. E1299), on which defendants rely (Def. Br. at 18-19), as discussed below (29-31).

The argument by defendants (Def. Br. at 18) and the *Simoneaux* court (2016 U.S. App. LEXIS 22117 at * 9) – that the legislative history shows that Congress only intended to resolve a dispute among courts as to whether the obligation's amount must be fixed – is unavailing and contradicts Congress's particularized criticism of *ATMI* and its insistence that the new definition included "contingent obligations." The legislative history confirms that Congress intended the amended FCA to reach the contingent obligations that the *ATMI* court had excluded.

4.    **The legislative history confirms Congress intended the term "not fixed" to mean those duties contingent on government discretion, while "fixed" duties include even those duties unfixed in amount.**

Importantly, in the Senate Judiciary Committee's Report explaining the 2009 amendments' new definition, the Committee referenced both liquidated and unliquidated obligations as "fixed" obligations: "The term "obligation" is now defined under new Section 3729(b)(3) and includes fixed and contingent duties owed to the Government—including *fixed liquidated obligations* such as judgments, and *fixed, unliquidated obligations* such as tariffs on imported goods." SEN. REP. No. 111-10 at 14 (emphasis added).

"[L]iquidated" here must refer to ascertaining the obligation's precise amount. Since the Committee stated that both "fixed liquidated obligations" and "fixed, unliquidated obligations" were included in the new definition of obligation, it considered an obligation "fixed" even if its precise amount had yet to be ascertained. Thus, the Committee necessarily used the term "not fixed" to reference an attribute other than the precise determination of the obligation's amount.

In the report's next sentence, the Committee indicated that non-fixed means contingent: "the new definition of 'obligation' expressly includes *contingent, non-fixed* obligations." SEN. REP. No. 111-10 at 14 (emphasis added). The Committee then directly contrasted "fixed" and "contingent" obligations, stating that Congress was "including contingent obligations" in the new definition to overrule those decisions that had required a "fixed obligation." *Id.* The Committee similarly contrasted the two types of obligations when it explained the new definition: "The term "obligation" is now defined under new Section 3729(b)(3) and includes *fixed* and *contingent* duties owed to the Government. . . ." *Id.* (emphasis added). By repeatedly contrasting "fixed" and "contingent" obligations, the Committee indicated that the terms describe opposite attributes of an obligation, such that a "fixed" obligation is "non-contingent" while a "not fixed" obligation

is "contingent." Thus, when Congress defined obligation to include "an established duty, whether or not fixed," it used "not fixed" as a synonym for "contingent."

5.  **The plain meaning of the statute's language and the legislative history confirm that FCA obligations include contingent obligations such as TSCA's payment obligation, even though a revision to the definition of obligation substituted the phrase "whether or not fixed" for the word "contingent."**

Defendants (Def. Br. at 18-19) and the *Simoneaux* court (2016 U.S. App. LEXIS 22117 at *10-11) relied on an incomplete legislative history, for they failed to assess the House presentation of the amendment, which indicated that the definition of "obligation" encompassed contingent obligations even after the adoption of Senator Kyl's amendment. Further, they failed fully to assess how the revised explanation that accompanied the adoption of Senator Kyl's amendment conforms to the text of his proposed amendment, while his earlier explanation, on which both primarily rely (Def. Br. at 18 and *Simoneaux* at * 10-11), diverges from that text.

As originally proposed, the 2009 FCA amendments had defined "obligation" to mean:

a fixed duty, or a contingent duty arising from an express or implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, statutory, fee-based, or similar relationship, and the retention of overpayment.

SEN. REP. NO. 111-10 at 23. A Senate amendment revised this definition by, among things, replacing the phrase "a fixed duty, or a contingent duty" with "an established duty, whether or not fixed," so that the revised definition (subsequently enacted into law) reads:

The term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

155 CONG. REC. S45439 (daily ed. April 22, 2009) (Statement of Sen. Kyl).

Senator Kyl explained that this revised language, by removing the word "contingent," would prevent FCA claims seeking "to treble and enforce a fine before the duty to pay that fine

29

has been formally established." *Id*. at S4539. His revision therefore required that the payment duty be an "established duty." However, TSCA creates automatic and immediate liability ("shall be liable") for the penalty and thus each defendant's duty to pay "has been formally established." Senator Kyl's revision may have excluded some statutory penalties, but not TSCA's.

Senator Kyl had earlier expressed hope that the revision would "preclud[e] the possibility that conduct that makes a defendant liable for a penalty or fine could become actionable under this law before that *fine* is actually established *or* assessed." *Id*. at S4543 (emphasis added). Notably, while Senator Kyl in these earlier remarks referenced whether the *fine* itself is "established or assessed," his later explanation (quoted in the preceding paragraph) – the one that immediately preceded the Senate's confirmation of his proposed revision – required only that the "duty to pay that fine has been formally established." *Id*. at S4539. Similarly, his revision – which was enacted – requires only that the payment *duty* is established ("an established *duty*") and expressly excluded any requirement that the penalty itself be established or assessed ("whether or not fixed"). Thus, Senator Kyl's earlier remarks, which differ from his proposed revision and his explanation immediately preceding the vote, provide little if any guidance.

Further, Senator Kyl's earlier remarks indicate he recognized the distinction between a fine's *establishment* and its *assessment*. Specifically, he had expressed hope that his revision would preclude FCA claims for concealing or avoiding a fine "before that fine is actually established *or* assessed." *Id*. at S4543 (emphasis added). By distinguishing these two events, Senator Kyl indicated that a fine can be established before it is assessed. In his later remarks delivered at the time of the vote, however, he removed any reference to the fine's assessment and spoke only about precluding FCA claims for fines "before the *duty to pay* that fine has been formally established." *Id*. at S4539 (emphasis added). By omitting "or assessed" from this

30

explanation, he conformed his explanation to the text of his proposed revision, and thus demonstrated his recognition that a fine's *assessment* is included within the "fixing" of the fine itself and is not necessary to establish the *duty to pay* the fine. Regardless, the revised definition requires that the *duty*, not the *fine*, be "established," and, as discussed above (28-29), explicitly allows the *duty itself* to be "not fixed."

The presentation to the House of the bill as revised by Senator Kyl's amendment described the revised definition as still encompassing contingent duties: "The amendments also define the term "obligation" to include fixed *and contingent* duties owed to the Government." 155 Cong. Rec. E1299 (daily ed. June 3, 2009) (Statement of Rep. Berman) (emphasis added). The House presentation also reiterated that "[t]he amendments are intended to overrule the result reached in [*ATMI*] as applied to ad valorem duties imposed for import violations." *Id.* As discussed above (26-27), the *ATMI* court had rejected the claims regarding ad valorem duties because it found the payment obligation was contingent – subject to government discretion. The House report presenting the revised bill for approval stated clearly that the definition would embrace such claims, even after Senator Kyl's revision.

## C.     Case Law Does Not Support Defendants' Motion.

As the *Simoneaux* court observed, "few courts have seriously engaged with FERA's definition of 'obligation.'" *Simoneaux*, 2016 U.S. App. LEXIS 22117 at *11. Defendants cite several cases that suffer this defect, which "weakens [their] persuasive value" (*id.* at *12, n. 17), and their other cases are inconsistent with this Circuit's precedent and are based on incomplete information or analysis, as already discussed above (13-14, 27, 29-31) with respect to *Simoneaux*.

Three of defendants' cases are inapplicable because those courts found that the defendant's liability for the penalty or fine would "attach" or "arise" only after government

31

discretion and prosecution, in stark contrast to this Circuit's binding precedent that each defendant's "liability for the [TSCA] penalty *attaches* at the moment of the violation." *3M*, 17 F.3d at 1461 (emphasis supplied). In *U.S. ex rel. Nissman v. Southland Gaming of the Virgin Islands, Inc.*, No. 2011 0010 2016 WL 1317495 at * 15 (D.V.I. March 31, 2016), the court dismissed relator's claim because the putative obligation was "contingent on government discretion" (*id.* at *16), which it had earlier defined as "contingent obligations that '*attach* only after the exercise of administrative or prosecutorial discretion.'" *Id.* at * 15 (emphasis added). The Court in *U.S. ex rel. Schaengold v. Memorial Health, Inc.*, 2014 WL 6908856 (S.D. Ga. 2014) never indicated whether it was analyzing the pre- or post-FERA statute. Citing pre-FERA precedent, including the legislatively overruled *ATMI* decision, the court observed that the FCA did not cover contingent obligations that will "arise" (*id.* at * 16) or for which liability "attaches only after the exercise of administrative or prosecutorial discretion" (*id.* at *17). Regardless, the court acknowledged that its discussion of the nature of an FCA obligation was dicta, for it had already found a sufficient FCA obligation. *Id.* at *16.

Similarly, in *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, No. 12-1562-SLR, 2016 WL 4051266 (D. Del. July 26, 2016), the district court found that "*liability* [for the penalties] under these acts is contingent on the government's discretion to impose fines on defendants." *Id.* at *8 (emphasis added). Defendants contend that one of those reporting statutes has liability language similar to TSCA's – the violator "shall be liable" and the "penalty shall be assessed." Def. Br. at 30. But unlike TSCA, that statute expressly conditions liability on defendant being "found by the Secretary, or the Administrator . . . after notice and an opportunity for a hearing, to have [violated the statute]." *Moore,* 2016 WL 4051266 at *8, quoting 33 U.S.C.

§ 1908(b). These three cases are therefore inapplicable, because under TSCA liability for the penalties attaches at the violation and is not thereafter contingent. *3M*, 17 F.3d at 1461.

The statement defendants cite (Def. Br. at 20) in *U.S. ex rel. Boise v. Cephalon, Inc.*, CIV. A. 08-287, 2015 WL 1724572, at *3 n.1 (E.D. Pa. Apr. 15, 2015) is dicta that, in any event, conflicts with this Circuit's precedent. That court denied defendant's motion challenging relator's reverse false claims, but observed in a footnote that the phrase "whether or not fixed" referred only to whether the amount owed was fixed, therefore requiring all particulars other than the amount to be fixed. *Id.* at *3 n.1. The statement is dicta, for the court denied the dismissal motion "[r]egardless" of its view of the statutory language. *Id.* But as discussed above at 17, the *Boise* court's view conflicts with the view expressed by the D.C. Circuit one year prior to the FERA amendments – specifically that the "unfixed" nature of an obligation is linked to its contingency on government discretion. *Hoyte*, 518 F.3d at 69, n.6. And as shown above (28-29), the legislative history confirms that when it amended the FCA Congress used the phrase "not fixed" exactly as the *Hoyte* court did. Finally, the *Boise* dicta is also inconsistent with this Court's recent observation that by amending the FCA to define the term obligation to include "fixed and contingent duties owed to the Government," Congress appears to have intended "to explicitly overrule the set of decisions" – including *Hoyte* – that had excluded FCA liability for fraud as to "future or contingent dut[ies]." *Hick*s, 2016 U.S. Dist. LEXIS 56372 at * 18.

In *U.S. ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister,* CA 13-6000, 2014 WL 7274913 (E.D. La. Dec. 18, 2014), *aff'd*, 626 F. App'x 528 (5th Cir. 2015), the court merely cited pre-FERA cases and conducted no analysis of the statutory definition of "obligation" supplied by the FERA amendments. The Fifth Circuit recently recognized that this defect "weakens the persuasive value" of *Guth* and similar cases. *Simoneaux,* 2016 U.S. App.

Lexis 22117 at *12, n. 17. And in *U.S. ex rel. Comeaux v. W&T Offshore, Inc.*, No. 10-494, 2013 WL 4012644, at 3, n. 6 (E.D. La. Aug. 6, 2013) the relator conceded the application of pre-FERA precedent to his claims. These cases therefore provide no analytical guidance.

In a case defendants fail to discuss, however, the Third Circuit recently ruled that the FERA definition authorizes reverse false claims liability for the improper avoidance of some statutory penalties. *Victaulic,* 839 F.3d at 256. There, defendant Victaulic had avoided paying customs duties on pipes when it failed to report to customs officials that those pipes were improperly marked. *Id.* at 246, 255-256. The court held that even though Victaulic technically "d[id] not owe marking duties upon importation," nevertheless when its fraud succeeded and customs officials failed to detect the mismarking, the "duty is deemed to 'have accrued at the time of importation.'" *Id.* at 254. Similarly here, each defendant's "liability for the penalty attaches at the moment of the violation." *3M,* 17 F.3d at 1461. The court reasoned that "[t]he FERA rejected the reasoning in *ATMI*, with the Senate Report highlighting the definition's express inclusion of 'contingent, non-fixed obligations.'" *Victaulic*, 839 F.3d at 253.

The *Simoneaux* court believed *Victaulic's* holding inapplicable to TSCA penalties because, unlike the TSCA statute, the customs statute does not provide customs officials with remission authority. *Simoneaux* 2016 U.S. App. LEXIS 22117 at *13-15 and n. 20. But as discussed fully above (20), the power to remit necessarily indicates an established, pre-existing duty to pay. By providing that "established" duties need not be "fixed" in their final form to be FCA obligations, Congress explicitly anticipated that "established" FCA duties could be subject to modification. And the EPA has made clear that in exercising its discretion it must impose a penalty in a case where, as here, defendant has derived an economic benefit from its non-compliance (above at 21-22).

The *Victaulic* court, however, never focused on the remission issue. Instead, after finding that liability accrued at the moment of violation, the court turned immediately to whether Victaulic had *knowingly* concealed or avoided that obligation. *Victaulic*, 839 F.3d at 254-255. The court held that "Victaulic would be liable under the FCA" if (a) Victaulic had "knowingly" concealed the marking information, "despite its affirmative [disclosure] obligation" imposed by statute, and (b) if that fraud then resulted in the release of the goods, thereby triggering the penalty. *Id.* at 255. Importantly, the court commended the use of FCA liability to combat such regulatory fraud. When voluntary disclosure is central to the regulatory scheme, the defendant "may have an incentive" to withhold that information "if [it] believes the value [to be gained from concealment] exceeds the risk that the deception will be discovered . . . since the chance that [the concealment] will be discovered … [and a penalty] will be owed would still result in a net gain to the company. *Reverse false claims liability changes that value proposition because a finding of deception carries the possibility of treble damages. Id.* at 255-256 (emphasis added).

Defendants' contrary policy arguments (Def. Br. at 22-25) fail because they completely ignore defendants' extensive fraud as well as the central role Congress designed for the FCA in combatting that fraud. Defendants' fraud, and not their FCA liability, have "undermine[d]" (Def. Br. at 22) the EPA's enforcement discretion. Defendants deprived the EPA of the Concealed SRI because they calculated that the profits they would gain would exceed the amount of any penalties imposed if the EPA discovered their fraud. AC at ¶¶ 877-887. But, as the *Victaulic* court noted, "[r]everse false claims liability changes that value proposition because a finding of deception carries the possibility of treble damages." *Victaulic*, 839 F.3d at 256. Congress intended the FCA to have an expansive scope so that it would "reach all types of fraud, without qualification, that might result in financial loss to the Government." *Neifert-White*, 390 U.S. at

232. While FCA liability should not be imposed in the context of routine or inadvertent

disclosure violations, it is both appropriate and necessary in situations like this, where defendants

have engaged in an extensive and lengthy campaign of fraud designed to continue making

billions of dollars in profits by depriving the EPA of valuable information necessary for its

regulatory functions and to avoid paying the significant penalties arising from that misconduct.

Imposing FCA liability will not "eviscerate TSCA's comprehensive scheme" (Def. Br. at

24) nor "undermine" the EPA's "agency discretion" (*id.* at 22). Indeed, Congress envisioned

FCA liability in precisely these situations, for the FCA explicitly permits claims "based on . . . an

administrative civil money penalty" *unless* the penalty is the "subject of a . . . proceeding in

which the Government is already a party." 31 U.S.C. § 3730(e)(3). These penalties are not the

subject of such a proceeding and the FCA therefore explicitly authorizes these claims.

Nor was Congress concerned that FCA liability would encroach on agency discretion.

Defendants correctly observe that the Ninth Circuit in *U.S. v. Universal Fruits & Vegetables*

*Corp.*, 370 F.3d 829, 836 (9th Cir. 2004) transferred the Government's FCA claims concerning

customs duties to the Court of International Trade, which by statute had had exclusive

jurisdiction over customs duty claims. Yet as discussed in detail above (26-27), Congress

subsequently amended the FCA in 2009 expressly to impose FCA liability for the concealment

or avoidance of customs duties. Congress expressed no concerns that such liability would

encroach on the CIT's exclusive jurisdiction, and district courts have since entertained FCA

claims involving customs duties. *See, e.g., Victaulic*, 839 F.3d at 246, 255-256.

Indeed, even prior to the 2009 FCA amendments, a district court in the Ninth Circuit held

Universal Fruits' jurisdictional ruling inapplicable to FCA claims brought by a relator. *U.S. ex*

*rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prod., Inc.*, 370 F. Supp. 2d 993, 996 (N.D.

Cal. 2005). Further, although it ultimately dismissed the claims as inadequately pleaded, this

Court recently rejected such an exclusive agency defense in an FCA case involving the

Department of Labor's administration of the Services Contract Act, finding "scant support" for

such a defense. *U.S. ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*, 843 F. Supp.

2d 20, 34, n. 10 (D.D.C. 2012). Thus, the FCA authorizes KBT&F's claims even assuming the

EPA otherwise has exclusive jurisdiction over certain aspects of the penalties.

**D.    Because their fraud prevented the EPA from assessing TSCA penalties, defendants
        are estopped from raising the absence of assessment as a defense.**

Throughout their brief, defendants improperly insist that the fruit of their fraud

completely immunizes them from FCA liability. They erroneously contend that the TSCA

penalties for which they are liable cannot be FCA obligations because the EPA has not sought to

enforce or assess them. But defendants designed their fraudulent conspiracy to prevent the EPA

from conducting the administrative or prosecutorial actions necessary to assess those penalties.

Especially since, as here, defendants' "liability for the penalties attached at the moment of

violation" (*3M*, 17 F.3d at 1461), axiomatic equitable principles preclude defendants from

arguing that they can prevent – by their fraud – the technical completion of the obligation.

This Circuit has disallowed exactly such arguments. In *Pierce v. S.E.C.*, 786 F.3d 1027

(D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1713 (2016) this Circuit disallowed defendant's *res

judicata* defense to the Government's second enforcement action because defendant's fraudulent

concealment of evidence prevented the Government from including those violations in its initial

enforcement action. *Id.* at 1036. The D.C. Circuit held that "[t]o find otherwise would reward

[defendant] for his duplicitous conduct." *Id.* Defendants here should likewise be denied any

reward for their fraud. *See also In re McGuirl*, 162 B.R. 630, 633 (D.D.C. 1993) (preventing a

mother, who had her son report income and dividends from property on his tax returns to obtain more favorable tax treatment, from contending that she, in fact, owned the property).

Defendants should not be allowed to benefit from their fraud. To accept defendants' "argument would permit the alleged conspirators in this case to enter into a scheme to commit fraud and then hide behind the argument that the success of their fraud precludes prosecution." *U.S. v. Sullivan*, No. 2:13-cr-00039, 2013 U.S. Dist. LEXIS 91660, at *24 (E.D. Pa. July 1, 2013). Defendants' fraud equitably estops them from contending that the absence of EPA enforcement action or penalty assessment – an absence they designed their fraud to secure – has prevented the "establishment" of their duty to pay TSCA penalties.

## II.     DEFENDANTS CONCEALED OR IMPROPERLY AVOIDED STATUTORY PROPERTY TRANSFER OBLIGATIONS

Defendants do not challenge the established nature of their statutory reporting duty and concede that if the SRI is property then their FCA liability is "clear." Def. Br. at 33. They even admit that "Defendants did not inform the EPA about the ten specific pieces of alleged SRI identified in the complaint." Def. Br. at 58. Rather, defendants challenge this claim solely on their erroneous contention that the Concealed SRI is not property.

## A.     The Concealed SRI is FCA "Property."

"Property" is a bundle of "rights in a valued resource," including "the right to possess and use, the right to exclude, and the right to transfer." *Black's Law Dictionary*, at 1410. Defendants possess these rights in the Concealed SRI they continue to conceal from the EPA.

First, the Concealed SRI is a "valued resource." Congress emphasized SRI's significant value by partially conditioning a chemical company's ability to sell a chemical on its development and submission of SRI (AC at ¶¶ 1386-1389) and by imposing significant monetary penalties that increase daily for non-compliance (AC at ¶ 1390). The EPA highlighted SRI as

"critically important" and "extremely valuable" information, the absence of which would have "far-reaching effects" on its regulatory effectiveness. AC at ¶¶ 1391-1392. As well – and for these reasons – the EPA contracted with defendants to obtain SRI, and offered valuable consideration in exchange. AC at ¶¶ 1393-1394. Indeed, in developing the CAP Agreement, the EPA stated that the SRI it sought under the contract was "*vital* in supporting EPA efforts to protect human health and the environment from risks from toxic chemicals." CAP Agreement, Ex. 26 to AC, 56 Fed Reg. at 4128, Unit I, Background (emphasis added).

Further, each defendant possesses and has exercised various rights in the valuable SRI. Defendants "possessed and used" the SRI because, among other things, they created and collected the medical and scientific information that comprises the Concealed SRI in the course of developing, formulating, and analyzing their chemicals. AC at ¶¶ 9, 11, 187-800, and 1383. Additionally, defendants have "transferred" other SRI to the EPA in exchange for the right to continue selling their chemicals. *Id.* at ¶¶ 1386-1389. Moreover, the defendants entered a contract with the EPA under which the EPA provided valuable consideration – the amnesty-reduced penalties – to acquire SRI and defendants exchanged SRI (or were obligated to) for that valuable consideration. *Id.* at ¶¶ 908, 980, and 1397. Indeed, the CAP Agreement cannot be described as anything other than a transfer (or expected transfer) of property in exchange for a monetary benefit in the form of significantly reduced statutory penalties. *See also U.S. v. Poirier*, 321 F.3d 1024, 1029-1030 (11th Cir. 2003) (defendant's use of confidential bids on bond refinancing project constituted violation of wire fraud statutes because those bids constituted property and had "commercial value" to the county to which they were submitted).

Most importantly, defendants have exercised the right to exclude, the right they say is "most relevant here." Def. Br. at 34. Defendants have long exercised the right of exclusion by

fraudulently concealing the Concealed SRI from the EPA and the public for decades. Moreover, they used their exclusion right to gain significant benefits – billions of dollars in continuing profits and the avoidance of increased regulatory scrutiny. AC at ¶¶ 877-895. Having improperly benefited from their exclusive use of the Concealed SRI for decades, to the detriment of EPA and the public, defendants cannot now contend that this SRI is not property.

Indeed, "[c]onfidential business information has long been recognized as property." *Carpenter v. U.S.*, 484 U.S. 19, 26 (1987). In the context of environmental reporting, the Supreme Court has held that "intangible" health, safety, and environmental (HSE) data submitted to government agencies can constitute a "trade-secret property" that is protected by the Taking Clause of the Fifth Amendment. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003-1004 (1984). Accordingly, EPA provided a mechanism for regulated companies to designate SRI as "Confidential Business Information" (CBI), protecting it from disclosure. *Toxic Substances Control Act, Statement of Interpretation and Enforcement Policy; Notification of Substantial Risk*, 43 Fed. Reg. 11110, 11113, Unit X(a), March 16, 1978. The EPA reiterated these CBI-designation rights in the CAP Agreement. CAP Agreement, AC Ex. 26 at Fed. Reg. at 4130-4131, Unit II.D.6-12. Since the regulated company can retain property rights in the SRI after submission, the company necessarily had property rights in the SRI before submission.

This Court reached a similar conclusion in *Envtl. Integrity Project v. U.S. Envtl. Protection Agency*, 177 F. Supp.3d 36 (2016) ("*EIP*"). That case concerned whether the EPA was required to publicly disclose CBI contained in information submitted by regulated companies under the Clean Water Act. *Id*. at 38. This Court held: "Plaintiffs do not acknowledge the potential takings-related consequences if the Court were to read the CWA's 'shall be available' language as mandating disclosure even where a FOIA exemption would otherwise

permit withholding. Such a requirement could simultaneously effectuate a taking of property under the Fifth Amendment and trigger the government's obligation to pay just compensation." *Id*. at 44. Thus, this Court recognized that certain information provided to the government under environmental statutes remains the *property* of the providing companies.

Although the *EIP* Court observed that the Government could more broadly withhold confidential information provided under the CWA than under TSCA (177 F.3d at 44), that distinction deals only with the post-submission ownership of the property. Even though the government may have authority to disclose certain information *after it has been submitted to the government*, that information is still the property of the submitting company *before* it is submitted. Indeed, the Supreme Court recognized in *Ruckelshaus* that companies can have a property interest in their HSE information, and federal regulations – like the CWA and TSCA – provide that companies can retain a property interest in that information even *after* its transfer to the EPA. Accordingly, the information must have been the property of submitting companies *before* its submission to the government.

Here, as in *Ruckelshaus* and *EIP*, defendants developed health and safety information regarding their isocyanate products, although, unlike in those cases, they concealed critical portions of that information from the government. That information was defendants' property; property they contracted to provide to the EPA in the CAP Agreement and which formed the currency with which they purchased the privilege of selling their products. Having gained substantial benefits from their selective – indeed exclusive – use of that property, they cannot now claim immunity under the FCA for their misuse and improper withholding of it by arguing that it is not "property" for FCA purposes.

Moreover, although it did not explicitly hold that reporting information was FCA property, the Third Circuit in *Victaulic* emphasized that defendant Victaulic "would be liable under the FCA" because it "knowingly failed to disclose [the information] despite its affirmative obligation to do so under [the customs statute]." *Victaulic,* 839 F.3d at 255. The court later evoked the FCA's description of a reverse false claim ("avoids . . . an obligation") to describe Victaulic's non-reporting conduct: "In [concealing the information], an importer *avoids its obligation* under [the customs statute] to provide the government with such information as is necessary to enable [customs agents] to determine whether the merchandise may be released." *Id*. at 255 (emphasis added). The court's focus on Victaulic's avoidance of its information-disclosure obligation suggests that it may have viewed the information as property, the value of which is measured by the penalties caused by its non-transmittal to the government.

Regardless, defendants' reliance (Def. Br. at 32-33) on the D.C. Circuit's *Hoyte* opinion is misplaced. As defendants are compelled to concede, that pre-FERA opinion "focused on whether the failure to pay unassessed penalties flowing from a reporting violation supported an FCA suit." *Id.* at 33. The absence of any discussion of the property issue strongly discounts any suggestion that the court or the parties even considered the argument. Rather, the court simply tracked the FCA's "money or property" language when it observed that there was "no obligation on [defendant] to tender money or property to the Government." *Hoyte*, 518 F.3d at 67. That decision therefore provides no guidance on this question.

The question is instead resolved by traditional notions of property rights, as discussed above. As a district court recently observed, while "[t]he FCA does not define what constitutes property," "when a court determines 'whether a particular interest is property for purposes of the fraud statutes,' *it should 'look to whether the law traditionally has recognized and enforced it as*

42

*a property right*.'" *Moore,* 2016 WL 4051266 at *6 (emphasis added) (citations omitted). The Supreme Court and this Court have held that HSE information like SRI can be property, the EPA's regulations explicitly recognize that SRI can be property, and the parties themselves have treated SRI as property. This Court should also treat it as property.

As this reasoning confirms, KBT&F does not argue, as defendants falsely contend (Def. Br. at 35) that all "reportable information *per se* qualifies as 'property.'" To the contrary, as detailed above (38-40), KBT&F alleged with particularity the facts establishing that this SRI is property and has analyzed those facts under the governing law. Information other statutes require to be reported must undergo a similar analysis. But even if some of that information also is property, enforcing the FCA when a violator fraudulently conceals it would not produce "shocking results," as defendants contend (Def. Br. at 35). Rather, as discussed above (35-36), Congress designed the FCA to combat fraud in these very situations. FCA liability will deter entities from fraudulently depriving the Government of valuable information necessary for its regulatory and risk assessment duties, ensure that the Government is alerted to any undeterred fraud, and provide an appropriate vehicle to recover the financial loss caused by the fraud.

### III.   DEFENDANTS KNOWINGLY CONCEALED OR IMPROPERLY AVOIDED CONTRACTUAL MONEY-PAYMENT AND PROPERTY-TRANSFER OBLIGATIONS.

### A.   The CAP contract established money-payment obligations for breach.

As set out in the Factual Background above (8-9), each defendant entered into a written contract with the EPA in which it agreed to audit and correct prior SRI reporting compliance in return for reduced amnesty-level penalties for any previously-unsubmitted SRI defendant provided under the contract. Each defendant agreed that breach of its contractual obligations would make it liable for full penalties (a) on any SRI not submitted and (b) on the submitted SRI for which it received an amnesty reduction, as discussed below. And each company waived its

right to challenge or appeal the EPA's assessment of those penalties (see above at 8-9),

effectively imposing automatic liability for the EPA's unilateral assessment.

1.      **CAP established an obligation for each defendant to forfeit its amnesty reduction and pay the full penalties for the SRI for which it had received a reduced amnesty penalty.**

The CAP Agreement conditioned each defendant's amnesty on its submission of all

previously-unsubmitted SRI. AC Ex. 26 at 4129-4130 Units II.B.1-4 and II.D.4. Each defendant

agreed that each piece of SRI submitted under CAP "constitute[s] a violation of TSCA section

8(e) and 15(3)(b), for which a civil penalty *will be assessed.*" *Id.* at 4129 Unit II.A.4 (emphasis

added). The agreement stipulated reduced amnesty penalties for different categories of SRI

submitted, capped all penalties at $1 million, and exempted defendant from any other penalties

that could have arisen from the late submission of the SRI. *Id.* at 4130 Units II.B.2 and 3.

Thus, when each defendant knowingly withheld the Concealed SRI, it fraudulently

obtained amnesty reductions for the SRI it had submitted. It therefore became liable to the EPA

for the difference between the reduced amnesty penalties and the full penalties to be assessed by

the EPA. And because each defendant waived its right to challenge or appeal the EPA's

assessment of those penalties, it has automatic liability for contract damages in an amount

determined unilaterally by the EPA. Although the post-FERA FCA does not require a "self-

executing obligation," as defendants erroneously contend (Def. Br. at 26 and 28), this payment

obligation is effectively self-executing. Regardless, the contractual payment obligation is an

"established duty" because each defendant stipulated its penalty-liability for the SRI submitted

under CAP, agreed that penalties "will be assessed," and waived its right to challenge or appeal

the EPA's determination of the amount.

Accordingly, defendants' contract breaches obligate them to pay stipulated contract damages, and do not, as defendants erroneously contend (Def. Br. at 30-32), merely expose them to unassessed statutory penalties subject to a TSCA Section 16(a)(2) hearing.

**2.      CAP established an obligation for each defendant to pay the full penalties for the Concealed SRI it failed to submit under CAP.**

Under the CAP Agreement each defendant agreed to audit its files for SRI reporting compliance and to submit all previously-unsubmitted SRI to the EPA. AC at ¶ 908. As discussed above, the EPA provided a significant amnesty benefit in exchange for the SRI. And the agreement provided that if a defendant failed to submit previously-unsubmitted SRI, the "EPA reserves it rights under TSCA section 16 [31 U.S.C. § 2615] to take appropriate enforcement action." AC at ¶ 911, AC Ex. 26 at 4129 Unit II.A.5.

Defendants erroneously characterize this provision as merely permitting the EPA "to seek TSCA penalties" (Def. Br. at 30) or as merely giving it "the *option* to initiate an administrative enforcement proceeding" (Def. Br. at 32) (emphasis in original). But each defendant waived its right to a TSCA Section 16 hearing, so the contract does not require the EPA to "seek" TSCA penalties but rather authorizes it to assess the penalty unilaterally, imposing automatic liability. Nor does the contract require the EPA to "initiate an administrative enforcement proceeding" because each defendant has waived its right to request such a hearing. Thus, the contract establishes a stipulated damages provision that obligates each defendant to pay an amount EPA unilaterally determines. The contract requires the EPA's determination be made in accordance with "the terms of the EPA TSCA Sections 8, 12, and 13 Enforcement Response Policy" (AC Ex. 26 at 4129 II.A.5), but defendants have waived their right to challenge, request a hearing about, or appeal that determination. And as discussed above (21-22), that policy requires the penalty to be at least equal to the economic benefit the defendant gained from non-compliance.

Thus, as to each item of SRI defendants should have submitted under the CAP Agreement, each defendant has an "established duty" – automatic and mandatory liability – to pay the penalty amount the EPA unilaterally determines.

### 3.  Defendants' pre-FERA cases not applicable.

Defendants erroneously rely on two cases that apply the pre-FERA judicial definition of "obligation" abrogated by the 2009 amendments. Moreover, neither case involved a contract that provided automatic liability for unilaterally determined damages, not subject to appeal.

As discussed above, the D.C. Circuit's pre-FERA *Hoyte* decision applied the then-majority view that "an unassessed potential penalty for regulatory noncompliance does not constitute an [FCA] obligation." *Hoyte,* 518 F.3d at 67. In *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 271-272 (D.D.C. 2016), this Court reconsidered its prior order and, relying on *ATMI, Hoyte*, and other pre-FERA cases, declined to find that a contract whose penalties were subject to governmental discretion imposed an FCA obligation. In a subsequent decision, however, Judge Cooper made clear that he was applying the pre-FERA FCA in his earlier decision and conceded that FERA amendments might require a different result. *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 167 F. Supp. 3d 80, 83-84 (D.D.C. 2016). Additionally, he refused to consider, because untimely, several of the Government's compelling arguments that the pre-FERA FCA language embraced contingent obligations. *Id.* at 84-85.

But as this Court recently observed, by amending the FCA to define *obligation* to include "fixed and contingent duties owed to the Government," Congress appears to have intended "to explicitly overrule the set of decisions" – including *Hoyte* and *Landis* – that had excluded FCA liability for fraud as to "future or contingent dut[ies]." *Hick*s, 2016 U.S. Dist. LEXIS 56372 at * 18. And even assuming, against the evidence, that these decisions have continuing application in post-FERA cases, they have no application to this case, for here defendant's payment liability is

not "[t]he mere contingent potential that such fines or penalties might be . . . sought and imposed." *Landis*, 160 F. Supp. 3d at 271 (ellipses in original) (citation omitted). Rather, as demonstrated above, defendants have waived their right to challenge or appeal the EPA's unilateral determination of damages. Neither the contract in *Landis* nor the decree in *Hoyte* imposed such an automatic obligation. For though Judge Cooper indicated that the *Hoyte* decree may have authorized unilateral assessment (*id.* at 272), the *Hoyte* court stated that the decree placed the defendant there "in the same position as any regulated entity subject to possible sanctions for violating an administrative requirement" (*Hoyte*, 518 F.3d at 67). A regulated entity can challenge and appeal a penalty assessment, but under the CAP Agreements each of the defendants voluntarily waived these rights.

**B.      The CAP Agreement established property-transmission obligations.**

Defendants do not deny that the CAP Agreements obligated them to transmit SRI to the EPA and they even admit they "did not inform the EPA about the ten specific pieces of SRI identified in the complaint." Def. Br. at 58. Instead, they contend that SRI is not "property" and therefore their concealment or avoidance of that obligation did not violate the FCA. Def. Br. at 32-36. Defendants confine their arguments, however, to whether SRI is property in the statutory reporting context. Those arguments fail, as demonstrated above at 38-43, but more importantly defendants never challenge the allegations (AC ¶¶ 1393-1397, 1491-1492) that the Concealed SRI is property in the context of the CAP Agreements. *See* Def. Br. at 32-36. Thus, defendants having raised no challenge, the portion of Count II based on defendants' concealment or improper avoidance of their contractual property-transmission obligations must survive.

Regardless, KBT&F demonstrates above at 38-43 that the Concealed SRI the defendants fraudulently concealed and failed to transmit under the CAP Agreements is property. Indeed, the EPA designed and initiated the program to exchange valuable consideration (significantly

reduced amnesty penalties) to obtain the SRI, which it identified as "vital information" necessary to support EPA's regulatory activities. CAP Agreement, AC Ex. 26 at 4128, Unit I, Background. As KBT&F alleged in the AC, "the heart of the CAP Agreement concerned each participating company's submission of [SRI] in exchange for the EPA's "amnesty"-level penalties. [Cit.] The [SRI] that [defendants] failed to provide was the contractual property that the EPA contracted to obtain." AC at ¶ 1492. The CAP Agreement patently demonstrates that the SRI is property.

IV.   **DEFENDANTS HAVE POSSESSION, CUSTODY, OR CONTROL OF MONEY OR PROPERTY TO BE USED BY THE GOVERNMENT AND KNOWINGLY DELIVERED LESS THAN ALL OF IT**

An entity violates the FCA when it "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D). The 2009 FERA amendments removed the requirement that defendant receive a "certificate or receipt" for the money or property. Therefore, on May 20, 2009, the effective date of the FERA amendments, each defendant began to violate the FCA when it "knowingly deliver[ed], or cause[d] to be delivered, less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D).

A.   **Each defendant possessed property to be used by the Government.**

Defendants do not dispute that the EPA would have "used" the Concealed SRI if they had delivered it as required by both the TSCA statute and the CAP Agreement, but instead contend that the Section 3729(a)(1)(D) property claims fail because SRI is not "property." As previously established (38-43), however, the SRI that each defendant was obligated to deliver to the EPA is property, both in the statutory reporting context and the contractual context. Thus, each defendant's delivery of "less than all" of that property necessarily violated the FCA.

**B.     Each defendant possessed money to be used by the Government.**

As of May 20, 2009, the effective date of the FERA amendments, each defendant "had possession, custody, or control" of money for which it was liable to the EPA under TSCA and the CAP Agreement. AC at ¶¶ 1585, 1601, 1617, and 1633. Since both the TSCA statute and the CAP Agreement required this money be paid to the Government, it would have been "used [] by the Government" had defendants delivered it. Indeed, defendants acknowledge that "use" here means to "employ for the accomplishment of a purpose" (Def. Br. at 37), and defendants cannot credibly contend that the EPA would not have employed the money had it been delivered.

Defendants argue instead that the money-delivery duty is contingent and it is therefore "incoherent to think of such contingent penalties as money that the Government is or will be employing." Def. Br. at 37. But KBT&F has already demonstrated (18-22) that defendants had an "obligation" – an "established duty, whether or not fixed" – to deliver this money to the EPA, even though the duty remained subject to government discretion. KBT&F also demonstrated (8-9) that the CAP Agreement damages are not contingent, because each defendant has automatic liability for the contract damages EPA unilaterally assesses. Thus, the money defendants possessed and failed to deliver is money "used, or to be used" by the Government.

Section 3729(a)(1)(D) nowhere requires that its delivery duty meet the definition of an FCA "obligation," as defendants erroneously contend. Def. Br. at 37. Rather, it merely requires that the defendant possess money "to be used" by the Government and then deliver "less than all" of that money. Indeed, the provision's language appears to contemplate "contingent" obligations, for it concerns the defendant's possession of money "used, *or to be used*, by the Government." 31 U.S.C. § 3729(a)(1)(D) (emphasis added). The phrase "to be used" is a reference to future use and thus appears to encompass payment duties that may not be completely fixed in terms of time, amount, or even enforcement. Regardless, there is no textual

49

evidence that Congress intended that the provision would be limited to reverse false claim "obligations." Defendants possessed money that was "to be used" by the Government and violated this provision by delivering less than all of it, regardless of whether their payment duty met all the technical requirements of a Section 3729(a)(1)(G) obligation.

**C.     Partial delivery is not a required element, but KBT&F's allegations satisfy whatever partial delivery element may exist.**

Defendants contend, however, that they are immune from Section 3729(a)(1)(D) claims because they committed a comprehensive, all-encompassing fraud rather than a partial fraud. Specifically, defendants argue that the FCA's prohibition against delivering "less than all of that money or property" does not include a prohibition against delivering *none* of the money or property. Def. Br. at 38-39. But one who delivers none of the property by definition delivers "less than all" of the property. Defendants' argument rests on the obviously erroneous contention that "less than all" cannot include "none," and must be rejected on that basis alone.

Defendants attempt to salvage this *non sequitur* by arguing that "delivery" is a required element of a Section 3729(a)(1)(D) claim. Def. Br. at 38-39. The pre-FERA version of this provision had prohibited the delivery of "less property than the amount for which the person received a certificate or receipt." 31 U.S.C. § 3729(a)(4) (2008). Courts applying this provision therefore held that a required element of the claim was "delivery of less property than the amount for which a person receives a certificate or receipt." *See, e.g., U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 36 (D.D.C. 2003). But this formerly-required element focused not on the delivery itself but instead on the receipt of a certificate or receipt, for this Court dismissed those claims because "none of the allegations implicate delivering property to the United States *and receiving a receipt in return*." *Id.* (emphasis added).

In partially quoting this holding, defendants misleadingly obscure this emphasis by omitting the concluding portion of the Court's ruling on the claim. Def. Br. at 38.

To the extent, as defendants contend, requirement of a "certificate or receipt" established an independent delivery requirement in the pre-FERA provision (Def. Br. at 38, n. 10), its elimination from the post-FERA provision also eliminated whatever delivery requirement may have existed. The amended statute does not prohibit delivering "*some, but* less than all" of the money or property, but instead prohibits "deliver[ing] less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D). Again, defendants' argument can succeed only if this Court inserts words into the statute's text. To deliver *none* of the money or property necessarily means to deliver "less than all of that money or property." The required element here is not delivery – which the statute is encourages – but rather improper withholding – which the statute prohibits.

Regardless, KBT&F's allegations satisfy whatever delivery requirement may still exist. With respect to property-delivery under the CAP Agreement, KBT&F alleged that each defendant delivered some SRI, for which it received a reduced amnesty penalty, while it concealed and failed to deliver the Concealed SRI. AC at ¶ 1284. And in the context of property-delivery under TSCA, KBT&F alleged that each defendant, either individually or jointly with the other defendants, delivered some SRI while it concealed and failed to deliver the specific items of Concealed SRI. AC at ¶¶ 1031-1032. Thus, KBT&F has alleged that each defendant possessed SRI and delivered some but "less than all" of it to the EPA.

As to defendants' money-delivery duties, KBT&F alleged that each defendant delivered some money – the amnesty-reduced penalties for the SRI submitted under the CAP Agreement – while it withheld the penalty money for which it was liable as to the Concealed SRI, as well as the additional penalty money for which it was liable as to the submitted SRI. AC ¶ 1283-1284.

Moreover, the amount of money withheld in relation to the CAP Agreement will be set unilaterally by the EPA because each defendant waived its right to challenge or appeal the EPA's determination (8-9). Thus, KBT&F has alleged that each defendant possessed money and delivered some but "less than all" of that money to the EPA.

## V.     KBT&F SUFFICIENTLY PLEADED ITS CONSPIRACY CLAIM

In paragraph 2 of its AC, KBT&F alleged:

> For decades, each defendant, individually and in conspiracy with the others, has aggressively concealed from the EPA its statutory and contractual violations, as well as its liability for civil penalties and breach of contract damages, and has knowingly and improperly concealed and avoided paying those penalties and damages. Similarly, each defendant has concealed its multiple obligations to transmit to the government property (the multiple separate items of concealed hazard information) that is worth billions of dollars.

AC ¶ 2. KBT&F thereafter meticulously describes the particulars of defendants' conspiracy, in many cases referencing and incorporating documents or testimony that evidenced those particulars. Among other things, KBT&F describes how, when, and where the defendants individually and collectively obtained the Concealed SRI (AC at ¶¶ 174-800); when and where the defendants met and conspired to conceal that SRI from regulators and the public (AC at ¶¶ 1039-1107); and the numerous individual and collective overt actions taken to execute the conspiracy (AC at ¶¶ 933-1129 and 1723-1748), including in the period after May 20, 2009 (AC at ¶¶ 932, 1116-1129, and 1723-1748). Far from offering "conclusory statements" (Def. Br. at 40), KBT&F pleaded with particularity the conspiracy's origin and agreed purpose, as well as numerous overt actions taken in furtherance of the conspiracy.

The factual overview of KBT&F's allegations set out above (9-13) establishes the AC's sufficiency. Those allegations show that defendants initiated their conspiracy shortly after they began developing and obtaining the Concealed SRI, and that they designed the conspiracy to conceal that SRI from the EPA and the public, and to mislead the EPA into believing that there

was no human evidence for the hazards confirmed by the Concealed SRI. Defendants agreed to "harmonize" their federally-mandated hazard communication documents (MSDSs and product labels) so that they excluded any disclosure of the Concealed SRI. Each defendant's concealment actions mirrored those of its co-conspirators, raising the reasonable inference of coordinated, conspiratorial action. And they coordinated to publicly dispute the potential for the very health hazards their Concealed SRI confirmed. Defendants maintained their fidelity to the conspiracy even after being confronted with testimony in May 2010 from a TSCA compliance expert who confirmed that the medical and scientific information they were concealing was SRI that they were required to submit to the EPA. Rather than delivering that SRI to the EPA, defendants doubled down on their fraud by sending the EPA a February 26, 2013 letter in which they collectively misled the EPA with misrepresentations that were designed to conceal their money-payment and property delivery obligations.

This partial summary of the allegations detailing the particulars of defendants' conspiracy establishes that KBT&F pleaded its conspiracy claim with particularity. Contrary to defendants' contention, KBT&F specified in detail "when the alleged conspiracy to defraud arose, who agreed with whom, the object of the conspiracy, what was done to effect the conspiracy, [and] other required particulars." Def. Br. at 40. Moreover, KBT&F alleged the circumstances indicating that defendants agreed after May 20, 2009 to continue the conspiracy as well as the overt acts taken after that date to further it. KBT&F sufficiently pleaded its conspiracy claim.

## VI.    KBT&F SUFFICIENTLY ALLEGED THAT DEFENDANTS ACTED KNOWINGLY

KBT&F sufficiently alleged that each defendant *knowingly* concealed or avoided its money-payment or property-delivery obligations. Indeed, the detailed conspiracy allegations summarized in the preceding section themselves demonstrate that defendants knowingly and intentionally violated the FCA. As shown above, KBT&F alleged with particularity that

defendants entered a decades-long agreement to conceal the SRI they obtained, committed numerous overt actions to conceal the SRI from regulators and the public in furtherance of that conspiracy, and took other overt actions to affirmatively mislead regulators and the public about the existence of the Concealed SRI. Despite making a contractual promise to the EPA to audit and correct their reporting compliance, defendants instead falsely assured the EPA that they had no more unreported SRI, demonstrating a knowing and unwavering zeal to hide the both the SRI and their previously avoided reporting and money-payment obligations. AC at ¶¶ 951-963.

Even after being confronted by expert testimony that confirmed their property-delivery and money-payment obligations (AC at ¶¶ 932, 1120-1129), defendants maintained their conspiracy not only by continuing to conceal and avoid their obligations, but also by falsely assuring the EPA – again – that they were unaware of the isocyanate hazards confirmed by the very SRI they were concealing. Indeed, as KBT&F alleged (AC at ¶ 1129), defendants' February 26, 2013 letter to the EPA conclusively demonstrates that they were *knowingly* concealing their reporting and payment obligations, for they misled the EPA and continued to conceal the SRI *fully aware* that an expert with extensive TSCA compliance experience had testified that the information constituted SRI required by law to be submitted to the EPA.

Thus, KBT&F did not merely allege in "rote conclusory" fashion that each defendant's concealment of the Concealed SRI "*ipso facto* means it knowingly concealed an obligation to transmit money or property to the Government." Def. Br. at 44. To the contrary, KBT&F specified the evidence summarized above – and more – in the 198 paragraphs comprising the AC's Section V (paragraphs 931-1129), entitled "Each Defendant Concealed its Violations of its Statutory, Regulatory, and Contractual Obligations." KBT&F then incorporated that evidence as

proof that each defendant *knowingly* concealed or avoided its money-payment (Section VII.A) and property-delivery (Section VII.B) obligations.

Specifically, KBT&F alleged that the evidence of defendants' concealment conspiracy detailed in Section V and summarized in paragraphs 1208.a-d and 1214 demonstrated that each defendant (BASF in these citations) had been "actively and knowingly concealing" (AC at ¶¶ 1206, 1215, and 1219) and "avoiding" (AC at ¶¶ 1207, 1216, 1220) its money-payment obligations, both before (AC at ¶ 1205) and after (AC at ¶ 1214) May 20, 2009. Because defendants coordinated their concealment and avoidance activities, KBT&F made the same allegations against each defendant in Section VII.A's other subsections, covering each defendant's knowing concealment and avoidance of its money-payment obligations, as well as in Section VII.B, which covers each defendant's knowing concealment and avoidance of its property-transfer obligations.

Thus, KBT&F alleged that each defendant actively and knowingly concealed and avoided its money-payment and property-transfer obligations, and alleged with particularity the evidence demonstrating each defendants' knowledge. The nature, extent, and duration of the defendants' concealment, misrepresentation, and avoidance activities demonstrate that defendants knew of their obligations and fraudulently took actions to conceal and avoid them. At a minimum, the allegations identified above, which must be taken as true, indicate that defendants acted in reckless disregard of those obligations, which the FCA defines as acting knowingly. Under the FCA, "the terms 'knowing' and 'knowingly' . . . require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B). Rather, those terms "mean that a person, with respect to information . . . acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless

disregard of the truth or falsity of the information." *Id.* at § 3729(b)(1)(A)(ii) and (iii). KBT&F's allegations more than meet this standard.

Defendants erroneously contend (Def. Br. at 42-43) that KBT&F failed to allege that each defendant knew the information it possessed was SRI of which the EPA was unaware. But KBT&F alleged in paragraphs 9 and 11 of the AC that defendants "knew" the information they obtained met the definition of SRI and that the EPA was not adequately informed of its existence. AC at ¶¶ 9 and 11. The AC's Sections IV.C.2-11 contain KBT&F's detailed allegations about the ten separate items of Concealed SRI. Each numbered subsection (2-11) addresses a distinct item of SRI and is divided into seven subparagraphs (a-g) addressing different aspects of that item of SRI. In subparagraph (b) of each subsection KBT&F painstakingly demonstrated that the information meets TSCA's definition of SRI. In subparagraphs (f) and (g) of each subsection, KBT&F provided a detailed analysis demonstrating that neither TSCA nor the EPA's guidance documents provided a reporting exemption. Moreover, in paragraphs 135-173, KBT&F separately demonstrated that none of this SRI was exempt from the reporting requirement. Thus, KBT&F alleged that each defendant knew it had obtained SRI that was not exempt from reporting, and then alleged extensive supporting facts. When coupled with the allegations of defendants' extensive concealment and misrepresentation activities, these allegations are not mere "conclusory allegations and legal conclusions" (Def. Br. at 44) but rather plead each defendants' knowledge with particularity.

Defendants also erroneously contend that to sufficiently allege defendants' knowledge of their respective money-payment obligations, KBT&F must have alleged that defendants knew the EPA would have commenced and won enforcement proceedings and the penalty imposed would be upheld on appeal. Def. Br. at 42, 43. But defendants' argument incorrectly presumes

that only a final judgment no longer subject to appeal constitutes an FCA money-payment obligation. As demonstrated above (13-18, 24-31), at least since the 2009 FERA amendments, FCA money-payment obligations include established payment duties, even if contingent on government discretion. And because each defendants' liability for the penalty accrued at the moment of its violation, the payment duty was "established" at that moment. Thus, by sufficiently alleging that each defendant knew it had failed to report the Concealed SRI (see above at 53-56) and was actively concealing or avoiding both its duty to report and its resulting duty to pay the penalty (as demonstrated above at 54-55), KBT&F adequately alleged that each defendant knew it was obligated to pay the penalty. Indeed, a defendant must necessarily be aware of an obligation before it can take action to "actively conceal or avoid" that obligation.

Finally, defendants erroneously contend that KBT&F has improperly alleged each defendant's "collective knowledge" when it is required to identify a single individual within each defendant who has "all of the requisite knowledge." Def. Br. at 43. Defendants are wrong both factually and legally. First, defendants overstate the legal standards applicable to KBT&F's claims at this stage of the case. As this Court pointed out in distinguishing *U.S. v. Science Applications Intern. Corp*., 626 F.3d 1257 (D.C. Cir. 2010) ("*SAIC*") – the primary case on which defendants rely for their "collective knowledge" argument – *SAIC* "involved defective jury instructions *following a trial* at which the plaintiff was required to prove each element of its FCA claim." *U.S. ex rel. Shemesh v. CA, Inc*., 89 F. Supp.3d 36, 50 (D.D.C. 2015) ("*Shemesh I*") (emphasis added). However, "[b]y contrast, *during the motion to dismiss stage*, relator must only allege facts accepted as true from which 'the court [can] draw the *reasonable inference* that the defendant is liable for the misconduct alleged.'" *Id*. (emphasis added). To sufficiently meet the FCA's "scienter" requirement, a relator is "only obligated to plead knowledge generally." *U.S.*

*ex rel. Shemesh v. CA, Inc*., 89 F. Supp.3d 67, 78 (D.D.C. 2015) ("*Shemesh II*"). "Because Rule 9(b) permits knowledge to be pled generally, there is no basis for dismissal for failure to plead knowledge with particularity."  *Shemesh I,* 89 F. Supp.3d at 49.

This Court therefore denied the Shemesh defendants' motion to dismiss, holding that "fail[ure] to identify a specific employee who knew he or she was submitting a false claim for payment or was making a false statement to the government" is "not fatal at this [motion to dismiss] stage." *Id.* at 50. This Court explained that "plaintiffs are not required 'to specifically name which employees of a corporate defendant submitted the false claims." *Id.* at 52-53. In a later decision in the same case, this Court stated: "Although the government has not identified an individual who knew that [defendant] was making false statements and submitting false claims to the government, it has provided sufficient information to infer that, at the very least, [defendant] recklessly disregarded the truth or falsity of the information it was providing to the government." *Shemesh II,* 89 F. Supp.3d at 78.

The Shemesh cases confirm that the collective knowledge prohibition is not applicable at the motion to dismiss stage. Nonetheless, KBT&F identified by name or position the specific individual(s) within each defendant who obtained each item of Concealed SRI. With the exception of Bayer's discovery or development of Bayer's 1979 Skin Contact SRI, KBT&F alleged that each defendant obtained each item of SRI through a representative it had designated as its representative on a committee or the Board of Directors of the III. AC ¶¶ 214, 247-250, 305-308, 366-369, 434-436, 499-507, 582-585, 659-662, 736-738. The EPA's 1978 TSCA Policy Statement provides that a "business organization is considered to have obtained any information which any officer or employee capable of appreciating the significance of the information has obtained." 43 Fed. Reg. 11109 at 11111, Unit 2. KBT&F alleged that by such

designation each defendant indicated its confidence in the individual(s) capability to appreciate the significance of isocyanate safety or hazard information they would obtain in that representative role. AC ¶¶ 214, 247-250, 305-308, 366-369, 434-436, 499-507, 582-585, 659-662, 736-738. To "appreciate the significance" of the information necessarily includes an appreciation of whether it is potential SRI that must be submitted to the EPA. Although KBT&F did not make a similar allegation about the industrial hygienists who obtained or developed Bayer's 1979 Skin Contact SRI, their capability to appreciate the significance of that SRI can be inferred from their positions, but if necessary KBT&F can amend to supply the allegation.

As discussed above (11-13, 54) and alleged in detail in the AC's Sections V.A and V.E, defendants were frequently reminded of their possession of Concealed SRI and thus their corresponding money-payment and property-transmission obligations. Perhaps the two most significant of these reminders are the CAP Agreement – through which each defendant certified that it had audited its past compliance and corrected all past reporting violations – and defendants' receipt of the testimony of a TSCA compliance expert who identified some of defendants' reporting violations. KBT&F is currently unaware of the individual at each defendant who certified that defendant's completion of the audit and corrective reporting required under the CAP Agreements, but anticipates acquiring that information during discovery. Similarly, KBT&F is currently unaware of the individual(s) at each company who obtained the TSCA compliance expert's testimony, but anticipates acquiring that information during discovery if not protected by the attorney-client privilege. Although these individuals' respective capability to appreciate the significance of the information can be inferred from the circumstances, KBT&F can amend to supply that allegation and to allege that it anticipates acquiring the information in discovery. *See, e.g., U.S. ex rel. Williams v. Martin-Baker Aircraft*

*Co., Ltd.*, 389 F.3d 1251, 1258 (D.C. Cir. 2004) (noting that *qui tam* plaintiffs "often have difficulty getting access" to information supporting their claims and, therefore, "this circuit provides an avenue for plaintiffs unable to meet the particularity standard because defendants control the relevant documents," for example by alleging lack of access in their complaint).

Accordingly, defendants' reliance on *SAIC* is misplaced. First, as indicated above, that decision was rendered on a motion for a new trial after a jury verdict, not, as here, on a motion to dismiss. Moreover, in *SAIC*, the court made it clear that the "collective knowledge" proscription is designed to avoid a situation where fraud claims are based on disconnected, "honest mistakes" that lead to claims being submitted to the government through "mere negligence." 626 F.3d at 1274. Thus, the court was concerned that the district court's jury instruction incorporating a "collective knowledge" element would allow for scienter to be proved by merely "piecing together scraps of 'innocent' knowledge held by various corporate officials." *Id*. at 1275. That is not the case here. To the contrary, KBT&F alleged in extensive detail defendants' purposeful and deliberate concealment, misrepresentation, and avoidance conspiracy as well as numerous specific acts taken to further and maintain that conspiracy. Thus, KBT&F has alleged far more than mere "honest mistakes" or "scraps" of "innocent knowledge" on defendants' part, and the "collective knowledge" proscription does not apply here.

Defendants' other cases also are inapposite. For example, in *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 51 (D.D.C. 2014) there were *no allegations* that defendant had "actual knowledge" of the alleged fraudulent conduct involved (doping by members of a cycling team) and, moreover, even accepting all of plaintiff's allegations as true, "none [of those facts] identify acts specifically taken by [defendant] that actually facilitated any of the [fraud], nor do they show that he knew about [the fraud]." 51 F. Supp.3d at 51-52. In

contrast, as shown above, KBT&F alleged defendants' "actual knowledge" of – and direct

participation in – the fraud at issue.

Similarly, in *U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d

430 (6th Cir. 2016), the Court noted that relators failed even to allege that defendant "concealed

an obligation to transmit property to the United States." *Id.* at 436. Because of this and other

deficiencies, relators' complaint could have supported liability only if the court made "inference

upon inference" to provide the "facts missing from their complaint." *Id.* In sharp contrast, here

KBT&F alleged numerous facts showing that defendants agreed to conceal the SRI and

maintained their fidelity to that agreement – to the point of active misrepresentation – even when

confronted with information that confirmed or reminded them of their obligations. Unlike in

*Harper*, this Court need not supply missing facts based on inference, let alone "inference upon

inference," because KBT&F more than adequately alleged them in the AC.

## VII. THE PUBLIC DISCLOSURE BAR DOES NOT BAR KBT&F'S CLAIMS

KBT&F's FCA claims arose as a result of the May 20, 2009 FERA amendments. AC at

¶ 3, 1179, 1583. Under the Patient Protection and Affordable Care Act, Pub. L. No. 11-148, 124

Stat 119 (2010), the amended FCA's public disclosure bar (31 U.S.C. § 3730(e)(4)(A)(2016)

(hereinafter "Amended Bar") provisions are not retroactive. *U.S. ex rel. Oliver v. Philip Morris*

*USA Inc.*, 763 F.3d 36, 39 n. 2 (D.C. Cir. 2014). Therefore, the Pre-Amendment Bar applies to

FCA violations preceding that date and the Amended Bar applies to FCA violations on or after

that date. *U.S. ex rel. Shea v. Verizon Comm., Inc.*, 160 F. Supp. 3d 16, 24 (D.D.C. 2015).

KBT&F will not be pursuing claims for FCA violations between May 20, 2009 and March 23,

2010 that predated the enactment of the Amended Bar. As a result, the defendants' arguments

concerning KBT&F's pre-March 23, 2010 claims (Def. Br. at 51-54) do not have any bearing on

whether the Amended Bar forecloses KBT&F's post-March 23, 2010 FCA claims.

Under both versions of the bar, information in "news media" or government agency "reports" can be a claim-barring public disclosure, but disclosures in state court litigation, or in federal litigation not involving the Government as a party, are no longer considered public disclosures under the Amended Bar. 31 U.S.C. § 3730(e)(4)(A) (2016); *see* Def. Br. at 46 and n. 14. Because KBT&F will not be pursuing claims for FCA violations defendants committed between May 20, 2009 (the date defendants' FCA violations commenced, AC at ¶¶ 3, 1179, 1583) and March 23, 2010 (the effective date of the Amended Bar), none of the court filings defendants submitted as exhibits 18-31 to their motion are public disclosures. Those exhibits have no bearing on KBT&F's post-Amended Bar claims.

Further, this Court cannot consider any of the exhibits defendants submitted with their motion. As defendants concede (Def. Br. at 45 n. 12), their motion to dismiss KBT&F's claims for defendants' post-Amended Bar FCA violations must be adjudicated under Rule 12(b)(6), and this Court can consider only the four corners of the complaint and any attachments incorporated by reference. *English v. District of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013); *see Shea,* 160 F. Supp. at 25 (court must "limit itself to the pleadings"). Defendants have neither requested that this Court take judicial notice of any of their exhibits nor established that this Court even could. This Court should not consider those exhibits.

None of KBT&F's claims are barred, but even if they were, KBT&F is an original source as to the additional claims it added against Huntsman in the AC. KBT&F voluntarily provided to the Government, before filing those additional claims, the information on which the new claims were based (AC at ¶ 6), contrary to defendants' contentions (Def. Br. at 58). Further, KBT&F possesses knowledge that is independent of and materially adds to any information found to have

been publicly disclosed. AC at ¶ 19. KBT&F is an original source for those Huntsman claims only, and it does not intend to argue that it is an original source for any other claims.

A.      **The Standard for Evaluating Whether The Amended Bar Applies.**

Defendants' motion is premature. Under the Amended Bar, the procedural mechanism for raising an alleged public disclosure defense is to assert it as an affirmative defense: "post-amendment, the public disclosure bar is . . . effectively, an affirmative defense rather than a jurisdictional bar." *Beauchamp v. Academi Training Ctr.,* 816 F.3d 37, 40 (4th Cir. 2016) (citing *U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015); *see also, Harper*, 842 F.3d at 435 (public disclosure bar may be pleaded as an affirmative defense as it is no longer jurisdictional). Accordingly, this Court should not consider defendants' public disclosure arguments until after they have answered the AC and asserted their affirmative defenses. If this Court elects to convert defendants' motion into a motion for summary judgment, KBT&F respectfully requests the opportunity to take discovery and submit additional briefing.

The Amended Bar revisions to the FCA are significant not only because they are no longer jurisdictional, but also because Congress clarified the specificity required for a media or federal report disclosure to operate as a bar. The statute provides, in pertinent part: "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if *substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed.* 31 U.S.C. § 3730(e)(4)(A)(2016) (emphasis supplied). The pre-Amended Bar's "substantially similar" standard, and related X+Y=Z formula adopted by most courts, including in this Circuit, remains instructive. *See Hagerty*, 95 F. Supp. 3d at 257 n. 5 (D. Mass 2015); *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 829 n. 1 (7th Cir. 2013).

Defendants' motion fails even assuming this Court could consider the outside-the-record exhibits defendants submitted. Defendants contend that fifteen media reports about prior

isocyanate litigation ("Tort Litigation Articles," Defendants' Ex. 2-16) and the EPA's 2006

response to a Freedom of Information Act request ("2006 FOIA Response," Defendants' Ex. 17)

publicly disclosed substantially the same allegations or transactions as alleged in the AC. As

shown below, they do not, and they therefore do not bar KBT&F's claims.

**B.      The Tort Litigation Articles Are Not "Substantially the Same" As The
        Amended Complaint's Allegations and Fail to Reference Let Alone Identify
        Defendants' Fraud.**

The AC's extensive allegations delineate defendants' repeated failures to transmit the

Concealed SRI under TSCA's reporting mandate and related regulations and their respective

CAP Agreements (AC at ¶¶ 184-799), and their conspiracy to conceal those violations as well as

their consequent monetary liability (AC at ¶¶ 931-1129). Contrary to defendants' assertions, SRI

is not simply information regarding the "health effects" of exposure to certain isocyanate-based

chemicals but is rather a statutorily defined term – information "which reasonably supports the

conclusion" that a chemical "presents a substantial risk of injury to the health and environment."

15 U.S.C. § 2607(e). Exhaustive regulations further refine that definition and the related

reporting requirements. AC at ¶¶ 46-173.

A news article or federal report cannot operate as a bar under 31 U.S.C. § 3730(e)(4)(A)

unless it discloses the "allegation of fraud itself," or "critical aspects of the fraudulent

transaction." *U.S. ex rel. Kester v. Novartis*, 43 F. Supp. 3d 332, 347 (S.D.N.Y. 2014) *citing U.S.

ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994). Information in the

public domain is not a bar if it does not "present so clear and substantial an indication of fraud or

a fraudulent transaction on which a *qui tam* suit could be based." *Quinn*, 14 F.3d at 656.

Taking the AC's allegations as true and viewing them in the light most favorable to

KBT&F, the FCA claims are predicated upon the concealment of ten distinct items of SRI that

confirmed respiratory hazards caused by two publicly-unknown routes of exposure – (1) skin

contact ("dermal-induction risk") (AC at ¶ 9) and (2) inhalation at concentrations below regulatory inhalation exposure limits ("low-level-inhalation risk") (AC at ¶ 11). TSCA required submission of SRI that indicated health effects could be caused by a *previously-unknown route of exposure or dose*. AC at ¶¶ 157-161; TSCA Section 8(e) Reporting Guide, June 1991 at 8.

But none of the Tort Litigation Articles even identifies the risk from either exposure route, much less indicates either route's causal link to respiratory injury. Instead, those articles reported allegations that one or more of the tort defendants concealed "the truth about the dangers of the product" (Ex. 2-3), the "hazards" (Ex. 4), the "health risks of occupational exposure" (Ex. 5), or the "true health effects" (Ex. 15, 16), or conspired to "hide the risk" (Exhibits 6-14). But the articles never identify those dangers, health effects, hazards, or risks the tort plaintiffs alleged were being concealed from them. Instead, the articles merely reported the health effects for which those product liability plaintiffs were suing. Likewise, none of the articles identify the dermal induction or low-level inhalation risk at issue here.

Specifically, none of the articles mentions the inhalation concentrations involved or suggested that those concentrations were below regulatory limits. Further, none of the articles linked skin contact exposure with respiratory injuries. Most simply noted skin exposure without reporting on the alleged injury. Ex. 8-14. Five articles indicated that the tort plaintiffs sustained skin and respiratory injuries allegedly caused by skin or inhalation exposures (Ex. 5-7, 15-16), suggesting only what was already well known (AC at ¶ 12 and 162) – that skin exposure could cause dermal injury while inhalation exposure at concentrations exceeding applicable limits could cause respiratory injury. Well-known information by definition is not being concealed.

Recognizing that these articles did not disclose their knowledge and concealment of dermal or low-level-inhalation routes of causation, in their Appendix (Ex. 1) defendants

misleadingly quote two of the articles to make it appear that they disclosed the dermal induction

risk. In the "Relevant Disclosures" column of their Appendix, defendants represent that those

two articles reported: "Inhalation and skin exposure to the chemical can cause . . . asthma [and]

respiratory illness." Defendants' Ex. 1 describing Ex. 15 and 16. Defendants' ellipses obscure

the articles' content, for the full sentence reads: "Inhalation and skin exposure to the chemical

[isocyanate] can cause *skin rashes and lesions*, asthma, respiratory illness and possibly death."

Defendants' Ex. 15 and 16 (emphasis added). Because the dermal induction route was not

publicly known and the article did not highlight the unexpected dermal induction route, the

uninformed reader would reasonably and naturally assume that skin exposure causes skin effects

while inhalation exposures cause respiratory effects. Un-elided, the sentence suggests merely

that skin exposures may cause skin effects, an effect already well known.

   Thus, the Tort Litigation Articles do not disclose even that defendants are concealing

information about non-public routes of causation, much less any specific, or even general,

information about those causal routes. Until it knows that information, the Government has no

way to begin investigating whether defendants submitted SRI about those causal routes. The

2006 FOIA Response, which identifies the SRI that had been submitted to the EPA (by

defendants and others), does not suggest on its own that the EPA lacks SRI about isocyanates,

and is completely useless to Government investigators until they know at a minimum the general

category of health risk information being concealed. For example, until the Government knows

the defendants possessed information about the dermal induction risk, or even that there is such a

risk, it cannot determine whether defendants or anyone else has ever submitted information to

the EPA about that risk. Accordingly, the articles and the 2006 FOIA Response, even when

combined, provide insufficient information "to enable [the Government] adequately to investigate the case and to make a decision whether to prosecute." *Quinn,* 14 F.3d at 654.

Moreover, the articles do not disclose that defendants were concealing SRI reportable under TSCA. Selectively quoting the articles in their Ex. 2 and 3, defendants contend those articles disclosed that defendants "'*violated*," the "federal *Toxic Substances Control Act*.'" Def. Br. at 49 (emphasis in original). But the articles actually stated: "The suit claims the companies violated the Hazard Communication Standard contained in the Occupational Health and Safety Act, guidelines set by the American National Standards Institute and the federal Toxic Substances Control Act." Def. Ex. 2 and 3. The articles do not identify which TSCA "guidelines" defendants allegedly violated, or even that the violations related to a failure to submit health hazard information, much less SRI under TSCA Section 8(e). Once again, the information is insufficient to enable [the Government] adequately to investigate the case and to make a decision whether to prosecute." *Quinn,* 14 F.3d at 654.

None of the articles mention defendants' breach of the CAP Agreement, much less their liability for and efforts to conceal and avoid their billions of dollars in accumulated TSCA penalties and CAP Agreement damages. To conduct an investigation about potential FCA claims – the claims alleged in the AC – the Government would need all of this information, none of which was publicly disclosed. Thus, neither the articles nor the 2006 FOIA Response disclosed transactions substantially similar to those alleged in the AC.

Further, effective May 20, 2009, the FCA prohibits "knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). AC at ¶¶ 3 & 43. "[T]he FCA is concerned with fraud *on the government*, and thus, public disclosure of a predicate allegation of

fraud – one that does not by itself lead to an inference of a false or fraudulent claim *on the government* – does not disclose 'allegations or transactions' for purposes of the FCA." *U.S. ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 519 (N.D. Tx. 2012) (emphasis supplied). None of the defendants' Tort Litigation Articles even reference the federal government, let alone give rise to an inference that there was fraud *on the Government*. While the article in Defendants' Ex. 4 refers to defendants concealing hazard information from "government regulators," the article does not distinguish between federal or state regulators, does not identify any specific government agency, and does not identify the fraud alleged in the AC – that defendants concealed and avoided statutory and contractual property-transmission and money-payment duties to the Government.

These FCA claims arose under the FERA amendments (AC ¶¶ 3, 1179, 1583). Therefore, the Government's claims (*ex rel.* KBT&F) did not exist prior to May 20, 2009 and an article published before that date could not have put the Government, or by extension a *qui tam* relator, on notice of the FCA claims because those claims *did not exist* when the article was published. Further, any alleged public disclosure must either explicitly identify the defendant as a participant in the fraud or provide sufficient information to identify the defendant as the fraud actor. *Kester*, 43 F. Supp. 3d at 347; *see U.S. ex rel. Baltazar v. Warden* 866, 867-68 (7th Cir. 2011); *U.S. ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995); *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 566 (11th Cir. 1994). Defendants' Exhibit 2 does not reference any Defendant. Exhibits 3, 15 and 16 fail to reference Huntsman, Bayer and BASF; and Exhibit 4 fails to reference Huntsman. Each of those articles cannot serve as the basis for a public disclosure bar to any defendant not identified in the article. Defendants' Tort Litigation Articles and FOIA Exhibits fail to expose "all the *essential elements* of the alleged fraud" and

cannot operate as a bar, as a result. *Kester*, 43 F. Supp. 3d at 347 (*quoting U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 427 Fed. App'x 13, 17 (2d Cir. 2011).

**C.      The Defendants' Tort Litigation Articles and FOIA Exhibit Do Not Provide Notice of A Transaction and Defendants Miscalculate the X+Y=Z Formula.**

The defendants' Tort Litigation Articles and 2006 FOIA Response exhibits fair no better in supporting defendants' X+Y=Z argument. Formulaically, courts have interpreted the "X" to mean the misrepresented fact, while the "Y" is the true state of facts. *U.S. ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 303 (3d Cir. 2015). The key for determining whether allegations or transactions have been publicly disclosed is whether the "critical elements of the fraudulent transaction were in the public domain" and would enable the "government to draw an inference of fraud." *Colquitt*, 864 F. Supp. at 499, 519; *see*, *Quinn*, 14 F.3d at 654. A "transaction" causing an inference of fraud is "composed of a misrepresented state of facts plus the actual state of facts." *Moore*, 812 F.3d at 303; *see U.S. ex rel. Oliver v. Philip Morris USA, Inc.*, 826 F.3d 466, 472 (D.C. Cir. 2016) (two or more elements when considered together give rise to an inference fraud has occurred); *Quinn*, 14 F.3d at 654 (same). The "Z" that the reader must infer from the X and Y information is that: "*fraud has been committed*" upon the government, and that the Government has a basis to 'adequately to investigate the case and made a decision whether to prosecute.'" *Quinn*, 14 F.3d at 654; *U.S. ex rel. Joseph v. Cannon*, 642 F. 2d 1373, 1377 (D.C. Cir. 1981).

Here, defendants' 2006 FOIA Response imparts no relevant information, and cannot be considered to be the X – the misrepresented facts regarding Defendants' Concealed SRI, or the "Y" – the true state of facts regarding Defendants' Concealed SRI. As discussed above, the FOIA response is useless until the Government knows the general category of information being

concealed. The 2006 FOIA response adds no value and is a "zero" integer to the question of whether after March 2010 the defendants possessed and concealed that specific Concealed SRI.

Similarly, the Tort Litigation Articles do not reference any of the Concealed SRI or the non-public causal exposure routes that SRI confirmed. They also cannot operate as either "X" or the "Y." As discussed above (63-69), they do not represent either the true state of affairs, or any misrepresented facts, because they fail to reference: defendants' specific Concealed SRI; either causal modality; some or all of the Defendants; or the United States Government.

Defendants' exhibits, viewed together or independently, do not and cannot put the Government on notice that each defendant was concealing the Concealed SRI and thereby avoiding statutory and contractual payment obligations. *See Quinn*, 14 F.3d. at 656 (no Z conclusion if foul play is not clearly indicated as to qualify as either an allegation of fraud, or a fraudulent transaction upon which to base an action). Defendants' X+Y=Z calculus is bad math and would serve only to *reward* the Defendants for their concealment conduct. Fraudsters should not be able to reap such defensive benefits.

## CONCLUSION

KBT&F alleged with particularity how defendants' fraud deprived the Government of money and valuable property, and how they conspired to conceal their statutory and contractual obligations from the Government. KBT&F's allegations, which must be taken as true, show that defendants knowingly concealed and avoided money-payment and property-transmission obligations to the Government, and conspired to do so. KBT&F more than sufficiently pleaded its claims, and the law imposes liability against defendants for the claims as pleaded. This Court should deny defendants' motion.

DATED: February 14, 2017.

KASOWITZ, BENSON, TORRES, &
  FRIEDMAN LLP

 /s/ Andrew A. Davenport
Daniel R. Benson (admitted *pro hac vice*)
dbenson@kasowitz.com
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1720
Facsimile:  (212) 506-1800

Andrew A. Davenport (admitted *pro hac vice*)
adavenport@kasowitz.com
Two Midtown Plaza, Suite 1500
1349 West Peachtree Street, N.W.
Atlanta, GA 30309
Telephone:  (404) 260-6106
Facsimile:  (404) 260-6081

Ann M. St. Peter-Griffith (admitted *pro hac vice*)
astpetergriffith@kasowitz.com
The Four Seasons Tower
1441 Brickell Avenue
Suite 1420
Miami, Florida 33131
Telephone:  (786) 587-1054
Facsimile:  (305) 377-1664
*Attorneys for Kasowitz, Benson, Torres &
Friedman LLP*

POTOMAC LAW GROUP, PLLC

 /s/ Sotiris Planzos
Sotiris Planzos (D.C. Bar No. 421941)
tplanzos@potomaclaw.com
1300 Pennsylvania Avenue
Suite 700
Washington, DC 20004
Telephone:  (202) 204-3005
Facsimile:  (202) 318-7707
*Attorneys for Kasowitz, Benson, Torres &
Friedman LLP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of February, 2017, I caused this document to be  electronically filed with the Clerk of Courts by using the electronic filing system, which will send  a notice of electronic filing to all parties who have registered with the electronic filing system.


  /s/ Andrew A. Davenport
Andrew A. Davenport