UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATS OF AMERICA *ex rel.* KASOWITZ BENSON TORRES LLP, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 16-2269 (RMC) |
| BASF CORPORATION, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## OPINION

The law firm Kasowitz Benson Torres LLP sues a group of chemical companies under the False Claims Act alleging that Defendants violated the "reverse" false claims provision, 31 U.S.C. § 3729(a)(1)(G), and conversion false claims provision, 31 U.S.C. § 3729(a)(1)(D), of the False Claims Act by failing to report substantial risk information to the Environmental Protection Agency under the Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq*. The Complaint will be dismissed. An unassessed penalty is not an "obligation" to pay the United States under the reverse false claims provision and characterizing substantial risk information as "property" does not establish a claim under either the reverse or conversion theories of liability.

### I. BACKGROUND

Defendants BASF Corporation, Covestro LLC, The Dow Chemical Company, and Huntsman International LLC manufacture isocyanate chemicals, which are used to produce various polyurethane-based materials such as paint, adhesives, rigid foam for insulation, flexible foam for mattresses and cushions, and parts for automotive interiors. Am. Compl. [Dkt. 21] ¶ 7.

1

The law firm Kasowitz Benson Torres LLP (Kasowitz), relators in this action, previously represented plaintiffs bringing personal injury claims against BASF, Covestro, and Dow. Kasowitz brings this suit based on information obtained during discovery in that case. Kasowitz alleges that all Defendants failed to report substantial risk information and to pay penalties to the United States Environmental Protection Agency (EPA), thereby committing fraud in violation of the False Claims Act (FCA), 31 U.S.C. § 3729. Defendants have moved to dismiss Kasowitz's suit. Defs.' Mot. to Dismiss (Mot.) [Dkt. 110]. Kasowitz opposes. Pl.'s Resp. to Defs.' Mot. to Dismiss (Opp'n) [Dkt. 115]. Defendants replied. Defs.' Reply in Supp. of Mot. to Dismiss (Reply) [Dkt. 118]. The Government, as an interested party, filed a Statement of Interest in this case. Statement of Interest by United States of America (Statement of Interest) [Dkt. 117].

### A. The False Claims Act

FCA became law in 1863, during the Civil War, "amid reports of widespread corruption and fraud in the sale of supplies and provisions to the union government during the war." 132 Cong. Rec. H6474-02 (Sept. 9, 1986) (statement of Rep. Glickman). FCA remains "the primary vehicle by which the Government prosecutes civil fraud." *Id*. As originally enacted, an action under FCA could be brought by either the Attorney General or a private individual suing on the government's behalf—a "relator"—to recover from persons who make fraudulent claims to secure payment by the United States. 31 U.S.C. § 3729(a)(1)(A). An FCA claim can also be brought under a "conversion" theory of liability against "any person who has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D). In 1986, Congress amended the statute to include a "reverse" theory of liability for any person who:

> knowingly makes, uses, or causes to be made or used, a false record
> or statement material to an obligation to pay or transmit money or
> property to the Government, or knowingly conceals or knowingly
> and improperly avoids or decreases an obligation to pay or transmit
> money or property to the Government.

31 U.S.C. § 3729(a)(1)(G). "In a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payments to the government when a payment is obligated." *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004).

### B. The Toxic Substances Control Act

The Toxic Substances Control Act (TSCA) was enacted to ensure that adequate data was developed on the health and environmental impacts of chemical substances and mixtures. Under TSCA, those who manufacture and process such chemical substances and mixtures are responsible for developing the relevant data. Toxic Substances Control Act, Pub. L. No. 94-469, 90 Stat. 2003 (1976) (codified as 15 U.S.C. §§ 2601 *et seq*.). To ensure such information is gathered, section 8(e) of TSCA requires "[a]ny person who manufactures, processes, or distributes in commerce a chemical substance or mixture and who obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment" to immediately inform EPA. 15 U.S.C. § 2607(e). Failure to report this "substantial risk information" may lead to civil penalties and each day a violation continues is considered a separate violation that can carry an additional penalty. 15 U.S.C. § 2615(a)(1).

TSCA lays out a process whereby such penalties may be imposed. Civil penalties "shall be assessed by the Administrator by an order made on the record after opportunity . . . for a hearing." 15 U.S.C. § 2615(a)(2)(A). Persons being assessed must be given notice and may

3

request a hearing "within 15 days of the date the notice is received." *Id*. TSCA also gives the government discretion in determining the amount of a civil penalty, provided the following is taken into account: "the nature, circumstances, extent, and gravity of the violation or violations and, with respect to the violator, ability to pay, effect on ability to continue to do business, any history of prior such violations, the degree of culpability, and such other matters as justice may require." 15 U.S.C. § 2615(a)(2)(B). The government may also "compromise, modify, or remit, with our without conditions, any civil penalty which may be imposed." 15 U.S.C. § 2615(a)(2)(C). Only after an order rendering an assessment becomes final, with no petition for judicial review, or after a court has entered a final judgment in favor of the government, does the Act direct the Attorney General to recover the amount assessed. 15 U.S.C. § 2615(a)(4).

### C. The Compliance Audit Program

In 1991, EPA announced a Compliance Audit Program (CAP) in response to the critique that EPA's enforcement process then imposed significant disincentives, "namely very high monetary penalties," that could dissuade chemical manufacturers from auditing past studies and reporting them to EPA. 56 Fed. Reg. 4128, 4128 (Feb. 1, 1991). To obtain any outstanding data, CAP was introduced as a "one-time voluntary compliance program designed to strongly encourage companies to voluntarily audit their files for studies reportable under section 8(e)." *Id*. at 4129. If a company voluntarily enrolled in the CAP program, it agreed that any disclosures that were determined reportable under TSCA's section 8(e) would be subject to penalties and, in turn, EPA agreed to limit those penalties and created a cap on the total penalties that may be assessed. *Id*. at 4130.

The Court need not address Kasowitz's arguments regarding CAP because it has abandoned all claims for pre-2010 conduct, Opp'n at 61, and CAP ended in 1996.

4

## II. LEGAL STANDARDS

### A. Motion to Dismiss Under Rule 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). Nevertheless, "the Court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).

### B. Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual information, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A court must assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in favor of the plaintiff. *Sissel v. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). A court need not accept inferences drawn by a plaintiff if such inferences are not supported by facts set out in the complaint. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Further, a court does not need to accept as true legal conclusions set forth

in a complaint. *Iqbal*, 556 U.S. at 678. In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

### C. Pleading Fraud or Mistake Under Rule 9(b)

Federal Rule of Civil Procedure 9(b) requires a heightened pleading standard for a party alleging fraud or mistake, requiring any such party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To allege fraud, a plaintiff must state the time, place, and content of the false misrepresentations, the fact misrepresented, and what was obtained or given up as a consequence of the fraud. *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981).

### III. ANALYSIS

This case involves the intersection between FCA and TSCA. Kasowitz alleges that by failing to provide substantial risk information to EPA as required by TSCA, Defendants have avoided an obligation to pay TSCA penalties and failed to give property, *i.e.*, the substantial risk information, to the Government in violation of the reverse FCA provision, 31 U.S.C. § 3729(a)(1)(G). Furthermore, Kasowitz argues that Defendants have unlawfully withheld money or property used or to be used by the Government, thus converting it to Defendants' own use in violation of TSCA, 31 U.S.C. § 3729(a)(1)(D). Kasowitz also alleges that Defendants conspired to commit these frauds, in violation of § 3729(a)(1)(C). For the reasons below, Kasowitz's allegations and legal arguments fail.

6

### A. Reverse False Claim, 31 U.S.C. § 3729(a)(1)(G)

The parties disagree on what constitutes an "obligation to pay" in the context of the reverse FCA provision, which imposes liability on any person who either: (a) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or [(b)] knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

Of immediate reference is the Fraud Enforcement and Recovery Act (FERA), which amended FCA in 2009 to define "obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, sec. 4, § 2, 123 Stat. 1617 (2009) (codified as 31 U.S.C. § 3729(b)(3)).

Prior to FERA, courts generally agreed that "contingent" obligations could not constitute reverse false claims because contingent obligations require government enforcement and/or discretion before they may become due and owing. *See United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1195-96 (10th Cir. 2006) (citing other circuits holding the same). Kasowitz argues that FERA was intended to "make clear that contingent obligations are FCA obligations" and, in so doing, "overrul[ed] the narrow interpretation of 'obligation'" adopted by several courts. Opp'n at 7. Thus, Kasowitz posits that an FCA "obligation" encompasses obligations that are both "established" *and* "not fixed," or contingent on future government action or discretion. *Id*. at 2.

7

Defendants insist, and the Government agrees, that "not fixed" means an uncertain *amount* of monetary penalties, and not "contingent" upon future government action. Mot. at 16; Statement of Interest at 4. According to both, an obligation must be "established," *i.e.*, the government must have assessed a violation and decided to impose a penalty, but the amount of the penalty need not be "fixed" or certain, in order to bring a reverse-FCA claim.

FCA defines neither an "established duty" nor "fixed." Plaintiff and Defendants rely heavily on FERA's legislative history. Both agree that Congress defined "obligation" to resolve disagreement among the courts as to its meaning. *See* S. Rep. No. 111-10, at 14 (2009) (stating "this legislation addresses current confusion among courts that have developed conflicting definitions of the term 'obligation'" in the reverse-FCA provision). Kasowitz insists that the confusion concerned whether FCA "obligations" included contingent assessments. Defendants and the Government argue that the courts were split over whether an FCA "obligation" even existed unless fixed at a sum certain in amount. On reviewing the case law prior to the 2009 amendment, the Court agrees with Defendants and the Government.

Prior to 2009, the question whether an FCA "obligation" required a duty to pay a sum certain was one that divided the federal circuit courts of appeals. For instance, in *United States v. Q International Courier, Inc.*, 131 F.3d 770 (8th Cir. 1997), the defendant corporation transferred bulk mail from the United States to Barbados, only to then mail each piece of mail individually back to the United States in order to take advantage of the difference between international and domestic postage rates. Because the relevant regulation provided for "a range of penalties that might be assessed," the Eighth Circuit held that there was no "obligation" because the regulation did "not create an immediate duty to pay a specific sum." *Id.* at 774. The Eighth Circuit defined an FCA "obligation" as "an existing, specific legal duty in the nature of a

8

debt," and therefore "a fixed sum that is immediately due." *Id*. at 773-74. The Sixth Circuit adopted the same definition in *American Textile Manufacturers Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729 (6th Cir. 1999), a case involving a corporation that had allegedly mislabeled Chinese products as coming from Hong Kong or Macau in violation of several statutes prohibiting the use of false documents and imposing penalties. *See id.* at 736 ("[A] reverse false claim action cannot proceed without proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation sufficiently certain to give rise to an action of debt at common law."); *see also Georgia Gulf*, 386 F.3d 648, 656-57 (5th Cir. 2004) (describing the holdings in *Q Int'l* and *Am. Textile Mfrs.* but declining to decide whether to adopt the same approach).

Other circuit courts found that an FCA "obligation" did not require a known, specific, amount and reconciled that view with *Q International* by distinguishing between different types of obligations that can form the basis of a reverse FCA claim.

For instance, *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234 (11th Cir. 1999) (en banc), involved a contract between the government and an aircraft maintenance company requiring the company to inform the government when it was holding property in excess of the requirements of the contract. The Eleventh Circuit distinguished *Q International* on the basis that any obligation Q International "owed to the government could only have derived from statutes, regulations, or judgments—legal sources other than a written contract." *Id*. at 1237-38. The Eleventh Circuit stressed that *Q International* had "explicitly noted that the government did not have a contract . . . , thereby suggesting that a contractual duty would qualify as an 'obligation' in its opinion" even if the amount owed were not certain. *Id*. Because *Pemco* involved a contract, the Eleventh Circuit decided that it was irrelevant that a specific purchase

9

price had not been agreed upon: "This legal obligation was a specific, ongoing obligation during the life of the contract." *Id*. at 1237. The Circuit held that the "pre-existing contractual obligation" was sufficiently specific to form the basis of a reverse false claims action. *Id*.

The Tenth Circuit expounded further on the definition of an FCA "obligation" in *United States ex rel. Bahrani v. Conagra, Inc*., 465 F.3d 1189, 1202 (10th Cir. 2006). Analyzing *Q International*, *American Textile Manufacturers*, and *Pemco*, the Tenth Circuit found that these decisions establish "a dichotomy between 'existing debts,' which are covered by the [FCA], and 'contingent penalties,' which are not." *Id*. at 1197. According to this analysis, FCA "obligations" need not be fixed because "there are instances in which a party is required to pay money to the government, but, at the time the obligation arises, the sum has not been precisely determined." *Id*. at 1201. However, the Tenth Circuit added that although an "'obligation' need not be for a precise amount in order to be actionable . . . the obligation must arise from a source independent of 'the allegedly fraudulent acts taken to avoid it.'" *Id*. at 1202 (quoting *United States ex rel. Bahrani v. Conagra, Inc*., 338 F. Supp. 2d 1202, 1207 (D. Colo. 2004)). This conclusion, according to the Tenth Circuit, "comport[ed] with the Sixth and Eighth Circuits decisions in *Am[erican] Textile Manufacturers* and *Q International*, both of which concluded on the facts before them that no obligation existed independently of the alleged false statements themselves." *Id*.

After discussing this precedent, the Ninth Circuit in *United States v. Bourseau*, 531 F.3d 1159, 1170 (9th Cir. 2008), held that a hospital had a legal obligation to pay the government at the time it submitted fraudulent cost reports for Medicare reimbursements, despite the fact that the specific amount of the debt was unknown. The obligation to make the payment

"was not potential, like fines and penalties which have not been levied or assessed, but rather existing and specific because [appellant] had been accepting Medicare funds." *Id*.

As evidenced by these cases, the question of whether an FCA "obligation" requires a duty to pay a specific, fixed amount was a source of confusion among the circuit courts, with fact-specific analyses to distinguish different outcomes. In contrast, the circuits' understanding of whether an FCA "obligation" includes an *unassessed* penalty remained consistent and unambiguous. As the Sixth Circuit made clear in *American Textile Manufacturers*:

> A defendant does not execute a reverse false claim by engaging in behavior that might or might not result in the creation of an obligation to pay or transmit money or property to the government. Contingent obligations—those that will arise only after the exercise of discretion by government actors—are not contemplated by the statute. Examples of contingent obligations include those arising from civil and criminal penalties that impose monetary fines after a finding of wrongdoing: as opposed to quasi-contractual obligations created by statute or regulation (such as the imposition of a standard mailing rate), contingent obligations (such as the imposition of a civil penalty for an antitrust violation) attach only after the exercise of administrative or prosecutorial discretion, and often after a selection from a range of penalties.

190 F.3d at 738. Multiple circuits similarly excluded contingent obligations (such as the imposition of civil penalties) from the definition of an FCA "obligation" subject to a reverse false claims action. *See Bourseau*, 531 F.3d at 1170 (distinguishing between actionable obligations and those that are "potential, like fines and penalties which have not been levied or assessed"); *Conagra*, 465 F.3d at 1195 ("[T]he fact that the making or using of a false statement or record might result in a fine or a penalty is insufficient to establish a [reverse false claims] obligation."); *Georgia Gulf*, 386 F.3d at 657 ("It is clear to us that . . . the reverse false claims act does *not* extend to the potential or contingent obligations to pay the government fines or

penalties which have not been levied or assessed."); *Q Int'l*, 131 F.3d at 773 ("The deliberate use of the certain, indicative, past tense suggests that Congress intended the reverse false claims provision to apply only to existing legal duties to pay or deliver property. Had Congress wished to cover attempts to avoid potential fines or sanctions it would have used language appropriate to that end."). Given this clear opinion in the circuits that an assessed penalty does not create a reverse false claims "obligation," the Court cannot agree with Kasowitz that this was the confusion that FERA sought to clarify. To the contrary, as Defendants and the Government argue, Congress wanted to clarify that an FCA "obligation" need not be for a sum certain although distinctly due under a contract or statutory requirement.

This reading of the statute is consistent with Senator Kyl's explanation of the amendment defining "obligation" at the time FERA was adopted. Statements of individual legislators are not controlling, but "when they are consistent with the statutory language and other legislative history, they provide evidence of Congress' intent." *Brock v. Pierce Cnty.*, 476 U.S. 253, 263 (1986). As originally proposed, FERA defined an FCA "obligation" as "a fixed duty or a contingent duty arising from an express or implied contractual . . . or similar relationship." 155 Cong. Rec. S. 4539 (2009) (daily ed. Apr. 22, 2009) (statement of Sen. Kyl). Senator Kyl proposed revising the language to state "an established duty, whether or not fixed." *Id*. He explained:

> The bill's new definition of the word "obligation," in particular, posed several problems. The original language spoke to "contingent" obligations. Such contingent or potential duties could include duties to pay penalties or fines, which could arise—and at least become "contingent" obligations—as soon as the conduct that is the basis for the fine as occurred. . . . Obviously, we don't want the Government or anyone else suing under the False Claims Act to treble and enforce a fine before the duty to pay that fine has been formally established.

*Id*.

Caselaw since FERA's adoption in 2009 also supports this interpretation.  In *United States ex rel. Simoneaux v. E.I. DuPont De Nemours & Co.*, 843 F.3d 1033 (5th Cir. 2016), the Fifth Circuit considered an FCA claim strikingly similar to the one at issue here.  A relator claimed that his former employer had violated the reverse false claims provision by failing to report substantial risk information to the EPA, thereby concealing an obligation to pay penalties under TSCA.  *Id*. at 1034.  After analyzing the text and legislative history of FERA, the Fifth Circuit concluded that "unassessed regulatory penalties are not obligations under the FCA.  For FCA liability to attach, there must be an 'established' duty 'to pay or transmit money or property to the Government.'"  *Id*. at 1039 (quoting 31 U.S.C. § 3729(a)(1)(G)).  It added, "[w]here, as in this case, a regulatory penalty has not been assessed and the government has initiated no proceeding to assess it, there is no established duty to pay."  *Id*.

More recently, the Third Circuit considered the issue in *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497 (3d Cir. 2017), in which the defendant engaged in fraudulent conduct to avoid paying contingent dividends to the Small Business Association (SBA).  The Third Circuit dismissed, on the grounds that the SBA was not acting as the government under the circumstances, but opined that even if the SBA had qualified as the government, an FCA "'obligation' refers to one existing at the time of the improper conduct to pay the Government funds, the amount of which may not be fixed at the time of the improper conduct."  *Id*. at 506.  In *Petras*, no obligation to pay accrued dividends yet existed and the Court held that an FCA "obligation" "does *not* include a duty that is dependent on a future discretionary act."  *Id*. at 505.

13

In light of the above legislative history and case law, the Court agrees with Defendants that an "obligation" under § 3729(a)(1)(G) refers to an established duty to pay that exists at the time of the fraudulent conduct, the amount of which may or may not be specifically known at that time. An unassessed, contingent penalty is not an FCA "obligation" subject to suit under the reverse false claims provision. TSCA creates a duty to obey the law, but the duty to pay penalties is not established until penalties are assessed and final. *See Simoneaux*, 843 F.3d at 1040. TSCA lays out a clear process by which such assessment occurs and the factors to consider, all of which must occur before a penalty can be imposed, much less collected. The distinction between penalties in TSCA from other statutory schemes, such as for failure to pay customs duties, is that the latter give rise to an immediate duty to pay because "the customs law imposes a duty to *pay*. In contrast, most regulatory statutes, such as the TSCA, impose only a duty to obey the law, and the duty to *pay* regulatory penalties is not 'established' until the penalties are assessed." *Id.*[1]

Kasowitz also contends that the substantial risk information Defendants were required to disclose under section 8(e) of TSCA is "property" under the reverse false claims provision and therefore liability under FCA is clear. The argument creates a distinction with little relevance to the facts of this particular case. The law firm's claims rely on an alleged violation of TSCA, which requires that "[a]ny person who manufactures, processes, or distributes in commerce a chemical substance or mixture and who obtains information which

---

[1] The Court has reviewed Kasowitz's Motion for Leave to File a Surreply and Proposed Surreply [Dkt. 126] and Defendants' Opposition Memorandum [Dkt. 129]. Without explaining the delay, Kasowitz did not move to file its Proposed Surreply until more than six months after Defendants had filed their Reply. In any event, the Proposed Surreply added nothing new to the merits of the arguments at issue, and does not alter the reasoning or outcome set forth in this Opinion.

reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform" the EPA. 15 U.S.C. § 2607(e).

Information may, under certain circumstances, be deemed "property" even when that information must be disclosed to the government. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011-12 (1984). "[C]ourts agree that an item is property only if the owner has the right to exclude others from using it," *Patrick v. Comm'r of Internal Revenue*, 799 F.3d 885, 888 (7th Cir. 2015), and certain information, such as "[c]onfidential business information has long been recognized as property," *Carpenter v. United States*, 484 U.S. 19, 26 (1987). However, TSCA does not distinguish between information that is or is not "property." The only relevant consideration is whether the information "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." 15 U.S.C. § 2607(e).

Whether substantial risk information would constitute "property" in the sense of commercial secrets has no impact on the subsequent steps required by TSCA. An entity that is charged with failing to report such information may demand a hearing before an order assessing penalties is made and such an order must become final before penalties can be collected. 15 U.S.C. § 2615(a)(2)(A). Thus, the nature of substantial risk information cannot be considered an "obligation" owed the government before a decision is made, in the government's discretion, that the information should have been transmitted to the government in the first place. It is not the role of this Court to assess whether the information at issue here was substantial risk information under TSCA and nor is that task to be performed by Kasowitz.

Accordingly, all claims pursuant to the reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G), will be dismissed for failure to state a claim.

## B. Conversion Claim, 31 U.S.C. § 3729(a)(1)(D)

As originally drafted, FCA's conversion provision imposed liability on anyone who has "possession, custody, or control of property or money used, or to be used, by the Government, and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt." 31 U.S.C. § 3729(a)(4) (2000). FERA amended this provision as well in 2009, because "the archaic language ha[d] made recoveries under a conversion theory contingent upon the individual receiving an actual receipt for the property." Senate Judiciary Committee Report, S. Rep. No. 111-10, at 13. Congress removed the receipt requirement, *id*., and also replaced "intent to defraud" with a knowledge requirement, establishing liability for any person who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." 31 U.S.C. § 3729(a)(1)(D). Its purpose, to allow "the Government to recover losses that are incurred because of conversion of Government assets," remained unchanged. Senate Judiciary Committee Report, S. Rep. No. 111-10, at 13.

Kasowitz argues that the words "to be used" indicate that money or property owed to the government can be "contingent." Opp'n at 49. Defendants disagree, arguing that "[c]ivil penalties that the Government has not even decided to assess cannot be considered money 'to be used' by the Government." Reply at 23. Defendants contend that had Congress intended to encompass contingent penalties under a conversion theory of FCA violation, it would have used conditional language, such as "may be used" or "could be used." *Id*.

Few courts have considered FCA's conversion provision, either before or after FERA. Most recently, the Sixth Circuit addressed it in *United States ex rel. Harper v.*

16

*Muskingum Watershed Conservancy Dist.*, 842 F.3d 430 (6th Cir. 2016), in which relators brought a claim against a state entity alleging a violation of a property deed, which triggered a provision in the deed reverting ownership of the land back to the United States.  The Sixth Circuit analyzed the statutory text and concluded "that the word 'knowingly' modifies not only the verbs 'deliver' or 'cause,' but also the phrase 'less than all of that money or property.'" *Id*. at 439.  On that basis, the Circuit held that "[f]or a defendant to 'know' that he is delivering or causing to be delivered 'less than all' of a certain property 'used, or to be used, by the Government,' *he must necessarily also know that the property belongs to the government.*" *Id*. (quoting 31 U.S.C. § 3729(a)(1)(D)) (emphasis added).  As a result, the Circuit dismissed the conversion claim because relators had not shown that the defendant had "actual knowledge" that title to the relevant land had reverted or would revert back to the government.  *Id*.

While the Sixth Circuit did not discuss the phrase "to be used," its interpretation of the knowledge requirement is persuasive and strongly suggests that the "property or money used, or to be used, by the Government" cannot be contingent but must belong to the Government at the time of the violation in order for a defendant to have the requisite knowledge.  For the reasons already discussed, neither unassessed penalties nor the substantial risk information at issue in this case belonged to the Government at the time of the alleged violation because the Government had not determined whether the information qualified as substantial risk information and if so, what appropriate civil penalties, if any, should be assessed; provided appropriate process for Defendants to contest its determination and assessment; and obtained a final penalty order.  Accordingly, Kasowitz has failed to state a claim for conversion under § 3729(a)(4) of FCA.

17

### C. Conspiracy Claim, 31 § 3729(a)(1)(C)

Count V of Kasowtiz's complaint alleges that Defendants conspired together to violate FCA. *See* Am. Compl. ¶¶ 1794-1800; *see also* 31 U.S.C. § 3729(a)(1)(C). Since "there can be no liability for conspiracy where there is no underlying violation of the FCA," the conspiracy claim must be dismissed. *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014).

### IV. CONCLUSION

For the reasons stated above, Kasowitz's claims under the False Claims Act reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G), conversion provision, *id.* § 3729(a)(1)(D), and conspiracy provision, *id.* § 3729(a)(1)(C), will be dismissed for failure to state a claim. A memorializing order accompanies this Opinion.

Date: October 23, 2017

/s/
ROSEMARY M. COLLYER
United States District Judge